# Mohammad Al Muhtaseb

Partner, Litigation

DIFC, Dubai - UAE

E: m.almuhtaseb@tamimi.com

T: +971 4 364 1641



## Education and Admission

| | |
|---|---|
| Al-Ahliyya Amman University, Jordan | 1996-2000 |
| College of Law | |
| Jordan Bar Association | 2000 |
| Musallam Law Office | 2000-2005 |
| Al Najdawi Law Office | 2006-2008 |
| Al Wasel International | |
| Advocates and legal consultants - UAE | 2009-2010 |
| Al Tamimi & Company - UAE | 2010 |

## Biography

Mohammad is a Jordanian national lawyer and legal consultant who has more than Twenty-one years of experience in practising law; he is a specialist in litigation and disputes resolution.

Mohammad has handled various sensitive and complex cases. Mohammad specialises in real estate, civil and commercial litigation. Mohammad has significant experience in such disputes related to banking, cross border litigation, foreign judgments and arbitration awards enforcement and financial litigation.

He is one of the primary external advisors for major developers, governmental investments bodies, banks and giant investment companies and represents them in many disputes. Provide legal consultancy concerning United Arab Emirates (UAE) Laws, mainly in the fields of Civil Transactions, Commercial Transactions Law, Commercial Companies Law, Real Estate Laws. Provide assistance to parties litigating in a Common Law Court (DIFC courts) by providing opinions from local laws perspective.

## Recent experience

- He participated in successfully contesting the recognition and enforcement of a foreign judgment for the value of AED 450 M in the UAE on reasons of violating the UAE laws and public order.

- Assisting a giant development company in terminating a land sale and GFA lease for a massive project in Dubai and claiming approx. AED 2 B as compensation and dues.

- Leading many disputes between partners in Limited Liability Companies.

1

Exhibit MM1 Page 1

- Assisted in imposing a compulsory liquidation of a limited liability company with a capital value of AED 43 M as one of the partners resisted applying a voluntary liquidation.

- Engaged as one of the principal consultants for an international company that owns a global hospitality brand in complex disputes. It involved multi lawsuits in arbitration in UK, DIFC Courts and Dubai on-shore courts in claiming specific performance and compensation of unlawful termination of multi agreements concerning project development, units sale and hotel operational management for a major hotel in Dubai.

### Languages

- Arabic
- English

Exhibit MM1 Page 2

# Westlaw MIDDLE EAST - Summary Page

User: Kariem Bessisso
Date: MAY 15 2023
Time: 16:13:37
Content Type: **Legislation**

Document
## FED DECREE No. 42 of 2022

*Copyright 2023: Thomson Reuters. All Rights Reserved.*

WESTLAW | MIDDLE EAST

Exhibit MM1 Page 3

Status: ✅ Law in force

FED DECREE No. 42 of 2022

**Gazette No. 737**

**UAE Official Gazette**

**Federal Decree-Law No. (42) of 2022 Promulgating the Civil Procedure Code**

**We, Mohamed Bin Zayed Al Nahyan, President of the United Arab Emirates,**

**Having reviewed:**

The Constitution;

Federal Law No. (1) of 1972 regarding the Competences of Ministries and the Powers of Ministers, as amended;

Federal Law No. (10) of 1973 regarding Supreme Federal Court, as amended;

Federal Law No. (6) of 1978 concerning the Establishment of Federal Courts and the Transfer of Jurisdictions of the Current Judicial Authorities in some Emirates thereto, as amended;

Federal Law No. (26) of 1981 concerning the Maritime Commercial Law, as amended;

Federal Law No. (5) of 1985 promulgating the Civil Code of the United Arab Emirates, as amended;

Federal Law No. (11) of 1992 regarding the Civil Procedure Code, as amended;

Federal Law No. (18) of 1993 regarding commercial transactions, as amended;

Federal Law No. (28) of 2005 regarding Personal Status, as amended;

Federal Decree Law No. (9) of 2016 regarding Bankruptcy, as amended;

Federal Law No. (13) of 2016 regarding Judicial Fees Payable to Federal Courts, as amended;

Federal Law No. (17) of 2016 Establishing Centers of Mediation and Conciliation in Civil and Commercial Disputes, as amended;

Federal Law No. (7) of 2017 regarding Tax Procedures, as amended;

Federal Law No. (6) of 2018 regarding Arbitration;

Federal Law No. (10) of 2019 Regulating the Judicial Relations between Federal and Local Judicial Authorities;

Federal Decree-Law No. (19) of 2019 regarding Insolvency;

Federal Law No. (6) of 2021 regarding Mediation for the Settlement of Civil and Commercial Disputes;

Federal Decree-Law No. (32) of 2021 regarding commercial companies,

Federal Decree-Law No. (46) of 2021 regarding Electronic Transactions and Trust Services,

Federal Decree-Law No. (32) of 2022 regarding the Federal Judicial Authority;

Federal Decree-Law No. (34) of 2022 Regulating the Legal and Legal Consultancy Professions; and

*Copyright 2023: Thomson Reuters. All Rights Reserved.*

WESTLAW MIDDLE EAST

**Exhibit MM1 Page 4**

Federal Decree-Law No. (35) of 2022 promulgating the Law of Evidence in Civil and Commercial Transactions,

And based on the Presentation of the Minister of Justice and the Approval of the Cabinet,

**We hereby enact the following Decree-Law:**

### Article 1

The accompanying law shall apply to civil procedures before the courts in the State.

### Article 2

Federal Law No. (11) of 1992 regarding the Civil Procedure Code as amended, is hereby repealed.

Any provision contained in any other legislation that contradicts or is in conflict with the provisions of the Civil Procedure Code attached to this Decree-Law is hereby repealed, with the exception of the authority of the competent Authority in the Emirate that has not transferred its local judiciary to the Federal judiciary, to form special courts or judicial committees to consider and decide on any lawsuit or specific rights-related issue in accordance with its law.

### Article 3

1. The courts shall refer, without fees and of their own volition, the cases brought thereto that have already fallen within the jurisdiction of other courts pursuant to the provisions of the Civil Procedure Code attached to this Decree-Law, in their existing stage of proceedings. In the event of the absence of one of the litigants, the case management office shall serve on him the referral order and instruct him to appear on the set date before the court to which the case is referred.
2. The provisions of the preceding paragraph shall not apply to the disputes and lawsuits that have been adjudicated, or the lawsuits that have been postponed for the pronouncement of judgment, or the appeals filed prior to the effective date of the Civil Procedure Code attached to this Decree-Law and the judgments issued thereon shall remain subject to the rules regulating the appeal methods applicable on the date of their issuance.

### Article 4

The President of the Federal Judicial Council and the heads of the local judicial authorities, as the case may be, shall issue the necessary decisions to implement the provisions of the Civil Procedure Code attached to this Decree-Law.

### Article 5

This Decree-Law shall be published in the Official Gazette, and shall come into force as of January 2, 2023.

**Civil Procedure Code Preliminary Part General Provisions**

### Article 1

1. The provisions of this Code shall apply to all legal proceedings that have yet to be adjudicated on, as well as all procedures that have yet to be implemented, prior to the date of entry into force of this Code, with the following exceptions:

A. The jurisdiction-amending provisions where their date of entry into force falls beyond the close of pleadings into the legal proceeding before the Court of First Instance;

B. The time limit-amending provisions where the underlying time limit has already commenced prior to their entry into force; and

C. The provisions regulating the means of challenging judgments with regard to the judgments rendered prior

Exhibit MM1 Page 5

to their date of entry into force, where such laws are either repealed or creating any of such means.

2. Every procedure validly conducted under an applicable law shall remain valid and effective unless otherwise stipulated.

3. The time limits regulating the inadmissibility or lapse of proceedings or other procedural time limits that are newly prescribed shall only commence on the date of entry into force of the law prescribing the same.

### Article 2

No application or plea shall be admitted insofar as the filing party thereof has no existing lawful interest in respect thereof. However, the potential interest shall be legally sufficient for the application or plea to be admitted if the purpose of the same is to take a precautionary measure to avoid an imminent damage or to safeguard a right which might be lost if it becomes a matter of dispute.

### Article 3

1. Legal proceeding for revocation of administrative decisions shall not be admitted after sixty [60] days from the date of publishing the underlying administrative decision, or the date of serving the same upon the interested party, or the date on which it is established that the interested party has become fully aware of the same.

2. This time limit shall be interrupted when a grievance or objection is filed with the competent administrative authority based on the applicable procedures set out in the relevant legislation. In which case, the competent administrative authority shall decide on the grievance within sixty [60] days following its filing date. If the grievance is rejected, the rejection decision shall be reasoned. The lapse of sixty [60] days following the filing date of the grievance with no decision being made on the grievance by the competent administrative authority shall be construed as rejection of the grievance. The time limit for instituting the case shall commence on the date of explicit or implicit rejection, as the case may be.

### Article 4

1. Where this Code prescribes a mandatory time limit for taking any action that is conducted by service of process, the time limit shall only be observed if either the application is submitted or the service of process is conducted within such a time limit.

2. Where this Code prescribes that a particular action be performed by way of filing, the filing procedures shall be performed within the time limit described in the Law.

### Article 5

1. Arabic shall be the official language of courts, and the Court shall hear the statements of the non-Arabic-speaking litigants, witnesses and others through an interpreter after the latter takes the oath according to the Law.

2. Notwithstanding any provision set forth in any other law, the Chairman of the Federal Judicial Council or the Head of the Local judicial body, as the case may be, may decide that English be the language of trials, procedures, judgments and decisions in respect of certain tribunals that are assigned to hear the proceedings involving specialized matters, specific cases or particular proceedings. In which case, the statements of litigants, witnesses or lawyers, shall all be heard in English, and the statements, pleadings, applications and other documents shall also be submitted to such tribunals in English. In addition, the court shall hear the statements of non-English-speaking litigants, witnesses or other persons through an interpreter after the latter takes the oath according to the law, in the cases and according to the controls and conditions to be prescribed in the relevant decision.

### Article 6

1. The service of process shall be conducted upon the request of the litigant, or based on an order of the competent court or a decision of the Case Management Office, either by the process server or by the means

*Copyright 2023: Thomson Reuters. All Rights Reserved.*

WESTLAW  MIDDLE EAST

Exhibit MM1 Page 6

prescribed by this Code.

2. The competent court, the Case Management Office or the supervising judge, as the case may be, may authorize the Plaintiff or its Lawyer to serve the process by the means described in Article [9.1] of this Code.

3. The service of process may be conducted by one or more private companies or firms according to the provisions of this Code, and the Chairman of the Federal Judicial Council or the Head of the Local judicial body, as the case may be, shall issue the rules regulating the service of process by private companies and firms according to the provisions of this Code. Anybody tasked with serving the process in this regard shall be deemed a process server.

4. In all cases, the service of process may be conducted throughout the State without compliance with the rules of territorial jurisdiction.

**Article 7**

1. Any service of process shall be conducted, or any Execution procedure shall be initiated by the process server or the Execution Bailiff, between seven in the morning [07:00 am] and nine in the afternoon [09:00 pm], and the same shall only be conducted on public holidays where there is a state of urgency based on the permission of the supervising judge, the chief justice of the competent court or the judge of urgent matters.

2. Should the service of process be conducted by any modern means of communication, whether upon natural persons or legal persons, the time limits set forth in Clause [1] of this Article shall not apply, except for the recorded calls.

3. For the government and public legal persons, the time of service or commencement of Execution in relation to their activities shall be their working hours, except for the service of process by any modern means of communication.

**Article 8**

1. The process to be served shall include the following details:
A.  The Plaintiff's name, surname, occupation or profession, domicile, mobile phone number, fax number, email, or its elected domicile and place of residence, the legal representative's name, surname, occupation or profession, domicile and place of work if working for a third party;
B.  The name, surname, occupation or profession, domicile or elected domicile of the Defendant. If the latter has no known domicile at the time of serving the notice, the last known domicile and place of work of the same shall be included, along with its mobile phone number, fax number and email address, if any;
C.  The process server's name, occupation and employer, and his signature;
D.  The date of the day, month, year and hour of serving the notice;
E.  The name of the court, subject of the service of process, case number and the hearing date, if any; and
F.  The name, capacity, surname, seal or fingerprint of the person receiving the process as a proof of receipt, or the reasons for his / her refusal to receive the process.

2. If the service of process is conducted by modern means of communication, the data described in the paragraphs [A], [B], [D] and [E] of Clause [1] of this Article shall be legally sufficient.

3. If the Defendant's native language is not Arabic, the Claimant shall enclose with the process a certified translation thereof in English, unless there is prior agreement between the parties to provide the translation in any other language.

4. The provision of Clause [3] of this Article shall apply to all civil and commercial proceedings, except for the labor proceedings initiated by the employee and workers, as well as personal status proceedings.

**Article 9**

1. The Defendant shall be served by any of the following means:
A.  Audio or video recorded call, SMS to mobile phone, smart applications, email, fax, other modern means of communication or by any other means to be agreed upon by the parties from among the means of

*Copyright 2023. Thomson Reuters. All Rights Reserved.*

THOMSON REUTERS
**WESTLAW**   MIDDLE EAST

**Exhibit MM1 Page 7**

service described herein;

B.   By hand delivery to the Defendant at his / her place of residence or domicile, or to his / her attorney. If the process fails to be served due to any reason on the part of the Defendant, or if the latter refuses to receive the process, the same shall be construed as personal service upon the intended person. If the process server fails to find the Defendant at his / her place of residence or domicile, the process shall be served upon any person cohabitating with the intended person; i.e. his / her spouse, relative by blood or marriage or servant. If none of the above-mentioned persons is willing to receive the notice, or where there is no person upon whom the notice can be legally served, or the place of residence is closed, the process server shall either directly post the process visibly on the outer door of the intended recipient's place of residence, or post the same on the court's website;

C.   At the elected domicile of the Defendant; or

D.   At the place of work of the Defendant. If the Defendant is not available at his / her place of work, the process shall be delivered to his boss, any person in charge of the management of the Defendant, or his / her colleague, with the exception of the service of process relating to personal status proceedings, which shall be served upon the Defendant in person at his / her place of work.

2. The process server shall verify the identity of the person served, by ensuring that his appearance indicates that he is at least eighteen [18] years of age, and that neither he nor his representative has an apparent interest that conflicts with that of the Defendant. If the process is served by the means of communications described in [1.A] of this Article, the process server shall ensure that the means of communication used is personally relating to the Defendant. If the notice is served by audio or video recorded calls, the process server shall draw up a report setting out the content, time and date of the call and the details of the call recipient. Such a report shall have the probative force as evidence and shall be enclosed with the case file.

3. If the Defendant cannot be served as indicated in Clause [1] of this Article, the matter shall be referred to the Case Management Office, the competent judge or the chief justice of the court, as the case may be, in order to gather information from at least one relevant entity and then serve the notice upon the intended person either by posting on the court's website or by publication in both a widely-circulated electronic or paper daily newspaper that is published in the State in Arabic, and a foreign newspaper published in a foreign language, if necessary, where the Defendant intended to be served is a foreigner.

**Article 10**

Unless otherwise provided for in any other legislative instrument, a copy of the process shall be served as follows:

1.   For the ministries, federal and local government bodies, public authorities and public institutions of all types, the process shall be served upon their legal representative;

2.   For the private legal persons, private societies, companies and organizations, private sole proprietorships and foreign companies that have a branch or representative office in the State, if the process is relating to the company's branch, it shall be served according to the provisions of Article [9.1] of this Code, and shall be delivered at their headquarters to their legal representative or any person acting on his behalf or any partner thereof, as the case may be. If neither the legal representative nor any person acting on his behalf is available, the process shall be delivered to any employee of their office. If the organization concerned has no headquarters or is closed, or if its manager or any of its employees refuses to receive the process, the same shall be served by posting on the court's website, by directly posting the process on the door without permission of the court, or by publication, as the case may be;

3.   For members of the armed forces or the police or the like, the process shall be served upon their competent department as instructed by the aforesaid bodies;

4.   For the persons in prison and detention, the process shall be delivered to their place of existence for service, and the delivery of the papers required to be served upon the intended person shall be established;

5.   For the seafarers or crew members of commercial vessels, the process shall be delivered to their captain for service. If the vessel has already set out from the port, the process shall be delivered to its shipping agent; and

6.   For the persons whose whereabouts are outside the State and could not be served by way of the means of communication, private companies or firms, or the way agreed upon by the parties, the process shall be submitted to the Ministry of Justice, in order to be referred to the Ministry of Foreign Affairs and International Cooperation, so as to be delivered to the diplomatic mission concerned in the State, unless the means of service is such a case is regulated by special agreements.

**Article 11**

*Copyright 2023: Thomson Reuters. All Rights Reserved.*

THOMSON REUTERS
WESTLAW   MIDDLE EAST

Exhibit MM1 Page 8

The service of process shall be deemed effective as follows:

1. As of the date of service according to the provisions of Articles [9] and [10] of this Code, or the date on which the Defendant refuses to receive the same;
2. Following the expiry of twenty-one [21] business days, starting from the date on which the diplomatic mission concerned in the State receives the Ministry of Foreign Affairs and International Cooperation's letter containing the process to be served;
3. As of the date of receiving the fax or the sending date of the email message or text message to the mobile phone, the date of sending the process by means of communication, or the date of making the audio or video recorded message; or
4. As of the date of posting the process on the court's website on the designated page. The posting shall remain valid for at least fifteen [9] days, and as of the date of completing the posting or publication according to the provisions of this Part.

**Article 12**

1. If the law prescribes a time limit in days, months or years for appearance or for the occurrence of a particular procedure, neither the day of service nor the date of occurrence of the incident regarded by the law as giving rise to the relevant time limit shall be included in the time limit, and the same shall expire upon the lapse of the last day thereof.

2. If the time limit is prescribed in hours, neither the hour of service nor the hour of occurrence of the incident regarded by the law as giving rise to the relevant time limit shall be included in the time limit, and the same shall expire upon the lapse of the last hour thereof.

3. If the time limit is required to expire before a particular procedure takes place, the underlying procedure shall only occur after the lapse of the last day of the time limit.

4. If the last day of the time limit falls on a public holiday, the time limit shall be automatically extended to the first following business day.

5. The time limits specified in months or years shall be calculated in the Gregorian calendar, so that the month is thirty [30] days and the year is three hundred sixty-five [365] days, unless the law provides otherwise.

**Article 13**

1. The procedure shall be invalid if such invalidity is explicitly provided for in the law, or if the underlying procedure involves any essential defect or shortcoming due to which the purpose of the procedure cannot be achieved.

2. In all cases, the invalidity shall not be decided in spite of being provided for in the law, if the purpose of the underlying procedure is achieved.

**Article 14**

Except for the cases where the invalidity is relating to the public order:

1. Invalidity may only be invoked by the party in whose favor the same is established by the law.
2. Invalidity may not be invoked by the party causing the same.
3. Invalidity shall be extinguished if the party in whose favor such invalidity is established explicitly or implicitly waives the same.

**Article 15**

The invalid procedure may be rectified even after being invoked, provided that such rectification takes place within the time limit prescribed by law for the underlying procedure to be performed. If there is no time limit prescribed by law in respect of the underlying procedure, the Court shall determine an appropriate time limit for rectifying the same. The procedure rectified shall only become effective as of its rectification date.

**Article 16**

*Copyright 2023: Thomson Reuters. All Rights Reserved.*

WESTLAW   MIDDLE EAST

Exhibit MM1 Page 9

If the procedure is invalid but satisfies the elements of any other procedure, the latter shall be deemed valid as being the procedure whose elements are satisfied. If the procedure is partially invalid, only the invalid part thereof shall be invalid.

Invalidity of the procedure shall not invalidate the procedures preceding, or subsequent to, it, if they are not dependent thereupon.

**Article 17**

The transcript of court hearing shall be deemed an official deed in respect of its content, and shall be drawn up by a clerk who, together with the judge, shall sign the transcript in a paper or electronic format.; otherwise, the transcript shall be null and void.

**Article 18**

The process server, clerks or other judicial assistants shall not get involved in any activity that falls within the scope of their jobs in respect of the legal proceedings relating to them or their spouses, blood relatives or in-laws up to the fourth degree; otherwise, such an activity shall be null and void.

**Title I: Litigation before Courts**

**Part I Jurisdiction of Courts**

**Chapter I Universal Jurisdiction of Courts**

**Article 19**

Except for actions in-rem relating to real property abroad, the Courts shall have the jurisdiction to hear and adjudicate on the legal proceedings instituted against national citizens as well as foreigners having a place of residence or domicile in the State.

**Article 20**

The Courts shall have the jurisdiction over the foreigner who has no place of residence or domicile in the State in the following cases:
1.    If the foreigner has an elected domicile in the State;
2.    If the legal proceeding is relating to property in the State, inheritance share of a national citizen or an estate opened in the State;
3.    If the legal proceeding is relating to an obligation that is executed or performed, or required to be performed, in the State, a contract required to be attested in the State, an incident taking place in the State, or a bankruptcy process established by any Court of the State;
4.    If the legal proceeding is instituted by a wife who has a place of residence in the State against her husband who had a place of residence therein;
5.    If the legal proceeding is relating to the maintenance expenses of either parent, a wife, an interdicted person, a young child or his / her parentage, guardianship over the property or persons, in the event that the party claiming the maintenance expenses, the wife, the young child or the interdicted person has a place of residence in the State;
6.    If the legal proceeding is relating to personal status matters, and the Plaintiff is a UAE national or foreigner having a place of residence in the State, if the Defendant has no known address abroad, or where the national law is applicable to the legal proceeding; or
7.    If any of the Defendants has a place of residence or domicile in the State.

**Article 21**

Exhibit MM1 Page 10

تاريخ الاستلام : 13/05/2025
محاكم دبي - ارامكس الفرع الرئيسي
MAIN COURT -- ARAMEX



إفادة المكلف بالاعلان ( ارامكس )

الـــمنذر : بايجوس ألفا، إنك

البريد الالكتروني : mohamed.alsabah@oghlegal.com

رقــم المحرر : 801869 /2025/1

المنذر إليه : بيجو رافيندران رافيندران كونارو فات

العنوان : رسالة نصية 0562636320

انه في يوم ------------------الموافق ----/------/ 2025 في الساعة ---------------- صباحا / مساءا

انتقلت أنـا _____ المكلف بالأعلان من قبل محاكم دبي الى عنوان

المطلوب أعلانه الموضح أعلاه وهناك _____

_____

_____

_____

| | | |
|---|---|---|
| اسم المستلم : _____ | توقيع المكلف بالاعلان : _____ | |
| الصفة : _____ | ختم المكلف بالاعلان | |
| هوية رقم : _____ | | |
| التوقيع : _____ | | ختم التدقيق |
| رقـم الـمـهـمـة | | |

 حكومـــة دبـــي
GOVERNMENT OF DUBAI

 محاكــم دبــي
DUBAI COURTS


SN2025/0000173317



# إنذار

## بيانات أطراف المعاملة

| بيانات منذر | | | |
|---|---|---|---|
| الصفة القانونية | رقم الرخصة | نوع الرخصة | الاسم |
| ١.شركة/مؤسسة/منشأة | • | أخرى | بايجوس ألفا. إنك |

| بيانات ممثل المنذر | | | | |
|---|---|---|---|---|
| وثيقة الإنابة | العلاقة | رقم الوثيقة | نوع الوثيقة | الجنسية | الاسم |
| بموجب الوكالة المصدقة من الخارجية رقم ٤٥١٩٣١٩٤ | وكيل | VAD٩V١٣AV١٨١٨- | هوية | الإمارات | عمر عبد العزيز عبد الله عزيز أل عمر |

| بيانات المنذر اليه | | | |
|---|---|---|---|
| رقم الوثيقة | نوع الوثيقة | الجنسية | الاسم |
| VAEI٩٧٨-٩٧١٣٨٥١ | هوية | الهند | بيجو رافيندران رافيندران كولاروفات |

| بيانات المنذر اليه | | | |
|---|---|---|---|
| رقم الوثيقة | نوع الوثيقة | الجنسية | الاسم |
| VAE٩٨١٩٧١٢٤٨-٣ | هوية | الهند | حيفيا جوكولتات جوكولتات |

موضوع الإنذار : إنذار عدلي

حيثيات الإنذار : المنذرة: شركة بايجوس ألفا. إنك
وعنوانها المختار: مكتب وكيلها القانوني آل عمر والصباح الكائن في الإمارات - إمارة دبي - بر دبي - منطقة الخليج التجاري - شارع برج خليفة - برايم تاور - الطابق ١٢ - مكتب رقم ١٢٠٧ - هاتف أرضي �043808839 - رقم مكاني: 2636589460.
البريد الإلكتروني: arb.case@oghlegal.com
بوكالة المحامي/ مجد حميد الصباح بموجب الوكالة المصدقة بوزارة الخارجية (رقم التصديق 19369645)
بوكالة المحامي/ عمر عبد العزيز عبد الله عزيز أل عمر بموجب الوكالة المصدقة بوزارة الخارجية (رقم التصديق 19369645)
المنذر إليهم:
١. بيجو رافيندران رافيندران كولاروفات
الجنسية: هندية، هوية إماراتية رقم: 784197809716851.

Exhibit MM1 Page 12


حكومة دبـــي
GOVERNMENT OF DUBAI


محاكم دبـــي
DUBAI COURTS


SN2025/0000173317



العنوان: فيلا L33، تلال الإمارات، شارع ليلك 2، التنبه 4، دبي، الإمارات العربية المتحدة ـــــ بريد إلكتروني: byjuraveendran@gmail.com

2. ديفيا جوكولنات جوكولنات،

الجنسية: هندية، هوية إماراتية رقم: 784198696124803،

العنوان: فيلا L33، تلال الإمارات، شارع ليلك 2، التنبه 4، دبي، الإمارات العربية المتحدة ـــــ بريد إلكتروني: melonie19@gmail.com

الموضوع: تبليغ بمستندات بخصوص دعوى رقم(Chapter 11, Case No.24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS المسجلة ضد المنذر إليهم، والمقامة من المنذرة والمنظورة لدى محكمة بالولايات المتحدة

=========================================================================================

Notifying Party: BYJU'S ALPHA, INC

Chosen address: Office of its attorney, Al Omar and AlSabah Advocates ("OGH LEGAL"), resided at: UAE, Dubai, Bur Dubai, Business Bay, Burj Khalifa St, Prime Tower, 12 floor, office No. 1207

Tele: 043908839 – Makani No. 2636589460

Email: arb.case@oghlegal.com

Represented By, Attorney: Omar Abdul Aziz Abdullah Aziz Al Omar, by virtue of the certified POA by the Ministry of Foreign Affairs .[(Certification No. 19369645

Represented By, Attorney: Mohamed Humaid AlSabah, by virtue of the certified POA by the Ministry of Foreign Affairs (Certification No. /19369645

:Notified Parties

BYJU RAVEENDRAN RAVEENDRAN KUNNARUVATH .1

Nationality: India, EID No: 784197809716851, Address: Villa L33, Emirates Hills, Lailak 2 Street, Al Thanyah 4, Dubai, UAE, Email: byjuraveendran@gmail.com

DIVYA GOKULNATH GOKULNATH .2

Nationality: India, EID No: 784198696124803, Address: Villa L33, Emirates Hills, Lailak 2 Street, Al Thanyah 4, Dubai, UAE, Email: melonie19@gmail.com

Subject: Service of documents with respect to Chapter 11, Case No. 24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS) registered against the Notified Parties, brought by the Notifying Party and considered before The United States Bankruptcy Court For The District Of Delaware

=========================================================================================

المطالبة : بموجب هذا الإخطار، ننذركم ونرفق لكم مع هذا الإخطار (بما يعيد تمام استلامكم لها) المستندات الآتي ذكرها، الخاصة بالدعوى رقمChapter 11, Case No.24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS) بالإضافة إلى الشكوى المسجلين ضد المنذر إليهم، والمقامين من المنذرة والمنظورين لدى محكمة الإفلاس بالولايات المتحدة، مقاطعة ديلاور، وهي كالتالي:

1- إعلان في دعوى الإفلاس المقامة لدى محكمة الإفلاس بالولايات المتحدة، مقاطعة ديلاور، بخصوص الدعوى رقمChapter 11, Case No.24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS)) والمقامة ضدكم من المنذر في إجراءات التقاضي المقامة ضدكم أمام المحكمة المشار إليها أعلاه.

2- الشكوى المسجلة بالدعوى رقم(Chapter 11, Case No.24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS) لدى محكمة الإفلاس بالولايات المتحدة، مقاطعة ديلاور، والمقامة والموجهة من المخطر في إجراءات التقاضي المقامة ضدكم أمام المحكمة المشار إليها أعلاه.

بوكالة المحامي/ مجد حميد الصباح بموجب الوكالة المصدقة بوزارة الخارجية (رقم التصديق 19369645)

بوكالة المحامي/ عمر عبد العزيز عبد الله عزيز آل عمر بموجب الوكالة المصدقة بوزارة الخارجية (رقم التصديق 19369645)

=========================================================================================

By virtue of this Notice, we put you on notice and serve you with, attach hereto the documents of Chapter 11, Case No. 24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS) and Complaint Chapter 11, Case No. 24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS) registered against the Notified Parties, brought by the Notifying Party and considered before The United States Bankruptcy Court For The District Of Delaware) (Acknowledgment of receipt of these documents by you) as follows:

Summons in the Bankruptcy Case brought before The United States Bankruptcy Court For The District Of Delaware with respect to .1 Chapter 11, Case No. 24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS), brought and filed against you by the Notifying Party in the judicial proceedings brought against you before the abovementioned Court

A Complaint filed in the Bankruptcy Case brought before The United States Bankruptcy Court For The District Of Delaware with .2 respect to Chapter 11, Case No. 24-10140 (BLS), Adv. Pro. Case No. 25-50526 (BLS), brought and filed against you by the Notifying Party in the judicial proceedings brought against you before the abovementioned Court

Represented By, Attorney: Omar Abdul Aziz Abdullah Aziz Al Omar, by virtue of the certified POA by the Ministry of Foreign Affairs .[(Certification No. 19369645

Represented By, Attorney: Mohamed Humaid AlSabah, by virtue of the certified POA by the Ministry of Foreign Affairs (Certification No.

Exhibit MM1 Page 13







SN2025/0000173317



(19369645.

عنوان التبليغ : العنوان: فيلا 33، تلال الإمارات، شارع تبلك 2، النبية 4، دبي، الإمارات العربية المتحدة ـــــ بريد إلكتروني:
byjuraveendran@gmail.com

العنوان: فيلا 33، تلال الإمارات، شارع تبلك 2، النبية 4، دبي، الإمارات العربية المتحدة - ـــــ بريد إلكتروني: melonie19@gmail.com.

يتعهد المنذر بأخطار المنذر إليه

Exhibit MM1 Page 14

 حكومـــة دبـــــي
GOVERNMENT OF DUBAI

 محاكــم دبـــــي
DUBAI COURTS


SN2025/0000173317



| اسم الطرف/النائب | التوقيع | تاريخ و وقت التوقيع | تاريخ و وقت الحضور |
|---|---|---|---|
| عمر عبد العزيز عبد الله عزيز آل عمر<br>(نائب رقم 1 للمنذر رقم 1) |  | 11:25:32 05-05-2025 | |

Exhibit MM1 Page 15


حكومــة ديـــــي
GOVERNMENT OF DUBAI


محاكـم ديـــــي
DUBAI COURTS


SN2025/0000173317



| تاريخ الإصدار: ٢٠٢٥-٥-٥ | رقم المحرر: AE1997/١/٢-٢٥ | رقم الإيصال: ٢٠٢٥/٢٧٥٨٧ | رقم الطلب: ٢٠٢٥/١٧٣٣١٧ |
|---|---|---|---|

الكاتب العدل الخاص (البرشاء لخدمات الكاتب العدل الخاص)




محاكـم ديـــــي
DUBAI COURTS

تمت المصادقة على التوقيع باستخدام تقنيات التعاملات الرقمية.

الكاتب العدل الخاص
عبدالرحمن محمد عبدالرحمن الشريهات


SN2025/173317/N3205704

www.dc.gov.ae

للتأكد من صحة المحرر يمكنك مسح هذا QR أو استخدام موقع محاكم دبي



Exhibit MM1 Page 16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| | ) | |
| | ) | Adv. Pro. Case No. 25-50526 (BLS) |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BYJU RAVEENDRAN, DIVYA GOKULNATH, | ) | |
| and ANITA KISHORE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### SUMMONS AND NOTICE OF PRETRIAL
### CONFERENCE IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

Address of Clerk:    United States Bankruptcy Court
824 Market Street, 3ʳᵈ Floor
Wilmington, Delaware 19801

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorneys.

---

[1]  The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

Names and Addresses of Plaintiff's Attorneys:

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Susheel Kirpalani, Esq.
Benjamin Finestone, Esq.
Daniel Holzman, Esq.
Jianjian Ye, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

**YOUNG CONAWAY STARGATT &**
**TAYLOR, LLP**
Robert S. Brady, Esq.
Kenneth J. Enos, Esq.
Jared W. Kochenash, Esq.
Timothy R. Powell, Esq.
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

Address:        United States Bankruptcy Court for the District of Delaware
                824 Market Street, 6 Floor, Courtroom No. 1
                Wilmington, Delaware 19801

Date and Time:  **TBD**

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**


United States Bankruptcy
Court the District

/s/ Una O'Boyle
*Clerk of the Court*

Dated: April 9, 2025

Exhibit MM1 Page 18

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | | ) |
| | | ) |
| BYJU'S ALPHA, INC.,[1] | | ) Chapter 11 |
| | | ) |
| | Debtor. | ) Case No. 24-10140 (BLS) |
| | | ) |
| | | ) Adv. Pro. Case No. 25-50526 (BLS) |
| BYJU'S ALPHA, INC., | | ) |
| | Plaintiff, | ) |
| | | ) |
| | v. | ) |
| | | ) |
| BYJU RAVEENDRAN, DIVYA GOKULNATH, | | ) |
| and ANITA KISHORE, | | ) |
| | | ) |
| | Defendants. | ) |
| | | ) |

### NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As a party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The use of these services is often productive and effective in settling disputes. **The purpose of this Notice is to furnish general information about ADR.**

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral."

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

---

[1]   The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

Exhibit MM1 Page 19

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision. If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

/s/ Una O'Boyle
*Clerk of the Court*

Dated: April 9, 2025

2

| | |
|---|---|
| From: | DEBdb_ECF_Reply@deb.uscourts.gov |
| To: | dummail@deb.uscourts.gov |
| Subject: | Ch- 25-50526-BLS BYJUs Alpha, Inc. Exhibit(s) |
| Date: | Wednesday, April 9, 2025 4:52:37 PM |

\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.

## U.S. Bankruptcy Court

## District of Delaware

Notice of Electronic Filing

The following transaction was received from Kenneth J. Enos entered on 4/9/2025 at 4:51 PM EDT and filed on 4/9/2025

Case Name:     BYJUs Alpha, Inc. v. Raveendran et al

Case Number:     25-50526-BLS

Document Number: 2

**Docket Text:**
[SEALED] Exhibit(s) // *Sealed Complaint* (related document(s)[1]) Filed by BYJUs Alpha, Inc.. (Enos, Kenneth)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** SEALED BYJU's - Complaint Against Raveendran Gokulnath and Kishore.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/9/2025] [FileNumber=19138124-0]
[8ea2fa9cebc59d25d09b23b38a6f6c6136ce10afb073ebba8b493d302cdbafd145be
1efb76c81205fb4fa9ad9f294d77c20bb50ba635dddb5424594848160613]]

## 25-50526-BLS Notice will be electronically mailed to:

Kenneth J. Enos on behalf of Plaintiff BYJUs Alpha, Inc.
bankfilings@ycst.com

## 25-50526-BLS Notice will not be electronically mailed to:

Divya Gokulnath
L33 Lailak 2 Street
Emirates Hills
Dubai,

FILED UNDER SEAL
DOCKET NO. 2, 4/9/25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| BYJU'S ALPHA, INC.,[1] | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 24-10140 (BLS) |
| | ) |
| | ) Adv. Pro. Case No. _____ |
| BYJU'S ALPHA, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BYJU RAVEENDRAN, DIVYA GOKULNATH, | ) |
| and ANITA KISHORE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff-Debtor BYJU's Alpha, Inc. (the "Debtor") alleges as follows:

## PRELIMINARY STATEMENT[2]

1.      This is an action to hold three powerful BYJU's executives accountable for having purposefully caused the Debtor to fraudulently transfer an asset valued at *over half a billion dollars* for *no consideration*. The Debtor's former CEO, Byju Raveendran,[3] took these actions—with the support and assistance of, and in coordination with, his co-founder and wife Divya Gokulnath and consigliere Anita Kishore, among others—in complete disregard of his duties as

---

[1]   The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2]   Capitalized terms not defined in the Preliminary Statement have the meanings given to them below.

[3]   To distinguish between the Raveendran brothers, Byju Raveendran is referred to herein as "Byju" and Riju Ravindran is referred to herein as "Riju."

Exhibit MM1 Page 22

an officer to, and a fiduciary of, a Delaware corporation and while knowing that what he was doing was nothing short of corporate theft.

2.    Specifically, as has been well documented, Byju and his cohorts, including his nuclear family and former student (Kishore), orchestrated an ongoing illegal scheme to take and then conceal from the Debtor $533 million *of the Debtor's own funds* (the "Alpha Funds") and the proceeds thereof. *See generally BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del.).[4] *First*, in mid-2022, the Debtor, acting at the direction of at least Byju, Riju, and Gokulnath, transferred the Alpha Funds to Camshaft Fund, a sham hedge fund, ostensibly in exchange for receiving a limited partnership interest in such fund (the "Camshaft LP Interest"). *Second*, on March 31, 2023, Defendants, among others, caused the Debtor's purported transfer of that Camshaft LP Interest, which Camshaft Fund (through its then-administrator, Apex Fund Services) contemporaneously valued at $540,647,109.29, to a non-guarantor BYJU's affiliate, Inspilearn LLC, for no consideration whatsoever. To be certain, Defendants (and also Riju) did not secure any replacement or substitute asset whatsoever—not even an intercompany receivable or promissory note, as purportedly had been the case with certain prior advances of loan proceeds, indeed, not even $1 of value was conveyed. *Third*, on the February 1, 2024 Petition Date, Inspilearn, acting at the direction of the ultimate corporate parent of the BYJU's enterprise— Think & Learn Pvt. Ltd. ("T&L"), in which Byju, Gokulnath, and Kishore played key roles in managing—transferred the entire Camshaft LP Interest to an offshore trust, which then purportedly fully redeemed it.[5] *Lastly*, according to T&L, after the Petition Date, Inspilearn moved the

---

[4]    On February 27, 2025, this Court issued its *Memorandum Opinion* entering summary judgment in favor of the Debtor and GLAS on various claims associated with the unlawful scheme to transfer the Alpha Funds, including claims of actual fraudulent transfer against Camshaft, Inspilearn, and T&L, breach of fiduciary duty against Riju, and conversion against Riju and T&L. Memorandum Opinion, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Feb. 27, 2025) [Adv. D.I. 383] (the "MSJ Mem. Op.").

[5]    As this Court found, "Inspilearn is T&L's alter ego as a matter of law." *Id.* at 16.

Exhibit MM1 Page 23

resulting funds to an unidentified, non-U.S. T&L subsidiary. It remains unknown at this time whether additional transfers since have been made.

3.     Though critical details about the Alpha Funds and their current whereabouts remain concealed, the Debtor has learned that Byju was acting as the Debtor's "*self-appointed CEO*" when he surreptitiously directed the second fraudulent transfer of the Debtor's Camshaft LP Interest on March 31, 2023.[6] The timing of the transfer on March 31 is significant; it was Defendants' way to retaliate against the Lenders' exercise of remedies. Twenty-eight days earlier, on March 3, the Debtor's Lenders (acting through their agent) had, based on the occurrence of multiple conceded Events of Default and the plain terms of the Debtor's Credit Agreement, accelerated the term loans and assumed control of the Debtor, becoming its sole shareholder. Immediately thereafter, the Lenders' agent removed the Debtor's existing directors and officers, *i.e.*, the Raveendran brothers, and replaced them with Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director.

4.     Byju's blatant disregard for his non-waivable fiduciary duties to the Debtor, with Gokulnath's and Kishore's assistance, is evident from the timeline of events surrounding the second fraudulent transfer. As of October 2022, there were at least four defaults outstanding under the Debtor's Credit Agreement. An *ad hoc* group of Lenders had formed, and, in October 2022, the Lenders, T&L, and the Debtor, among others, executed the first of a series of amendments to the Credit Agreement, three of which memorialized the occurrence and/or the consequences of the four prior defaults. Byju signed the first of those three notable amendments on behalf of, among others, T&L and the Debtor; Riju (the Debtor's then-sole director) signed the other two. Also in

---

[6]   *Id.* at 6 (emphasis added).

3

Exhibit MM1 Page 24

October 2022, the Debtor "started the process of transferring its limited partnership interest in Camshaft Fund to Inspilearn," as Riju himself admitted in the instant bankruptcy proceeding.[7]

5.  Three months later, on January 6, 2023, the Debtor executed the third of the referenced amendments. In exchange for a forbearance through February 10, 2023, T&L and the Debtor, among others, reaffirmed that the failure to cure the four defaults "entitles" the Lenders to exercise remedies. Underscoring that point, they further agreed that the outstanding Specified Defaults could no longer be cured. This point was so important that it was memorialized four times in an 18-page amendment.

6.  But there was no consensual resolution. As noted, on Friday, March 3, 2023, the Lenders directed their agent to exercise remedies. In turn, their agent, GLAS, sent the BYJU's organization numerous notices of the Debtor's default and the agent's exercise of remedies. Kishore in particular received the notice by three mediums—email (anita@byjus.com), courier, and certified mail.



GLAS's Notice of Default and Acceleration Letter

---

[7] Ravindran Ans. to First Am. Compl. ¶ 6, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 8, 2024) [Adv. D.I. 124 (sealed); Adv. D.I. 129 (redacted)].

Exhibit MM1 Page 25

| From: | Irena Goldstein [Irena.Goldstein@glas.agency] |
|---|---|
| Sent: | 3/3/2023 10:56:12 AM |
| To: | anita@byjus.com |
| CC: | Katie Fischer [Katie.Fischer@glas.agency] |
| Subject: | BYJU Notice of Default and Acceleration [GLAS-ACTIVE.FID26B62] |
| Attachments: | Notice of Default and Acceleration [Executed].pdf |

To whom it may concern,

Please see the attached Notice of Default and Acceleration.

GLAS Trust Company LLC, as Administrative Agent and Collateral Agent

*GLAS's email to Anita Kishore enclosing Notice of Default and Acceleration Letter*

7.      The very next business day—before Pohl, the Debtor's newly-appointed corporate governor, was able to secure actual control of the Debtor's assets—Byju, Kishore, and their confederates commenced the final steps of transferring the Camshaft LP Interest. To this end, Kishore, having just received GLAS's notice of default—and with Byju copied but without Pohl's knowledge—expressly directed Camshaft's founder to "resume the process" of transferring the Camshaft LP Interest to Inspilearn, where Riju was the sole manager. With the subject line of "Account transfer," Kishore's motivation in sending this email was clear: hide the money.



From: Anita Kishore <anita@byjus.com>
Sent: Monday, March 6, 2023 7:17:32 PM
To: William Morton <william@camshaftcapital.com>
Cc: Byju Sir <byju@byjus.com>
Subject: Account transfer

Hi William,

Can we resume the process of transferring Byju's Alpha Inc.'s account to Inspilearn LLC.

Warm regards,
Anita

*Anita Kishore's Transfer Instruction to Camshaft Fund*

8.      Another 25 days later and once again unbeknownst to Pohl, the transfer of the Camshaft LP Interest to Inspilearn was purportedly completed via a Transfer Agreement (and a separate Subscription Agreement executed contemporaneously). The Transfer Agreement, dated March 31, 2023, provided that, "upon execution and delivery of [the Transfer Agreement] by the parties thereto, Transferor shall assign, transfer, and convey the Transferred Interest to

Exhibit MM1 Page 26

Transferee[.]" This Transfer Agreement was signed by Byju, *holding himself out as the Debtor's CEO*; and Riju, the Debtor's then-former sole director and the then-sole manager of the transferee Inspilearn, on Inspilearn's behalf (Camshaft also executed the Agreement). Byju, on behalf of the transferor Debtor, falsely and fraudulently represented and warranted that he, on the Debtor's behalf, had "all requisite power and authority to execute, deliver and perform this Agreement."

9.      It was not until 2024, upon receiving discovery in this bankruptcy proceeding, that the Debtor (under Pohl's control) learned about and obtained a copy of this Transfer Agreement.

10.     Following Byju's execution of the Transfer Agreement, the Debtor's accounts were largely depleted. The Debtor had under $500,000 in cash in its bank accounts compared to at least approximately $1.2 billion in liabilities, which had been accelerated, and now no longer held the Camshaft LP Interest. Defendants, at a time when they no longer had legal control of the Debtor, intentionally and maliciously stripped the Debtor barren to keep the Alpha Funds (or the proceeds of such funds) beyond the reach of the Debtor's creditors.

11.     Accordingly, the Debtor brings this action, comprised of six separate claims, to hold Defendants accountable for the material damage they have caused, and continue to cause, to the Debtor and its estate. *First*, the Debtor asserts an aiding and abetting claim against Byju and Gokulnath for deliberately directing one or more of Riju's fraudulent transfers of the $533 million Alpha Funds (or the proceeds thereof) in complete disregard of Riju's fiduciary duties to the Debtor. *Second*, the Debtor asserts a breach of fiduciary duties claim against Byju as the Debtor's former chief executive officer for his role in directing and causing the transfer of the Camshaft LP Interest on account of the Alpha Funds for no consideration, stripping the Debtor of an asset valued at over $540 million. *Third*, the Debtor asserts an aiding and abetting breach of fiduciary duties claim against Kishore for her role in deliberately assisting Byju so he could transfer the Camshaft

6

LP Interest, knowing this action amounted to a breach of Byju's fiduciary duties as it was theft. *Fourth*, the Debtor asserts an accounting claim against all Defendants, given the extensive deficiencies and mischaracterizations in the Debtor's books and records, particularly with respect to the Alpha Funds and the proceeds thereof. *Fifth*, the Debtor asserts a conversion claim against all Defendants. The second fraudulent transfer was not purportedly consummated until March 31, 2023, by which time Byju had already been removed as the Debtor's officer and T&L no longer indirectly owned the Debtor. As this Court already has found, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor."[8] *See also Ravindran v. GLAS Tr. Co. LLC*, 237 A.3d 1061 (Del. 2024) (upholding the change of control of the Debtor and Pohl's appointment). This meant that Defendants lacked the legal authority to exercise control over the Debtor's property (whether on behalf of the Debtor or its former corporate parent T&L) on March 31, 2023, including causing the transfer of the Debtor's Camshaft LP Interest. As with the Debtor's prior conversion claims against Riju and T&L, the Debtor's conversion claim against Byju, Gokulnath, and Kishore is being asserted as their actions amounted to a denial of the Debtor's rights as the proper owner of the Camshaft LP Interest. *Sixth and finally*, the Debtor asserts a civil conspiracy claim against all Defendants for acting in concert along with Riju, among others, to deprive the Debtor of its Camshaft LP Interest, knowing they had no lawful authority to direct the Debtor's affairs or take possession of its assets.

---

[8]   MSJ Mem. Op. at 42.

Exhibit MM1 Page 28

## JURISDICTION AND VENUE

12.     On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

13.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334(b). The Debtor's claims are related to its bankruptcy case, and this lawsuit concerns an important asset of the Debtor's estate.

14.     This Court has personal jurisdiction over the three Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f). Importantly, with respect to Byju, under 10 *Del. C.* § 3114(b), by serving as the CEO of a Delaware corporation, as reflected in the Transfer Agreement,[9] Byju irrevocably consented to the acceptance of service of process through the Debtor's registered agent in any action against him for breach of fiduciary duties in his capacity as CEO.[10] And, as a result of the Debtor's incorporation in the State of Delaware and Byju becoming an officer of that corporation, Byju purposefully availed himself of certain rights,

---

[9]   Additionally, on August 3, 2023, Byju, acting improperly on behalf of the Debtor, executed a so-called "Merchant Agreement" and related "Security Agreement and Guaranty" as part of another lending arrangement.

[10]  10 *Del. C.* § 3114(b) provides a statutory basis for not just serving non-resident directors of Delaware corporations, but also asserting personal jurisdiction in "any action or proceeding against such officer for violation of a duty in such capacity[.]" 10 *Del. C.* § 3114(b); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293 (Del. 2016) (finding that Section 3114 authorized the Delaware lower court to exercise personal jurisdiction over the Canadian defendant, because he was acting in his capacity as the Delaware corporation's President and Chief Executive Officer). Moreover, the exercise of personal jurisdiction pursuant to Section 3114 is consistent with due process. *See, e.g., id.* at 292-94 (exercising personal jurisdiction did not offend traditional notions of fair play and substantial justice where, as here: (1) the Canadian defendant purposefully availed himself of Delaware duties and protections by becoming a director and officer of a Delaware corporation; (2) the claims against the Canadian defendant involved actions in his official capacity, namely, negotiating contracts that involved the change of control of a Delaware public corporation; and (3) such agreements reflected the parties' express choice to use the law of Delaware as their common language of commerce, and their understanding that litigation over later contractual differences could ensue in Delaware).

Exhibit MM1 Page 29

privileges, and protections under Delaware law, while accepting certain attendant non-waivable duties and obligations, including fiduciary duties. Accordingly, Byju was on notice that he could be haled into the Delaware courts at any time to answer for the breaches of those duties to which he is subject.

15.    Nor should the Court's jurisdiction over Byju be in dispute. On October 9, 2024, Byju, in the separate adversary proceeding against Riju, voluntarily submitted to this Court a *Declaration of Byju Raveendran* in support of his brother's opposition to the Debtor's pending motion for summary judgment and volunteered to sit for a deposition. *See* Decl. of B. Raveendran ("Byju Decl."), *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [Adv. D.I. 371-1]. Accordingly, Byju has waived any possible objection to the jurisdiction or purported inconvenience of this Court.

16.    Furthermore, this Court also has personal jurisdiction over Byju for purposefully directing his activities towards the United States and the State of Delaware, in particular. Specifically, Byju directed his tortious conduct towards the Debtor, a *Delaware* corporation, and brother Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds to Camshaft Fund, a *Delaware* limited partnership. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge he gained as a T&L director, Byju expressly directed his tortious conduct at this forum.

17.    Similarly, this Court has personal jurisdiction over Gokulnath, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Specifically, Gokulnath directed her tortious conduct towards the Debtor, a *Delaware* corporation,

Exhibit MM1 Page 30

and Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds first to Camshaft Fund, a *Delaware* limited partnership, and then to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge she gained as a T&L director, Gokulnath expressly directed her tortious conduct at this forum.

18.     Lastly, this Court has personal jurisdiction over Kishore, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Kishore directed her tortious conduct towards Camshaft Fund, a *Delaware* limited partnership, and caused the transfer of the Camshaft LP Interest—*i.e.*, an ownership interest in a *Delaware* limited partnership—from the Debtor, a *Delaware* corporation, to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. Kishore, in her senior role at T&L in which she facilitated the Debtor's diligence with Camshaft, knew, or should have known, that the Debtor was incorporated in the United States and held the Camshaft LP Interest in the United States. She also communicated directly with Camshaft to transfer, then conceal, the Camshaft LP Interest. Again, the intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, Kishore expressly directed her tortious conduct at this forum.

19.     Additionally, Gokulnath and Kishore voluntarily conspired with at least Byju and Riju—two former fiduciaries of the Delaware Debtor—to defraud and deprive the Debtor of the Alpha Funds and Camshaft LP Interest. Gokulnath and Kishore have been integral members of

10

this conspiracy and, at all times relevant to the Complaint, had knowledge of their lack of authority to act on behalf of the Debtor. Nevertheless, both of them facilitated the process of transferring the Alpha Funds and/or the Camshaft LP Interest. In a number of respects, Gokulnath's and Kishore's tortious conduct—all of which was directed at Delaware entities—underlies Byju's and Riju's fiduciary breaches when transferring away the Alpha Funds and the proceeds thereof. Stated bluntly and precisely, the Debtor was used to perpetrate a fraud in Delaware, and Gokulnath and Kishore are an integral part of that wrongful scheme.[11] By any reasonable measure, they should have anticipated that their involvement in a concerted plan to strip assets from the Debtor would result in a Delaware court asserting jurisdiction over each of them to account for such unlawful conduct.

20.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21.     This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(1) and (7) and 28 U.S.C. § 2201.

22.     Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

23.     Plaintiff-Debtor BYJU's Alpha is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021, as a special purpose financing vehicle of its former ultimate corporate parent, T&L, an Indian entity. Until

---

[11]   MSJ Mem. Op. at 21 ("Considering the extensive evidence suggesting T&L's creation of a U.S. subsidiary which was then used to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.").

Exhibit MM1 Page 32

March 3, 2023, T&L wholly owned the Debtor through an intermediate subsidiary, BYJU's Pte. Ltd. The Debtor has never had any material active business operations. From its formation until March 3, 2023, the Debtor's officer and sole director was Riju Ravindran. Byju Raveendran also served as the Debtor's officer, namely, CEO, for an indeterminate period of time. On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in these roles at all times through the present time.

24.     Defendant Byju Raveendran, who currently resides in Dubai, is the eponymous founder of the BYJU's enterprise (the entities that collectively do business under the tradename, "BYJU's," and that previously included the Debtor). He co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India. As noted, Byju also served as the Debtor's CEO, including in March 2023.

25.     Defendant Divya Gokulnath, who also currently resides in Dubai in the same house as Byju (and also Riju), is a co-founder of the BYJU's enterprise. As with her husband, Gokulnath co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India.

26.     Anita Kishore, one of Byju's former students, rose to become T&L's Chief Strategy Officer. Yet, Kishore's role was even more powerful than even her C-suite title suggested, as she has been described by sources as T&L's *de facto* CFO, the only person (other than Byju) who actually understood T&L's financial affairs, and the leader of T&L's investor relations and global expansion.[12] Altogether, Kishore apparently was one of the most powerful people within the

---

[12]   Pradip K. Saha, *Everyone in the Byjuverse is looking for Anita Kishore*, THE MORNING CONTEXT (Aug. 11, 2024), https://themorningcontext.com/internet/everyone-in-the-byjuverse-is-looking-for-anita-kishore.

Exhibit MM1 Page 33

BYJU's organization outside of Byju and his close family.[13] The Debtor understands that Kishore currently resides in Bengaluru, India.

## FACTUAL BACKGROUND

### A.    The Debtor's $1.2 Billion Term Loan Arrangement.

27.    On November 24, 2021, GLAS Trust Company LLC ("GLAS"), as Administrative and Collateral Agent, the Lenders, the Debtor, T&L, and certain other BYJU's entities as guarantors closed on a $1.2 billion term loan facility that would mature in five years absent acceleration. The definitive terms of that facility are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement") and various security and collateral assignment agreements.

28.    The Credit Agreement contains the Debtor's legal rights, duties, and obligations with respect to the term loans. In consideration for the $1.2 billion in loan proceeds, the Debtor and its affiliated guarantors accepted various covenants so that the Lenders could monitor and protect the term loans on a continuous and ongoing basis. Each relevant covenant is clear on its face; they are the result of extensive negotiations by sophisticated parties, advised by experienced legal and financial advisors. Most relevant here are the financial reporting and guarantee covenants. As of November 24, 2021, the Debtor, T&L, and the other BYJU's guarantors owed— yet subsequently failed to provide—the following deliverables to GLAS and the Lenders pursuant to the Credit Agreement:

29.    **Audited Financial Disclosures:** Pursuant to Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L was required

---

[13]   *See id.*

13

to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing.

30.  **Unaudited Financial Disclosures:** Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, T&L was required to provide to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year.

31.  **Whitehat Guarantee:** Under Section 5.9(c) of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign on to an Onshore Guarantee Deed, by no later than April 1, 2022, to guarantee the full amount of the Debtor's term loans.

32.  The Debtor and its former management apparently understood soon after signing the Credit Agreement—and well before April 28, 2022, when it made the first of the *at least* four fraudulent transfers of the Alpha Funds (or the proceeds thereof)—that there were multiple material defaults on the Credit Agreement's financial reporting and guarantee covenants. Those defaults ultimately entitled GLAS to certain remedies, which it properly exercised in March 2023, as discussed below.

## B.   The Debtor's Insolvency as of April 2022 and Acknowledged Events of Default.

33.  Within months of executing the Credit Agreement, the Debtor defaulted.[14] From March to September 2022, the Debtor and its affiliates failed to satisfy three or more covenants at least four times, each of which, on its own, empowered the Lenders to accelerate the term loans and exercise other available remedies, as they ultimately did.

---

[14]  *See* MSJ Mem. Op. at 2-3.

14

34.    To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year. T&L did not furnish any information for the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

35.    Shortly after, Whitehat India failed to provide the Guarantee due as of April 1, 2022. Nonetheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that guarantee until October 8, 2022. Whitehat India also failed to meet the extended deadline.

36.    A third Default occurred on September 13, 2023, when T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Therefore, T&L failed to furnish a material amount of required information across this and the prior quarterly period. What T&L did furnish on that date showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $500 million (based on prevailing exchange rates) at the time. [15]

37.    As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year by the September 27, 2022 deadline. T&L's failure was so significant that its independent auditor, Deloitte, publicly resigned in June 2023, citing T&L's failure to provide the financial information necessary to complete the audit.[16]   T&L's audited financial statements for its 2021-22 fiscal year, which ended March 31, 2022, did not become public until

---

[15]  *See id.* at 4 ("T&L (on whose board [Byju and Riju] sat) actively misled the Lenders into believing that the funds remained in the Debtor's bank accounts in cash or cash equivalents.").

[16]  *See* Alex G. Simon & Anto Antony, *Deloitte Quits as Byju's Auditor Piling Pressure on Tech Startup*, BLOOMBERG (June 22, 2023, 9:25 AM), https://www.bloomberg.com/news/articles/2023-06-22/deloitte-resigns-as-auditor-for-byju-s-on-filings-delay. Then, in September 2024, a second T&L independent auditor, BDO, likewise resigned, citing "inordinate" delays in T&L's filing of its FY 2022-23 annual financial statements and expressing concern that T&L's management "lacks transparency with respect to providing full information to the auditor." Aditya Kalra, *Byju's auditor BDO resigns after start of bankruptcy proceedings, company says*, REUTERS (Sept. 9, 2024, 7:13 AM), https://www.reuters.com/technology/byjus-auditor-bdo-resigns-after-start-bankruptcy-proceedings-company-says-2024-09-07/.

Exhibit MM1 Page 36

January 2024, at which point the financial results in those statements were outdated by nearly two years.

38.     Unsurprisingly, T&L's accounting deficiencies extend to the Debtor. While now under Pohl's control, the Debtor lacks reliable accounting records of its assets and liabilities. In fact, the Debtor has no audited financial statements for the fiscal year ended March 31, 2023, no audited or unaudited financial statements reflecting the March 31, 2023 transfer of the Camshaft LP Interest, and no financial statements of any kind, covering any quarter or fiscal year following March 31, 2023.

C.     **The First Fraudulent Transfer: The Debtor's Transfer of $533 Million to Camshaft Fund While in Default.**

39.     Mere weeks after defaulting twice on the Credit Agreement and entering into one forbearance agreement, on April 27-28, 2022, the Debtor (during which time Riju was the Debtor's sole director and taking direction from the T&L Board, as he later conceded during depositions) initiated three wire transfers totaling $318,000,000 to Camshaft Capital Fund, L.P., a Delaware limited partnership ("Camshaft Fund," and collectively with its affiliates, "Camshaft"), with the purported purpose of subscribing for a limited partnership interest therein. Kishore understood this "investment" required directing the activities of the Debtor, a Delaware corporation. Indeed, Kishore was responsible for facilitating diligence on behalf of the Debtor. The Debtor made each one of those transfers (which were not made pursuant to any known Board investment policy and thus were in direct contravention of the Credit Agreement) without notice to or consent of GLAS or the Lenders. Fewer than three months later, on July 12-13, 2022, the Debtor initiated three additional transfers in the total amount of $215,000,000 from another checking account of the Debtor to Camshaft Fund. In total, the Debtor had transferred $533,000,000 to Camshaft Fund, in

16

exchange for limited partnership interests in Camshaft Fund pursuant to two sets of subscription agreements and corresponding side letters.

40.     Time has shown that, once the Alpha Funds were transferred, they were gone—the Debtor never received any money back from Camshaft Fund, or anyone else, on account of this purported "investment." According to Byju, the money went to pay vendors on behalf of T&L and its subsidiaries (which, again, would be to persons other than the Debtor, which lacked any meaningful operations of its own). Byju Decl. ¶ 36.

41.     In the process of making this first fraudulent transfer, Riju had wholly abandoned his fiduciary duties as an officer and the sole director of the Debtor, and instead allowed its ultimate parent, T&L, to make the Debtor's decisions on its behalf. Hr'g Tr. at 20:1-6, 42:7-13, 49:3-12, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (conceding that "[i]t was Think and Learn that decided to make that transfer" to Camshaft, with Riju simply taking "instructions" from T&L and "signing [] documents" without question); *see also id.* at 43:19-44:4 (admitting that he "didn't think very much about the decision" to move $533 million into Camshaft Fund, not even asking "one question"). As Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." *Id.* at 32:19-23; *see also id.* at 43:19-44:4. Furthermore, when previously asked under oath to confirm who at T&L made those decisions, Riju answered, "I think most of the time by the board, most of the time by the board." Riju then promptly confirmed that the "board" at the time was himself, Byju, and Gokulnath.

42.     The transfer of the $533 million to Camshaft Fund is the first of at least four known fraudulent transfers in this case. The first fraudulent transfer was made without the Lenders' knowledge or approval. As a result of the first fraudulent transfer, the Debtor was rendered

17

insolvent, if not already so. Specifically, the Debtor's liabilities (approximately $1.194 billion in outstanding principal on defaulted loans as of July 12-13, 2022) far exceeded the Debtor's liquid assets (around $131 million in available funds), and the Debtor had no meaningful active operations capable of generating income.

## D. The Illegitimacy of the Debtor's Transfer to Camshaft Fund, a Sham Hedge Fund.

43. There was no legitimate reason for the Debtor to allegedly "invest" over half a billion dollars in Camshaft Fund, which at the time had under $10 million in assets under management, particularly after multiple loan defaults had occurred. It has since become well publicized that Camshaft Fund was an unproven, fly-by-night hedge fund founded in August 2020 by William Morton—then a 23-year old with no formal training in investing or money management, and no apparent qualification to manage a hedge fund—and which previously listed on federal and state regulatory filings the address of an International House of Pancakes in the Little Havana neighborhood of Miami as its principal place of business. Simply put, Camshaft Fund was a complete "sham,"[17] and Morton was an inexperienced and highly unqualified manager.

44. Indeed, there was no reason for the Debtor to purportedly "invest" the $533 million in Camshaft Fund other than to hinder, delay, and/or defraud the Lenders. And in fact, the Debtor did not decide to make that purported investment. Rather, as has come to light, it was the combination of at least T&L, OCI Limited ("OCI") (which received the Alpha Funds from Camshaft Fund), and their respective principals that played a role in developing, orchestrating, and/or directing this fraudulent scheme.

---

[17] *See* MSJ Mem. Op. at 3 n.11 ("GLAS's investigator concluded that the hedge fund was a sham, and I agree. It is unclear why the Debtor[] would choose to invest in Camshaft Fund at all.").

18

E.    **The Lenders' Unsuccessful Negotiations with BYJU's.**

45.    In the summer and fall of 2022, around the same time as the third and fourth Defaults, an *ad hoc* group of Lenders engaged legal and financial advisors and contacted the Debtor's representatives, including Byju, Gokulnath, Riju, and Kishore, and T&L's legal and financial advisors, in an effort to resolve the outstanding Defaults and restructure the term loans. Over the following eight or so months, the Lenders and their advisors spent many hours negotiating and implementing nine separate Amendments to the Credit Agreement, all in a good faith, yet ultimately unsuccessful, effort to reach a negotiated resolution. As part of that process and so that the negotiations would not prejudice the Lenders' rights to exercise remedies, the Debtor and its guarantors, including T&L, acknowledged the four Defaults, which matured into Events of Default under the Credit Agreement, in three separate amendments to the Credit Agreement (namely, Amendment Nos. 2, 3, and 7), which further memorialized the Lenders' entitlement to exercise remedies as a result of those Events of Default.

46.    To protect the Lenders' rights during the pendency of negotiations, T&L, on behalf of itself and the Debtor (among others), and the Lenders, also began entering into a series of forbearance agreements. On October 4, 2022, the parties entered into Amendment No. 1, which extended call protections for the Lenders so they would not be financially disadvantaged by continuing negotiations.  The following week, on October 12, 2022, the parties executed Amendment No. 2, which Byju signed on behalf of T&L and the other BYJU's loan parties.  In Amendment No. 2, the parties agreed to memorialize that BYJU's' four reporting and guarantee breaches constituted Defaults (the "Specified Defaults").  The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would begin on October 10, 2022 and expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default.

19

Unbeknownst to the Lenders, also in or around October 2022, the Debtor initiated the process that would soon lead to the second fraudulent transfer, *i.e.*, the Debtor's transfer of its Camshaft LP Interest to Inspilearn, a non-guarantor under the Credit Agreement of which Riju was the sole manager and T&L was the controller and sole owner. Indeed, Riju has unequivocally admitted the Debtor "started the process" of transferring the Camshaft LP Interest in October 2022, and Camshaft's correspondence with its then-third-party administrator, Apex Fund Services ("Apex"), concerning the steps required to effectuate this second transfer confirms the same.

47.     The timing of these efforts reveals that Byju, Gokulnath, Riju, Kishore, and the T&L organization as a whole understood that the Lenders were contractually authorized to exercise remedies if the Specified Defaults were not cured by November 24, 2022.

48.     Indeed, as of November 24, 2022, none of the Specified Defaults had been cured, whereupon they matured into Events of Default, entitling GLAS and the Lenders to exercise remedies. Also on November 24, 2022, T&L and the Debtor, among others, executed Amendment No. 3, in which they "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured. Importantly, they went one step further, agreeing that the Lenders were "entitle[d]" to deliver to the "Loan Parties" (*i.e.*, the Debtor and its guarantors) a "Specified Notice of Default and Acceleration," meaning "a notice of default and acceleration with respect to the Specified Defaults."

49.     The Lenders nevertheless agreed to forbear through December 1, 2022. When that forbearance period expired, T&L (again, on behalf of itself and the Debtor, among others) and the Lenders entered into a final forbearance agreement—Amendment No. 7, dated as of January 6, 2023. Under Section 1 of Amendment No. 7, the Lenders agreed to forbear from exercising

20

remedies, including accelerating the term loans, until February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then.

50.    As a condition to the Lenders' forbearance agreement, Amendment No. 7 included several important milestones. However, T&L and its subsidiaries, including the Debtor, defaulted on Amendment No. 7's milestones. Additionally, on January 23, 2023, T&L furnished to the Lenders incomplete unaudited financial statements for Q2 FY 2022-23 (the period ended September 30, 2022). Those financials had been due over a month earlier, by December 14, 2022. The financials showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange rates) as of September 30, 2022.

51.    On February 10, 2023, the forbearance period expired by its own terms. Less than a month later, the Lenders directed their agent, GLAS, to exercise remedies, as discussed *infra*.

## F.    The Second Fraudulent Transfer: Byju Raveendran's Transfer of the Debtor's Camshaft LP Interest to Inspilearn on Behalf of the Debtor.

52.    Through February 2023, the Lenders and the Loan Parties had entered into nine formal waivers and amendments to the Credit Agreement to address the outstanding Defaults, which by then had matured into Events of Default (after the Defaults were not cured).

53.    At that time, BYJU's had misrepresented to the Lenders that it had well over $500 million in liquid assets. As disclosed on January 23, 2022, T&L's unaudited financial statements for the period ended September 30, 2022 showed that the Debtor had well over $500 million in "Cash and Bank" balances at that time. Consistent with earlier financial disclosures, T&L's unaudited financial statements for the period ended December 31, 2022, which were provided in mid-March 2023, similarly showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange

21

Exhibit MM1 Page 42

rates). To state the obvious, both financial statements clearly represented that the Debtor—the borrower on a defaulted loan—had hundreds of millions of dollars in liquid cash or cash equivalents available to service its outstanding debts.

54.     Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by the Debtor in cash or in its bank or brokerage accounts, as the "Cash and Bank" label suggested. Instead, those funds had already been transferred to Camshaft Fund. Further, whatever interest in Camshaft Fund that the Debtor held or received on account of its $533 million in transfers was itself soon to be transferred to Inspilearn, again unbeknownst to the Lenders and GLAS.

55.     After the final forbearance expired on February 10, 2023, GLAS, at the Lenders' direction, began exercising remedies. On March 3, 2023, GLAS accelerated all amounts outstanding under the term loans—over $1.2 billion in principal and outstanding interest and fees—to become due and payable immediately. That same day, GLAS also took control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Pohl as the Debtor's sole director. Pohl then appointed himself as the Debtor's sole officer.

56.     Pohl was appointed on March 3, 2023, a Friday.

57.     The very next business day—Monday, March 6, 2023—Kishore emailed Morton, copying Byju, directing Camshaft Fund to "*resume* the process of transferring Byju's Alpha Inc.'s account to Inspilearn LLC" (emphasis added). In doing so, Kishore was resuming the process that at least Camshaft, Inspilearn, and the Raveendran brothers had first commenced more than four months prior, in the previous October.

58.     Over the following weeks, Camshaft and Apex requested information of BYJU's so that they could conduct KYC and AML diligence on the proposed transferee, Inspilearn, and the transfer could be completed.

22

59.     Finally, on March 31, 2023, the Debtor, Inspilearn, and Camshaft executed various agreements that, collectively, purported to consummate the second fraudulent transfer, effective for all purposes as of that same date. The second fraudulent transfer is squarely at issue in this Complaint, and provides the basis for many of the Debtor's claims herein.

60.     Of particular significance here, the Debtor, Inspilearn, and Camshaft executed a Transfer Agreement "made as of 3/31/2023." The Transfer Agreement, by its terms, effectuated the transfer of the entire Camshaft LP Interest from the transferor Debtor to the transferee Inspilearn. *See, e.g.*, Transfer Agreement § 1 ("[U]pon execution and delivery of this Agreement by the parties hereto, Transferor shall assign, transfer and convey the Transferred Interest[18] to Transferee."). Further, upon execution of the Transfer Agreement the Camshaft Fund's sole general partner and control person, Camshaft Capital Management, LLC ("Camshaft Management") agreed to "record the transfer of the Transferred Interest to Transferee as contemplated by this Agreement." *Id.* §§ 1-2. Following the transfer, the Debtor "shall have zero remaining interest in the Transferred Interest," while Inspilearn would accede to all of the Debtor's existing obligations to Camshaft Fund. *Id.* §§ 3(A)-(B). And, upon execution of an accompanying Subscription Agreement (discussed below) dated as of the same date, Inspilearn "shall be entitled to all rights, under the Partnership Agreement, which arise from and after the date hereof, in respect of the Transferred Interest." *Id.* § 3(B).

61.     Riju signed the Transfer Agreement on behalf of Inspilearn. *Id.* at 6. Significantly, Byju signed the Transfer Agreement on behalf of the Debtor, listing his title as "CEO." *Id.* On behalf of the Debtor, Byju represented and warranted (falsely) that the Debtor had "all requisite power and authority to execute, deliver and perform this agreement." *Id.* § 4(A).

---

[18]  The "Transferred Interest" was defined in the Transfer Agreement as "100% of the Interest," referring to the Debtor's "total Capital Commitment to [Camshaft Fund] in the amount of $533,000,000.00." *Id.* at 1 (Recitals).

23

62.     Also on March 31, 2023, Inspilearn and Camshaft Management executed the aforementioned Subscription Agreement, by which Inspilearn would, as of such date, subscribe to, and become a substitute limited partner in, Camshaft Fund with an in-kind capital contribution equal to "100% of Byju's Alpha Inc.'s LP Interests in Camshaft Capital Fund, LP." Riju, on behalf of Inspilearn, executed the Subscription Agreement on March 29, 2023, but Camshaft Fund's general partner, Camshaft Management, did not countersign the Subscription Agreement until March 31, 2023, the same day the Transfer Agreement was effective by its terms.

63.     According to Riju, the transfer of the Camshaft LP Interest from the Debtor to Inspilearn was the brainchild of T&L, of which Byju and Gokulnath were directors and Kishore was one of the most senior executives. *See, e.g.*, Hr'g Tr. at 32:19-23, 59:18-21, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (repeatedly testifying that he "just took direction from the parent company," T&L). When examined at trial and asked why he thought T&L conceived of and directed the transfer to Inspilearn, Riju admittedly did not know "the reason why [he was] signing documents to move assets from BYJU's Alpha to Inspilearn." *Id.* at 25:4-14, 53:16-19. Rather, he followed instructions willfully and blindly—unable to "think of one idea" for the transfer, despite the fact that the Lenders had recently exercised their remedies under the Credit Agreement. *Id.* at 53:25-54:1. Indeed, he did not know whether the Debtor received even $1 of value for the Camshaft LP Interest. *Id.* at 56:8-15. Riju stated that he "just sign[ed]" the documents authorizing the transfer and "mov[ed] on." *Id.* at 25:4-14, 56:3-7. As set forth herein, at least the three Defendants directed this second fraudulent transfer.

64.     Defendants' motivation for transferring the Camshaft LP Interest to Inspilearn—a non-obligor under the Credit Agreement—is readily apparent: to conceal that asset from the

24

Debtor's creditors and to frustrate their rights to exercise remedies under the Credit Agreement and applicable law. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1.2 billion outstanding on the term loans. Further, the parties had recently entered into a forbearance agreement expiring on February 10, 2023, at which point GLAS, acting at the Lenders' direction, could exercise those remedies. Negotiations were reaching an impasse, and the Lenders had clearly signaled their intention to exercise remedies. Defendants knew the Debtor had no defense to the Lenders exercising remedies, because Amendment No. 7 reaffirmed that the Debtor's failure to cure the Specified Defaults "*entitles*" the Lenders to exercise remedies, and *four times* acknowledged that "*none* of the Specified Defaults can be cured or remedied." This is a classic fact pattern of fraud: a borrower concealing virtually all its assets at around the time of a forbearance agreement expiring and, indeed, *after* the creditors had exercised remedies.

65.     Consistent with that fraudulent motive, the Debtor was left with virtually no assets following the second fraudulent transfer. As of March 31, 2023, the Camshaft LP Interest had been valued by Camshaft at $540,647,109.29. In exchange for the Camshaft LP Interest, the Debtor received nothing—not even a cent or a promise to pay anything—in consideration. Indeed, to this day, Riju cannot identify "$1 of value that Inspilearn promised it would pay BYJU's Alpha for the Camshaft investment." Hr'g Tr. at 56:10-15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). As a result, the Debtor was rendered at least balance sheet insolvent, if not already so. Its liabilities (almost $1.2 billion in outstanding principal on accelerated loans in default) far exceeded its liquid assets, under $500,000 in its bank accounts, and now not even the illiquid Camshaft LP Interest.[19]

---

[19]   *See* MSJ Mem. Op. at 37-38.

Exhibit MM1 Page 46

G.     **Defendants' Concealment of the Second Fraudulent Transfer to Inspilearn from the Lenders and GLAS.**

66.     At the beginning of 2023, the Lenders continued to work toward a negotiated resolution, if one could be had. But those efforts were exhausted without success and with only more concerns arising, including regarding the BYJU's enterprise's overall financial condition and the predicted risk that the Debtor would move the vast majority of the money it held to frustrate the Lenders' exercise of remedies. In light of the lack of meaningful progress and responsiveness by the Debtor and its affiliates, the Lenders exercised their contractual and legal remedies to address the acknowledged Events of Default and to protect their collateral.

67.     On March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default to initiate the exercise of remedies. Immediately, Byju reached out to the Lenders, requesting that the parties reengage on a potential resolution. The Lenders were open to engage, which then prompted several weeks of negotiation. During those negotiations, an area of focus for the Lenders was on cash verification.

68.     Kishore actively participated in efforts to mislead the Lenders regarding the Debtor's cash position. On March 16, 2023, T&L, with Kishore copied, posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that the Debtor had the equivalent of well over $500 million in "Cash and Bank" balances as of December 31, 2022.

69.     Also in March 2023, in support of broader negotiations among the parties, the Lenders requested that BYJU's confirm the funds available to the Debtor. In response to this cash verification request, BYJU's representatives agreed to a roundabout cash verification process with the Lenders. To that end, according to what BYJU's outside counsel informed one of the Lenders' advisors on or about March 27, 2023, counsel had, on a recent videoconference call with Kishore

26

(and also T&L's then-General Counsel Roshan Thomas), watched Kishore virtually log into a purported bank portal. According to counsel, "the login process was smooth, nothing was glitchy." Counsel saw a statement showing that the account held a substantial amount of cash, which counsel said was located "in the U.S." (even though the money actually had been transferred abroad to OCI). Counsel disclosed to the Lenders' advisor the exact amount of funds he had seen, an amount that is consistent with the aggregate amount of the April and July 2022 transfers.

70. Based on the information that has since come to light, it now appears that BYJU's outside counsel had seen the Debtor's capital account at Camshaft Fund, reflecting the ascribed value of the Camshaft LP Interest, without disclosing that critical fact to the Lenders' advisor, let alone disclosing that Defendants were in the midst of transferring that LP Interest to Inspilearn. The deception is apparent.

71. Moreover, the Lenders' hopes for a negotiated resolution once again turned out to be misplaced as BYJU's ultimately appeared insincere about trying to enter into a successful amendment. More likely, the reasonable inference is that Defendants were simply buying time to complete the second fraudulent transfer and to move the Camshaft LP Interest out of the Lenders' reach.

72. On May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery against Riju, among others, seeking confirmation that, pursuant to the Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control of the Debtor. *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "225 Action"). Upon commencing that action, Pohl, and the Lenders, had every reason to believe from BYJU's' financial and cash verification disclosures that the Debtor had in its possession a significant sum of money. However, five days later, during a May 8, 2023 call, Byju, with his

27

Exhibit MM1 Page 48

General Counsel, Thomas, on the line, told one of the Lenders' advisors that the Debtor no longer had the money. Rather, as Byju's asserted, "*the money is someplace the Lenders will never find it.*" Byju's comments were so shocking that the Lenders' advisor immediately wrote them down on a piece of scratch paper.[20]

73.     Over a month after the execution of the Transfer Agreement, in May 2023 and following Kishore's request, Camshaft's fund administrator changed the Transfer Agreement's "dealing date" to March 1, 2023. This was an unlawful attempt to backdate the transfer of the Camshaft LP Interest to a time *before* the Lenders exercised remedies on March 3, 2023. The request was made to accomplish a clear objective—to further conceal the Camshaft LP Interest and place it further out of the Lenders' reach.

74.     On May 18, 2023, the Chancery Court issued a *Status Quo* Order (an interim order similar in effect to a temporary injunction) authorizing Pohl to remain in control of the Debtor as sole director and officer pending a final case decision and requiring the BYJU`s defendants in that lawsuit to provide Pohl with access to and control of the Debtor's open bank and other accounts. Other than the Debtor's bank statements reflecting the Camshaft Fund transfers, BYJU's never shared, and in fact, flatly refused to disclose, any information about the Camshaft Fund transfers with the Debtor's current director and officer, Pohl. To this day, Pohl has not received books and

---

[20]  In a filing made on October 9, 2024, almost 18 months after his infamous May 8 remark, Byju—on the morning of argument on summary judgment against his brother Riju—in a transparent and desperate effort to save face and attempt to forestall a half-billion-dollar judgment against Riju—*for the first time* denied that he ever said those words. Byju Decl. ¶ 3. But Byju had not denied saying what he said to Stephen Spencer (the Lenders' financial advisor) when Spencer confronted him with his remark on a second conference call on May 8, 2023, with the Lenders' and BYJU's' own advisors in attendance. Decl. of Stephen Spencer ¶ 15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. July 8, 2024) [Adv. D.I. 280]. BYJU's' counsel subsequently acknowledged its founder's remarks during a May 18, 2023 hearing before the Chancery Court. Counsel admitted that Byju's remark "raises [an] antenna," but defended Byju's concealment of the Alpha Funds as being done "based on fears of lenders acting expeditiously." Hr'g Tr. at 34:5, 21-22, *GLAS Tr. Co. LLC v. Ravindran*, Case No. 2023-0488-MTZ (Del. Ch. May 18, 2023). Nor did Byju's deny his remark in prior conversations with the Lenders.

records from the Debtor's former management or its former ultimate corporate parent, T&L. Based on Riju's deposition, Pohl understands that, to the extent the Debtor has books and records, they were maintained by or in the custody of T&L. Though Pohl has been able to piece together certain information through discovery, he has been unable to obtain a complete and accurate picture of the Debtor's finances from its formation through the present.

75.     On August 4, 2023, the Chancery Court held a bench trial in the 225 Action. On November 2, 2023, it found that "the Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" and to then "seat[]" Pohl. On November 13, 2023, the Chancery Court issued its Final Order and Judgment declaring that GLAS's enforcement steps on March 3, 2023, were valid and effective as to the removal of the Debtor's preexisting director and officer and the appointment of Pohl to serve as the Debtor's sole replacement director and officer. The Delaware Supreme Court affirmed that Judgment on September 23, 2024. *See Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061 (Del. 2024).

### H.     Byju Raveendran's Web of Deception.

76.     In the face of his wrongdoings and unlawful conduct, Byju, his family, and his business enterprise repeatedly misrepresented the use and location of the Alpha Funds. The deception has been pervasive and extreme, as demonstrated by each of the following material misrepresentations.

77.     (1) First, on August 22, 23, and 25, 2023, in the days immediately before Pohl's discovery of the transfers to sham hedge fund Camshaft Fund, Kishore met with some of the Lenders in New York to discuss a potential resolution, including proposals predicated upon BYJU's' ongoing access to the $533 million Alpha Funds.

29

78.     (2) Then, following Pohl's discovery and GLAS's subsequent September 5, 2023 suit against Camshaft, on September 13, 2023, BYJU's released an opaque statement. In it, BYJU's "categorically denie[d] media reports which insinuated that BYJU's was no longer a beneficiary owner of the [Alpha Funds]," instead representing that "an offshore subsidiary remains the beneficiary of the money invested in high security fixed income instruments invested with a multi-hundred billion dollar fund in the U.S." Camshaft, however, was not, and never has been, a "multi-hundred billion dollar fund," and no "*high security* fixed income instruments" were ever received on account of the Alpha Funds.

79.     (3) Then, in a January 14, 2024 call, Byju and Kishore (whom the Lenders only later learned had directed Camshaft to "resume" the transfer of the Debtor's Camshaft LP Interest immediately following Pohl's appointment) answered three of the Lenders' direct questions about the Alpha Funds. When asked if the Alpha Funds still exist, Byju and Kishore first went silent. Byju eventually asked Kishore to answer, but she continued to remain silent. As the silence dragged on, Byju stepped in, adamantly stating, "[w]e have not touched that money," and emphasizing that he was "not siphoning money." When then asked "[h]ow much cash" remains, he said "more than $500 million," which he promptly confirmed in response to the Lenders' questions was "in cash and cash equivalents." For her part, Kishore corroborated Byju, representing that the money still existed at least as of the end of October 2023.

80.     (4) On February 1, 2024, the Debtor commenced this bankruptcy proceeding. One month later, with the Debtor pursuing expedited discovery into the Alpha Funds, Riju filed with this Court a March 5 Official Statement from BYJU's that the Alpha Funds were "currently in a 100% non US subsidiary of BYJU'S." *See* Official Statement, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 5, 2024) [Adv. D.I. 59-2]. The

30

Official Statement left no doubt that the BYJU's "group entities remained the beneficiary holders of the money." *Id.*

81.     (5) On March 14, 2024, Riju testified that the "[m]oney was at Inspilearn." Hr'g Tr. at 36:15-16, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). That same day, the Court issued a preliminary injunction (memorialized four days later in a corresponding order), freezing the Alpha Funds and ordering Riju to "take all necessary steps" to, *inter alia*, locate the Alpha Funds.[21]  *See* Order Granting Debtor's Mot. for Prelim. Inj., *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2024) [Adv. D.I. 84] (the "P.I. Order").   Notably, the Court also enjoined Byju personally (along with Gokulnath, who sat on the T&L board along with Riju and Byju). *Id.*  All of the enjoined parties, including Byju and Gokulnath, were enjoined from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights related to the Alpha Funds. *Id.*

82.     (6) The very next day, on March 15, 2024, BYJU's issued yet another statement in response to the Court's Order. With respect to the Alpha Funds, BYJU's represented that "the said funds are safely parked in one of our subsidiaries and, as per the order, it will rightfully remain there."[22]

83.     Altogether, in a span of seven months, Byju, Riju, Kishore, or Byju's business enterprise at least *six* times—nearly once per month—represented that the \$533 million had not been spent and was safe and secure.

---

[21]  Riju violated the P.I. Order by, *inter alia*, failing to take all such necessary steps to find the Alpha Funds, and has been held, and remains, in contempt. *See* Order on Finding of Contempt, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. May 28, 2024) [Adv. D.I. 204].

[22]  *See Order maintains status quo: Byju's after US bankruptcy court orders hedge fund manager arrest*, BUSINESS TODAY (Mar. 15, 2024, 8:50 PM), https://www.businesstoday.in/entrepreneurship/start-up/story/order-maintains-status-quo-byjus-after-us-bankruptcy-court-orders-hedge-fund-manager-arrest-421681-2024-03-15.

Exhibit MM1 Page 52

84. After months of telling this Court and the public that the Alpha Funds were safely within BYJU's' control, and notwithstanding his own brother's sworn corroborating testimony, Byju did a 180-degree pivot the morning of the summary judgment hearing against his brother (Riju) and company (T&L).[23] In his declaration, Byju swore that OCI Limited, a UK-registered company that purportedly made various, unspecified "purchases" for the benefit of the BYJU's enterprise, had "set-off its outstanding dues against the Alpha Funds as a result of BYJU's' inability to reimburse OCI," the lack of mutuality with the Debtor notwithstanding. Byju Decl. ¶ 39.

85. It is impossible to square Byju's current representation with his own, his brother's, Kishore's, and his business enterprise's repeated statements to the Court, investors, Lenders, and the public over the past year. Either they all consistently lied to the world or, having asserted the day after the preliminary injunction hearing that the money was "safely parked" in one of BYJU's' subsidiaries, Byju followed in his brother's footsteps and violated the same P.I. Order. The one truthful statement Byju has made publicly is that his "strategy" of trying to conceal money from creditors "has not gone right."[24]

86. Notwithstanding the contradictory statements made to the public and the Court, Byju's attempts to conceal the Alpha Funds continue to this day.

87. At present, the whereabouts of the Alpha Funds remain unknown, and the apparent mastermind of this scheme, Byju, has largely escaped accountability—*until now*.[25]

---

[23] Likewise, in an interview with the Financial Times, Byju "told FT that his company no longer had access to capital and the entirety of the $1.2 bn term loan at the heart of the sprawling legal battle with its creditors had been spent." Christ Kay & Chloe Cornish, *'Screaming into a hurricane': the fall of India's most valuable start-up Byju's*, THE FINANCIAL TIMES (Oct. 3, 2024), https://www.ft.com/content/8788b2d7-98c1-469b-acbc-fd5fadd97939.

[24] *Id.*

[25] Nor has Byju's misconduct abated. In related bankruptcy proceedings before this Court involving three of the Debtor's guarantors, Byju went so far as to purchase an international plane ticket to prevent a critical witness from testifying. *See* Hr'g Tr. at 46:18-49-17, *In re Epic! Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del.

32

## CAUSES OF ACTION

### COUNT ONE
### AIDING AND ABETTING RIJU RAVINDRAN'S BREACH OF FIDUCIARY DUTIES
### (AGAINST BYJU RAVEENDRAN AND DIVYA GOKULNATH)

88.    The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

### A.    Riju Ravindran's Breach of His Fiduciary Duties.

89.    In his capacity as the sole director of the Debtor from its incorporation on September 27, 2021, and an officer from September 29, 2021, Riju owed non-waivable fiduciary duties to the Debtor through at least the time of the first and second fraudulent transfers.

90.    At the time of the first fraudulent transfer to Camshaft Fund in mid-2022, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of its making the transfer, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no meaningful active operations; (b) had defaulted on the term loans as early as March 2022, before the first fraudulent transfer was made, had entered into a forbearance agreement, and could foresee further defaults occurring; (c) had no ability to comply with its financial obligations and other covenants under the Credit Agreement, subsequent forbearance agreements. and other loan documents due to a lack of funds; and (d) owed the Lenders an amount of money exceeding $1.2 billion, which would soon be accelerated, and with respect to which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

---

Nov. 21, 2024). The Court was "gravely disturbed by the testimony that I heard today both. about witness tampering and about actions being taken to take assets from these debtors after I entered my order saying that that should not happen." *Id.* 92:12-16. The concerns here are similar: Byju will seemingly stop at nothing to illegally conceal the Alpha Funds from the Debtor, its creditors. and this Court.

Exhibit MM1 Page 54

91.    Even if the Debtor was not insolvent at the time of the first fraudulent transfer, Riju's actions to transfer the Alpha Funds would have rendered the Debtor unable to meet its contractual obligations under the Credit Agreement. The funds were the Debtor's largest known liquid asset, and even prior to their transfer were of lower size than the Debtor's obligations under the term loans. Moving the Alpha Funds away from the Debtor in mid-2022 left the Debtor with only approximately $131 million in available cash (which itself would soon be transferred out of the Debtor) and rendered the Debtor unable to make any interest payments or to pay down the outstanding balance of the accelerated term loans, as required under the Credit Agreement. The Court itself has found that the Debtor was insolvent immediately following the first fraudulent transfer.[26]

92.    Because the Debtor either was insolvent at the time of the first fraudulent transfer, or was rendered unable to meet its contractual obligations by Riju's action, Riju owed to the Debtor, for the benefit of the Debtor and its creditors, fiduciary duties to: (i) act with the care that an ordinarily prudent director and officer would in a similar position, (ii) serve in the best interests of the Debtor, for the benefit of the Debtor and its creditors; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor, for the benefit of the Debtor and its creditors.

93.    As the sole director and officer of the Debtor at the time, and without being exhaustive, Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund without conducting any known due diligence or investigation. He already has admitted in sworn testimony that he had never heard of Camshaft or its inexperienced founder prior to transferring the Debtor's

---

[26]    MSJ Mem. Op. at 37 (finding that "even assuming the LP Interest did have a value of $540 million at the time of the First Transfer, the Debtor's balance sheet would still have reflected only about $671 million in assets against approximately $1.2 billion in debt," which "meets the definition for insolvency under the [Bankruptcy] Code").

34

Alpha Funds to Camshaft, much less conducted any diligence into Camshaft Fund or its founder, nor did he speak to any advisors or counsel when approving this investment. Riju also never read Camshaft Fund's offering materials or other legal documents, nor did he have any skill related to investment management, despite signing an agreement claiming that he did. Additionally, Riju did not once speak to Morton before or after authorizing the investment in Camshaft, nor did he inquire as to why T&L instructed him to approve this half-billion-dollar investment. Worse still, he admitted to never monitoring the investment or hiring someone to monitor the investment on the Debtor's behalf to ensure that Camshaft Fund did not completely dissipate the Alpha Funds.

94.     There is no legitimate reason for the transfer other than to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Riju's conduct grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. Not only did Riju remove the Debtor's largest known liquid asset when the Debtor had substantial monetary obligations to fulfill under the Credit Agreement, he transferred that asset to a sham hedge fund, whose principal place of business was once at the location of an IHOP in Miami and which is run by a man in his twenties with no formal training in money management or experience in regulatory compliance. Riju did so with no apparent benefit to the Debtor, while knowing that the Debtor was already insolvent or would become insolvent as a result of the first fraudulent transfer, that the Debtor already was in default at the time of the aforementioned transfer, and that the Debtor lacked any meaningful revenue-generating capabilities.    By transferring away the Alpha Funds, Riju secretly removed the principal source of available cash that the Debtor could have used to satisfy its obligations under the Credit Agreement. Riju thus actively concealed the money from the Debtor, which needed the money in order to meet the Debtor's legal and financial obligations to the creditors. As such, Ravindran was grossly negligent

35

and acted in bad faith, willfully failing to exercise the care of an ordinarily prudent director of a Delaware corporation. This actively and materially harmed the Debtor. Riju, who signed the Credit Agreement on behalf of the Debtor, knew or should have known what his obligations were thereunder, and he deliberately and willfully disregarded them notwithstanding the consequences.

95.    Riju also caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, and could not articulate any value that the Debtor received in consideration for this transfer. There is no legitimate reason for these transfers other than to frustrate the Lenders' exercise of remedies. Riju's conduct thus grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. As such, Riju acted at least with gross negligence and/or willfulness or even bad faith in failing to exercise the care of an ordinarily prudent director of a Delaware corporation by actively harming the Debtor and causing it to transfer its property without receiving any consideration in return.

96.    Riju caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, in order to thwart the Lenders' ability to exercise remedies, thereby violating his duty of loyalty to the Debtor and the Debtor's creditors. Riju acted to keep the money within his family's exclusive control. Riju is (or was) a director for most of T&L's subsidiaries and is a significant stockholder in T&L. The funds also were put outside the reach of the Debtor and its creditors because Inspilearn was neither the borrower nor a guarantor under the Credit Agreement. Riju thus intentionally subordinated the interests of the Debtor to those of himself and his family, thereby breaching his duty of loyalty to the Debtor. As a result of Riju's egregious conduct, the Debtor has been unable to meet its legal and financial obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount

36

of the term loans on and after March 3, 2023. This caused material injury to the Debtor, which had to pay premium, interest, and expenses on the late payments and defaulted term loans. This also caused injury to the Debtor's creditors, which have not been paid under the Credit Agreement as a result of Riju's actions.

97.     For the foregoing reasons, and as held by the Court in the MSJ Memorandum Opinion, Riju breached his fiduciary duties to the Debtor through his dereliction and conscious disregard of his fiduciary duties to the Debtor, including with respect to the first fraudulent transfer.[27]

### B.    Byju Raveendran's and Divya Gokulnath's Aiding and Abetting of Riju Ravindran's Breach of His Fiduciary Duties to the Debtor.

98.     Byju and Gokulnath each knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the first fraudulent transfer in 2022, and Gokulnath also knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the second fraudulent transfer in 2023.[28] Byju and Gokulnath, each co-founders and directors of T&L, understood that Riju owed non-waivable fiduciary duties to the Debtor because T&L formed the Debtor as a Delaware corporation (as opposed to an LLC or LP, in which fiduciary duties can be waived) and appointed Riju as its sole director.

99.     In an effort to keep the Alpha Funds out of the reach of the Lenders, Byju and Gokulnath directed Riju, as the Debtor's director, to cause or to approve of the Debtor's transfer

---

[27]   *See, e.g.*, MSJ Mem. Op. at 38-39 ("Having considered the evidence in the record regarding Ravindran's total abdication of his duties to the Debtor, as well as the absence of any evidence to the contrary, I find that Debtor has established as a matter of law that Ravindran breached his duty of good faith."); *see also* Judgment Order, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP.* Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2025) [Adv. D.I. 388] (entering judgment against Riju for his breach of fiduciaries to the Debtor as to the first fraudulent transfer).

[28]   As alleged in Count Two, Byju owed his own fiduciary duties to the Debtor at the time of the second fraudulent transfer, and then breached those duties when effectuating that transfer while holding himself out as the Debtor's CEO.

37

Exhibit MM1 Page 58

of the Alpha Funds and then the Camshaft LP Interest. Byju and Gokulnath did this when they knew, or should have known as T&L directors, that, *inter alia*, the Debtor was insolvent, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Moreover, as Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." Hr'g Tr. at 32:19-23, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024).

100. Byju and Gokulnath had no legitimate reason to facilitate the transfers, which stripped the Debtor of the Alpha Funds for their own interests, but rather sought to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Byju and Gokulnath were not acting to further any legitimate interest of the Debtor, or even T&L, by facilitating the unlawful and fraudulent transfer of the Alpha Funds and the Camshaft LP Interest. Like Riju, Byju's and Gokulnath's actions were taken for the purpose of keeping the Alpha Funds out of reach of the Lenders and within their family's own reach, all to the ultimate detriment of the Debtor.

101. Byju's and Gokulnath's knowing and active participation and substantial assistance in Riju's fiduciary breaches caused direct and proximate harm to the Debtor. Specifically, it was foreseeable that Byju's active participation in Riju's fiduciary breaches related to the first fraudulent transfer would cause the Debtor to suffer the loss of the Alpha Funds (or the proceeds thereof) and other harms stemming from those losses. The same is true of Gokulnath's active participation in Riju's fiduciary breaches related to the first and second fraudulent transfers.

102. In light of the foregoing, the Debtor is, at a minimum, entitled to damages for Byju and Gokulnath aiding and abetting Riju's breach of his fiduciary duties (and discovery may reveal that Byju also breached his own fiduciary duties to the Debtor in causing it to make the first

38

fraudulent transfer), including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY
## (AGAINST BYJU RAVEENDRAN)

103.    The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

104.    On March 31, 2023, Byju, while holding himself out as the Debtor's CEO, caused the Debtor to transfer the Camshaft LP Interest to a non-guarantor affiliate, Inspilearn, for no consideration. This process for consummating this transfer commenced no later than fall of 2022, well before the Debtor's former directors and offers, including Byju, had been removed. Accordingly, Byju is liable for his March 31, 2023 breach of fiduciary duties as the Debtor's officer, even though he had no authority to continue acting in that role at that time.

105.    At the time of this transfer, the Debtor, under applicable law, was insolvent, *i.e.*, its liabilities exceeded its assets and/or was unable to pay its debts as they came due and remained so at all times thereafter through and including the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no material active operations; (b) had defaulted on its term loans; (c) had no ability to comply with its obligations under the accelerated Credit Agreement due to a lack of funds, whether directly or directly from its affiliated guarantors (which were unwilling to step-in and honor those obligations); and (d) owed the Lenders principal and interest exceeding $1.2 billion, which had been accelerated.

106.    The Camshaft LP Interest was contemporaneously valued at over $540 million. After the transfer to Inspilearn, a non-guarantor affiliate, the Debtor was left without the Camshaft LP Interest and less than $500,000 in its bank accounts. Moreover, it was financially unable to

39

make any interest payments or pay down the outstanding principal of the accelerated term loans, as required under the Credit Agreement.

107.    As the Debtor was insolvent, Byju owed fiduciary duties to the Debtor, as a putative officer, to: (i) act with the care that an ordinarily prudent officer would in a similar position, (ii) serve in the best interests of the Debtor; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor.

108.    Byju failed to serve in the best interests of the Debtor when he directed and purportedly effectuated the Inspilearn transfer.  The Debtor received no consideration for this transfer.  As Riju, the Debtor's former director and officer admitted in sworn testimony, he could not identify what, if anything, Inspilearn had paid or provided in value to the Debtor for acquiring the Camshaft LP Interest, nor did he know whether Inspilearn promised to pay anything or provide any value to the Debtor for the investment in the future.  The Debtor's term loans had been accelerated, and Byju knew that the Debtor was insolvent, and indeed lacked any material revenue-generating capabilities.  Moreover, Byju actively concealed the Alpha Funds and the Camshaft LP Interest from the Debtor, which needed the money to meet its legal and contractual obligations to its creditors.  Byju has offered no legitimate reason for the transfers and asset concealment, rather admitting only weeks after the second fraudulent transfer that the Alpha Funds were someplace the Lenders would "never" find it.  As this Court has observed, "[i]t is difficult to imagine a single combination of words to demonstrate actual fraudulent intent more clearly." *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, 661 B.R. 109, 123 (Bankr. D. Del. 2024).

109.    Byju's conduct grossly deviated from the standard of care that an ordinarily prudent director and officer of a Delaware corporation would have exercised in a similar situation.  He materially harmed the Debtor, causing it to transfer its property without receiving any

40

consideration in return. His actions were willful and in bad faith. Byju deliberately directed the second fraudulent transfer in order to thwart the Lenders' exercise of their contractual remedies by placing the Debtor's primary remaining assets beyond their reach, while remaining accessible to T&L (and thus, to Byju himself). This violated his duty of loyalty to the Debtor, for the benefit of its creditors, whose interests were paramount in light of the Debtor's ongoing insolvency. In doing so, Byju—the founder, director, and a significant shareholder of T&L—acted in furtherance of his own interests and the interests of T&L's (former) indirect equity in the Debtor, while subordinating the Debtor's interests.

110.   By subordinating the Debtor's interests to those of himself and his family through T&L, and by continuing to conceal his self-dealing and misappropriation, Byju breached his overriding fiduciary duties to the Debtor. As a result of this egregious and offensive conduct, the Debtor has been unable to meet its legal obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount of the term loans on and after March 3, 2023. This has caused (and continues to cause) material injury to the Debtor and its estate, the creditors of which have not received a single payment under the Credit Agreement since March 2023. Indeed, it is a proximate cause of the Debtor's bankruptcy filing. And exacerbating the injury, Byju has spent his time since the filing doing everything he can to frustrate the discovery of the Alpha Funds and the proceeds thereof.

111.   In light of the foregoing, the Debtor is entitled to damages for Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, the disgorgement of the Alpha Funds, the disgorgement of any profits received as a result of the wrongful transfer of the Alpha Funds and/or the Camshaft LP Interest, the disgorgement of any

41

Exhibit MM1 Page 62

fees that Byju earned in his capacity as the CEO of Debtor around the time of the second fraudulent transfer, attorneys' fees and expenses, and pre- and post-judgment interest.

## COUNT THREE
## AIDING AND ABETTING BYJU RAVEENDRAN'S BREACH OF FIDUCIARY DUTIES
### (AGAINST ANITA KISHORE)

112.    The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

113.    As discussed more fully in Count Two, Byju, as the former chief executive officer of the Debtor, owed to the Debtor fiduciary duties to, among other things, exercise due care, act loyally, and serve in the best interest of the Debtor for the benefit of its creditors.

114.    As discussed more fully in Count Two, Byju breached his fiduciary duties to the Debtor by, among other things, causing the Debtor to transfer the Camshaft LP Interest to Inspilearn for no consideration, on the heels of the Lenders' exercise of remedies, including the Lenders' agent exercising control over the Debtor and appointing Pohl as its sole director.

115.    Kishore knowingly and actively participated in, and substantially assisted, Byju's breach of his fiduciary duties. Kishore, acting in concert with Byju, caused the Debtor to transfer the Camshaft LP Interest to Inspilearn (a T&L subsidiary) and facilitated Camshaft Fund's consent to the transfer. Based on the factual record, including the reasonable inferences therefrom, Kishore did all of this with knowledge that, *inter alia,* the Debtor was insolvent following the Lenders' acceleration of the term loans, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Additionally, Kishore knew that, at the time she was directing the transfer, she and Byju had no lawful authority to direct the Debtor's affairs, following a change of control based on conceded Events of Default, and the Lenders' resulting exercise of remedies. Kishore also took active measures to conceal the unlawful transfer of the Camshaft LP Interest. Furthermore, Byju and Kishore made the fraudulent transfer to

42

Inspilearn to advance T&L's interests, in knowing disregard of Byju's obligations to the Debtor. Indeed, as discussed above, two of the directors of T&L, either personally or through counsel, have admitted to moving the funds in order to protect T&L's own interests by thwarting the Debtor's ability to meet its legal obligations to the creditors.

116.     In light of the foregoing, the Debtor is entitled to damages for Kishore's aiding and abetting Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

## COUNT FOUR
## ACCOUNTING
## (AGAINST ALL DEFENDANTS)

117.     The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

118.     The Debtor failed to maintain complete and accurate books and records of the Debtor's assets and liabilities. To the extent books and records were maintained, they were maintained by or in the custody of T&L—of which (i) Byju and Gokulnath were co-founders and directors, in addition to being significant shareholders, and (ii) Kishore was a senior officer—or by Byju, Gokulnath, and Kishore personally. *See* Hr'g Tr. at 73:15-24, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (Riju testifying that T&L "maintains financial and accounting records with respect to its subsidiaries," including BYJU's Alpha, and that information and records concerning the Alpha Funds "should be" maintained in the books of T&L).

119.     The Debtor (under Pohl's direction) has repeatedly requested information from the Debtor's former management and representatives, including, among other things, the location, purported beneficial owners, form, value, and other information regarding the Alpha Funds and the Camshaft LP Interest. For instance, on May 3, 2023, Pohl's counsel sent a letter to Kishore

43

and BYJU's General Counsel, copying T&L's outside counsel and Pohl personally, demanding that they—"as current officers of Think and Learn Pvt Ltd."—"immediately" disclose "all information you possess or have access to concerning any assets of the Company," among other information.

120.    However, neither T&L's senior executives nor anyone else has provided Pohl with complete information about the Debtor's assets. Instead, all of them, including Byju, Gokulnath, and Kishore, have actively concealed and provided misleading information about the Debtor's assets. In fact, based on Riju's in-court testimony on March 14 and May 21, 2024, Byju and Gokulnath—then comprising two thirds of the T&L board—failed to disclose the current location of the Alpha Funds in response to Riju's direct request for this information. There is no doubt that Byju and Gokulnath have, at all times, had the ability to obtain the information the Debtor has long sought concerning the missing Alpha Funds. This is information that Defendants, in their roles at the Debtor and/or T&L and as key participants in the fraudulent transfers scheme, would have to have known. However, the Debtor is unaware whether the Alpha Funds presently exist in cash, cash equivalents, or in other forms—or if those funds still exist at all.

121.    Because the Alpha Funds are the Debtor's assets, Byju was acting as a fiduciary with respect to his handling of them, as discussed in Count Two. Byju, therefore, breached his fiduciary duties to the Debtor when he, acting as the Debtor's CEO, effectuated the transfer of the Camshaft LP Interest to a non-guarantor affiliate for no consideration.

122.    Moreover, Gokulnath and Kishore, in their fiduciary roles at T&L, were also responsible for maintaining the Debtor's books and records. In fact, as for Kishore, the record confirms that she had access to the Debtor's account at Camshaft Fund.

123.   As a result of Defendants' material breaches of their duties, the Debtor has suffered, and will continue to suffer, injury and significant harm as set forth in detail herein.

124.   Accordingly, the Debtor requires, and is entitled to, a full and accurate accounting of the Debtor's Alpha Funds, through the production and examination of all books and records associated with those funds and any proceeds thereof, specifically those relating to the second fraudulent transfer to Inspilearn. Accordingly, the Debtor seeks entry of a judgment directing each of the Defendants to perform a full and accurate accounting of the Alpha Funds and any proceeds thereof, such as the Camshaft LP Interest, including each and every subsequent transfer and any proceeds thereof.

## COUNT FIVE
## CONVERSION
## (AGAINST ALL DEFENDANTS)

125.   The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

126.   GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju, Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was

45

purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

127.   Because all three Defendants lacked any authority to exercise control over the Debtor's property on and after March 3, 2023, the Debtor's purported transfer of the Camshaft LP Interest on March 31, 2023, which was made without the consent or knowledge of the Debtor (at that time under the control of Pohl, its sole director and officer), constituted a wrongful act of possession and disposition of the Debtor's Camshaft LP Interest. As such, Defendants are joint tortfeasors who unlawfully exerted control over the Camshaft LP Interest as if it remained property under their control when, in fact, it was the Debtor's exclusive property over which they had no control.

128.   By transferring away the Camshaft LP Interest for no consideration, Defendants denied and eliminated the Debtor's contractual rights to that property. Because Defendants had continuously concealed the existence of the Camshaft LP Interest, Pohl was unable to specifically demand that the interest be returned to the Debtor before it was transferred to Inspilearn. These actions by Defendants amounted to an unlawful conversion of the Debtor's rights as the legal owner of the Camshaft LP Interest.

129.   In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

## COUNT SIX
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)[29]

130. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

131. GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju and Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

132. However, Defendants, acting in concert along with at least Riju and Inspilearn, among others, took a series of unlawful and coordinated steps to defeat the Debtor's ownership of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest. These unlawful steps included: (i) Kishore, with Byju copied—which was no accident—defrauding the Debtor by directing Camshaft Fund to transfer the Camshaft LP Interest on the first business day following

---

[29] Though Riju and Inspilearn are among the co-conspirators, the Debtor already obtained judgments against them and, for that reason, among others, has chosen not to name them as defendants at this time in this current lawsuit. *See generally* MSJ Mem. Op.

47

Exhibit MM1 Page 68

GLAS's exercise of remedies, at a time when Kishore knew that neither she nor Byju had any lawful authority to direct the Debtor's affairs and assert control over its assets, (ii) Kishore facilitating the unlawful transfers at issue, (iii) Kishore engaging in a sham cash verification exercise to mislead the Lenders about the location and availability of the Alpha Funds, (iv) Byju falsely representing that he had the authority to execute the Transfer Agreement on behalf of the Debtor, and (v) Byju and Riju executing various integrated agreements on March 31, 2023 to purportedly consummate the Debtor's transfer of the Camshaft LP Interest for no consideration. The orchestration of these events from March 3 to 31, 2023, along with the subsequent efforts taken by Byju, Riju, Gokulnath, and Kishore, among others, to transfer the Camshaft LP Interest *again* in May 2023 and February 2024, and then to cover-up the transfer during the course of these bankruptcy proceedings, including in response with the Court's P.I. Order directing Riju to take all "necessary steps" to locate the Alpha Funds,[30] demonstrates a meeting of the minds to move the Camshaft LP Interest away from the control of the Debtor (rightfully under the control of Pohl) and GLAS. The ultimate effect of this conspiracy was to deprive the Debtor of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest.

133.   In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

---

[30]   Order Granting Debtor's Mot. for Prelim. Inj. ¶ 2. *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2025) [Adv. D.I. 84] (the "P.I. Order"). As came out at the hearing on May 21, 2024, Byju, Riju, and Gokulnath had engaged in a charade to conceal the Alpha Funds while they were all living together.

48

Exhibit MM1 Page 69

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Debtor BYJU's Alpha, Inc. requests that this Court enter

judgment and grant the following relief against Byju Raveendran, Divya Gokulnath, and Anita

Kishore:

a. Award of damages for breach of fiduciary duties and aiding and abetting such breach of fiduciary duties, including compensatory damages for damages caused to the Debtor and disgorgement of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

b. An accounting of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

c. Award of damages for conversion of, and civil conspiracy to defeat, the Debtor's ownership of the Camshaft LP Interest;

d. Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

e. Pre- and post-judgment interest up to the statutory maximum; and

f. Any other relief that this Court may deem just, proper, or equitable under the circumstances.

49

Dated: April 9, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone (*pro hac vice* forthcoming)
Kate Scherling (*pro hac vice* forthcoming)
Jordan M. Nakdimon (*pro hac vice* forthcoming)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
jordannakdimon@quinnemanuel.com

*Counsel for Plaintiff-Debtor, BYJU's Alpha, Inc.*

50

Exhibit MM1 Page 71

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| | ) | |
| | ) | Adv. Pro. Case No. _____ |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BYJU RAVEENDRAN, DIVYA GOKULNATH, | ) | |
| and ANITA KISHORE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff-Debtor BYJU's Alpha, Inc. (the "Debtor") alleges as follows:

## PRELIMINARY STATEMENT[2]

1.      This is an action to hold three powerful BYJU's executives accountable for having purposefully caused the Debtor to fraudulently transfer an asset valued at *over half a billion dollars* for *no consideration*. The Debtor's former CEO, Byju Raveendran,[3] took these actions— with the support and assistance of, and in coordination with, his co-founder and wife Divya Gokulnath and consigliere Anita Kishore, among others—in complete disregard of his duties as

---

[1]   The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2]   Capitalized terms not defined in the Preliminary Statement have the meanings given to them below.

[3]   To distinguish between the Raveendran brothers, Byju Raveendran is referred to herein as "Byju" and Riju Ravindran is referred to herein as "Riju."

an officer to, and a fiduciary of, a Delaware corporation and while knowing that what he was doing was nothing short of corporate theft.

2.    Specifically, as has been well documented, Byju and his cohorts, including his nuclear family and former student (Kishore), orchestrated an ongoing illegal scheme to take and then conceal from the Debtor $533 million *of the Debtor's own funds* (the "Alpha Funds") and the proceeds thereof. *See generally BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del.).[4] *First*, in mid-2022, the Debtor, acting at the direction of at least Byju, Riju, and Gokulnath, transferred the Alpha Funds to Camshaft Fund, a sham hedge fund, ostensibly in exchange for receiving a limited partnership interest in such fund (the "Camshaft LP Interest"). *Second*, on March 31, 2023, Defendants, among others, caused the Debtor's purported transfer of that Camshaft LP Interest, which Camshaft Fund (through its then-administrator, Apex Fund Services) contemporaneously valued at $540,647,109.29, to a non-guarantor BYJU's affiliate, Inspilearn LLC, for no consideration whatsoever. To be certain, Defendants (and also Riju) did not secure any replacement or substitute asset whatsoever—not even an intercompany receivable or promissory note, as purportedly had been the case with certain prior advances of loan proceeds, indeed, not even $1 of value was conveyed. *Third*, on the February 1, 2024 Petition Date, Inspilearn, acting at the direction of the ultimate corporate parent of the BYJU's enterprise— Think & Learn Pvt. Ltd. ("T&L"), in which Byju, Gokulnath, and Kishore played key roles in managing—transferred the entire Camshaft LP Interest to an offshore trust, which then purportedly fully redeemed it.[5] *Lastly*, according to T&L, after the Petition Date, Inspilearn moved the

---

[4]    On February 27, 2025, this Court issued its *Memorandum Opinion* entering summary judgment in favor of the Debtor and GLAS on various claims associated with the unlawful scheme to transfer the Alpha Funds, including claims of actual fraudulent transfer against Camshaft, Inspilearn, and T&L, breach of fiduciary duty against Riju, and conversion against Riju and T&L. Memorandum Opinion, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Feb. 27, 2025) [Adv. D.I. 383] (the "MSJ Mem. Op.").

[5]    As this Court found, "Inspilearn is T&L's alter ego as a matter of law." *Id.* at 16.

2

resulting funds to an unidentified, non-U.S. T&L subsidiary. It remains unknown at this time whether additional transfers since have been made.

3.      Though critical details about the Alpha Funds and their current whereabouts remain concealed, the Debtor has learned that Byju was acting as the Debtor's "*self-appointed CEO*" when he surreptitiously directed the second fraudulent transfer of the Debtor's Camshaft LP Interest on March 31, 2023.[6] The timing of the transfer on March 31 is significant; it was Defendants' way to retaliate against the Lenders' exercise of remedies. Twenty-eight days earlier, on March 3, the Debtor's Lenders (acting through their agent) had, based on the occurrence of multiple conceded Events of Default and the plain terms of the Debtor's Credit Agreement, accelerated the term loans and assumed control of the Debtor, becoming its sole shareholder. Immediately thereafter, the Lenders' agent removed the Debtor's existing directors and officers, *i.e.*, the Raveendran brothers, and replaced them with Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director.

4.      Byju's blatant disregard for his non-waivable fiduciary duties to the Debtor, with Gokulnath's and Kishore's assistance, is evident from the timeline of events surrounding the second fraudulent transfer. As of October 2022, there were at least four defaults outstanding under the Debtor's Credit Agreement. An *ad hoc* group of Lenders had formed, and, in October 2022, the Lenders, T&L, and the Debtor, among others, executed the first of a series of amendments to the Credit Agreement, three of which memorialized the occurrence and/or the consequences of the four prior defaults. Byju signed the first of those three notable amendments on behalf of, among others, T&L and the Debtor; Riju (the Debtor's then-sole director) signed the other two. Also in

---

[6]   *Id.* at 6 (emphasis added).

3

Exhibit MM1 Page 74

October 2022, the Debtor "started the process of transferring its limited partnership interest in Camshaft Fund to Inspilearn," as Riju himself admitted in the instant bankruptcy proceeding.[7]

5.     Three months later, on January 6, 2023, the Debtor executed the third of the referenced amendments. In exchange for a forbearance through February 10, 2023, T&L and the Debtor, among others, reaffirmed that the failure to cure the four defaults "entitles" the Lenders to exercise remedies. Underscoring that point, they further agreed that the outstanding Specified Defaults could no longer be cured. This point was so important that it was memorialized four times in an 18-page amendment.

6.     But there was no consensual resolution. As noted, on Friday, March 3, 2023, the Lenders directed their agent to exercise remedies. In turn, their agent, GLAS, sent the BYJU's organization numerous notices of the Debtor's default and the agent's exercise of remedies. Kishore in particular received the notice by three mediums—email (anita@byjus.com), courier, and certified mail.



GLAS's Notice of Default and Acceleration Letter

---

[7]    Ravindran Ans. to First Am. Compl. ¶ 6, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 8, 2024) [Adv. D.I. 124 (sealed); Adv. D.I. 129 (redacted)].

4

Exhibit MM1 Page 75

*GLAS's email to Anita Kishore enclosing Notice of Default and Acceleration Letter*

7.      The very next business day—before Pohl, the Debtor's newly-appointed corporate
governor, was able to secure actual control of the Debtor's assets—Byju, Kishore, and their
confederates commenced the final steps of transferring the Camshaft LP Interest. To this end,
Kishore, having just received GLAS's notice of default—and with Byju copied but without Pohl's
knowledge—expressly directed Camshaft's founder to "resume the process" of transferring the
Camshaft LP Interest to Inspilearn, where Riju was the sole manager. With the subject line of
"Account transfer," Kishore's motivation in sending this email was clear: hide the money.



*Anita Kishore's Transfer Instruction to Camshaft Fund*

8.      Another 25 days later and once again unbeknownst to Pohl, the transfer of the
Camshaft LP Interest to Inspilearn was purportedly completed via a Transfer Agreement (and a
separate Subscription Agreement executed contemporaneously). The Transfer Agreement, dated
March 31, 2023, provided that, "upon execution and delivery of [the Transfer Agreement] by the
parties thereto, Transferor shall assign, transfer, and convey the Transferred Interest to

5

Exhibit MM1 Page 76

Transferee[.]" This Transfer Agreement was signed by Byju, *holding himself out as the Debtor's CEO*; and Riju, the Debtor's then-former sole director and the then-sole manager of the transferee Inspilearn, on Inspilearn's behalf (Camshaft also executed the Agreement). Byju, on behalf of the transferor Debtor, falsely and fraudulently represented and warranted that he, on the Debtor's behalf, had "all requisite power and authority to execute, deliver and perform this Agreement."

9.     It was not until 2024, upon receiving discovery in this bankruptcy proceeding, that the Debtor (under Pohl's control) learned about and obtained a copy of this Transfer Agreement.

10.     Following Byju's execution of the Transfer Agreement, the Debtor's accounts were largely depleted. The Debtor had under $500,000 in cash in its bank accounts compared to at least approximately $1.2 billion in liabilities, which had been accelerated, and now no longer held the Camshaft LP Interest. Defendants, at a time when they no longer had legal control of the Debtor, intentionally and maliciously stripped the Debtor barren to keep the Alpha Funds (or the proceeds of such funds) beyond the reach of the Debtor's creditors.

11.     Accordingly, the Debtor brings this action, comprised of six separate claims, to hold Defendants accountable for the material damage they have caused, and continue to cause, to the Debtor and its estate. *First*, the Debtor asserts an aiding and abetting claim against Byju and Gokulnath for deliberately directing one or more of Riju's fraudulent transfers of the $533 million Alpha Funds (or the proceeds thereof) in complete disregard of Riju's fiduciary duties to the Debtor. *Second*, the Debtor asserts a breach of fiduciary duties claim against Byju as the Debtor's former chief executive officer for his role in directing and causing the transfer of the Camshaft LP Interest on account of the Alpha Funds for no consideration, stripping the Debtor of an asset valued at over $540 million. *Third*, the Debtor asserts an aiding and abetting breach of fiduciary duties claim against Kishore for her role in deliberately assisting Byju so he could transfer the Camshaft

6

LP Interest, knowing this action amounted to a breach of Byju's fiduciary duties as it was theft. *Fourth*, the Debtor asserts an accounting claim against all Defendants, given the extensive deficiencies and mischaracterizations in the Debtor's books and records, particularly with respect to the Alpha Funds and the proceeds thereof. *Fifth*, the Debtor asserts a conversion claim against all Defendants. The second fraudulent transfer was not purportedly consummated until March 31, 2023, by which time Byju had already been removed as the Debtor's officer and T&L no longer indirectly owned the Debtor. As this Court already has found, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor."[8] *See also Ravindran v. GLAS Tr. Co. LLC*, 237 A.3d 1061 (Del. 2024) (upholding the change of control of the Debtor and Pohl's appointment). This meant that Defendants lacked the legal authority to exercise control over the Debtor's property (whether on behalf of the Debtor or its former corporate parent T&L) on March 31, 2023, including causing the transfer of the Debtor's Camshaft LP Interest. As with the Debtor's prior conversion claims against Riju and T&L, the Debtor's conversion claim against Byju, Gokulnath, and Kishore is being asserted as their actions amounted to a denial of the Debtor's rights as the proper owner of the Camshaft LP Interest. *Sixth and finally*, the Debtor asserts a civil conspiracy claim against all Defendants for acting in concert along with Riju, among others, to deprive the Debtor of its Camshaft LP Interest, knowing they had no lawful authority to direct the Debtor's affairs or take possession of its assets.

---

[8] MSJ Mem. Op. at 42.

7

## JURISDICTION AND VENUE

12.     On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

13.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334(b). The Debtor's claims are related to its bankruptcy case, and this lawsuit concerns an important asset of the Debtor's estate.

14.     This Court has personal jurisdiction over the three Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f). Importantly, with respect to Byju, under 10 *Del. C.* § 3114(b), by serving as the CEO of a Delaware corporation, as reflected in the Transfer Agreement,[9] Byju irrevocably consented to the acceptance of service of process through the Debtor's registered agent in any action against him for breach of fiduciary duties in his capacity as CEO.[10]  And, as a result of the Debtor's incorporation in the State of Delaware and Byju becoming an officer of that corporation, Byju purposefully availed himself of certain rights,

---

[9]   Additionally, on August 3, 2023, Byju, acting improperly on behalf of the Debtor, executed a so-called "Merchant Agreement" and related "Security Agreement and Guaranty" as part of another lending arrangement.

[10]  10 *Del. C.* § 3114(b) provides a statutory basis for not just serving non-resident directors of Delaware corporations, but also asserting personal jurisdiction in "any action or proceeding against such officer for violation of a duty in such capacity[.]"  10 *Del. C.* § 3114(b); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293 (Del. 2016) (finding that Section 3114 authorized the Delaware lower court to exercise personal jurisdiction over the Canadian defendant, because he was acting in his capacity as the Delaware corporation's President and Chief Executive Officer). Moreover, the exercise of personal jurisdiction pursuant to Section 3114 is consistent with due process. *See, e.g., id.* at 292-94 (exercising personal jurisdiction did not offend traditional notions of fair play and substantial justice where, as here:  (1) the Canadian defendant purposefully availed himself of Delaware duties and protections by becoming a director and officer of a Delaware corporation; (2) the claims against the Canadian defendant involved actions in his official capacity, namely, negotiating contracts that involved the change of control of a Delaware public corporation; and (3) such agreements reflected the parties' express choice to use the law of Delaware as their common language of commerce, and their understanding that litigation over later contractual differences could ensue in Delaware).

8

privileges, and protections under Delaware law, while accepting certain attendant non-waivable duties and obligations, including fiduciary duties. Accordingly, Byju was on notice that he could be haled into the Delaware courts at any time to answer for the breaches of those duties to which he is subject.

15.     Nor should the Court's jurisdiction over Byju be in dispute. On October 9, 2024, Byju, in the separate adversary proceeding against Riju, voluntarily submitted to this Court a *Declaration of Byju Raveendran* in support of his brother's opposition to the Debtor's pending motion for summary judgment and volunteered to sit for a deposition. *See* Decl. of B. Raveendran ("Byju Decl."), *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [Adv. D.I. 371-1]. Accordingly, Byju has waived any possible objection to the jurisdiction or purported inconvenience of this Court.

16.     Furthermore, this Court also has personal jurisdiction over Byju for purposefully directing his activities towards the United States and the State of Delaware, in particular. Specifically, Byju directed his tortious conduct towards the Debtor, a *Delaware* corporation, and brother Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds to Camshaft Fund, a *Delaware* limited partnership. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge he gained as a T&L director, Byju expressly directed his tortious conduct at this forum.

17.     Similarly, this Court has personal jurisdiction over Gokulnath, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Specifically, Gokulnath directed her tortious conduct towards the Debtor, a *Delaware* corporation,

Exhibit MM1 Page 80

and Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds first to Camshaft Fund, a *Delaware* limited partnership, and then to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge she gained as a T&L director, Gokulnath expressly directed her tortious conduct at this forum.

18.     Lastly, this Court has personal jurisdiction over Kishore, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Kishore directed her tortious conduct towards Camshaft Fund, a *Delaware* limited partnership, and caused the transfer of the Camshaft LP Interest—*i.e.*, an ownership interest in a *Delaware* limited partnership—from the Debtor, a *Delaware* corporation, to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. Kishore, in her senior role at T&L in which she facilitated the Debtor's diligence with Camshaft, knew, or should have known, that the Debtor was incorporated in the United States and held the Camshaft LP Interest in the United States. She also communicated directly with Camshaft to transfer, then conceal, the Camshaft LP Interest. Again, the intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, Kishore expressly directed her tortious conduct at this forum.

19.     Additionally, Gokulnath and Kishore voluntarily conspired with at least Byju and Riju—two former fiduciaries of the Delaware Debtor—to defraud and deprive the Debtor of the Alpha Funds and Camshaft LP Interest. Gokulnath and Kishore have been integral members of

10

Exhibit MM1 Page 81

this conspiracy and, at all times relevant to the Complaint, had knowledge of their lack of authority to act on behalf of the Debtor. Nevertheless, both of them facilitated the process of transferring the Alpha Funds and/or the Camshaft LP Interest. In a number of respects, Gokulnath's and Kishore's tortious conduct—all of which was directed at Delaware entities—underlies Byju's and Riju's fiduciary breaches when transferring away the Alpha Funds and the proceeds thereof. Stated bluntly and precisely, the Debtor was used to perpetrate a fraud in Delaware, and Gokulnath and Kishore are an integral part of that wrongful scheme.[11] By any reasonable measure, they should have anticipated that their involvement in a concerted plan to strip assets from the Debtor would result in a Delaware court asserting jurisdiction over each of them to account for such unlawful conduct.

20.    Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21.    This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(1) and (7) and 28 U.S.C. § 2201.

22.    Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

23.    Plaintiff-Debtor BYJU's Alpha is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021, as a special purpose financing vehicle of its former ultimate corporate parent, T&L, an Indian entity. Until

---

[11]    MSJ Mem. Op. at 21 ("Considering the extensive evidence suggesting T&L's creation of a U.S. subsidiary which was then used to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.").

11

Exhibit MM1 Page 82

March 3, 2023, T&L wholly owned the Debtor through an intermediate subsidiary, BYJU's Pte. Ltd. The Debtor has never had any material active business operations. From its formation until March 3, 2023, the Debtor's officer and sole director was Riju Ravindran. Byju Raveendran also served as the Debtor's officer, namely, CEO, for an indeterminate period of time. On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in these roles at all times through the present time.

24.     Defendant Byju Raveendran, who currently resides in Dubai, is the eponymous founder of the BYJU's enterprise (the entities that collectively do business under the tradename, "BYJU's," and that previously included the Debtor). He co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India. As noted, Byju also served as the Debtor's CEO, including in March 2023.

25.     Defendant Divya Gokulnath, who also currently resides in Dubai in the same house as Byju (and also Riju), is a co-founder of the BYJU's enterprise. As with her husband, Gokulnath co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India.

26.     Anita Kishore, one of Byju's former students, rose to become T&L's Chief Strategy Officer. Yet, Kishore's role was even more powerful than even her C-suite title suggested, as she has been described by sources as T&L's *de facto* CFO, the only person (other than Byju) who actually understood T&L's financial affairs, and the leader of T&L's investor relations and global expansion.[12] Altogether, Kishore apparently was one of the most powerful people within the

---

[12]    Pradip K. Saha, *Everyone in the Byjuverse is looking for Anita Kishore*, THE MORNING CONTEXT (Aug. 11, 2024), https://themorningcontext.com/internet/everyone-in-the-byjuverse-is-looking-for-anita-kishore.

Exhibit MM1 Page 83

BYJU's organization outside of Byju and his close family.[13] The Debtor understands that Kishore currently resides in Bengaluru, India.

## FACTUAL BACKGROUND

### A.   The Debtor's $1.2 Billion Term Loan Arrangement.

27.   On November 24, 2021, GLAS Trust Company LLC ("GLAS"), as Administrative and Collateral Agent, the Lenders, the Debtor, T&L, and certain other BYJU's entities as guarantors closed on a $1.2 billion term loan facility that would mature in five years absent acceleration. The definitive terms of that facility are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement") and various security and collateral assignment agreements.

28.   The Credit Agreement contains the Debtor's legal rights, duties, and obligations with respect to the term loans. In consideration for the $1.2 billion in loan proceeds, the Debtor and its affiliated guarantors accepted various covenants so that the Lenders could monitor and protect the term loans on a continuous and ongoing basis. Each relevant covenant is clear on its face; they are the result of extensive negotiations by sophisticated parties, advised by experienced legal and financial advisors. Most relevant here are the financial reporting and guarantee covenants. As of November 24, 2021, the Debtor, T&L, and the other BYJU's guarantors owed—yet subsequently failed to provide—the following deliverables to GLAS and the Lenders pursuant to the Credit Agreement:

29.   **Audited Financial Disclosures:**   Pursuant to Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L was required

---

[13]   *See id.*

13

to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing.

30.     **Unaudited Financial Disclosures:** Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, T&L was required to provide to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year.

31.     **Whitehat Guarantee:** Under Section 5.9(c) of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign on to an Onshore Guarantee Deed, by no later than April 1, 2022, to guarantee the full amount of the Debtor's term loans.

32.     The Debtor and its former management apparently understood soon after signing the Credit Agreement—and well before April 28, 2022, when it made the first of the *at least* four fraudulent transfers of the Alpha Funds (or the proceeds thereof)—that there were multiple material defaults on the Credit Agreement's financial reporting and guarantee covenants. Those defaults ultimately entitled GLAS to certain remedies, which it properly exercised in March 2023, as discussed below.

**B.     The Debtor's Insolvency as of April 2022 and Acknowledged Events of Default.**

33.     Within months of executing the Credit Agreement, the Debtor defaulted.[14] From March to September 2022, the Debtor and its affiliates failed to satisfy three or more covenants at least four times, each of which, on its own, empowered the Lenders to accelerate the term loans and exercise other available remedies, as they ultimately did.

---

[14] *See* MSJ Mem. Op. at 2-3.

14

34.    To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year. T&L did not furnish any information for the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

35.    Shortly after, Whitehat India failed to provide the Guarantee due as of April 1, 2022. Nonetheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that guarantee until October 8, 2022. Whitehat India also failed to meet the extended deadline.

36.    A third Default occurred on September 13, 2023, when T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Therefore, T&L failed to furnish a material amount of required information across this and the prior quarterly period. What T&L did furnish on that date showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $500 million (based on prevailing exchange rates) at the time.[15]

37.    As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year by the September 27, 2022 deadline. T&L's failure was so significant that its independent auditor, Deloitte, publicly resigned in June 2023, citing T&L's failure to provide the financial information necessary to complete the audit.[16] T&L's audited financial statements for its 2021-22 fiscal year, which ended March 31, 2022, did not become public until

---

[15]    *See id.* at 4 ("T&L (on whose board [Byju and Riju] sat) actively misled the Lenders into believing that the funds remained in the Debtor's bank accounts in cash or cash equivalents.").

[16]    *See* Alex G. Simon & Anto Antony, *Deloitte Quits as Byju's Auditor Piling Pressure on Tech Startup*, BLOOMBERG (June 22, 2023, 9:25 AM), https://www.bloomberg.com/news/articles/2023-06-22/deloitte-resigns-as-auditor-for-byju-s-on-filings-delay. Then, in September 2024, a second T&L independent auditor, BDO, likewise resigned, citing "inordinate" delays in T&L's filing of its FY 2022-23 annual financial statements and expressing concern that T&L's management "lacks transparency with respect to providing full information to the auditor." Aditya Kalra, *Byju's auditor BDO resigns after start of bankruptcy proceedings, company says*, REUTERS (Sept. 9, 2024, 7:13 AM), https://www.reuters.com/technology/byjus-auditor-bdo-resigns-after-start-bankruptcy-proceedings-company-says-2024-09-07/.

Exhibit MM1 Page 86

January 2024, at which point the financial results in those statements were outdated by nearly two years.

38.    Unsurprisingly, T&L's accounting deficiencies extend to the Debtor. While now under Pohl's control, the Debtor lacks reliable accounting records of its assets and liabilities. In fact, the Debtor has no audited financial statements for the fiscal year ended March 31, 2023, no audited or unaudited financial statements reflecting the March 31, 2023 transfer of the Camshaft LP Interest, and no financial statements of any kind, covering any quarter or fiscal year following March 31, 2023.

### C.    The First Fraudulent Transfer: The Debtor's Transfer of $533 Million to Camshaft Fund While in Default.

39.    Mere weeks after defaulting twice on the Credit Agreement and entering into one forbearance agreement, on April 27-28, 2022, the Debtor (during which time Riju was the Debtor's sole director and taking direction from the T&L Board, as he later conceded during depositions) initiated three wire transfers totaling $318,000,000 to Camshaft Capital Fund, L.P., a Delaware limited partnership ("Camshaft Fund," and collectively with its affiliates, "Camshaft"), with the purported purpose of subscribing for a limited partnership interest therein. Kishore understood this "investment" required directing the activities of the Debtor, a Delaware corporation. Indeed, Kishore was responsible for facilitating diligence on behalf of the Debtor. The Debtor made each one of those transfers (which were not made pursuant to any known Board investment policy and thus were in direct contravention of the Credit Agreement) without notice to or consent of GLAS or the Lenders. Fewer than three months later, on July 12-13, 2022, the Debtor initiated three additional transfers in the total amount of $215,000,000 from another checking account of the Debtor to Camshaft Fund. In total, the Debtor had transferred $533,000,000 to Camshaft Fund, in

16

exchange for limited partnership interests in Camshaft Fund pursuant to two sets of subscription agreements and corresponding side letters.

40.    Time has shown that, once the Alpha Funds were transferred, they were gone—the Debtor never received any money back from Camshaft Fund, or anyone else, on account of this purported "investment." According to Byju, the money went to pay vendors on behalf of T&L and its subsidiaries (which, again, would be to persons other than the Debtor, which lacked any meaningful operations of its own). Byju Decl. ¶ 36.

41.    In the process of making this first fraudulent transfer, Riju had wholly abandoned his fiduciary duties as an officer and the sole director of the Debtor, and instead allowed its ultimate parent, T&L, to make the Debtor's decisions on its behalf. Hr'g Tr. at 20:1-6, 42:7-13, 49:3-12, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (conceding that "[i]t was Think and Learn that decided to make that transfer" to Camshaft, with Riju simply taking "instructions" from T&L and "signing [] documents" without question); *see also id.* at 43:19-44:4 (admitting that he "didn't think very much about the decision" to move $533 million into Camshaft Fund, not even asking "one question"). As Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." *Id.* at 32:19-23; *see also id.* at 43:19-44:4. Furthermore, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

42.    The transfer of the $533 million to Camshaft Fund is the first of at least four known fraudulent transfers in this case. The first fraudulent transfer was made without the Lenders' knowledge or approval. As a result of the first fraudulent transfer, the Debtor was rendered

17

insolvent, if not already so. Specifically, the Debtor's liabilities (approximately $1.194 billion in outstanding principal on defaulted loans as of July 12-13, 2022) far exceeded the Debtor's liquid assets (around $131 million in available funds), and the Debtor had no meaningful active operations capable of generating income.

### D. The Illegitimacy of the Debtor's Transfer to Camshaft Fund, a Sham Hedge Fund.

43. There was no legitimate reason for the Debtor to allegedly "invest" over half a billion dollars in Camshaft Fund, which at the time had under $10 million in assets under management, particularly after multiple loan defaults had occurred. It has since become well publicized that Camshaft Fund was an unproven, fly-by-night hedge fund founded in August 2020 by William Morton—then a 23-year old with no formal training in investing or money management, and no apparent qualification to manage a hedge fund—and which previously listed on federal and state regulatory filings the address of an International House of Pancakes in the Little Havana neighborhood of Miami as its principal place of business. Simply put, Camshaft Fund was a complete "sham,"[17] and Morton was an inexperienced and highly unqualified manager.

44. Indeed, there was no reason for the Debtor to purportedly "invest" the $533 million in Camshaft Fund other than to hinder, delay, and/or defraud the Lenders. And in fact, the Debtor did not decide to make that purported investment. Rather, as has come to light, it was the combination of at least T&L, OCI Limited ("OCI") (which received the Alpha Funds from Camshaft Fund), and their respective principals that played a role in developing, orchestrating, and/or directing this fraudulent scheme.

---

[17] *See* MSJ Mem. Op. at 3 n.11 ("GLAS's investigator concluded that the hedge fund was a sham, and I agree. It is unclear why the Debtor[] would choose to invest in Camshaft Fund at all.").

18

Exhibit MM1 Page 89

E.    **The Lenders' Unsuccessful Negotiations with BYJU's.**

45.    In the summer and fall of 2022, around the same time as the third and fourth Defaults, an *ad hoc* group of Lenders engaged legal and financial advisors and contacted the Debtor's representatives, including Byju, Gokulnath, Riju, and Kishore, and T&L's legal and financial advisors, in an effort to resolve the outstanding Defaults and restructure the term loans. Over the following eight or so months, the Lenders and their advisors spent many hours negotiating and implementing nine separate Amendments to the Credit Agreement, all in a good faith, yet ultimately unsuccessful, effort to reach a negotiated resolution. As part of that process and so that the negotiations would not prejudice the Lenders' rights to exercise remedies, the Debtor and its guarantors, including T&L, acknowledged the four Defaults, which matured into Events of Default under the Credit Agreement, in three separate amendments to the Credit Agreement (namely, Amendment Nos. 2, 3, and 7), which further memorialized the Lenders' entitlement to exercise remedies as a result of those Events of Default.

46.    To protect the Lenders' rights during the pendency of negotiations, T&L, on behalf of itself and the Debtor (among others), and the Lenders, also began entering into a series of forbearance agreements. On October 4, 2022, the parties entered into Amendment No. 1, which extended call protections for the Lenders so they would not be financially disadvantaged by continuing negotiations. The following week, on October 12, 2022, the parties executed Amendment No. 2, which Byju signed on behalf of T&L and the other BYJU's loan parties. In Amendment No. 2, the parties agreed to memorialize that BYJU's' four reporting and guarantee breaches constituted Defaults (the "Specified Defaults"). The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would begin on October 10, 2022 and expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default.

19

Exhibit MM1 Page 90

Unbeknownst to the Lenders, also in or around October 2022, the Debtor initiated the process that would soon lead to the second fraudulent transfer, *i.e.*, the Debtor's transfer of its Camshaft LP Interest to Inspilearn, a non-guarantor under the Credit Agreement of which Riju was the sole manager and T&L was the controller and sole owner. Indeed, Riju has unequivocally admitted the Debtor "started the process" of transferring the Camshaft LP Interest in October 2022, and Camshaft's correspondence with its then-third-party administrator, Apex Fund Services ("Apex"), concerning the steps required to effectuate this second transfer confirms the same.

47.     The timing of these efforts reveals that Byju, Gokulnath, Riju, Kishore, and the T&L organization as a whole understood that the Lenders were contractually authorized to exercise remedies if the Specified Defaults were not cured by November 24, 2022.

48.     Indeed, as of November 24, 2022, none of the Specified Defaults had been cured, whereupon they matured into Events of Default, entitling GLAS and the Lenders to exercise remedies. Also on November 24, 2022, T&L and the Debtor, among others, executed Amendment No. 3, in which they "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured. Importantly, they went one step further, agreeing that the Lenders were "entitle[d]" to deliver to the "Loan Parties" (*i.e.*, the Debtor and its guarantors) a "Specified Notice of Default and Acceleration," meaning "a notice of default and acceleration with respect to the Specified Defaults."

49.     The Lenders nevertheless agreed to forbear through December 1, 2022. When that forbearance period expired, T&L (again, on behalf of itself and the Debtor, among others) and the Lenders entered into a final forbearance agreement—Amendment No. 7, dated as of January 6, 2023. Under Section 1 of Amendment No. 7, the Lenders agreed to forbear from exercising

20

Exhibit MM1 Page 91

remedies, including accelerating the term loans, until February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then.

50. As a condition to the Lenders' forbearance agreement, Amendment No. 7 included several important milestones. However, T&L and its subsidiaries, including the Debtor, defaulted on Amendment No. 7's milestones. Additionally, on January 23, 2023, T&L furnished to the Lenders incomplete unaudited financial statements for Q2 FY 2022-23 (the period ended September 30, 2022). Those financials had been due over a month earlier, by December 14, 2022. The financials showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange rates) as of September 30, 2022.

51. On February 10, 2023, the forbearance period expired by its own terms. Less than a month later, the Lenders directed their agent, GLAS, to exercise remedies, as discussed *infra*.

F. **The Second Fraudulent Transfer: Byju Raveendran's Transfer of the Debtor's Camshaft LP Interest to Inspilearn on Behalf of the Debtor.**

52. Through February 2023, the Lenders and the Loan Parties had entered into nine formal waivers and amendments to the Credit Agreement to address the outstanding Defaults, which by then had matured into Events of Default (after the Defaults were not cured).

53. At that time, BYJU's had misrepresented to the Lenders that it had well over $500 million in liquid assets. As disclosed on January 23, 2022, T&L's unaudited financial statements for the period ended September 30, 2022 showed that the Debtor had well over $500 million in "Cash and Bank" balances at that time. Consistent with earlier financial disclosures, T&L's unaudited financial statements for the period ended December 31, 2022, which were provided in mid-March 2023, similarly showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange

21

rates). To state the obvious, both financial statements clearly represented that the Debtor—the borrower on a defaulted loan—had hundreds of millions of dollars in liquid cash or cash equivalents available to service its outstanding debts.

54.    Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by the Debtor in cash or in its bank or brokerage accounts, as the "Cash and Bank" label suggested. Instead, those funds had already been transferred to Camshaft Fund. Further, whatever interest in Camshaft Fund that the Debtor held or received on account of its $533 million in transfers was itself soon to be transferred to Inspilearn, again unbeknownst to the Lenders and GLAS.

55.    After the final forbearance expired on February 10, 2023, GLAS, at the Lenders' direction, began exercising remedies.  On March 3, 2023, GLAS accelerated all amounts outstanding under the term loans—over $1.2 billion in principal and outstanding interest and fees—to become due and payable immediately.  That same day, GLAS also took control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Pohl as the Debtor's sole director.  Pohl then appointed himself as the Debtor's sole officer.

56.    Pohl was appointed on March 3, 2023, a Friday.

57.    The very next business day—Monday, March 6, 2023—Kishore emailed Morton, copying Byju, directing Camshaft Fund to "*resume* the process of transferring Byju's Alpha Inc.'s account to Inspilearn LLC" (emphasis added). In doing so, Kishore was resuming the process that at least Camshaft, Inspilearn, and the Raveendran brothers had first commenced more than four months prior, in the previous October.

58.    Over the following weeks, Camshaft and Apex requested information of BYJU's so that they could conduct KYC and AML diligence on the proposed transferee, Inspilearn, and the transfer could be completed.

22

59. Finally, on March 31, 2023, the Debtor, Inspilearn, and Camshaft executed various agreements that, collectively, purported to consummate the second fraudulent transfer, effective for all purposes as of that same date. The second fraudulent transfer is squarely at issue in this Complaint, and provides the basis for many of the Debtor's claims herein.

60. Of particular significance here, the Debtor, Inspilearn, and Camshaft executed a Transfer Agreement "made as of 3/31/2023." The Transfer Agreement, by its terms, effectuated the transfer of the entire Camshaft LP Interest from the transferor Debtor to the transferee Inspilearn. *See, e.g.*, Transfer Agreement § 1 ("[U]pon execution and delivery of this Agreement by the parties hereto, Transferor shall assign, transfer and convey the Transferred Interest[18] to Transferee."). Further, upon execution of the Transfer Agreement the Camshaft Fund's sole general partner and control person, Camshaft Capital Management, LLC ("Camshaft Management") agreed to "record the transfer of the Transferred Interest to Transferee as contemplated by this Agreement." *Id.* §§ 1-2. Following the transfer, the Debtor "shall have zero remaining interest in the Transferred Interest," while Inspilearn would accede to all of the Debtor's existing obligations to Camshaft Fund. *Id.* §§ 3(A)-(B). And, upon execution of an accompanying Subscription Agreement (discussed below) dated as of the same date, Inspilearn "shall be entitled to all rights, under the Partnership Agreement, which arise from and after the date hereof, in respect of the Transferred Interest." *Id.* § 3(B).

61. Riju signed the Transfer Agreement on behalf of Inspilearn. *Id.* at 6. Significantly, Byju signed the Transfer Agreement on behalf of the Debtor, listing his title as "CEO." *Id.* On behalf of the Debtor, Byju represented and warranted (falsely) that the Debtor had "all requisite power and authority to execute, deliver and perform this agreement." *Id.* § 4(A).

---

[18] The "Transferred Interest" was defined in the Transfer Agreement as "100% of the Interest," referring to the Debtor's "total Capital Commitment to [Camshaft Fund] in the amount of $533,000,000.00." *Id.* at 1 (Recitals).

23

62.     Also on March 31, 2023, Inspilearn and Camshaft Management executed the aforementioned Subscription Agreement, by which Inspilearn would, as of such date, subscribe to, and become a substitute limited partner in, Camshaft Fund with an in-kind capital contribution equal to "100% of Byju's Alpha Inc.'s LP Interests in Camshaft Capital Fund, LP." Riju, on behalf of Inspilearn, executed the Subscription Agreement on March 29, 2023, but Camshaft Fund's general partner, Camshaft Management, did not countersign the Subscription Agreement until March 31, 2023, the same day the Transfer Agreement was effective by its terms.

63.     According to Riju, the transfer of the Camshaft LP Interest from the Debtor to Inspilearn was the brainchild of T&L, of which Byju and Gokulnath were directors and Kishore was one of the most senior executives. *See, e.g.*, Hr'g Tr. at 32:19-23, 59:18-21, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (repeatedly testifying that he "just took direction from the parent company," T&L). When examined at trial and asked why he thought T&L conceived of and directed the transfer to Inspilearn, Riju admittedly did not know "the reason why [he was] signing documents to move assets from BYJU's Alpha to Inspilearn." *Id.* at 25:4-14, 53:16-19. Rather, he followed instructions willfully and blindly—unable to "think of one idea" for the transfer, despite the fact that the Lenders had recently exercised their remedies under the Credit Agreement. *Id.* at 53:25-54:1. Indeed, he did not know whether the Debtor received even $1 of value for the Camshaft LP Interest. *Id.* at 56:8-15. Riju stated that he "just sign[ed]" the documents authorizing the transfer and "mov[ed] on." *Id.* at 25:4-14, 56:3-7. As set forth herein, at least the three Defendants directed this second fraudulent transfer.

64.     Defendants' motivation for transferring the Camshaft LP Interest to Inspilearn—a non-obligor under the Credit Agreement—is readily apparent: to conceal that asset from the

24

Debtor's creditors and to frustrate their rights to exercise remedies under the Credit Agreement and applicable law. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1.2 billion outstanding on the term loans. Further, the parties had recently entered into a forbearance agreement expiring on February 10, 2023, at which point GLAS, acting at the Lenders' direction, could exercise those remedies. Negotiations were reaching an impasse, and the Lenders had clearly signaled their intention to exercise remedies. Defendants knew the Debtor had no defense to the Lenders exercising remedies, because Amendment No. 7 reaffirmed that the Debtor's failure to cure the Specified Defaults "*entitles*" the Lenders to exercise remedies, and *four times* acknowledged that "*none* of the Specified Defaults can be cured or remedied." This is a classic fact pattern of fraud: a borrower concealing virtually all its assets at around the time of a forbearance agreement expiring and, indeed, *after* the creditors had exercised remedies.

65. Consistent with that fraudulent motive, the Debtor was left with virtually no assets following the second fraudulent transfer. As of March 31, 2023, the Camshaft LP Interest had been valued by Camshaft at $540,647,109.29. In exchange for the Camshaft LP Interest, the Debtor received nothing—not even a cent or a promise to pay anything—in consideration. Indeed, to this day, Riju cannot identify "$1 of value that Inspilearn promised it would pay BYJU's Alpha for the Camshaft investment." Hr'g Tr. at 56:10-15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). As a result, the Debtor was rendered at least balance sheet insolvent, if not already so. Its liabilities (almost $1.2 billion in outstanding principal on accelerated loans in default) far exceeded its liquid assets, under $500,000 in its bank accounts, and now not even the illiquid Camshaft LP Interest.[19]

---

[19]   *See* MSJ Mem. Op. at 37-38.

Exhibit MM1 Page 96

## G.   Defendants' Concealment of the Second Fraudulent Transfer to Inspilearn from the Lenders and GLAS.

66.   At the beginning of 2023, the Lenders continued to work toward a negotiated resolution, if one could be had. But those efforts were exhausted without success and with only more concerns arising, including regarding the BYJU's enterprise's overall financial condition and the predicted risk that the Debtor would move the vast majority of the money it held to frustrate the Lenders' exercise of remedies. In light of the lack of meaningful progress and responsiveness by the Debtor and its affiliates, the Lenders exercised their contractual and legal remedies to address the acknowledged Events of Default and to protect their collateral.

67.   On March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default to initiate the exercise of remedies. Immediately, Byju reached out to the Lenders, requesting that the parties reengage on a potential resolution. The Lenders were open to engage, which then prompted several weeks of negotiation. During those negotiations, an area of focus for the Lenders was on cash verification.

68.   Kishore actively participated in efforts to mislead the Lenders regarding the Debtor's cash position. On March 16, 2023, T&L, with Kishore copied, posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that the Debtor had the equivalent of well over \$500 million in "Cash and Bank" balances as of December 31, 2022.

69.   Also in March 2023, in support of broader negotiations among the parties, the Lenders requested that BYJU's confirm the funds available to the Debtor. In response to this cash verification request, BYJU's representatives agreed to a roundabout cash verification process with the Lenders. To that end, according to what BYJU's outside counsel informed one of the Lenders' advisors on or about March 27, 2023, counsel had, on a recent videoconference call with Kishore

26

Exhibit MM1 Page 97

(and also T&L's then-General Counsel Roshan Thomas), watched Kishore virtually log into a purported bank portal. According to counsel, "the login process was smooth, nothing was glitchy." Counsel saw a statement showing that the account held a substantial amount of cash, which counsel said was located "in the U.S." (even though the money actually had been transferred abroad to OCI). Counsel disclosed to the Lenders' advisor the exact amount of funds he had seen, an amount that is consistent with the aggregate amount of the April and July 2022 transfers.

70.   Based on the information that has since come to light, it now appears that BYJU's outside counsel had seen the Debtor's capital account at Camshaft Fund, reflecting the ascribed value of the Camshaft LP Interest, without disclosing that critical fact to the Lenders' advisor, let alone disclosing that Defendants were in the midst of transferring that LP Interest to Inspilearn. The deception is apparent.

71.   Moreover, the Lenders' hopes for a negotiated resolution once again turned out to be misplaced as BYJU's ultimately appeared insincere about trying to enter into a successful amendment. More likely, the reasonable inference is that Defendants were simply buying time to complete the second fraudulent transfer and to move the Camshaft LP Interest out of the Lenders' reach.

72.   On May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery against Riju, among others, seeking confirmation that, pursuant to the Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control of the Debtor. *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "225 Action"). Upon commencing that action, Pohl, and the Lenders, had every reason to believe from BYJU's' financial and cash verification disclosures that the Debtor had in its possession a significant sum of money. However, five days later, during a May 8, 2023 call, Byju, with his

27

Exhibit MM1 Page 98

General Counsel, Thomas, on the line, told one of the Lenders' advisors that the Debtor no longer had the money. Rather, as Byju's asserted, *"the money is someplace the Lenders will never find it."* Byju's comments were so shocking that the Lenders' advisor immediately wrote them down on a piece of scratch paper.[20]

73.    Over a month after the execution of the Transfer Agreement, in May 2023 and following Kishore's request, Camshaft's fund administrator changed the Transfer Agreement's "dealing date" to March 1, 2023. This was an unlawful attempt to backdate the transfer of the Camshaft LP Interest to a time *before* the Lenders exercised remedies on March 3, 2023. The request was made to accomplish a clear objective—to further conceal the Camshaft LP Interest and place it further out of the Lenders' reach.

74.    On May 18, 2023, the Chancery Court issued a *Status Quo* Order (an interim order similar in effect to a temporary injunction) authorizing Pohl to remain in control of the Debtor as sole director and officer pending a final case decision and requiring the BYJU's defendants in that lawsuit to provide Pohl with access to and control of the Debtor's open bank and other accounts. Other than the Debtor's bank statements reflecting the Camshaft Fund transfers, BYJU's never shared, and in fact, flatly refused to disclose, any information about the Camshaft Fund transfers with the Debtor's current director and officer, Pohl. To this day, Pohl has not received books and

---

[20]   In a filing made on October 9, 2024, almost 18 months after his infamous May 8 remark, Byju—on the morning of argument on summary judgment against his brother Riju—in a transparent and desperate effort to save face and attempt to forestall a half-billion-dollar judgment against Riju—*for the first time* denied that he ever said those words. Byju Decl. ¶ 3. But Byju had not denied saying what he said to Stephen Spencer (the Lenders' financial advisor) when Spencer confronted him with his remark on a second conference call on May 8, 2023, with the Lenders' and BYJU's' own advisors in attendance. Decl. of Stephen Spencer ¶ 15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. July 8, 2024) [Adv. D.I. 280]. BYJU's' counsel subsequently acknowledged its founder's remarks during a May 18, 2023 hearing before the Chancery Court. Counsel admitted that Byju's remark "raises [an] antenna," but defended Byju's concealment of the Alpha Funds as being done "based on fears of lenders acting expeditiously." Hr'g Tr. at 34:5, 21-22, *GLAS Tr. Co. LLC v. Ravindran*, Case No. 2023-0488-MTZ (Del. Ch. May 18, 2023). Nor did Byju's deny his remark in prior conversations with the Lenders.

Exhibit MM1 Page 99

  
records from the Debtor's former management or its former ultimate corporate parent, T&L. Based on Riju's deposition, Pohl understands that, to the extent the Debtor has books and records, they were maintained by or in the custody of T&L. Though Pohl has been able to piece together certain information through discovery, he has been unable to obtain a complete and accurate picture of the Debtor's finances from its formation through the present.

75.     On August 4, 2023, the Chancery Court held a bench trial in the 225 Action. On November 2, 2023, it found that "the Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" and to then "seat[]" Pohl. On November 13, 2023, the Chancery Court issued its Final Order and Judgment declaring that GLAS's enforcement steps on March 3, 2023, were valid and effective as to the removal of the Debtor's preexisting director and officer and the appointment of Pohl to serve as the Debtor's sole replacement director and officer. The Delaware Supreme Court affirmed that Judgment on September 23, 2024. *See Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061 (Del. 2024).

**H.     Byju Raveendran's Web of Deception.**

76.     In the face of his wrongdoings and unlawful conduct, Byju, his family, and his business enterprise repeatedly misrepresented the use and location of the Alpha Funds. The deception has been pervasive and extreme, as demonstrated by each of the following material misrepresentations.

77.     (1) First, on August 22, 23, and 25, 2023, in the days immediately before Pohl's discovery of the transfers to sham hedge fund Camshaft Fund, Kishore met with some of the Lenders in New York to discuss a potential resolution, including proposals predicated upon BYJU's' ongoing access to the $533 million Alpha Funds.

Exhibit MM1 Page 100

78.     (2) Then, following Pohl's discovery and GLAS's subsequent September 5, 2023 suit against Camshaft, on September 13, 2023, BYJU's released an opaque statement. In it, BYJU's "categorically denie[d] media reports which insinuated that BYJU's was no longer a beneficiary owner of the [Alpha Funds]," instead representing that "an offshore subsidiary remains the beneficiary of the money invested in high security fixed income instruments invested with a multi-hundred billion dollar fund in the U.S." Camshaft, however, was not, and never has been, a "multi-hundred billion dollar fund," and no "*high security* fixed income instruments" were ever received on account of the Alpha Funds.

79.     (3) Then, in a January 14, 2024 call, Byju and Kishore (whom the Lenders only later learned had directed Camshaft to "resume" the transfer of the Debtor's Camshaft LP Interest immediately following Pohl's appointment) answered three of the Lenders' direct questions about the Alpha Funds. When asked if the Alpha Funds still exist, Byju and Kishore first went silent. Byju eventually asked Kishore to answer, but she continued to remain silent. As the silence dragged on, Byju stepped in, adamantly stating, "[w]e have not touched that money," and emphasizing that he was "not siphoning money." When then asked "[h]ow much cash" remains, he said "more than $500 million," which he promptly confirmed in response to the Lenders' questions was "in cash and cash equivalents." For her part, Kishore corroborated Byju, representing that the money still existed at least as of the end of October 2023.

80.     (4) On February 1, 2024, the Debtor commenced this bankruptcy proceeding. One month later, with the Debtor pursuing expedited discovery into the Alpha Funds, Riju filed with this Court a March 5 Official Statement from BYJU's that the Alpha Funds were "currently in a 100% non US subsidiary of BYJU'S." *See* Official Statement, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 5, 2024) [Adv. D.I. 59-2]. The

30

Exhibit MM1 Page 101

Official Statement left no doubt that the BYJU's "group entities remained the beneficiary holders of the money." *Id.*

81.     (5) On March 14, 2024, Riju testified that the "[m]oney was at Inspilearn." Hr'g Tr. at 36:15-16, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). That same day, the Court issued a preliminary injunction (memorialized four days later in a corresponding order), freezing the Alpha Funds and ordering Riju to "take all necessary steps" to, *inter alia*, locate the Alpha Funds.[21] *See* Order Granting Debtor's Mot. for Prelim. Inj., *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2024) [Adv. D.I. 84] (the "P.I. Order"). Notably, the Court also enjoined Byju personally (along with Gokulnath, who sat on the T&L board along with Riju and Byju). *Id.* All of the enjoined parties, including Byju and Gokulnath, were enjoined from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights related to the Alpha Funds. *Id.*

82.     (6) The very next day, on March 15, 2024, BYJU's issued yet another statement in response to the Court's Order. With respect to the Alpha Funds, BYJU's represented that "the said funds are safely parked in one of our subsidiaries and, as per the order, it will rightfully remain there."[22]

83.     Altogether, in a span of seven months, Byju, Riju, Kishore, or Byju's business enterprise at least *six* times—nearly once per month—represented that the $533 million had not been spent and was safe and secure.

---

[21]   Riju violated the P.I. Order by, *inter alia*, failing to take all such necessary steps to find the Alpha Funds, and has been held, and remains, in contempt. *See* Order on Finding of Contempt, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. May 28, 2024) [Adv. D.I. 204].

[22]   *See Order maintains status quo: Byju's after US bankruptcy court orders hedge fund manager arrest*, BUSINESS TODAY (Mar. 15, 2024, 8:50 PM), https://www.businesstoday.in/entrepreneurship/start-up/story/order-maintains-status-quo-byjus-after-us-bankruptcy-court-orders-hedge-fund-manager-arrest-421681-2024-03-15.

Exhibit MM1 Page 102

84.     After months of telling this Court and the public that the Alpha Funds were safely within BYJU's' control, and notwithstanding his own brother's sworn corroborating testimony, Byju did a 180-degree pivot the morning of the summary judgment hearing against his brother (Riju) and company (T&L).[23] In his declaration, Byju swore that OCI Limited, a UK-registered company that purportedly made various, unspecified "purchases" for the benefit of the BYJU's enterprise, had "set-off its outstanding dues against the Alpha Funds as a result of BYJU's' inability to reimburse OCI," the lack of mutuality with the Debtor notwithstanding. Byju Decl. ¶ 39.

85.     It is impossible to square Byju's current representation with his own, his brother's, Kishore's, and his business enterprise's repeated statements to the Court, investors, Lenders, and the public over the past year. Either they all consistently lied to the world or, having asserted the day after the preliminary injunction hearing that the money was "safely parked" in one of BYJU's' subsidiaries, Byju followed in his brother's footsteps and violated the same P.I. Order. The one truthful statement Byju has made publicly is that his "strategy" of trying to conceal money from creditors "has not gone right."[24]

86.     Notwithstanding the contradictory statements made to the public and the Court, Byju's attempts to conceal the Alpha Funds continue to this day.

87.     At present, the whereabouts of the Alpha Funds remain unknown, and the apparent mastermind of this scheme, Byju, has largely escaped accountability—*until now*.[25]

---

[23]   Likewise, in an interview with the Financial Times, Byju "told FT that his company no longer had access to capital and the entirety of the $1.2 bn term loan at the heart of the sprawling legal battle with its creditors had been spent." Christ Kay & Chloe Cornish, *'Screaming into a hurricane': the fall of India's most valuable start-up Byju's*, THE FINANCIAL TIMES (Oct. 3, 2024), https://www.ft.com/content/8788b2d7-98e1-469b-acbc-fd5fadd97939.

[24]   *Id.*

[25]   Nor has Byju's misconduct abated.  In related bankruptcy proceedings before this Court involving three of the Debtor's guarantors, Byju went so far as to purchase an international plane ticket to prevent a critical witness from testifying.  *See* Hr'g Tr. at 46:18-49-17, *In re Epic! Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del.

Exhibit MM1 Page 103

## CAUSES OF ACTION

### COUNT ONE
### AIDING AND ABETTING RIJU RAVINDRAN'S BREACH OF FIDUCIARY DUTIES
### (AGAINST BYJU RAVEENDRAN AND DIVYA GOKULNATH)

88.     The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

### A.     Riju Ravindran's Breach of His Fiduciary Duties.

89.     In his capacity as the sole director of the Debtor from its incorporation on September 27, 2021, and an officer from September 29, 2021, Riju owed non-waivable fiduciary duties to the Debtor through at least the time of the first and second fraudulent transfers.

90.     At the time of the first fraudulent transfer to Camshaft Fund in mid-2022, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of its making the transfer, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no meaningful active operations; (b) had defaulted on the term loans as early as March 2022, before the first fraudulent transfer was made, had entered into a forbearance agreement, and could foresee further defaults occurring; (c) had no ability to comply with its financial obligations and other covenants under the Credit Agreement, subsequent forbearance agreements, and other loan documents due to a lack of funds; and (d) owed the Lenders an amount of money exceeding $1.2 billion, which would soon be accelerated, and with respect to which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

---

Nov. 21, 2024). The Court was "gravely disturbed by the testimony that I heard today both, about witness tampering and about actions being taken to take assets from these debtors after I entered my order saying that that should not happen." *Id.* 92:12-16. The concerns here are similar: Byju will seemingly stop at nothing to illegally conceal the Alpha Funds from the Debtor, its creditors, and this Court.

Exhibit MM1 Page 104

91.   Even if the Debtor was not insolvent at the time of the first fraudulent transfer, Riju's actions to transfer the Alpha Funds would have rendered the Debtor unable to meet its contractual obligations under the Credit Agreement. The funds were the Debtor's largest known liquid asset, and even prior to their transfer were of lower size than the Debtor's obligations under the term loans. Moving the Alpha Funds away from the Debtor in mid-2022 left the Debtor with only approximately $131 million in available cash (which itself would soon be transferred out of the Debtor) and rendered the Debtor unable to make any interest payments or to pay down the outstanding balance of the accelerated term loans, as required under the Credit Agreement. The Court itself has found that the Debtor was insolvent immediately following the first fraudulent transfer.[26]

92.   Because the Debtor either was insolvent at the time of the first fraudulent transfer, or was rendered unable to meet its contractual obligations by Riju's action, Riju owed to the Debtor, for the benefit of the Debtor and its creditors, fiduciary duties to: (i) act with the care that an ordinarily prudent director and officer would in a similar position, (ii) serve in the best interests of the Debtor, for the benefit of the Debtor and its creditors; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor, for the benefit of the Debtor and its creditors.

93.   As the sole director and officer of the Debtor at the time, and without being exhaustive, Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund without conducting any known due diligence or investigation. He already has admitted in sworn testimony that he had never heard of Camshaft or its inexperienced founder prior to transferring the Debtor's

---

[26]   MSJ Mem. Op. at 37 (finding that "even assuming the LP Interest did have a value of $540 million at the time of the First Transfer, the Debtor's balance sheet would still have reflected only about $671 million in assets against approximately $1.2 billion in debt," which "meets the definition for insolvency under the [Bankruptcy] Code").

Exhibit MM1 Page 105

Alpha Funds to Camshaft, much less conducted any diligence into Camshaft Fund or its founder, nor did he speak to any advisors or counsel when approving this investment. Riju also never read Camshaft Fund's offering materials or other legal documents, nor did he have any skill related to investment management, despite signing an agreement claiming that he did. Additionally, Riju did not once speak to Morton before or after authorizing the investment in Camshaft, nor did he inquire as to why T&L instructed him to approve this half-billion-dollar investment. Worse still, he admitted to never monitoring the investment or hiring someone to monitor the investment on the Debtor's behalf to ensure that Camshaft Fund did not completely dissipate the Alpha Funds.

94.    There is no legitimate reason for the transfer other than to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Riju's conduct grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. Not only did Riju remove the Debtor's largest known liquid asset when the Debtor had substantial monetary obligations to fulfill under the Credit Agreement, he transferred that asset to a sham hedge fund, whose principal place of business was once at the location of an IHOP in Miami and which is run by a man in his twenties with no formal training in money management or experience in regulatory compliance. Riju did so with no apparent benefit to the Debtor, while knowing that the Debtor was already insolvent or would become insolvent as a result of the first fraudulent transfer, that the Debtor already was in default at the time of the aforementioned transfer, and that the Debtor lacked any meaningful revenue-generating capabilities.    By transferring away the Alpha Funds, Riju secretly removed the principal source of available cash that the Debtor could have used to satisfy its obligations under the Credit Agreement. Riju thus actively concealed the money from the Debtor, which needed the money in order to meet the Debtor's legal and financial obligations to the creditors. As such, Ravindran was grossly negligent

35

Exhibit MM1 Page 106

and acted in bad faith, willfully failing to exercise the care of an ordinarily prudent director of a Delaware corporation. This actively and materially harmed the Debtor. Riju, who signed the Credit Agreement on behalf of the Debtor, knew or should have known what his obligations were thereunder, and he deliberately and willfully disregarded them notwithstanding the consequences.

95.     Riju also caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, and could not articulate any value that the Debtor received in consideration for this transfer. There is no legitimate reason for these transfers other than to frustrate the Lenders' exercise of remedies. Riju's conduct thus grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. As such, Riju acted at least with gross negligence and/or willfulness or even bad faith in failing to exercise the care of an ordinarily prudent director of a Delaware corporation by actively harming the Debtor and causing it to transfer its property without receiving any consideration in return.

96.     Riju caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, in order to thwart the Lenders' ability to exercise remedies, thereby violating his duty of loyalty to the Debtor and the Debtor's creditors. Riju acted to keep the money within his family's exclusive control. Riju is (or was) a director for most of T&L's subsidiaries and is a significant stockholder in T&L. The funds also were put outside the reach of the Debtor and its creditors because Inspilearn was neither the borrower nor a guarantor under the Credit Agreement. Riju thus intentionally subordinated the interests of the Debtor to those of himself and his family, thereby breaching his duty of loyalty to the Debtor. As a result of Riju's egregious conduct, the Debtor has been unable to meet its legal and financial obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount

36

of the term loans on and after March 3, 2023. This caused material injury to the Debtor, which had to pay premium, interest, and expenses on the late payments and defaulted term loans. This also caused injury to the Debtor's creditors, which have not been paid under the Credit Agreement as a result of Riju's actions.

97.    For the foregoing reasons, and as held by the Court in the MSJ Memorandum Opinion, Riju breached his fiduciary duties to the Debtor through his dereliction and conscious disregard of his fiduciary duties to the Debtor, including with respect to the first fraudulent transfer.[27]

**B.    Byju Raveendran's and Divya Gokulnath's Aiding and Abetting of Riju Ravindran's Breach of His Fiduciary Duties to the Debtor.**

98.    Byju and Gokulnath each knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the first fraudulent transfer in 2022, and Gokulnath also knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the second fraudulent transfer in 2023.[28] Byju and Gokulnath, each co-founders and directors of T&L, understood that Riju owed non-waivable fiduciary duties to the Debtor because T&L formed the Debtor as a Delaware corporation (as opposed to an LLC or LP, in which fiduciary duties can be waived) and appointed Riju as its sole director.

99.    In an effort to keep the Alpha Funds out of the reach of the Lenders, Byju and Gokulnath directed Riju, as the Debtor's director, to cause or to approve of the Debtor's transfer

---

[27]    *See, e.g.,* MSJ Mem. Op. at 38-39 ("Having considered the evidence in the record regarding Ravindran's total abdication of his duties to the Debtor, as well as the absence of any evidence to the contrary, I find that Debtor has established as a matter of law that Ravindran breached his duty of good faith."); *see also* Judgment Order, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2025) [Adv. D.I. 388] (entering judgment against Riju for his breach of fiduciaries to the Debtor as to the first fraudulent transfer).

[28]    As alleged in Count Two, Byju owed his own fiduciary duties to the Debtor at the time of the second fraudulent transfer, and then breached those duties when effectuating that transfer while holding himself out as the Debtor's CEO.

Exhibit MM1 Page 108

of the Alpha Funds and then the Camshaft LP Interest. Byju and Gokulnath did this when they knew, or should have known as T&L directors, that, *inter alia*, the Debtor was insolvent, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Moreover, as Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." Hr'g Tr. at 32:19-23, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024).

100.  Byju and Gokulnath had no legitimate reason to facilitate the transfers, which stripped the Debtor of the Alpha Funds for their own interests, but rather sought to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Byju and Gokulnath were not acting to further any legitimate interest of the Debtor, or even T&L, by facilitating the unlawful and fraudulent transfer of the Alpha Funds and the Camshaft LP Interest. Like Riju, Byju's and Gokulnath's actions were taken for the purpose of keeping the Alpha Funds out of reach of the Lenders and within their family's own reach, all to the ultimate detriment of the Debtor.

101.  Byju's and Gokulnath's knowing and active participation and substantial assistance in Riju's fiduciary breaches caused direct and proximate harm to the Debtor. Specifically, it was foreseeable that Byju's active participation in Riju's fiduciary breaches related to the first fraudulent transfer would cause the Debtor to suffer the loss of the Alpha Funds (or the proceeds thereof) and other harms stemming from those losses. The same is true of Gokulnath's active participation in Riju's fiduciary breaches related to the first and second fraudulent transfers.

102.  In light of the foregoing, the Debtor is, at a minimum, entitled to damages for Byju and Gokulnath aiding and abetting Riju's breach of his fiduciary duties (and discovery may reveal that Byju also breached his own fiduciary duties to the Debtor in causing it to make the first

38

fraudulent transfer), including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY
## (AGAINST BYJU RAVEENDRAN)

103.  The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

104.  On March 31, 2023, Byju, while holding himself out as the Debtor's CEO, caused the Debtor to transfer the Camshaft LP Interest to a non-guarantor affiliate, Inspilearn, for no consideration. This process for consummating this transfer commenced no later than fall of 2022, well before the Debtor's former directors and offers, including Byju, had been removed. Accordingly, Byju is liable for his March 31, 2023 breach of fiduciary duties as the Debtor's officer, even though he had no authority to continue acting in that role at that time.

105.  At the time of this transfer, the Debtor, under applicable law, was insolvent, *i.e.*, its liabilities exceeded its assets and/or was unable to pay its debts as they came due and remained so at all times thereafter through and including the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no material active operations; (b) had defaulted on its term loans; (c) had no ability to comply with its obligations under the accelerated Credit Agreement due to a lack of funds, whether directly or directly from its affiliated guarantors (which were unwilling to step-in and honor those obligations); and (d) owed the Lenders principal and interest exceeding $1.2 billion, which had been accelerated.

106.  The Camshaft LP Interest was contemporaneously valued at over $540 million. After the transfer to Inspilearn, a non-guarantor affiliate, the Debtor was left without the Camshaft LP Interest and less than $500,000 in its bank accounts. Moreover, it was financially unable to

39

Exhibit MM1 Page 110

make any interest payments or pay down the outstanding principal of the accelerated term loans, as required under the Credit Agreement.

107.  As the Debtor was insolvent, Byju owed fiduciary duties to the Debtor, as a putative officer, to: (i) act with the care that an ordinarily prudent officer would in a similar position, (ii) serve in the best interests of the Debtor; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor.

108.  Byju failed to serve in the best interests of the Debtor when he directed and purportedly effectuated the Inspilearn transfer. The Debtor received no consideration for this transfer. As Riju, the Debtor's former director and officer admitted in sworn testimony, he could not identify what, if anything, Inspilearn had paid or provided in value to the Debtor for acquiring the Camshaft LP Interest, nor did he know whether Inspilearn promised to pay anything or provide any value to the Debtor for the investment in the future. The Debtor's term loans had been accelerated, and Byju knew that the Debtor was insolvent, and indeed lacked any material revenue-generating capabilities. Moreover, Byju actively concealed the Alpha Funds and the Camshaft LP Interest from the Debtor, which needed the money to meet its legal and contractual obligations to its creditors. Byju has offered no legitimate reason for the transfers and asset concealment, rather admitting only weeks after the second fraudulent transfer that the Alpha Funds were someplace the Lenders would "never" find it. As this Court has observed, "[i]t is difficult to imagine a single combination of words to demonstrate actual fraudulent intent more clearly." *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, 661 B.R. 109, 123 (Bankr. D. Del. 2024).

109.  Byju's conduct grossly deviated from the standard of care that an ordinarily prudent director and officer of a Delaware corporation would have exercised in a similar situation. He materially harmed the Debtor, causing it to transfer its property without receiving any

40

Exhibit MM1 Page 111

consideration in return. His actions were willful and in bad faith. Byju deliberately directed the second fraudulent transfer in order to thwart the Lenders' exercise of their contractual remedies by placing the Debtor's primary remaining assets beyond their reach, while remaining accessible to T&L (and thus, to Byju himself). This violated his duty of loyalty to the Debtor, for the benefit of its creditors, whose interests were paramount in light of the Debtor's ongoing insolvency. In doing so, Byju—the founder, director, and a significant shareholder of T&L—acted in furtherance of his own interests and the interests of T&L's (former) indirect equity in the Debtor, while subordinating the Debtor's interests.

110.   By subordinating the Debtor's interests to those of himself and his family through T&L, and by continuing to conceal his self-dealing and misappropriation, Byju breached his overriding fiduciary duties to the Debtor. As a result of this egregious and offensive conduct, the Debtor has been unable to meet its legal obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount of the term loans on and after March 3, 2023. This has caused (and continues to cause) material injury to the Debtor and its estate, the creditors of which have not received a single payment under the Credit Agreement since March 2023. Indeed, it is a proximate cause of the Debtor's bankruptcy filing. And exacerbating the injury, Byju has spent his time since the filing doing everything he can to frustrate the discovery of the Alpha Funds and the proceeds thereof.

111.   In light of the foregoing, the Debtor is entitled to damages for Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, the disgorgement of the Alpha Funds, the disgorgement of any profits received as a result of the wrongful transfer of the Alpha Funds and/or the Camshaft LP Interest, the disgorgement of any

41

Exhibit MM1 Page 112

fees that Byju earned in his capacity as the CEO of Debtor around the time of the second fraudulent transfer, attorneys' fees and expenses, and pre- and post-judgment interest.

## COUNT THREE
## AIDING AND ABETTING BYJU RAVEENDRAN'S BREACH OF FIDUCIARY DUTIES
## (AGAINST ANITA KISHORE)

112.    The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

113.    As discussed more fully in Count Two, Byju, as the former chief executive officer of the Debtor, owed to the Debtor fiduciary duties to, among other things, exercise due care, act loyally, and serve in the best interest of the Debtor for the benefit of its creditors.

114.    As discussed more fully in Count Two, Byju breached his fiduciary duties to the Debtor by, among other things, causing the Debtor to transfer the Camshaft LP Interest to Inspilearn for no consideration, on the heels of the Lenders' exercise of remedies, including the Lenders' agent exercising control over the Debtor and appointing Pohl as its sole director.

115.    Kishore knowingly and actively participated in, and substantially assisted, Byju's breach of his fiduciary duties. Kishore, acting in concert with Byju, caused the Debtor to transfer the Camshaft LP Interest to Inspilearn (a T&L subsidiary) and facilitated Camshaft Fund's consent to the transfer. Based on the factual record, including the reasonable inferences therefrom, Kishore did all of this with knowledge that, *inter alia*, the Debtor was insolvent following the Lenders' acceleration of the term loans, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Additionally, Kishore knew that, at the time she was directing the transfer, she and Byju had no lawful authority to direct the Debtor's affairs, following a change of control based on conceded Events of Default, and the Lenders' resulting exercise of remedies. Kishore also took active measures to conceal the unlawful transfer of the Camshaft LP Interest. Furthermore, Byju and Kishore made the fraudulent transfer to

42

Exhibit MM1 Page 113

Inspilearn to advance T&L's interests, in knowing disregard of Byju's obligations to the Debtor. Indeed, as discussed above, two of the directors of T&L, either personally or through counsel, have admitted to moving the funds in order to protect T&L's own interests by thwarting the Debtor's ability to meet its legal obligations to the creditors.

116.    In light of the foregoing, the Debtor is entitled to damages for Kishore's aiding and abetting Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

## COUNT FOUR
## ACCOUNTING
## (AGAINST ALL DEFENDANTS)

117.    The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

118.    The Debtor failed to maintain complete and accurate books and records of the Debtor's assets and liabilities. To the extent books and records were maintained, they were maintained by or in the custody of T&L—of which (i) Byju and Gokulnath were co-founders and directors, in addition to being significant shareholders, and (ii) Kishore was a senior officer—or by Byju, Gokulnath, and Kishore personally. *See* Hr'g Tr. at 73:15-24, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (Riju testifying that T&L "maintains financial and accounting records with respect to its subsidiaries," including BYJU's Alpha, and that information and records concerning the Alpha Funds "should be" maintained in the books of T&L).

119.    The Debtor (under Pohl's direction) has repeatedly requested information from the Debtor's former management and representatives, including, among other things, the location, purported beneficial owners, form, value, and other information regarding the Alpha Funds and the Camshaft LP Interest. For instance, on May 3, 2023, Pohl's counsel sent a letter to Kishore

43

Exhibit MM1 Page 114

and BYJU's General Counsel, copying T&L's outside counsel and Pohl personally, demanding that they—"as current officers of Think and Learn Pvt Ltd."—"immediately" disclose "all information you possess or have access to concerning any assets of the Company," among other information.

120.   However, neither T&L's senior executives nor anyone else has provided Pohl with complete information about the Debtor's assets. Instead, all of them, including Byju, Gokulnath, and Kishore, have actively concealed and provided misleading information about the Debtor's assets. In fact, based on Riju's in-court testimony on March 14 and May 21, 2024, Byju and Gokulnath—then comprising two thirds of the T&L board—failed to disclose the current location of the Alpha Funds in response to Riju's direct request for this information. There is no doubt that Byju and Gokulnath have, at all times, had the ability to obtain the information the Debtor has long sought concerning the missing Alpha Funds. This is information that Defendants, in their roles at the Debtor and/or T&L and as key participants in the fraudulent transfers scheme, would have to have known. However, the Debtor is unaware whether the Alpha Funds presently exist in cash, cash equivalents, or in other forms—or if those funds still exist at all.

121.   Because the Alpha Funds are the Debtor's assets, Byju was acting as a fiduciary with respect to his handling of them, as discussed in Count Two. Byju, therefore, breached his fiduciary duties to the Debtor when he, acting as the Debtor's CEO, effectuated the transfer of the Camshaft LP Interest to a non-guarantor affiliate for no consideration.

122.   Moreover, Gokulnath and Kishore, in their fiduciary roles at T&L, were also responsible for maintaining the Debtor's books and records. In fact, as for Kishore, the record confirms that she had access to the Debtor's account at Camshaft Fund.

44

Exhibit MM1 Page 115

123.   As a result of Defendants' material breaches of their duties, the Debtor has suffered, and will continue to suffer, injury and significant harm as set forth in detail herein.

124.   Accordingly, the Debtor requires, and is entitled to, a full and accurate accounting of the Debtor's Alpha Funds, through the production and examination of all books and records associated with those funds and any proceeds thereof, specifically those relating to the second fraudulent transfer to Inspilearn. Accordingly, the Debtor seeks entry of a judgment directing each of the Defendants to perform a full and accurate accounting of the Alpha Funds and any proceeds thereof, such as the Camshaft LP Interest, including each and every subsequent transfer and any proceeds thereof.

## COUNT FIVE
## CONVERSION
## (AGAINST ALL DEFENDANTS)

125.   The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

126.   GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju, Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was

45

Exhibit MM1 Page 116

purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

127.    Because all three Defendants lacked any authority to exercise control over the Debtor's property on and after March 3, 2023, the Debtor's purported transfer of the Camshaft LP Interest on March 31, 2023, which was made without the consent or knowledge of the Debtor (at that time under the control of Pohl, its sole director and officer), constituted a wrongful act of possession and disposition of the Debtor's Camshaft LP Interest. As such, Defendants are joint tortfeasors who unlawfully exerted control over the Camshaft LP Interest as if it remained property under their control when, in fact, it was the Debtor's exclusive property over which they had no control.

128.    By transferring away the Camshaft LP Interest for no consideration, Defendants denied and eliminated the Debtor's contractual rights to that property. Because Defendants had continuously concealed the existence of the Camshaft LP Interest, Pohl was unable to specifically demand that the interest be returned to the Debtor before it was transferred to Inspilearn. These actions by Defendants amounted to an unlawful conversion of the Debtor's rights as the legal owner of the Camshaft LP Interest.

129.    In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

46

Exhibit MM1 Page 117

## COUNT SIX
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)[29]

130. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

131. GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju and Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

132. However, Defendants, acting in concert along with at least Riju and Inspilearn, among others, took a series of unlawful and coordinated steps to defeat the Debtor's ownership of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest. These unlawful steps included: (i) Kishore, with Byju copied—which was no accident—defrauding the Debtor by directing Camshaft Fund to transfer the Camshaft LP Interest on the first business day following

---

[29] Though Riju and Inspilearn are among the co-conspirators, the Debtor already obtained judgments against them and, for that reason, among others, has chosen not to name them as defendants at this time in this current lawsuit. *See generally* MSJ Mem. Op.

Exhibit MM1 Page 118

GLAS's exercise of remedies, at a time when Kishore knew that neither she nor Byju had any lawful authority to direct the Debtor's affairs and assert control over its assets, (ii) Kishore facilitating the unlawful transfers at issue, (iii) Kishore engaging in a sham cash verification exercise to mislead the Lenders about the location and availability of the Alpha Funds, (iv) Byju falsely representing that he had the authority to execute the Transfer Agreement on behalf of the Debtor, and (v) Byju and Riju executing various integrated agreements on March 31, 2023 to purportedly consummate the Debtor's transfer of the Camshaft LP Interest for no consideration. The orchestration of these events from March 3 to 31, 2023, along with the subsequent efforts taken by Byju, Riju, Gokulnath, and Kishore, among others, to transfer the Camshaft LP Interest *again* in May 2023 and February 2024, and then to cover-up the transfer during the course of these bankruptcy proceedings, including in response with the Court's P.I. Order directing Riju to take all "necessary steps" to locate the Alpha Funds,[30] demonstrates a meeting of the minds to move the Camshaft LP Interest away from the control of the Debtor (rightfully under the control of Pohl) and GLAS. The ultimate effect of this conspiracy was to deprive the Debtor of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest.

133.   In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

---

[30]   Order Granting Debtor's Mot. for Prelim. Inj. ¶ 2, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2025) [Adv. D.I. 84] (the "P.I. Order"). As came out at the hearing on May 21, 2024, Byju, Riju, and Gokulnath had engaged in a charade to conceal the Alpha Funds while they were all living together.

Exhibit MM1 Page 119

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Debtor BYJU's Alpha, Inc. requests that this Court enter

judgment and grant the following relief against Byju Raveendran, Divya Gokulnath, and Anita

Kishore:

- a.   Award of damages for breach of fiduciary duties and aiding and abetting such breach of fiduciary duties, including compensatory damages for damages caused to the Debtor and disgorgement of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

- b.   An accounting of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

- c.   Award of damages for conversion of, and civil conspiracy to defeat, the Debtor's ownership of the Camshaft LP Interest;

- d.   Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

- e.   Pre- and post-judgment interest up to the statutory maximum; and

- f.   Any other relief that this Court may deem just, proper, or equitable under the circumstances.

49

Exhibit MM1 Page 120

Dated: April 9, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone (*pro hac vice* forthcoming)
Kate Scherling (*pro hac vice* forthcoming)
Jordan M. Nakdimon (*pro hac vice* forthcoming)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
jordannakdimon@quinnemanuel.com

*Counsel for Plaintiff-Debtor, BYJU's Alpha, Inc.*

Exhibit MM1 Page 121



