

**INDIA NON JUDICIAL**

## Government of Karnataka

**e-Stamp**

| | | |
|---|---|---|
| **Certificate No.** | : | **IN-KA47458261528004T** |
| Certificate Issued Date | : | 09-Nov-2021 10:35 AM |
| Account Reference | : | SHCIL (FI)/ ka-shcil/ JAYANAGAR/ KA-BA |
| Unique Doc. Reference | : | SUBIN-KAKA-SHCIL46426085715637T |
| Purchased by | : | THINK AND LEARN PRIVATE LIMITED |
| Description of Document | : | Article 5(J) Agreement (In any other cases) |
| Property Description | : | CREDIT AGREEMENT |
| Consideration Price (Rs.) | : | 0<br>(Zero) |
| First Party | : | THINK AND LEARN PRIVATE LIMITED |
| Second Party | : | GLAS TRUST COMPANY LLC |
| Stamp Duty Paid By | : | THINK AND LEARN PRIVATE LIMITED |
| Stamp Duty Amount(Rs.) | : | 600<br>(Six Hundred only) |




Authorised Signatory

For Stock Holding Corporation of India Ltd.

.......... Please write or type below this line ..........

**Statutory Alert:**
1. The authenticity of this Stamp certificate should be verified at 'www.shcilestamp.com' or using e-Stamp Mobile App of Stock Holding.
   Any discrepancy in the details on this Certificate and as available on the website / Mobile App renders it invalid
2. The onus of checking the legitimacy is on the users of the certificate.
3. In case of any discrepancy please inform the Competent Authority.

**EXECUTION COPY**

CREDIT AND GUARANTY AGREEMENT

Dated as of November 24, 2021

among

THINK AND LEARN PRIVATE LIMITED
as the Parent Guarantor

BYJU's ALPHA, INC.
as the Borrower

the Guarantors party hereto
the Lenders party hereto

GLAS TRUST COMPANY LLC
as Administrative Agent and as Collateral Agent

———————————————————————

MORGAN STANLEY SENIOR FUNDING INC.

and

JPMORGAN CHASE BANK, N.A.

as Joint Lead Arrangers and Joint Bookrunners

## Table of Contents

Page No.

ARTICLE I DEFINITIONS ...........................................................................................................1

Section 1.1.  Defined Terms ......................................................................................................1

Section 1.2.  Classification of Term Loans and Borrowings. ...................................................49

Section 1.3.  Terms Generally. ..................................................................................................49

Section 1.4.  Accounting Terms; GAAP. ...................................................................................49

Section 1.5.  Divisions. .............................................................................................................50

Section 1.6.  Interest Rates; LIBOR Notification ......................................................................50

Section 1.7.  Certain Calculations and Tests .............................................................................50

Section 1.8.  Cashless Rollovers. ..............................................................................................51

Section 1.9.  Exchange Rates; Currency Equivalents. ...............................................................51

Section 1.10.  Basket Reclassification. ......................................................................................52

Section 1.11.  Notices, etc. .........................................................................................................52

Section 1.12.  Parent Guarantor as Loan Parties' Agent. ...........................................................52

ARTICLE II THE CREDITS .........................................................................................................53

Section 2.1.  Term Commitments. .............................................................................................53

Section 2.2.  Term Loans and Borrowings. ...............................................................................53

Section 2.3.  Requests for Borrowings. .....................................................................................54

Section 2.4.  Funding of Borrowings. ........................................................................................54

Section 2.5.  Interest Elections. .................................................................................................55

Section 2.6.  Repayment of Term Loans; Evidence of Debt. .....................................................56

Section 2.7.  Prepayment of Term Loans. ..................................................................................56

Section 2.8.  Mandatory Prepayments. ......................................................................................57

Section 2.9.  Fees. ......................................................................................................................59

Section 2.10.  Interest. ................................................................................................................59

Section 2.11.  Alternate Rate of Interest. ...................................................................................60

Section 2.12.  Increased Costs. ...................................................................................................64

Section 2.13.  Break Funding Payments. ....................................................................................65

Section 2.14.  Taxes. ...................................................................................................................65

Section 2.15.  Payments Generally; Pro Rata Treatment; Sharing of Set-offs. ..........................68

Section 2.16.  Mitigation Obligations; Replacement of Lenders. ...............................................69

Section 2.17.  Incremental Credit Extensions ............................................................................70

Section 2.18.    Refinancing Facilities. ..............................................................................73

Section 2.19.    Extension of Term Loans. ...........................................................................75

Section 2.20.    Defaulting Lenders. .....................................................................................77

ARTICLE III REPRESENTATIONS AND WARRANTIES ...................................................78

Section 3.1.    Organization; Powers. ..................................................................................78

Section 3.2.    Authorization; Enforceability. .......................................................................79

Section 3.3.    Governmental Approvals; No Conflicts. ........................................................79

Section 3.4.    Financial Condition; No Material Adverse Change. ......................................79

Section 3.5.    Title. ................................................................................................................80

Section 3.6.    Litigation and Environmental Matters. ..........................................................80

Section 3.7.    Compliance with Laws and Agreements. ........................................................81

Section 3.8.    Investment Company Status. ..........................................................................81

Section 3.9.    Taxes. ...............................................................................................................81

Section 3.10.    U.S. Plans and Non-U.S. Plans. ....................................................................82

Section 3.11.    Disclosure. ......................................................................................................82

Section 3.12.    Subsidiaries. ...................................................................................................83

Section 3.13.    Anti-Terrorism Laws; USA Patriot Act. ........................................................83

Section 3.14.    Anti-Corruption Laws and Sanctions. ...........................................................83

Section 3.15.    Margin Stock. .................................................................................................84

Section 3.16.    Solvency. .........................................................................................................84

Section 3.17.    Affected Financial Institution. ......................................................................84

Section 3.18.    Insurance Matters. ..........................................................................................84

Section 3.19.    Material Contracts. .........................................................................................84

Section 3.20.    Collateral Documents. ....................................................................................84

Section 3.21.    Employee Matters ...........................................................................................85

Section 3.22.    Pari Passu Ranking. ........................................................................................85

Section 3.23.    Status as Senior Indebtedness. .......................................................................85

Section 3.24.    [Reserved]. ......................................................................................................85

Section 3.25.    Indian Guarantee ............................................................................................85

ARTICLE IV CONDITIONS .....................................................................................................86

Section 4.1.    The Effective Date. ..........................................................................................86

Section 4.2.    Each Credit Extension. ....................................................................................89

ARTICLE V AFFIRMATIVE COVENANTS ........................................................................89

Section 5.1.    Financial Statements; Other Information. ...................................................89

Section 5.2.    Notices of Material Events. .........................................................................91

Section 5.3.    Existence; Conduct of Business. .................................................................92

Section 5.4.    Payment of Obligations. ..............................................................................92

Section 5.5.    Maintenance of Properties; Insurance. ........................................................92

Section 5.6.    Books and Records; Inspection Rights, Quarterly Investor Calls. ..............92

Section 5.7.    Compliance with Laws and Agreements. .....................................................92

Section 5.8.    Use of Proceeds. ..........................................................................................93

Section 5.9.    Additional Guarantors. .................................................................................93

Section 5.10.   Further Assurances; Other Collateral Matters. ...........................................94

Section 5.11.   Designation of Restricted and Unrestricted Subsidiaries. ...........................95

Section 5.12.   Maintenance of Ratings. ..............................................................................97

Section 5.13.   Post-Closing Obligations. ............................................................................97

Section 5.14.   Shareholders (Call Option) Agreement. ......................................................97

Section 5.15.   Environmental Matters. ...............................................................................97

Section 5.16.   Great Learning Education Framework Agreement. ......................................97

Section 5.17.   Guarantee Maintenance Requirement. .........................................................97

Section 5.18.   Core Assets. .................................................................................................99

Section 5.19.   Indian Guarantors. .......................................................................................99

Section 5.20.   Information Utility. .....................................................................................100

ARTICLE VI NEGATIVE COVENANTS.......................................................................100

Section 6.1.    Indebtedness. ..............................................................................................100

Section 6.2.    Liens. ..........................................................................................................104

Section 6.3.    Fundamental Changes; Assets Sales; Changes in Business.........................107

Section 6.4.    Restricted Payments and Restricted Debt Payments...................................109

Section 6.5.    Restrictive Agreements. .............................................................................. 111

Section 6.6.    Transactions with Affiliates. ....................................................................... 112

Section 6.7.    Investments. ................................................................................................ 112

Section 6.8.    [Reserved] ...................................................................................................115

Section 6.9.    Amendments or Waivers of Organizational Documents; Amendments of Junior Financing Documentation....................................................................................................................115

Section 6.10.   Fiscal Year. .................................................................................................115

Section 6.11.   Accounting Policies.....................................................................................115

Section 6.12.    Anti-Terrorism Laws. ...................................................................................................116

Section 6.13.    Limitation on amendments to Material Contracts ...........................................................116

Section 6.14.    NBFC/CIC. ...................................................................................................................116

Section 6.15.    Treatment of Core Assets. ............................................................................................116

ARTICLE VII GUARANTY .......................................................................................................................117

Section 7.1.    Guaranty of the Obligations. ...........................................................................................117

Section 7.2.    Payment by the Relevant Guarantors. .............................................................................117

Section 7.3.    Liability of Relevant Guarantors Absolute. .....................................................................117

Section 7.4.    Waivers by Relevant Guarantors. ....................................................................................119

Section 7.5.    Relevant Guarantors' Rights of Subrogation, Contribution, Etc. ....................................119

Section 7.6.    Subordination of Other Obligations. ...............................................................................120

Section 7.7.    Continuing Guaranty. ....................................................................................................120

Section 7.8.    Authority of Relevant Guarantors or the Borrower. ........................................................120

Section 7.9.    Financial Condition of the Borrower. ..............................................................................120

Section 7.10.    Bankruptcy, Etc. .........................................................................................................120

ARTICLE VIII EVENTS OF DEFAULT .....................................................................................................121

Section 8.1.    Events of Default. ..........................................................................................................121

Section 8.2.    Application of Funds. .....................................................................................................124

ARTICLE IX THE AGENTS .......................................................................................................................125

Section 9.1.    Agents. ..........................................................................................................................125

Section 9.2.    Collateral Agent. ...........................................................................................................131

Section 9.3.    Certain ERISA Matters ..................................................................................................133

ARTICLE X MISCELLANEOUS ...............................................................................................................134

Section 10.1.    Notices.........................................................................................................................134

Section 10.2.    Waivers; Amendments..................................................................................................136

Section 10.3.    Expenses; Limitation of Liability; Indemnity, Etc ........................................................139

Section 10.4.    Successors and Assigns ................................................................................................141

Section 10.5.    Survival .......................................................................................................................147

Section 10.6.    Counterparts; Integration; Effectiveness........................................................................147

Section 10.7.    Severability ..................................................................................................................148

Section 10.8.    Right of Set-off ............................................................................................................148

Section 10.9.    Governing Law; Jurisdiction; Consent to Service of Process .........................................148

Section 10.10.    Waiver of Jury Trial....................................................................................................149

Section 10.11.    Headings....................................................................................................149

Section 10.12.    Confidentiality..........................................................................................149

Section 10.13.    Interest Rate Limitation ...........................................................................151

Section 10.14.    No Advisory or Fiduciary Responsibility .................................................151

Section 10.15.    Electronic Execution of Assignments and Certain Other Documents ............152

Section 10.16.    USA Patriot Act; Beneficial Ownership Regulation ........................................153

Section 10.17.    Release of Liens and Guarantors..............................................................153

Section 10.18.    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.................154

Section 10.19.    Acknowledgment Regarding Any Supported QFCs .......................................155

Section 10.20.    Limited Recourse and Non-Petition. .................................................................155

Section 10.21.    The Agreement Controls. ..................................................................................156

SCHEDULES

Schedule 1.1(a)          — Core Assets
Schedule 2.1             — Term Commitments
Schedule 3.6             — Disclosed Matters
Schedule 3.10(a)         — U.S. Plans
Schedule 3.12            — Restricted Subsidiaries
Schedule 5.11            — Unrestricted Subsidiaries
Schedule 5.13            — Post-Closing Obligations
Schedule 6.1             — Existing Indebtedness
Schedule 6.2(b)          — Existing Liens
Schedule 6.5             — Existing Restrictions
Schedule 6.6             — Existing Transactions with Affiliates
Schedule 6.7             — Existing Investments

EXHIBITS

Exhibit A-1              — Form of Assignment and Assumption
Exhibit A-2              — Form of Affiliated Lender Assignment and Assumption
Exhibit B                — Form of Borrowing Request
Exhibit C                — Form of Interest Election Request
Exhibit D                — Form of Term Loan Note
Exhibit E                — Form of Compliance Certificate
Exhibit F                — Form of Maturity Date Extension Request
Exhibit G                — Form of Counterpart Agreement
Exhibit H                — Form of Solvency Certificate
Exhibits I-1 – I-4       — Forms of Portfolio Interest Certificate
Exhibit J                — Form of Certification Regarding Beneficial Owners of Legal Entity Customers
Exhibit K                — Form of Prepayment Notice

CREDIT AND GUARANTY AGREEMENT, dated as of November 24, 2021, among Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427 (the "Parent Guarantor"), BYJU's Alpha, Inc. a Delaware corporation (the "Borrower"), certain Subsidiaries of the Parent Guarantor (together with the Parent Guarantor, the "Initial Guarantors" and each individually, an "Initial Guarantor"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as Administrative Agent and as Collateral Agent.

**RECITALS:**

**WHEREAS**, each capitalized term used and not otherwise defined herein shall have the meaning assigned to it in Article I hereof.

**WHEREAS**, the Borrower has requested that the Lenders provide a term loan facility in an aggregate principal amount of $1,200,000,000, and the Lenders are willing to do so on the terms and conditions set forth herein.

**WHEREAS**, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder.

**WHEREAS**, the proceeds of borrowings hereunder are to be used for the purposes described in Section 5.8 hereof.

**NOW, THEREFORE**, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    Defined Terms. As used in this Agreement, the following terms used herein, including in the preamble, recitals, appendices, schedules and exhibits hereto, shall have the meanings specified below:

"ABR", when used in reference to any Term Loan or Borrowing, refers to whether such Term Loan, or the Term Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"Acceptance Notice" has the meaning set forth in Section 2.8(e).

"Accepting Lender" has the meaning set forth in Section 2.8(e).

"Acquired EBITDA" means, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Acquired Entity or Business or Converted Restricted Subsidiary (determined as if references to the Parent Guarantor and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Acquired Entity or Business and its Subsidiaries or to such Converted Restricted Subsidiary and its Subsidiaries), as applicable, all as determined on a consolidated basis for such Acquired Entity or Business or Converted Restricted Subsidiary, as applicable.

"Acquired Entity or Business" has the meaning set forth in the definition of the term "Consolidated EBITDA".

"Acquisition" means any transaction or series of related transactions resulting in the acquisition by the Parent Guarantor or any of its Restricted Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all or substantially all of the Equity Interests of, or a business line or unit or a division of, any Person.

"<u>Action</u>" means any charge, claim, action, complaint, petition, investigation, appeal, suit, litigation or other similar proceeding initiated or conducted by a mediator, arbitrator or Governmental Authority, whether administrative, civil, regulatory or criminal, and whether at law or in equity, or otherwise under any applicable law.

"<u>Additional Agreement</u>" has the meaning set forth in <u>Section 9.1</u>.

"<u>Additional Lender</u>" means, at any time, any bank, institutional lender or other financial institution that is not an existing Lender and agrees to provide (a) all or a portion of any Incremental Term Loan in accordance with <u>Section 2.17</u> or (b) all or a portion of any Refinancing Term Facility in accordance with <u>Section 2.18</u>; <i>provided</i> that the Administrative Agent and the Borrower shall have consented to such Additional Lender in accordance with <u>Section 10.4</u> if such consent would be required under <u>Section 10.4</u> for an assignment of Term Loans to such Additional Lender.

"<u>Adjusted LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate <i>per annum</i> (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the LIBO Rate for such Interest Period <i>multiplied by</i> the Statutory Reserve Rate; <i>provided</i> that if such rate shall be less than 0.75%, such rate shall be deemed to be 0.75% for all purposes of this Agreement.

"<u>Administrative Agent</u>" means GLAS Trust Company LLC, in its capacity as administrative agent for the Lenders hereunder, or any successor administrative agent.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Lender</u>" means the Parent Guarantor or any of its Subsidiaries or Debt Fund Affiliates to the extent that such Person is (or is to become) a Lender pursuant to <u>Section 10.4(f)</u>.

"<u>Affiliated Lender Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Affiliated Lender (with the consent of any party whose consent is required by <u>Section 10.4</u>), and accepted by the Administrative Agent, in the form of <u>Exhibit A-2</u> or any other form approved by the Administrative Agent.

"<u>Agent</u>" means each of the Administrative Agent and the Collateral Agent.

"<u>Agent Parties</u>" has the meaning set forth in <u>Section 10.1</u>.

"<u>Agent-Related Person</u>" has the meaning set forth in <u>Section 10.3(d)</u>.

"<u>Agreement</u>" means this Credit and Guaranty Agreement, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

"<u>All-In Yield</u>" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate, margin, original issue discount, fees (including upfront fees), interest rate floors or otherwise, in each case, incurred or payable generally to all the lenders of such indebtedness; <i>provided</i> that (a) original issue discount shall be equated to interest rate assuming the shorter of the actual life to maturity of such Indebtedness and a four-year life to maturity, (b) upfront fees (which shall be deemed to constitute like amounts of original issue discount) shall be equated to interest rate assuming the shorter of the actual life to maturity of such Indebtedness and a five-year life to maturity, (c) the All-In Yield shall not include (i) underwriting fees, structuring fees, arrangement fees, commitment fees, amendment fees, consent fees (for

the avoidance of doubt, "consent fees" shall not include upfront fees payable to the Lenders in connection with their respective commitments with respect to the Term Facility or any Incremental Facility), placement fees, advisory fees, success fees, ticking fees, and similar fees (regardless of whether any of the foregoing fees are paid to or shared with, in whole or in part, to any or all lenders of such indebtedness) and (ii) any fees not paid or payable in the primary syndication of such Indebtedness or other fees not paid or payable generally to all lenders generally, and (d) for the purpose of determining the "All-In Yield", any Indebtedness that is fixed rate debt shall be swapped to a floating rate on a customary matched maturity basis.

"Alternate Base Rate" means, for any day, a rate *per annum* equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day *plus* $\frac{1}{2}$ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.00%; *provided* that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or if the Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.11 (but only until the Benchmark Replacement has been determined pursuant to Section 2.11(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. If the Alternate Base Rate as determined pursuant to the foregoing would be less than 0.00%, such rate shall be deemed to be 0.00% for the purposes of calculating such rate with respect to the Term Loans.

"Ancillary Document" has the meaning set forth in Section 10.15.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Parent Guarantor or any of its Subsidiaries from time to time concerning or relating to bribery, corruption or money laundering.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Term Commitments or Term Loans of all Classes hereunder represented by the aggregate amount of such Lender's Term Commitments or Term Loans of all Classes hereunder; *provided* that if any Defaulting Lender exists at such time, the Applicable Percentage shall be calculated disregarding such Defaulting Lender's Term Commitment.

"Applicable Rate" means, for any day, with respect to any (i) ABR Term Loan, 4.50% or (ii) Eurodollar Term Loan, 5.50% (the "Original Applicable Rate"); provided that in the event the Parent Guarantor fails to obtain the Credit Ratings by the date falling nine  months after the Effective Date (the "Ratings Deadline"), the Applicable Rate with respect to any (a) ABR Term Loan shall be 5.00% or (b) Eurodollar Term Loan shall be 6.00%; provided further that, in the event that the Parent Guarantor obtains the Credit Ratings at any time thereafter (such date being the "Ratings Effective Date"), the Original Applicable Rate shall apply.

Any change to the Original Applicable Rate shall apply during the period commencing on the date of the Ratings Deadline and ending on the date immediately preceding the Ratings Effective Date, and the Original Applicable Rate shall apply from the Ratings Effective Date. If any Rating Agency shall cease to be in the business of rating corporate credit or credit facility ratings, the Parent Guarantor and the Administrative Agent shall negotiate in good faith to amend this definition to reflect the unavailability of ratings from such Rating Agency (including, in such case, an amendment to replace Fitch, Moody's or S&P, as applicable, with another rating agency), and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the rating most recently in effect prior to such cessation.

"Applicable Premium" means, an amount equal to, upon and subject to the occurrence of an Applicable Premium Trigger Event:

(a)     on or prior to the first anniversary of the Effective Date, 5.00% of the principal amount of the Initial Term Loans prepaid or repaid;

(b)     after the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date, 3.00% of the principal amount of the Initial Term Loans prepaid or repaid;

(c)     after the second anniversary of the Effective Date but on or prior to the third anniversary of the Effective Date, 1.00% of the principal amount of the Initial Term Loans prepaid or repaid; and/or

(d)     thereafter, 0.0%.

"Applicable Premium Trigger Event" has the meaning set forth in Section 2.7(b).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means MS and JPMCB in their capacity as joint lead arrangers, and any successor thereto.

"Asset Sale" means a sale, lease (as lessor or sublessor), sale and leaseback, exchange, transfer or other Disposition to, any Person, in one transaction or a series of transactions, of any part of the Parent Guarantor's or any of its Restricted Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Equity Interests of any of the Parent Guarantor's Subsidiaries, other than:

(a)     Dispositions of inventory, ancillary services, goods held for sale (or other assets, including intangible assets) sold, leased or licensed out in the ordinary course of business (including allowing any registrations or any applications for registration of any Intellectual Property constituting non-Core Assets to lapse or go abandoned);

(b)     Dispositions of (i) damaged, obsolete, unusable, surplus or worn-out property and (ii) property or assets no longer used or useful in the conduct of the business of the Parent Guarantor or any of its Restricted Subsidiaries;

(c)     sales or other Dispositions of Cash Equivalents and Marketable Securities for the fair market value thereof;

(d)     Dispositions of property or assets (including the sale of any Equity Interest owned by such Person) from (i) any Restricted Subsidiary that is not a Guarantor to any other Restricted Subsidiary, (ii) any Restricted Subsidiary to any Loan Party, (iii) any Loan Party to any other Loan Party or (iv) any Loan Party to any Restricted Subsidiary constituting an Investment permitted by Section 6.7(b);

(e)     Dispositions of property or assets in connection with casualty (or other insured damage) or condemnation events or any taking under power of eminent domain or by similar proceeding, or consisting of or subsequent to a total loss or constructive total loss of such property or asset;

(f)     Dispositions of past due accounts receivable in connection with the collection, write-down or compromise thereof in the ordinary course of business and the sale or discount without recourse by the Parent Guarantor or its Subsidiaries of accounts receivable or notes receivable arising in the ordinary course of business in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable

account debtors and dispositions of any securities received in any such bankruptcy or reorganization;

(g)    Dispositions of property or assets to the extent that (i) such property or asset is exchanged for credit against the purchase price of similar replacement assets or property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property or asset;

(h)    Dispositions permitted by Section 6.3(a);

(i)    Dispositions of non-Core Assets (including any Intellectual Property or learning applications constituting non-Core Assets) acquired in connection with or in order to effectuate (or owned by a Person that is acquired in connection with) an Acquisition for the fair market value thereof (as determined in good faith by the Parent Guarantor) to the extent such Disposition is consummated within 180 days of such Acquisition;

(j)    non-exclusive licenses (other than in respect of Intellectual Property) and leases entered into in the ordinary course of business or which do not in any material respect interfere with the business of the Parent Guarantor and its Restricted Subsidiaries taken as a whole;

(k)    non-exclusive licenses of Intellectual Property constituting non-Core Assets to persons other than the Parent Guarantor and its Restricted Subsidiaries entered into in the ordinary course of business or customarily entered into by companies in the same or similar line of business conducted by the Parent Guarantor and its Restricted Subsidiaries on the Effective Date or which do not in any material respect interfere with the business of the Parent Guarantor and its Restricted Subsidiaries taken as a whole (or that avoid such interference by granting to the Parent Guarantor or any of its Restricted Subsidiaries a license or other ownership rights to use such Intellectual Property);

(l)    any Disposition or transfer by the Parent Guarantor or any of its Restricted Subsidiaries to any buyer or purchaser of or lender in respect of interests in accounts receivable in the ordinary course of business permitted by Section 6.1(r);

(m)    any conveyance, transfer, exchange or disposition of assets which would constitute a Restricted Payment permitted under Section 6.3 or an Investment permitted under Section 6.7;

(n)    any lease or sublease (as lessee or sublessee) or license or sublicense (as licensee or sublicensee), in each case in the ordinary course of business and that does not create a capital lease except to the extent permitted by Section 6.1;

(o)    the unwinding of any Swap Agreements;

(p)    Dispositions or sales of a de minimis amount of Securities of a Subsidiary in order to qualify members of the governing body of such Subsidiary, in each case to the extent required by applicable law;

(q)    any grant of an option to purchase, lease or acquire property, so long as the disposition resulting from the exercise of such option would otherwise be permitted hereunder;

(r)    Dispositions listed on Schedule 6.3;

(s)    Dispositions comprising a Permitted Listing Transaction Step made as a result of and concurrently with the consummation of any IPO and/or a Holdco Transaction;

(t)    any swap of assets (other than Core Assets or shares) in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the

business of the Parent Guarantor and its Restricted Subsidiaries as a whole, as determined in good faith by the management of the Parent Guarantor; and

(u)     Permitted Intercompany Activities.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by <u>Section 10.4</u>), and accepted by the Administrative Agent, in the form of <u>Exhibit A-1</u> or any other form approved by the Administrative Agent.

"<u>Authorized Agent</u>" has the meaning set forth in <u>Section 10.9(f)</u>.

"<u>Authorized Dealer</u>" means any bank which is an authorized dealer bank authorized by RBI pursuant to sub-section (1) of section 10 of Foreign Exchange Management Act, 1999 through which all transactions of the Parent Guarantor in respect of its investments in the Borrower, including the Guarantee to be provided pursuant to the Onshore Guarantee Deed, are routed from time to time.

"<u>Available Amount</u>" means, as of any date of determination, a cumulative amount not less than zero in the aggregate equal to the sum of (a) 50% of Consolidated Net Income for the period (treated as one accounting period) from the Quarter Date prior to the Effective Date to the end of the most recent Quarter Date prior to such date of determination (or in the case such Consolidated Net Income is a deficit for such period, minus 100% of such deficit), in each case to the extent any such amount is Not Otherwise Applied, (b) prior to an IPO, 100% of cash proceeds of any new private equity issuances of the Parent Guarantor (other than Disqualified Equity Interests), (c) capital contributions to the Parent Guarantor in cash or Cash Equivalents, (d) the aggregate principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Equity Interest, of the Parent Guarantor (other than Indebtedness or Disqualified Equity Interests issued to the Parent Guarantor or another Restricted Subsidiary) that has been converted into or exchanged for Qualified Equity Interests in the Parent Guarantor after the Effective Date, (e) Declined Proceeds, (f) 100% of the aggregate amount received by the Parent Guarantor or any Restricted Subsidiary in cash and Cash Equivalents from: (i) the sale (other than to the Parent Guarantor or any Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary, or (ii) any dividend or other distribution by an Unrestricted Subsidiary, or (iii) any interest, returns of principal payments or similar payments by an Unrestricted Subsidiary, and (g) in the event any Unrestricted Subsidiary has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary, the fair market value of the Investments of the Parent Guarantor and the Restricted Subsidiaries in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) so long as such Investments were made pursuant to Section 6.7(c)(ii).

"<u>Available Incremental Amount</u>" means, at any time, an aggregate principal amount equal to the sum of (a) the greater of (1) $1,500,000,000 *less* an amount equal to the aggregate of (y) an amount equal to the aggregate amount of the Term Commitments on the Effective Date and (z) an amount equal to the aggregate amount of Indebtedness incurred and outstanding under Section 6.1(m) (assuming for this purpose full utilization of any such revolving credit facility whether or not fully drawn) (the "<u>Free and Clear Incremental Basket</u>") and (2) an amount equal to 1.0x Consolidated EBITDA at the time of determination (the "<u>Base Incremental Amount</u>"); and (b) an unlimited amount at any time, so long as, in the case of this clause (b) only, after giving pro forma effect to any Incremental Facility or Incremental Equivalent Debt and the application of proceeds thereof, the Consolidated Total Net Leverage Ratio does not exceed 2.50 to 1.00 on a Pro Forma Basis (in each case as of the effective date of such Incremental Facility or Incremental Equivalent Debt and giving effect to the transactions to be funded with such Incremental Facility or Incremental Equivalent Debt and assuming full utilization of such Incremental Facility or Incremental Equivalent Debt whether or not fully drawn) (the "<u>Incurrence-Based Incremental Amount</u>"); *provided* that to the extent the proceeds of such Incremental Facility or Incremental Equivalent Debt will be used to finance a Limited Condition Transaction, such calculation shall be subject to <u>Section 1.7</u>; *provided, further*, that the Borrower may elect to use the Incurrence-Based Incremental Amount prior to the Base Incremental

- 6 -

Amount or the Free and Clear Incremental Basket, or any combination of the foregoing, and any portion of any Incremental Facility incurred in reliance on the Base Incremental Amount or Free and Clear Incremental Basket shall be reclassified, as the Borrower may elect from time to time, as incurred under the Incurrence-Based Incremental Amount if the Borrower meets the applicable ratio for the Incurrence-Based Incremental Amount at such time on a Pro Forma Basis. For purposes of determining compliance on a Pro Forma Basis and any testing of any ratios in the Incurrence-Based Incremental Amount, it shall be assumed that the cash proceeds of any Incremental Facility or Incremental Equivalent Debt shall be excluded from "net" Indebtedness in determining whether such Incremental Facility or Incremental Equivalent Debt can be incurred.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Event" means any insolvency, bankruptcy, dissolution, liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or similar proceeding or arrangement.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, substantially in the form of Exhibit J.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Beneficiary" means each Agent and Lender.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Bloomberg Currency Website" means the website on the Internet at www.bloomberg.com/markets/currencies/fxc.html (or any successor website reasonably identified by the Administrative Agent).

"Board of Directors" means the board of directors or comparable governing body of the Borrower, the Parent Guarantor or a Guarantor, as the case may be, or any committee thereof duly authorized to act on its behalf.

"Borrower" has the meaning specified in the Preamble.

"Borrowing" means Term Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Term Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.3.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, Bangalore, Singapore or Mumbai are authorized or required by law to remain closed; *provided* that, when used in connection with a Eurodollar Term Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Business Liability" means debts, liabilities and obligations (including Taxes), whether accrued or fixed, absolute or contingent, matured or unmatured, deferred or actual, determined or determinable, known or unknown, including those arising under any law, action or governmental order and those arising under any agreement or contract.

"Capital Expenditures" means, for any period, expenditures (including the aggregate amount of Capital Lease Obligations incurred during such period) made by the Parent Guarantor or any of its Restricted Subsidiaries to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements, but excluding repairs) or in respect of software development costs during such period, in each case, computed in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases (and not operating leases) on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; *provided* that, (a) all obligations that are or would have been treated as operating leases for purposes of GAAP prior to December 31, 2018 shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of the Loan Documents (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with GAAP (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations in the financial statements to be delivered pursuant to the Loan Documents and (b) any lease (whether such lease is in existence as of December 31, 2018 or entered into thereafter) that would constitute a capital lease in conformity with GAAP as in effect on December 31, 2018 (assuming for purposes hereof that any such future leases were in existence on December 31, 2018) shall be considered capital leases (without giving effect to the adoption or effectiveness of any changes in, or changes in the application of, GAAP after December 31, 2018 with respect thereto), and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

"Cash" means any cash treated as such according to GAAP and as shown in the relevant annual financial statements or quarterly financial statements.

"Cash Equivalents" means:

(a)     Dollars, Rupees or Singapore Dollars or money in other currencies received in the ordinary course of business, including all money held in current and savings accounts or held as demand deposits;

(b)     U.S. Government Obligations or certificates representing an ownership interest in U.S. Government Obligations maturing within 12 months from the date of acquisition;

(c)     (i) time deposits, fixed deposits, money market deposits and certificates of deposit, (ii) bankers' acceptances, and (iii) overnight bank deposits, in each case, with any bank or trust company organized or licensed under the laws of the United States of America or any State thereof or any foreign commercial bank having a combined capital and surplus of not less than (A) $500,000,000, in the case of any bank or trust company organized or licensed under the laws of the United States of America, and (B) $100,000,000 (or the Dollar Equivalent as of the date of determination), in the case of any foreign commercial bank; *provided* that the maximum maturity of any such individual investment shall not exceed 12 months from the date of acquisition;

(d)    repurchase obligations with a term of not more than 30 days for underlying securities of the type described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c) above;

(e)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(f)    commercial paper rated at least "P-2" by Moody's or "A-2" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(g)    securities with maturities of 12 months or less from the date of acquisition which (or the issuer of which) are rated at least "A" or "A-1" by S&P or "A2" or "P-1" by Moody's or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States of America or any political subdivision thereof having a rating of at least "A-3" by Moody's or "A-" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(i)    readily marketable direct obligations issued by any foreign government or any political subdivision thereof having a rating of at least "A-3" by Moody's or "A-" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(j)    money market funds at least 90% of the assets of which consist of investments of the type described in clauses (a) through (i) above;

(k)    auction rate securities issued by any domestic corporation or any domestic government instrumentality, in each case rated at least "A-1" by S&P or at least "P-1" by Moody's or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization and maturing within six months of the date of acquisition (or with interest rates or dividend yields that are reset at least every 35 days); and

(l)    in the case of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor that is not incorporated or organized under the laws of the United States of America, any state thereof or in the District of Columbia, other short-term investments that are analogous to the foregoing, are of comparable credit quality and are customarily used by companies in the jurisdiction of the Parent Guarantor or such Subsidiary for cash management purposes.

"Change in Control" means (a) prior to the occurrence of an IPO, the Permitted Holders do not or cease to directly or indirectly (whether by way of ownership of shares, proxy, contract, agency or otherwise) have the power to appoint or remove the majority of the directors of the Parent Guarantor, (b) after the occurrence of an IPO, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder), other than the Permitted Holders, individually or in the aggregate, of Equity Interests representing more than 40% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Parent Guarantor, (c) after the occurrence of an IPO, persons who were (i) directors of the Parent Guarantor on the date of consummation of such IPO, (ii) nominated by the Board of Directors of the Parent Guarantor or whose nomination for election by the stockholders of the Parent Guarantor was approved by the Board of Directors of the Parent Guarantor at any time before such persons actually commenced their service as directors or (iii) appointed by directors that were directors of the Parent Guarantor or directors nominated as provided in the preceding clause (ii), ceasing to occupy a majority of the seats (excluding vacant seats) on the Board of Directors of the Parent Guarantor *provided* that no cessation of occupation of the majority of the seats on the Board of Directors of the Parent Guarantor by

the relevant directors or persons, as per clause (i), (ii) or (iii), above shall constitute a "Change in Control", if such cessation occurs as a result of requirements of applicable law which become applicable due to IPO or listing requirements, (d) the Parent Guarantor does not or ceases to own and control directly or indirectly (i) 100% of the Equity Interests issued by the Borrower or (ii) (other than as a result of any disposition permitted by this Agreement) 51% or more of each Guarantor (other than the Parent Guarantor), or (e) on and following the consummation of a Holdco Transaction, Holdings shall cease to beneficially own, directly or indirectly, 100% of the Equity Interests issued by the Parent Guarantor; *provided* that neither the mere consummation of an IPO nor a Holdco Transaction shall constitute a Change in Control.

"Change in Control Payment Date" has the meaning set forth in Section 2.8(e).

"Change in Control Prepayment Notice" has the meaning set forth in Section 2.8(e).

"Change in Control Prepayment Offer" has the meaning set forth in Section 2.8(e).

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Charges" has the meaning set forth in Section 10.13.

"CIC Regulations" means the Reserve Bank of India Act, 1934 and the Master Direction - Core Investment Companies (Reserve Bank) Directions, 2016 dated August 25, 2016, each as amended and replaced from time to time and all other conditions, directions, guidelines and notifications issued by any Governmental Authority, from time to time, in relation to any of the foregoing.

"Class", when used in reference to (a) any Term Loan or Borrowing, refers to whether such Term Loan, or the Term Loans comprising such Borrowing, are Initial Term Loans, Incremental Term Loans, Refinancing Term Loans or Extended Term Loans and (b) any Term Commitment, refers to whether such Term Commitment is an Initial Term Commitment, an Incremental Term Loan Commitment or any commitment to provide Refinancing Term Loans or Extended Term Loans pursuant to any Refinancing Amendment or Extension Amendment, respectively.

"Code" means the U.S. Internal Revenue Code of 1986.

"Collateral" means, collectively, all of the property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations and all other assets, now existing or hereafter acquired and wherever located, that may at any time be or become subject to a Lien as security for the Obligations; *provided* that Collateral shall not include any Excluded Property.

"Collateral Agent" means GLAS Trust Company LLC, in its capacity as collateral agent for the Secured Parties hereunder, or any successor collateral agent.

"Collateral and Guarantee Requirement" means, at any time, subject to the applicable limitations set forth in this Agreement and/or any other Loan Document and the time periods (and extensions thereof) set forth in Section 5.9, Section 5.10 or Section 5.13, as applicable, (a) the Guarantee Maintenance Requirement and (b) the requirement that:

(i)      the Administrative Agent shall have received, (1) each Security Agreement required to be delivered on the Effective Date, (2), evidence that each member of the Group which (x) has granted (or will grant) all asset security or whose shares are the subject of the Collateral in favor of the Collateral Agent (or any Subsidiary of such a person) or (y) owns Intellectual Property which is licensed to or used by any member of the Group listed in the previous clause (x), has in each case entered into or acceded to the IP Licensing Agreement; and (3) each other document required to be delivered pursuant to any Collateral Document, <u>Section 5.9</u>, <u>Section 5.10</u> or <u>Section 5.13</u>, as applicable, at the time required to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(ii)     the Obligations shall be unconditionally guaranteed by the Parent Guarantor and each direct and indirect Material Subsidiary incorporated or acquired after the Effective Date (including upon the consummation of: (y) the EPIC Merger, EPIC and (z) the Tynker Acquisition, Tynker, but excluding any Excluded Subsidiary and (for so long as it is planned to merge with the Parent Guarantor) Aakash Educational Services Ltd);

(iii)    with respect to any Material Real Estate Asset, the Administrative Agent shall have received, in addition to any mortgage, deed or similar document required to be delivered pursuant to <u>Section 5.10(b)</u>, such other customary documents in the jurisdiction of such Material Real Estate Asset as the Administrative Agent may reasonably request in connection with such mortgage, deed or similar document (including title insurance policies and flood insurance, to the extent applicable);

(iv)     the Guarantor Coverage Requirement shall remain satisfied at all times; and

(v)      the Obligations shall be secured by a valid and perfected Lien on the Collateral, subject to no prior or equal Lien except those Liens permitted to be prior or equal by <u>Section 6.2</u>,

provided that, notwithstanding anything to the contrary in this Agreement or any other Loan Document to the contrary:

(A)     no Material Subsidiary incorporated or acquired after the Effective Date (other than a wholly-owned Material Subsidiary) shall be required to become a Guarantor (or provide any guarantee) if the Guarantor Coverage Requirement would otherwise remain satisfied; and

(B)     without prejudice to the requirement for any entity in incorporated India to enter into a Shareholders (Call Option) Agreement and to the extent required under <u>Section 5.14</u>, no Lien or other security will be granted by any member of the Group incorporated in India or over any shares of any member of the Group incorporated in India.

The Administrative Agent may grant extensions of time, in its reasonable discretion, for the perfection of a security interest in particular assets and the delivery of opinions with respect to the granting and perfection of any such security interest.

"<u>Collateral Documents</u>" means the Security Agreements and all other instruments, documents and agreements delivered by or on behalf of any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of the Lenders, a Lien on any Collateral of that Loan Party as security for the Obligations.

"<u>Communications</u>" has the meaning set forth in <u>Section 10.1</u>.

"<u>Company Financial Statements</u>" means audited consolidated financial statements (including the balance sheet and the related statements of income, members' and stockholders' equity and cash flows) of

the Parent Guarantor and its consolidated Subsidiaries for each of the fiscal years ended March 31, 2018, March 31, 2019 and March 31, 2020.

"Competitors" has the meaning set forth in the definition of "Disqualified Lender".

"Compliance Certificate" has the meaning set forth in Section 5.1(c).

"Confidential Information Memorandum" means that certain Confidential Information Memorandum, dated October 22, 2021.

"Confidentiality Restrictions" has the meaning set forth in Section 5.6.

"Consolidated Cash Interest Expense" means, for any period, the excess of (a) the sum of, without duplication, (i) the interest expense paid in cash (including imputed interest expense in respect of Capital Lease Obligations) of the Parent Guarantor and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, (ii) cash payments made during such period in respect of any interest or other financing costs in respect of Indebtedness of the Parent Guarantor or any of its Subsidiaries that is required to be capitalized or paid-in-kind rather than included in Consolidated Interest Expense of the Parent Guarantor for such period in accordance with GAAP, (iii) any cash payments made during such period in respect of obligations referred to in clause (b)(ii) below that were amortized or accrued in a previous period, and (iv) all cash dividends paid or payable during such period in respect of Disqualified Equity Interests of Holdings; *provided* that such dividends shall be multiplied by a fraction the numerator of which is one and the denominator of which is one minus the effective combined tax rate of the Parent Guarantor (expressed as a decimal) for such period (as estimated by a financial officer in good faith); *provided* that Consolidated Cash Interest Expense for any period shall exclude (to the extent otherwise included in Consolidated Cash Interest Expense for such period) (A) fees and expenses incurred during such period in connection with the consummation of the Transactions, (B) annual agency fees paid during such period to any administrative agent or collateral agent under any credit facilities or other debt instruments or documents, (C) costs associated with obtaining Secured Interest Rate Hedging Agreements and non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under Secured Interest Rate Hedging Agreements under GAAP, and any one-time cash costs associated with breakage in respect of Secured Interest Rate Hedging Agreements for interest rates, in each case for such period, and (D) any non-recurring cash interest expense for such period consisting of liquidated damages for failure to timely comply with registration rights obligations, minus (b) the sum of, without duplication, (i) to the extent included in such Consolidated Interest Expense for such period, non-cash amounts attributable to amortization or write-off of capitalized interest or other financing costs paid in a previous period, (ii) to the extent included in such Consolidated Interest Expense for such period, non-cash amounts attributable to amortization of debt discounts or accrued interest payable in kind for such period, and (iii) cash interest income of the Parent Guarantor and its Subsidiaries earned during such period, in each case as determined in accordance with GAAP.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period *plus*, without duplication and (except with respect to clause (h) below) to the extent deducted in determining such Consolidated Net Income for such period, the sum of:

(a)    Consolidated Cash Interest Expense and, to the extent not reflected in such Consolidated Cash Interest Expense any losses on Swap Agreements entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations;

(b)    consolidated income tax expense for such period, based on income, profits (including any margin tax related thereto) or capital, including federal, foreign, state, local, franchise, excise and similar taxes paid or accrued during such period (including in respect of repatriated funds), including penalties and interest related to such taxes or arising from any tax examinations (including any additions to such taxes, and any penalties and interest with respect thereto);

(c)    all amounts attributable to depreciation and amortization and capitalized fees for such period (including amortization or expense recorded for upfront payments related to any contract signing and signing bonus and incentive payments but excluding amortization expense attributable to a prepaid cash item that was paid in a prior period);

(d)    Non-Cash Charges;

(e)    all losses on sales of assets outside the ordinary course of business for such period, with a corresponding reduction in Consolidated EBITDA for gains on sales of assets outside the ordinary course of business;

(f)    any expenses or charges related to any equity offering (including any IPO or Holdco Transaction, but excluding ongoing ordinary course public company costs following an IPO), investment, acquisition, disposition, indebtedness or restricted payment, or any modification to any instrument of indebtedness, in each case regardless whether such transaction has been consummated;

(g)    restructuring costs, reorganization costs, transition costs, integration costs, costs related to the closure, relocation, reconfiguration and/or consolidation of facilities and costs to relocate employees, retention charges, future lease commitments, administrative systems establishment costs, administrative systems, facilities or equipment conversion costs, excess pension charges and costs consisting of professional consulting or other fees relating to any of the foregoing, costs attributable to the undertaking and/or implementation cost savings initiatives, cost rationalization programs and/or operating expense reductions (including, without limitation, in connection with any integration, restructuring or transition, any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, any facility opening and/or pre-opening, any inventory optimization program and/or any curtailment), any business optimization costs, any costs relating to the closure or consolidation of any facility and/or discontinued operations (including, but not limited to, severance, rent termination costs, moving costs and legal costs), any severance costs, contract termination costs, any one off or non recurring costs relating to entry into a new market, any costs relating to any strategic initiative, any expansion and/or relocation costs, any costs associated with any modification to any pension and post-retirement employee benefit plan, any project startup costs, any one off or non recurring costs in connection with new operations and other related nonrecurring charges (whether or not characterized as a restructuring charge in accordance with GAAP);

(h)    pro forma "run rate" cost savings, operating expense reductions and synergies related (x) to the Transactions or the EPIC Merger that are reasonably identifiable and factually supportable and projected by the Parent Guarantor in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Parent Guarantor) within 24 months after the Effective Date or the date the EPIC Merger is consummated, as applicable (including from any actions taken in whole or in part prior to the Effective Date or the date the EPIC Merger is consummated) or (y) to mergers and other business combinations, acquisitions, investments, dispositions, divestitures, restructurings, operating improvements, cost savings initiatives and other similar initiatives (including the modification and renegotiation of contracts and other arrangements) and other "specified transactions" after the Effective Date that are reasonably identifiable and factually supportable and projected by the Parent Guarantor in good faith to result, from actions that have been taken or with respect to which substantial steps have been taken (including prior to the Effective Date or the consummation of such transaction) or are expected to be taken (in the good faith determination of the Parent Guarantor), within 18 months after such transaction, initiative or event is consummated, net of the amount of actual benefits realized during such period from such actions, in each case, calculated on a Pro Forma Basis as though such cost savings, operating expense reductions

- 13 -

and synergies had been realized on the first day of such period for which Consolidated EBITDA is being determined and as if such cost savings, operating expense reductions and synergies were realized on the first day of the applicable period for the entirety of such period; provided that for any trailing 12-month period, the aggregate amount added to Consolidated EBITDA pursuant to this clause (h) shall not exceed the greater of (A) $50,000,000 and (B) 20% of Consolidated EBITDA for the applicable Relevant Period (calculated before giving effect to such addbacks);

(i)     accruals, payments, fees, charges and expenses (or amortization thereof) incurred during such period in connection with, or with respect to, any proposed or actual issuance of any indebtedness or equity interests, or any offering or repurchase thereof, or any proposed or actual acquisition, investment, dividend, recapitalization, asset sale, distribution or divestiture not prohibited under the Loan Documents and outside the ordinary course of business, for such period;

(j)     any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(k)     non-cash stock based compensation and payroll tax expense related to any management equity plan, management or employee benefit plan or agreement or any stock subscription or shareholder agreement, stock option and other equity-based compensation expenses;

(l)     unusual or non-recurring charges (including unusual or nonrecurring charges or expenses attributable to legal and judgment settlements);

(m)    any net pension or other postemployment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of IAS 19 (Employee Benefits), and any other items of a similar nature;

(n)     earnout and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments, in each case for such period in connection with any acquisition or other investment permitted under the Loan Documents;

(o)     research and development expenses as shall be mutually agreed upon by the Parent Guarantor and the Administrative Agent;

(p)     any net loss from disposed, abandoned or discontinued operations and all costs and expenses in connection with pre-opening and opening and closure and/or consolidation of facilities;

(q)     cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to the sub-clauses (i) through (v) below for any previous period and not added back;

(r)     [reserved];

(s)     the amount of any Permitted Tax Distributions made during that period;

(t)     [reserved];

(u)     any cost and expense incurred by the Parent Guarantor or a Restricted Subsidiary (A) in respect of major maintenance expenses, or (B) in respect of the operation and maintenance of its assets (other than major maintenance expenses), in each case only to the extent such

costs and expenses are paid for with the proceeds of cash contributions to the common equity of Parent Guarantor and/or purchases of or investments in Equity Interests of Parent Guarantor other than Disqualified Equity Interests;

(v)    all charges, costs, expenses, accruals or reserves in connection with the rollover, acceleration or payout of equity interests held by management and all losses, charges and expenses related to payments made to holders of options or other derivative equity interests in the common equity of such Person in connection with, or as a result of, any distribution being made to equity holders of such Person, which payments are being made to compensate such option holders as though they were equity holders at the time of, and entitled to share in, such distribution;

(w)    all costs and expenses associated with the retirement, remediation or decommissioning of any asset owned by the Parent Guarantor or any of its Restricted Subsidiaries;

(x)    any unrealized losses for the applicable reporting period attributable to the application of "mark-to-market" accounting in respect of Swap Agreements or in respect of foreign currency translation adjustments;

(y)    the amount of any non-controlling interest or minority interest expense consisting of Subsidiary income attributable to equity interests of third parties in any non-wholly owned Subsidiary;

(z)    the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period to the Permitted Holders or other equity holders to the extent otherwise permitted under Section 6.6;

(aa)    [reserved];

(bb)    with respect to any joint venture that is not a Restricted Subsidiary, an amount equal to the proportion of those items above relating to such joint venture corresponding to such Person's and the Restricted Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Restricted Subsidiary) solely to the extent Consolidated Net Income was reduced thereby;

(cc)    all Transaction Costs, subject to satisfactory review by the Administrative Agent; and

(dd)    fees and reasonable and documented out-of-pocket expenses incurred in connection with any amendments or waivers to the credit agreement with respect to the Term Facility and the other Loan Documents to the extent such fees and expenses have been notified by the Parent Guarantor or the Borrower to the Administrative Agent;

*minus*, without duplication and to the extent included in determining such Consolidated Net Income (except in the case of clause (iii) below), the sum of:

(i)    any income during such period relating to defined benefits pension or post-retirement benefit plans;

(ii)    all gains during such period attributable to the early extinguishment of debt or hedging obligations;

(iii)    any extraordinary gains for such period, determined on a consolidated basis in accordance with GAAP;

(iv)     any amounts contributed in cash to any defined benefits pension or post-retirement benefit plans during such period that are required to be contributed pursuant to the terms of such plans or by applicable law; and

(v)     any revenue for such period for which Consolidated EBITDA was increased in a prior period under clause (m) above.

There shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA of any Person, property, business or asset acquired by the Parent Guarantor or any Restricted Subsidiary during such period, to the extent not subsequently sold, transferred or otherwise disposed of by the Parent Guarantor or such Restricted Subsidiary during such period (each such Person, property, business or asset acquired and not subsequently so disposed of, an "Acquired Entity or Business") and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "Converted Restricted Subsidiary"), based on the actual Acquired EBITDA of such Acquired Entity or Business or Converted Restricted Subsidiary for such period (including the portion thereof occurring prior to such acquisition).  There shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than of an Unrestricted Subsidiary or its property, business or assets) sold, transferred or otherwise disposed of or, closed or classified as discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of) by the Parent Guarantor or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "Sold Entity or Business") and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each a "Converted Unrestricted Subsidiary"), based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition).

"Consolidated Interest Expense" means, for any period, the sum of (a) total interest expense (including that portion attributable to Capital Lease Obligations and capitalized interest) of the Parent Guarantor and Subsidiaries on a consolidated basis in accordance with GAAP with respect to all outstanding Indebtedness of the Parent Guarantor and Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, net costs under Swap Agreements and amounts referred to in Section 2.9 payable to the Administrative Agent and Lenders that are considered interest expense in accordance with GAAP, but excluding, however, any financing fees and expenses paid in connection with the consummation of the Transactions, *plus* (b) any discount, yield and/or interest component in respect of any Indebtedness incurred with respect to a Disposition or transfer of account receivables (regardless of whether such amounts would constitute interest expense in accordance with GAAP).

"Consolidated Net Income" means, for any period, the net income or loss of the Parent Guarantor and its Restricted Subsidiaries for such period, determined on a consolidated basis in conformity with GAAP; *provided* that the following shall be excluded:

(a)     the net income of any Person that is not a consolidated Restricted Subsidiary, except to the extent of the amount of dividends or similar distributions actually paid in, or converted into, cash or Cash Equivalents by such Person to the Parent Guarantor or any Restricted Subsidiary during such period;

(b)     the net income of any Restricted Subsidiary of the Parent Guarantor to the extent that, on the date of determination, the declaration or payment of cash dividends or similar cash distributions by such Restricted Subsidiary is not permitted by the operation of the terms of the organizational documents or constitutional documents (as applicable) of such Restricted Subsidiary, any agreement or other instrument binding upon such Restricted Subsidiary or any law, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary, unless such restrictions with respect to the payment of cash dividends

- 16 -

and other similar cash distributions have been legally and effectively waived except (solely to the extent permitted to be paid) to the extent of the amount of dividends or other distributions paid to the Parent Guarantor or any of its Restricted Subsidiaries by such Person during such period in accordance with such documents and regulations;

(c)    the net income or loss of, and any amounts referred to in clause (a) above paid to, any consolidated Restricted Subsidiary that is not wholly-owned by the Parent Guarantor to the extent such income or loss or such amounts are attributable to the noncontrolling interest in such consolidated Restricted Subsidiary; and

(d)    charges and expenses pursuant to any management equity plan, long-term incentive plan or stock option plan or any other management or employee benefit plan or agreement, any stock subscription or shareholder agreement to the extent that (in the case of any cash charges and expenses) such charges and expenses are funded with cash proceeds contributed to the capital of the Parent Guarantor or net cash proceeds of an issuance of Equity Interests (other than Disqualified Equity Interests) of the Parent Guarantor.

"Consolidated Total Debt" means, at any date of determination (without double counting), the aggregate principal amount of Indebtedness that constitutes funded liabilities of an interest bearing nature of the Group outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, excluding amounts owing in respect of any Capital Lease Obligations and excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any SPAC Transaction, Holdco Transaction, investment or acquisition (as shown in the relevant annual financial statements or quarterly financial statements), where, for the purposes of this definition, the exchange rate to be used shall be the same exchange rate used in the financial statements when calculating Consolidated EBITDA for the Relevant Period; provided that Consolidated Total Debt shall not include Indebtedness (i) in respect of letters of credit, except to the extent of unreimbursed amounts thereunder (provided that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until five Business Days after such amount is drawn), (ii) non-Capital Lease Obligations, (iii) constituting subordinated shareholder loans, and (iv) of Unrestricted Subsidiaries; it being understood, that unused commitments and obligations under Swap Agreements do not constitute Consolidated Total Debt.

"Consolidated Total Net Debt" means at any time Consolidated Total Debt less unrestricted Cash and Cash Equivalents of the Loan Parties (provided that the aggregate amount of unrestricted Cash and Cash Equivalents of the Loan Parties which may be deducted for the purpose of calculating Consolidated Total Net Debt shall not exceed $750,000,000).

"Consolidated Total Net Leverage Ratio" means, at any date, the ratio of (a) Consolidated Total Net Debt to (b) Consolidated EBITDA for the Relevant Period ended on, or most recently ended prior to, such date.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlled" has a meaning correlative thereto.

"Converted Restricted Subsidiary" has the meaning set forth in the definition of "Consolidated EBITDA".

"Converted Unrestricted Subsidiary" has the meaning set forth in the definition of "Consolidated EBITDA"

"Convertible Notes" means debt securities that are convertible solely into, or exchangeable solely for, Equity Interests of the Parent Guarantor (other than Disqualified Equity Interests) and/or cash; provided that such debt securities (a) do not have a scheduled maturity date any earlier than the date that is 181 days after the Latest Maturity Date applicable at the time of issuance thereof, (b) only require interest to be paid

in kind; *provided* that, after an IPO, cash interest will be permitted in an amount not to exceed 5.0% *per annum* and (c) issued prior to an IPO shall be convertible solely into Equity Interests of the Parent Guarantor (other than Disqualified Equity Interests) (and not for cash) and shall not require any cash payments (other than customary tax gross-ups, indemnities and expense reimbursement) to be made thereunder to the holders thereof prior to the maturity thereof or contain any cash redemption features, except, in the case of clauses (a), (b) and (c) above, if as a result of a customary fundamental change or change of control event.

"Core Assets" means (a) the intellectual property of the Group and the learning applications set forth in Schedule 1.1(a), in each case owned by the Group as at the Effective Date, (b) future Intellectual Property and learning applications owned by the Group with payments or revenues in excess of $75,000,000 per annum or (c) any Intellectual Property owned by a member of the Group which is necessary for the day-to-day businesses of the Parent Guarantor or any of its Restricted Subsidiaries.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Loan Party pursuant to Section 5.9.

"Covered Obligation" has the meaning set forth in the defined term "Guarantee Maintenance Amount".

"Credit Extension" has the meaning set forth in Section 4.2.

"Credit Ratings" has the meaning set forth in Section 5.12.

"Customary Bridge Facilities" means customary "bridge" facilities that automatically convert into or are exchanged for permanent financing that does not provide for either (a) an earlier final maturity date than the Latest Maturity Date of all Classes of Term Commitments and Term Loans then in effect or (b) a shorter Weighted Average Life to Maturity than the remaining Weighted Average Life to Maturity of all Classes of Term Commitments and Term Loans then in effect.

"Debt Fund Affiliate" means any Affiliate of the Parent Guarantor (other than a natural Person) (a) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course and (b) for which no personnel making investment decisions in respect of any equity fund which has a direct or indirect equity investment in the Parent Guarantor or its subsidiaries has the right to make any investment decisions.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Declined Proceeds" has the meaning set forth in Section 2.8(g).

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means, subject to Section 2.20(b), any Lender that (a) has failed to (i) fund all or any portion of its Term Loans within two Business Days of the date such Term Loans were required to be funded hereunder or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to such funding or payment (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund

a Term Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) become the subject of a Bail-In Action or (iii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; or (d) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such written confirmation by the Administrative Agent and the Borrower). Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"Designated Non-Cash Consideration" means the fair market value (as reasonably determined by the Parent Guarantor in good faith) of non-cash consideration received by the Parent Guarantor or any of its Restricted Subsidiaries in connection with a Disposition pursuant to Section 6.3(b) that is so designated as "Designated Non-Cash Consideration" pursuant to a certificate of a Responsible Officer of the Parent Guarantor *minus* the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-Cash Consideration.

"Disclosed Matters" means the Proceedings and the environmental matters disclosed in Schedule 3.6.

"Disclosure Material Adverse Effect" means (a) a material adverse effect on the business, financial position or operations of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, or (b) a material impairment of the ability of the Loan Parties, taken as a whole, to perform any of its material obligations under the Loan Documents.

"Disposed EBITDA" means, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or such Converted Unrestricted Subsidiary, all as determined on a consolidated basis for such Sold Entity or Business or such Converted Unrestricted Subsidiary and as if references to the Parent Guarantor and the Restricted Subsidiaries in the definition of Consolidated EBITDA (and in the component definitions used therein) were references to such Sold Entity or Business and its Subsidiaries or such Converted Unrestricted Subsidiary and its Subsidiaries.

"Disposition" or "Dispose" means, with respect to any property or right, any sale, lease, sale and leaseback, license, assignment, conveyance, transfer or other disposition thereof.

"Disqualified Equity Interest" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests and the payment in cash in lieu of the issuance of fractional shares of such

Equity Interests), in whole or in part, or (c) is or becomes convertible into, redeemable or exchangeable (unless at the sole option of the issuer thereof) for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (c), prior to the date that is 181 days after the Latest Maturity Date then in effect; *provided* that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control" occurring prior to the date that is 181 days after the Latest Maturity Date then in effect if the payment upon such redemption or repurchase is contractually subordinated in right of payment to the Obligations.

"Disqualified Lender" means, collectively, (a) any Person that is a competitor or potential competitor of the Parent Guarantor or any of its Subsidiaries or any direct or indirect equity holder of any such competitor, in each case as determined in good faith by the Borrower and to the extent identified by the Borrower to the Administrative Agent and the Lenders (including after the Effective Date which may be delivered in a form of a list provided to the Administrative Agent) by name in writing from time to time ("Competitors"), (b) those banks, financial institutions and other Persons separately identified by name by the Borrower to the Administrative Agent in writing on or before the syndication of the Term Facility, (which may be updated by the Borrower from time to time after the Effective Date and delivered to the Administrative Agent), (c) any other Person (including an Affiliate or Approved Fund of a Lender) whose primary activity is the trading or acquisition of distressed debt, to the extent identified by the Borrower to the Administrative Agent and the Lenders (including after the Effective Date which may be delivered in a form of a list provided to the Administrative Agent) by name in writing from time to time; *provided* that, for purposes of Section 10.12, senior employees of Lenders or their Affiliates who are required, in accordance with industry regulations or the Lenders' internal policies and procedures to act in a supervisory capacity and the Lenders' internal legal, compliance, risk management, credit or investment committee members shall not constitute Disqualified Lenders as a result of this clause (c), and (d) any subsidiary or other Affiliate of any bank, financial institution or other Person under clause (a) or (b) above, other than *bona fide* debt funds that would not be a Competitor or other Disqualified Lender but for this clause (d), that is clearly identifiable as a subsidiary or Affiliate of such bank, financial institution or other Person solely on the basis of the similarity of its name; *provided* that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the foregoing. Without limiting the generality of the foregoing, the Administrative Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender is a Disqualified Lender or (ii) have any liability with respect to or arising out of any assignment or participation of Term Loans or commitments or disclosure of confidential information, to, any Disqualified Lender. The identification of any Competitor or other Disqualified Lender after the Effective Date shall become effective three Business Days after delivery of notice by Borrower to the Administrative Agent and the Lenders, and shall not apply retroactively to disqualify the assignment, participation or other transfer of an interest in Term Commitments or Term Loans (including pursuant to a binding agreement to sell and assign all or a portion of any Lender's rights and obligations under this Agreement that was entered into prior to such identification) that was effective prior to the effective date of such supplement (but such Person shall not be able to increase its Term Commitments or participations hereunder); *provided* that such Person shall thereafter be considered a Disqualified Lender. Any update to the list of Disqualified Lenders shall be promptly identified to the Lenders by the Administrative Agent (which may be in the form of notice posted to the Platform). Disqualified Lenders shall exclude any Person that the Borrower has designated as no longer being a "Disqualified Lender" by written notice delivered to the Administrative Agent from time to time.

"Dollar Equivalent" means, at any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent at any time on the basis of the Spot Rate in effect on such date for the purchase of Dollars with such currency.

"Dollars" or "$" refers to lawful money of the United States of America.

"DQ List" has the meaning set forth in Section 10.4(e)(iv).

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) above, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means the date on which the conditions specified in <u>Section 4.1</u> are satisfied (or waived in accordance with <u>Section 10.2</u>).

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"<u>Environmental Claim</u>" means any notice of violation, claim, action, suit, proceeding, demand, abatement order or other written notice or order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law, (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity, or (iii) in connection with any actual or alleged damage, injury, threat or harm to health or safety (with respect to exposure to Hazardous Materials), natural resources or the environment.

"<u>Environmental Laws</u>" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, use, handling, transportation, storage, treatment, disposal, management, release or threatened release of any Hazardous Material or, health and safety matters as they relate to Hazardous Materials.

"<u>Environmental Liability</u>" means any Liability, contingent or otherwise (including any Liability for damages, costs of investigation, reclamation or remediation, fines, penalties or indemnities), of the Parent Guarantor or any Subsidiary of the Parent Guarantor directly or indirectly resulting from or based upon (a) compliance or noncompliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, release or threatened release of any Hazardous Materials into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which Liability is assumed or imposed with respect to any of the foregoing.

"<u>EPIC Merger</u>" means the merger or consolidation of all of the Equity Interests of EPIC with all of the Equity Interests of BYJU's Inc. on or prior to March 31, 2022; *provided* that the surviving entity is EPIC immediately after such merger or consolidation.

"<u>EPIC</u>" means EPIC! Creations Inc.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest; *provided* that Equity Interests shall not include any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that together with the Parent Guarantor or any of its Subsidiaries is treated as a single employer under Section 414 of the Code.

"ERISA Event" means any one or more of the following: (a) any reportable event, as defined in Section 4043 of ERISA, with respect to a Pension Plan; (b) the termination of any Pension Plan under Section 4041 of ERISA; (c) the institution of proceedings by the PBGC under Section 4041 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (d) the failure to make a required contribution to any Pension Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Sections 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; (e) the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate requesting a minimum funding waiver or failing to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA (whether or not waived); (f) a determination that any Pension Plan is, or is reasonably expected to be, considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (g) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to a U.S. Plan; (h) the complete or partial withdrawal of the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate from a Multiemployer Plan; (i) a determination that any Multiemployer Plan is in endangered or critical status under Section 432 of the Code or Section 305 of ERISA or is, or is expected to be, "insolvent" within the meaning of Section 4245 of ERISA; (j) the filing by the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (k) the failure by the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate to make by its due date any required contribution to a Multiemployer Plan; or (l) the imposition of liability on the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Term Loan or Borrowing, refers to whether such Term Loan, or the Term Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning set forth in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means a deposit account or securities account (a) that is used for the sole purpose of making payroll and withholding tax payments related thereto and other employee wage and benefit payments and accrued and unpaid employee compensation (including salaries, wages, benefits and expense reimbursements), (b) that is used for paying taxes, including sales taxes, (c) that is used as a withholding or an escrow account or as a fiduciary or trust account, (d) that is a zero balance deposit account, (e) with an average monthly balance of less than $3,000,000 (*provided* that the aggregate average monthly balance of all deposit accounts and securities accounts that are Excluded Accounts pursuant to this clause (e) shall not exceed, at any time, $25,000,000), (f) that is a deposit account which is established in the ordinary course and maintained solely for the purpose of serving as a cash collateral account in favor of any third party that provides credit card programs or other cash management and operating account arrangements for the Loan Parties (provided that the aggregate balance of all such deposit accounts that are Excluded Accounts pursuant to this clause (f) shall not exceed, at any time, $75,000,000), or (g) that is established, maintained and used solely to secure trade or commercial letters of credit to the extent permitted under this Agreement.

"Excluded Property" means (a) any lease, license or other agreement or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement (other than a lease or license between members of the Group relating to Intellectual Property owned by the Group) or purchase money security interest or similar arrangement or create a right of termination in favor of any party thereto (other than any other member of the Group) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or such other applicable law notwithstanding such prohibition; (b) those assets as to which the Administrative Agent and the Borrower reasonably agree that the cost of obtaining such a security interest or perfection thereof, are excessive in relation to the practical benefit to the Lenders of the security to be afforded thereby; (c) "intent-to-use" trademark applications; (d) governmental licenses or state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under applicable laws (including, without limitation, rules and regulations of any governmental authority or agency) or after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, or the pledge thereof or creation of a security interest therein would require governmental or other third party consent, approval, license or authorization (except to the extent already received or, in the case of any other third party consent, approval, license or authorization, to the extent such consent, approval, license or authorization can be given by the Parent Guarantor, the Borrower or any of their subsidiaries), other than to the extent such prohibition or limitation is rendered ineffective under the Uniform Commercial Code or other applicable law notwithstanding such prohibition, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or such other applicable law notwithstanding such prohibition or limitation; (e) Margin Stock and Equity Interests in or assets of any person other than wholly-owned Material Subsidiaries (including Unrestricted Subsidiaries, Joint Ventures, special purpose securitization vehicles or similar entities, captive insurance companies, not-for-profit subsidiaries and other Excluded Subsidiaries), (f) motor vehicles, aircraft and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a Uniform Commercial Code financing statement or a similar filing under non-U.S. law; (g) any property or assets for which the creation or perfection of pledges of, or security interests in would result in material adverse tax consequences to any member of the Group as reasonably determined by the Borrower in consultation with the Administrative Agent; (h) any Excluded Account and the funds or other property held in or maintained in any such Excluded Account; (i) any Real Estate Asset that is not a Material Real Estate Asset and any leasehold interest in real property, (j) all commercial tort claims below $50,000,000, (k) letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection of the security interest in such other Collateral may be accomplished by the filing of a Uniform Commercial Code financing statement or a similar filing under non-U.S. law (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a Uniform Commercial Code financing statement or a similar filing under non-U.S. law) and (l) (without prejudice to the requirements for any entity in incorporated India to enter into a Shareholders (Call Option) Agreement to the extent required under Section 5.14), any assets or property of, or any shares in, any member of the Group incorporated in India.

"Excluded Subsidiary" means (a) any Subsidiary that is prohibited by law, regulation or any existing contractual obligation from guaranteeing the Obligations or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such guaranty unless such consent, approval, license or authorization has been received, it being understood that there shall be no obligation to obtain such consent, approval, license or authorization (*provided* that (i) with respect to any Subsidiary existing on the Effective Date, any such contractual obligation containing such a prohibition was in existence on the Effective Date and (ii) with respect to any Subsidiaries acquired or created after the Effective Date, such prohibition is not the result of a contractual obligation that arose primarily to cause such Subsidiary to constitute an Excluded Subsidiary pursuant to this clause (a)), (b) any Subsidiary that is an investment company under the Investment Company Act of 1940 (or would be such an investment company if it were to provide or maintain a Guarantee), (c) any Subsidiary whose provision of a Guarantee would constitute an investment in "United States property" within the meaning of Section 956 of the Code

by a "controlled foreign corporation" (as defined in Section 957 of the Code) that has as a "United States shareholder" (as defined in Section 951(b) of the Code) the Borrower or one of its direct or indirect U.S. subsidiaries or direct or indirect U.S. parent entities, and that is directly or indirectly owned (within the meaning of Section 958(a) of the Code) by such United States shareholder (a "CFC"), (d) any subsidiary whose provision of a Guarantee would result in material adverse tax consequences to the Borrower or one of its direct or indirect subsidiaries or direct or indirect parent entities as reasonably determined by the Borrower in consultation with the Administrative Agent, (e) any subsidiary with no material assets other than capital stock and indebtedness of one or more foreign subsidiaries that are CFCs (a "FSHCO"), (f) any Unrestricted Subsidiary, (g) any Immaterial Subsidiary (other than an Immaterial Subsidiary which is a Loan Party), (h) any Subsidiary that is a captive insurance company, (i) any Subsidiary that is organized as a not-for-profit entity, (j) any Subsidiary that is not wholly-owned, directly or indirectly, by the Parent Guarantor to the extent the Equity Interests in such Subsidiary held by Persons other than the Parent Guarantor or any of its Affiliates are not due to requirements of applicable law (*provided* that upon written notice by the Borrower to the Administrative Agent, this clause (j) shall not apply to any Restricted Subsidiary designated by the Borrower in such written notice), (k) [*reserved*], (l) any other Subsidiary that the Borrower and the Administrative Agent reasonably determine the cost and/or burden of obtaining a guarantee of the Obligations from such Subsidiary outweigh the benefit to the Lenders and (m) any other Subsidiary organized outside of the United States which shall be subject to applicable maintenance of capital, corporate benefit, financial assistance and similar laws, rules and regulations (it being understood that the Parent Guarantor and each other subsidiary of the Parent Guarantor shall pursue any "whitewash" or similar procedures available in connection with such laws, rules and regulations in jurisdictions to be mutually agreed upon in a reasonable manner) and *provided* that (i) the limitations described in clauses (c) to (e) above shall not apply (A) to any of the Initial Guarantors (or their successors) and (B) if the provision of such guarantees would not result in material U.S. federal income taxes under Section 951(a)(1)(B) of the Code for the Borrower or one of its direct or indirect U.S. subsidiaries or direct or indirect U.S. parent entities as reasonably determined by the Borrower on notice to the Administrative Agent, after taking into account Treasury Regulations Section 1.956-1(a)(2) and Section 245A of the Code and any related guidance), and (ii) the Parent Guarantor may, at its option, cause any subsidiary organized in the United States or, as is reasonably acceptable to the Administrative Agent, any subsidiary organized outside of the United States to become a Guarantor.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on (or measured by) its net income or gross profit, franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction (or any political subdivision thereof) imposing such Tax or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or Term Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or Term Commitment (other than the acquisition of such interests on the Effective Date or pursuant to an assignment request by the Borrower under Section 2.16(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) withholding Taxes imposed under FATCA, and (d) any Taxes attributable to such recipient's failure to comply with Section 2.14(e).

"Existing Term Loan Tranche" has the meaning set forth in Section 2.19(a).

"Extended Term Loans" has the meaning set forth in Section 2.19(a).

"Extending Term Lender" has the meaning set forth in Section 2.19(b).

"Extension" means the establishment of a Term Loan Extension Series by amending a Term Loan pursuant to Section 2.19 and the applicable Extension Amendment.

- 24 -

"Extension Amendment" has the meaning set forth in Section 2.19(c).

"Extension Election" has the meaning set forth in Section 2.19(b).

"FATCA" means Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code or any published intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions (as determined in such manner as the NYFRB shall set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; *provided* that if such rate shall be less than zero, such rate shall be deemed to be zero for all purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor thereto.

"Fee Letters" means (a) the Letter Agreement, (b) that certain Fee Letter, dated on or prior to the Effective Date among the Administrative Agent, the Collateral Agent and the Borrower and (c) any other fee letter in connection with this Agreement between any Arranger and the Borrower, in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Financial Officer" means the chief financial officer, chief accounting officer, head of finance, vice president of finance, corporate controller or equivalent financial officer of the Borrower or the Parent Guarantor, as the case may be.

"Fitch" means Fitch Ratings Ltd, and any successor to its rating agency business.

"Foreign Currency Event" has the meaning set forth in Section 1.9(b).

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Form ODI" means the Form ODI to be filed with RBI by the Parent Guarantor, in accordance with and as per the format annexed to the ODI Regulations.

"GAAP" means generally accepted accounting principles in India, as in effect from time to time.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any *supra*-national bodies such as the European Union, the RBI or the European Central Bank).

"Great Learning Education Framework Agreement" means the framework agreement dated July 16, 2021 between, among others, Great Learning Education Pte. Ltd., BYJU's Pte. Ltd., Mohana Krisha Lakhamraju and the Parent Guarantor.

"Group" means the Parent Guarantor and its Restricted Subsidiaries from time to time.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and

including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; *provided* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business, or customary indemnification obligations entered into in connection with any acquisition or Disposition of assets or of other entities (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Maintenance Amount" means an amount equal to 115% of the sum of principal amounts outstanding under and without duplication any available or unutilized commitments under: (i) the Initial Term Loans and (ii) when incurred (a) any Incremental Facilities, (b) any Incremental Equivalent Debt, (c) any Refinancing Term Facility, (d) any Refinancing Equivalent Debt, (e) any Indebtedness incurred under Section 6.1(m) (assuming full utilization of such revolving credit facility whether or not fully drawn), (f) any Indebtedness under a Secured FX Hedging Agreement or a Secured Interest Rate Hedging Agreement and (g) any other relevant guaranteed amounts ((i) and (ii) being the "Covered Obligations").

"Guarantee Maintenance Requirement" has the meaning set forth in Section 5.17.

"Guaranteed Obligations" has the meaning set forth in Section 7.1.

"Guarantee Regulations" means the Foreign Exchange Management (Guarantee) Regulations, 2000 of India, as amended from time to time read together with the ODI Regulations.

"Guarantor" means the Initial Guarantors and each Person that shall have become a party hereto or to the Onshore Guarantee Deed as a "Guarantor" and shall have provided a Guaranty of the Obligations by (a) (in respect of the Relevant Guarantors) executing and delivering to the Administrative Agent a signature page hereto or a Counterpart Agreement and (b) (in respect of the Indian Guarantors) executing and delivering an Onshore Guarantee Accession Deed to the Administrative Agent; *provided* that on and after the consummation of a Holdco Transaction, the term "Guarantor" shall also include Holdings.

"Guarantor Coverage Requirement" means, at all times, the Consolidated EBITDA of the Guarantors shall be equal to or greater than 85% of the Consolidated EBITDA of the Parent Guarantor and its Restricted Subsidiaries; *provided* that no Default will occur if the Guarantor Coverage Requirement is not satisfied as a result of restrictions imposed by the RBI which prohibit the provision of a guarantee by persons incorporated in India which become members of the Group after the Effective Date.

"Guaranty" means the guaranty of each Guarantor set forth in Article VII or under the Onshore Guarantee Deed.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation,

transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreement" means a Secured Interest Rate Hedging Agreement or a Secured FX Hedging Agreement designed to hedge against fluctuations in interest rates or currency values, respectively.

"Holdco Transaction" means a transaction (or series of transactions) in preparation for, or in connection with, an IPO, which will, among other things, cause 100% of the Equity Interests in the Parent Guarantor to be held by a newly-formed entity ("Holdings"); *provided* that (a) the owners of 100% of the Equity Interests in Holdings immediately after giving effect to such transaction (and the amount of such Equity Interests owned by each such Person) are identical to the owners of 100% of the Equity Interests in the Parent Guarantor immediately prior to giving effect to such transaction (and the amount of such Equity Interests owned by each such Person); *provided* that, such Equity Interests of such owners may be held in different classes or series of Equity Interests of Holdings (with different voting and other governance rights and different liquidation preferences, dividend rights and other economic rights), (b) Holdings shall have entered into Collateral Documents, in form and substance reasonably satisfactory to the Administrative Agent, pursuant to which Holdings shall pledge its interest in the Collateral to the Collateral Agent for the benefit of the Secured Parties, and (c) Holdings shall have executed and delivered to the Administrative Agent a Counterpart Agreement and shall have provided such other documentation as would be required in connection with a joinder of a Guarantor pursuant to Section 5.9.

"Holdings" has the meaning set forth in the definition of "Holdco Transaction".

"IBA" has the meaning set forth in Section 2.11(b).

"IBC" means the provisions of the (Indian) Insolvency and Bankruptcy Code, 2016 and shall include any rules, re-enactments, regulations, directives or such other notification as may be issued pursuant thereto.

"Immaterial Subsidiary" means, at any time of determination, each Restricted Subsidiary of the Parent Guarantor (other than the Borrower) (a) whose Consolidated EBITDA as of the last day of the most recent fiscal quarter in respect of which financial statements have been delivered pursuant to Section 5.1(a) or (b) or Section 3.4(a) was less than 5% of the Consolidated EBITDA of the Parent Guarantor and its Restricted Subsidiaries at such date and (b) whose consolidated gross revenues for the most recent period of four fiscal quarters in respect of which financial statements have been delivered pursuant to Section 5.1(a) or (b) or Section 3.4(a) was less than 5% of the consolidated gross revenues of the Parent Guarantor and its Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, as of the most recent date or period referred to in clause (a) or (b) above, the combined Consolidated EBITDA or the combined consolidated gross revenues of all Restricted Subsidiaries that would constitute Immaterial Subsidiaries in accordance with clauses (a) and (b) above shall have exceeded 20% of the Consolidated EBITDA of the Parent Guarantor and its Restricted Subsidiaries at such date or 20% of consolidated gross revenues of the Parent Guarantor and its Restricted Subsidiaries for such period, then one or more of such Restricted Subsidiaries that would otherwise be an Immaterial Subsidiary shall for all purposes of this Agreement automatically be deemed to not be an Immaterial Subsidiary in descending order based on the amounts of their Consolidated EBITDA or consolidated gross revenues, as the case may be, until such excess shall have been eliminated.

"Impacted Interest Period" has the meaning set forth in the definition of "LIBO Rate".

"Impediment" has the meaning set forth in Section 2.8(d).

"Incremental Amendment" has the meaning set forth in Section 2.17(c).

"Incremental Equivalent Debt" has the meaning set forth in Section 2.17(d).

"<u>Incremental Facilities</u>" means each Incremental Term Loan Commitment and Incremental Term Loan.

"<u>Incremental Term Lender</u>" has the meaning set forth in <u>Section 2.17(a)</u>.

"<u>Incremental Term Loan Commitments</u>" has the meaning set forth in <u>Section 2.17(a)</u>.

"<u>Incremental Term Loan Maturity Date</u>" means, with respect to any Incremental Term Loans to be made pursuant to any Incremental Amendment, the maturity date specified in such Incremental Amendment.

"<u>Incremental Term Loans</u>" has the meaning set forth in <u>Section 2.17(a)</u>.

"<u>Indebtedness</u>" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade accounts, accounts payable and accrued expenses, and accruals for payroll incurred in the ordinary course of business, (ii) purchase price adjustments, earnouts, holdbacks and other similar deferred consideration payable in connection with acquisitions and (iii) deferred or equity compensation arrangements payable to directors, officers, employees, advisors, consultants or other providers of services), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness (excluding prepaid interest thereon) created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations (after giving effect to any prior drawings or reductions which may have been reimbursed) of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (g) all net obligations of such Person under any Swap Agreement (provided that such net obligations shall be deemed not to exceed an amount equal to the "early termination amount" (howsoever defined or described in the applicable Swap Agreement) that would be payable by such Person if, and assuming, that (x) the applicable Swap Agreement was terminated or closed-out in full as of such date as a result of the occurrence of an "event of default" (howsoever defined or described under the applicable Swap Agreement) with respect to such Person and (y) that such "early termination amount" was calculated using mid-market rates without taking into account the creditworthiness of any person); in each case of any of the foregoing paragraphs, provided that Indebtedness of any direct or indirect parent of a Person appearing on the balance sheet of such Person solely by reason of push-down accounting under GAAP shall be excluded; (h) to the extent not otherwise included above, (h) all Guarantees of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned or acquired by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. For all purposes hereof, the Indebtedness of the Parent Guarantor and its Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax and accounting operations and intercompany loans, advances or Indebtedness. "Indebtedness" shall not include the obligations or liabilities of any Person to pay rent or other amounts with respect to any lease of office space (or other arrangement conveying the right to use office space), which obligations (i) would be required to be classified and accounted for as an operating lease under GAAP as existing prior to December 31, 2018 or (ii) would be required to be classified and accounted for as a Capital Lease Obligation at any time due to build-to-suit accounting rules, "failed" sale and leaseback accounting rules, other lease classification rules or other similar rules so long as such obligations are not entered into for a financing purpose, are unsecured (other than the provision of any letters of credit required

to support such obligations), and do not otherwise constitute "Indebtedness" pursuant to clause (a), (b), (c) or (d) above.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document, the Letter Agreement or any Fee Letter and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Indemnitee" has the meaning set forth in Section 10.3(c).

"India" means the Republic of India and its constituent states from time to time and includes where the context so requires, the government of the Republic of India, the government of any constituent state thereof and any regulatory agency or authority thereof.

"Indian Guarantor" means the Parent Guarantor, Whitehat India and each other Guarantor incorporated in India.

"Information" means all information received from the Parent Guarantor, or from any of its Affiliates, representatives or advisors on behalf of the Parent Guarantor, relating to the Parent Guarantor or its business (including the DQ List), other than (a) any such information that is already known, or was lawfully disclosed without similar restriction prior to receipt thereof, to any Agent or any Lender prior to its receipt from the Parent Guarantor, or from any of its Affiliates, representatives or advisors on behalf of the Parent Guarantor and (b) publicly-available information provided to market data collectors, such as league tables or other service providers to the lending industry, regarding the Effective Date, size, type, purpose of, and parties to, this Agreement, *provided* that such information has become publicly available other than by reason of the breach of this Agreement or any other confidentiality obligations owing to the Parent Guarantor by any Agent, any Lender or any of their respective affiliates (to the extent such obligation is binding on the applicable Agent, Lender or affiliate).

"Information Utility" means the National E-Governance Services Limited or any other entity registered as an information utility under the Insolvency and Bankruptcy Board of India (Information Utilities) Regulations, 2017.

"Initial Guarantor" means the Guarantors which have provided a guarantee in respect of the Obligations (whether pursuant to this Agreement or the Onshore Guarantee Deed) on the Effective Date, being the Parent Guarantor, Tangible Play, Inc., Byju's Pte Ltd and Great Learning Education Pte. Ltd.

"Initial Term Loan" has the meaning set forth in Section 2.1.

"Intellectual Property" means, collectively, all rights, priorities and privileges in intellectual property (including copyrights, patents, trademarks, trade secrets, and proprietary rights in software and databases not otherwise included in the foregoing), and the right to sue at law or in equity or otherwise recover for any past, present or future infringement, dilution, misappropriation, breaches or other violation or impairment thereof, including the right to receive all proceeds therefrom, including license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

"Interest Election Request" has the meaning set forth in Section 2.5(b).

"Interest Expense" means, with respect to any Person for any period, the sum of (a) gross interest expense of such Person and its subsidiaries for such period on a consolidated basis whether paid or accrued, including (i) the amortization of debt discounts, (ii) the amortization of all fees payable in connection with the incurrence of Indebtedness to the extent included in interest expense, commissions, discounts and other fees and charges incurred in respect of letters of credit or bankers' acceptance financings, and (iii) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense, and (b) capitalized interest of such Person.

"<u>Interest Payment Date</u>" means (a) with respect to any ABR Term Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Term Loan, the last day of the Interest Period applicable to the Borrowing of which such Term Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"<u>Interest Period</u>" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months (or, with the consent of each Lender, 12 months or less than one month) thereafter, as the Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"<u>Interpolated Rate</u>" means, at any time for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the Screen Rate) determined by the Administrative Agent (which determination shall be *prima facie* evidence, absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period for which the Screen Rate is available that is shorter than the Impacted Interest Period; and (b) the applicable Screen Rate for the shortest period for which the Screen Rate is available that exceeds the Impacted Interest Period, in each case, at such time.

"<u>Investment</u>" means (a) any loan, advance (other than advances to officers, members of the Board of Directors, managers, consultants and employees or other providers of services for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business), extension of credit (by way of Guarantee, assumption of debt or otherwise) or capital contributions by the Parent Guarantor or any of its Restricted Subsidiaries to any other Person and (b) any purchase, acquisition or holding by the Parent Guarantor or any of its Restricted Subsidiaries of any Equity Interests in or Indebtedness or other securities (including any Acquisitions and any option, warrant or other right to acquire any of the foregoing) of any other Person.

"<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended.

"<u>IP Licensing Agreement</u>" means the perpetual and exclusive licensing agreement entered into or to be entered into by the Parent Guarantor,one or more members of the Group which own Intellectual Property as licensor, the Borrower as main licensee and the Collateral Agent.

"<u>IPO</u>" means (a) the sale on a *bona fide* nationally-recognized or internationally-recognized securities exchange of Equity Interests of the Parent Guarantor or of Holdings, (b) the listing for trading of Equity Interests of the Parent Guarantor or Holdings on a *bona fide* nationally-recognized or internationally-recognized securities exchange or (c) the acquisition, purchase, demerger, merger or combination of the Parent Guarantor or Holdings, by or with, a publicly traded special acquisition company or targeted acquisition company or any entity similar to the foregoing or any subsidiary thereof that results in the Equity Interests of the Parent Guarantor or Holdings (or its successor by acquisition, purchase, demerger, merger or combination) being (i) exchanged for Equity Interests of such publicly traded special acquisition company or targeted acquisition company or any entity similar to the foregoing or any subsidiary thereof or (ii) otherwise listed for trading on, or such parent being wholly-owned by another entity whose Equity Interests are listed for trading on, a *bona fide* nationally-recognized or internationally-recognized securities

exchange (a "**SPAC Transaction**"), in the case of each of clauses (a) and (b) above, whether in the form of a primary issuance, secondary sale or a combination thereof.

"Ipso Facto Event" means a Loan Party is the subject of any proceedings as described in section 440 of the IRDA.

"IRDA" means the Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018) of Singapore.

"IRS" means the U.S. Internal Revenue Service.

"Joint Bookrunner" means MS and JPMCB in their capacity as joint bookrunners, and any successor thereto.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"JPMCB" means JPMorgan Chase Bank, N.A.

"Junior Financing" means any Indebtedness of the Parent Guarantor and its Subsidiaries that is (i) subordinated in right of payment to the Obligations expressly by its terms, (ii) unsecured or (iii) is secured on a junior lien basis to the Liens securing the Obligations.

"Junior Financing Documentation" means any documentation governing any Junior Financing.

"Junior Refinancing Indebtedness" has the meaning set forth in Section 2.18(a)(ii).

"Latest Maturity Date" means, at any date of determination, the latest maturity or termination date applicable to any Term Loan or Term Commitment hereunder at such time, in each case as extended in accordance with this Agreement from time to time, including the Latest Term Loan Maturity Date.

"Latest Term Loan Maturity Date" means, at any date of determination, the latest maturity date applicable to any then-outstanding Term Loan, Incremental Term Loan, Refinancing Term Loan or Extended Term Loan, in each case as extended in accordance with this Agreement from time to time, and including the Term Loan Maturity Date and the Incremental Term Loan Maturity Date.

"law" means, as to any Person, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority, self-regulatory organization, market, exchange, or clearing facility charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, self-regulatory organization, market, exchange, or clearing facility, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether or not having the force of law.

"LCT Test Date" has the meaning set forth in Section 1.7(a).

"Lender-Related Person" has the meaning set forth in Section 10.3(b).

"Lenders" means the Persons listed in Schedule 2.1 and any other Person that shall have become a party hereto as an Additional Lender or pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter Agreement" means that certain Engagement Letter, dated September 29, 2021, between the Arranger and the Parent Guarantor, as amended, restated, supplemented (through joinders or otherwise) or otherwise modified from time to time (including by any joinder agreement).

"<u>Liabilities</u>" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, the applicable Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; *provided* that if the Screen Rate shall not be available at such time for such Interest Period (an "<u>Impacted Interest Period</u>"), then the LIBO Rate shall be the Interpolated Rate.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"<u>Limited Condition Transaction</u>" means any acquisition or other Investment permitted under <u>Section 6.7</u> by the Parent Guarantor or one or more of its Restricted Subsidiaries, (a) the consummation of which is not conditioned on (i) the availability of, or on obtaining, third-party financing, (ii) any repurchase, prepayment, refinancing, defeasance, satisfaction and discharge, redemption or repayment of Indebtedness requiring irrevocable notice in advance of such event, and/or (iii) any Restricted Payment requiring the declaration thereof in advance thereof, and (b) which is designated as a "Limited Condition Transaction" by the Parent Guarantor in writing to the Administrative Agent pursuant to or in accordance with <u>Section 1.7</u>.

"<u>Loan Documents</u>" means this Agreement (including any amendment hereto or waiver hereunder), the Term Loan Notes (if any), any Counterpart Agreement, the Collateral Documents, the IP Licensing Agreement, the Onshore Guarantee Deed, any Onshore Guarantee Accession Deed, any Shareholders (Call Option) Agreement, the Fee Letters and any other agreement entered into in connection herewith or therewith by the Borrower or any other Loan Party with or in favor of the Administrative Agent, the Collateral Agent or the Lenders and designated by the terms thereof as a "Loan Document".

"<u>Loan Parties</u>" means the Parent Guarantor, the Borrower and the Guarantors (including, on and after the consummation of a Holdco Transaction, Holdings).

"<u>Margin Stock</u>" has the meaning assigned to such term in Regulation U of the Federal Reserve Board as in effect from time to time.

"<u>Marketable Securities</u>" means, without duplication of any of the items described in the definition of Cash Equivalents, investments permitted pursuant to any applicable member of the Group's investment policy as approved by the Board of Directors (or committee thereof) of such member of the Group from time to time.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Loan Parties (taken as a whole), (b) the rights and remedies of the Lenders or the Administrative Agent under this Agreement or of any Agent, any Lender or any other Secured Party under the Loan Documents or the effectiveness or ranking of any Lien granted or purporting to be granted pursuant to any of the Collateral Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents.

"<u>Material Contract</u>" means (a) the IP Licensing Agreement, (b) each Shareholders (Call Option) Agreement.

"<u>Material Indebtedness</u>" means any Indebtedness for borrowed money and any other Indebtedness constituting Consolidated Total Debt (other than any Indebtedness under the Loan Documents) of any one or more of the Parent Guarantor and its Restricted Subsidiaries in a principal amount exceeding $100,000,000.

"Material Real Estate Asset" means any Real Estate Asset with a fair market value in excess of $10,000,000.

"Material Subsidiary" means, at any time of determination, each Restricted Subsidiary of the Parent Guarantor that is not an Immaterial Subsidiary (being on the Effective Date those indicated as "Material Subsidiary" in Schedule 3.12 and which shall include, following the completion of the EPIC Merger, EPIC).

"Material Swap Obligations" means any obligations of the Parent Guarantor or its Restricted Subsidiaries in respect of one or more Swap Agreements entered into in connection with the issuance of Convertible Notes constituting a call spread overlay or similar arrangement in a principal amount exceeding $100,000,000. For purposes of determining Material Swap Obligations, the "principal amount" of the obligations of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor in respect of any such Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) the Parent Guarantor or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maximum Rate" has the meaning set forth in Section 10.13.

"Ministerial Amendments" means any waiver, amendment or modification to (a) cure any ambiguity, omission, error or defect (b) effect changes of a minor, administrative, operational, technical or immaterial nature, and/or (c) fix incorrect cross references or similar inaccuracies , in each case, in any Loan Document.

"MFN Provisions" has the meaning set forth in Section 2.17(a)(ix).

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"MS" means Morgan Stanley Senior Funding Inc.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in Section 3(37) of ERISA to which the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliates has, or within the prior six years had, an obligation to contribute.

"Narrative Report" means, with respect to the financial statements in respect of which it is delivered, a management presentation or other management discussion and analysis describing the operations of the Parent Guarantor and its Restricted Subsidiaries for the relevant fiscal quarter (including the last fiscal quarter of the relevant fiscal year) and for the period from the beginning of the then-current fiscal year to the end of the period to which the relevant financial statements relate.

"Nationally Recognized Statistical Ratings Organization" means CRISIL Limited or ICRA Limited.

"Net Cash Proceeds" means, with respect to any event, (a) the cash proceeds actually received in respect of such event, and in each case, only as and when actually received, including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), and (ii) in the case of a Recovery Event, insurance proceeds and condemnation awards and similar payments, net of (b) the sum of (i) all duly documented fees (including attorney's fees, accountants' fees, and other expenses, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses), investment banking, consultant and other customary fees, commissions, discounts, (including underwriting discounts), and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event actually incurred, (ii) in the case of an Asset Sale or Recovery Event, the amount of all payments required to be made as a result of such event to repay Indebtedness (other than any Term Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (iii) in the case of any Asset Sale, Recovery Event or similar transaction by or of a non-wholly-owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iii))

attributable to minority interests and not available for distribution to or for the account of the Parent Guarantor, Borrower or a wholly-owned Restricted Subsidiary as a result thereof, (iv) in the case of a Recovery Event (iv) duly documented costs of preparing assets for transfer upon a taking or condemnation or similar event, and (v) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities or otherwise against any adjustment to the sale price reasonably estimated to be payable (including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations), in each case that are directly attributable, to such event (as determined reasonably and in good faith by a Responsible Officer of the Borrower); *provided* that on the date on which such reserve is no longer required to be maintained, the remaining amount of such reserve (other than in connection with a payment in respect of any such liability) shall then be deemed to be Net Cash Proceeds.

"Non-Affiliate Lenders" has the meaning set forth in Section 10.4(i).

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges and the amortization of intangibles), (b) all non-cash losses from investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, and (e) other non-cash charges (including non-cash charges related to deferred rent); *provided* that Non-Cash Charges shall not include additions to bad debt reserves or bad debt expense, any non-cash charge that results from the write-down or write-off of inventory or any non-cash charge that results from the write-down or write-off of accounts receivable or that is in respect of any other item that was included in Consolidated Net Income in a prior period.

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.2 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-U.S. Plan" means any plan, fund (including any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States of America by the Parent Guarantor or one or more Subsidiaries of the Parent Guarantor, primarily for the benefit of employees of the Parent Guarantor or such Subsidiaries or any Loan Party residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Not Otherwise Applied" means, with reference to any amount of net proceeds of any transaction or event, that such amount (a) was not required to be applied to prepay the Term Loans pursuant to the terms of any Loan Document, and (b) was not previously (and is not concurrently being) applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was or is (or may have been) contingent on receipt or retention of such amount or utilization of such amount for a specified purpose.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day).

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means all amounts owing by any Loan Party to any Agent or any Lender pursuant to the terms of this Agreement or any other Loan Document (including all interest which accrues after the commencement of any Bankruptcy Event, whether or not allowed or allowable).

"Obligee Guarantor" has the meaning set forth in Section 7.6.

"ODI Investments" means contributions to the capital of, all loans made to, and all forms of guarantees given or financial support provided in respect of any indebtedness or any other investments in any person incorporated or otherwise formed outside India, which is considered a "financial commitment" under the ODI Regulations.

"ODI Net Worth" has the meaning given to "Net Worth" in Regulation 2(o) as read with the second explanation to Regulation 6(3) of the ODI Regulations or as such definition may be amended, revised or replaced under the ODI Regulations.

"ODI Regulations" means the (Indian) Foreign Exchange Management (Transfer or Issue of any Foreign Security) Regulations, 2004, as amended, read with the Master Direction on Direct Investment by Residents in Joint Venture (JV)/Wholly Owned Subsidiary (WOS) Abroad dated January 1, 2016, as amended, and such other circulars and/or notifications as may be issued by the RBI from time to time varying, updating, consolidating, superseding, modifying or amending the same.

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Onshore Guarantee Accession Deed" means an "Accession Deed" as defined in the Onshore Guarantee Deed.

"Onshore Guarantee Deed" means that certain English law governed guarantee of the Obligations, dated as of the Effective Date, granted by the Parent Guarantor and each Indian Guarantor party thereto from time to time in favor of the Administrative Agent for the benefit of the Secured Parties.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement or any other Loan Document, or sold or assigned an interest in this Agreement or any other Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary Taxes or any other excise, property, intangible, recording, filing or similar Taxes, in each case, which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and the other Loan Documents; excluding, however, such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than such Taxes imposed with respect to an assignment that occurs as a result of the Borrower's request pursuant to Section 2.16(b)).

"Overnight Bank Funding Rate" means, for any day, the rate comprising both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate;

*provided* that if the Overnight Bank Funding Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of calculating such rate.

"Parent Guarantor" has the meaning specified in the Preamble.

"Parent Guarantor Shareholders Agreement" means the amended and restated shareholders agreement dated 28 February 2019 entered into by and between, inter alia, the Parent Guarantor, Mr. Byju Raveendran, Mr. Riju Raveendran, Mrs. Divya Gokulnath, SCI Investments V, Sequoia Capital India Investments IV, SCHF PV Mauritius, Ltd.  Naspers Ventures BV, Lightspeed India Partners I, LLC, Lightspeed Venture Partners Select Mauritius, Aarin Capital Partners, Chan Zuckerberg Mauritius and other investors, read with an addendum dated 6 July 2019 and various deeds of adherence.

"Participant" has the meaning set forth in Section 10.4(c)(i).

"Participant Register" has the meaning set forth in Section 10.4(c)(iii).

"Payment or Bankruptcy Event of Default" means an Event of Default pursuant to Section 8.1(a), 8.1(b), 8.1(h), 8.1(i), 8.1(j) or 8.1(k).

"PBGC" means the U.S. Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor entity performing similar functions.

"Pension Plan" means any U.S. Plan that is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes, assessments or governmental charges or levies that are not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves (including costs required to contest such Taxes, assessments or governmental charges or levies) are being maintained;

(b)    carriers', warehousemen's, mechanics', materialmen's, landlord's, supplier's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.4;

(c)    Liens incurred or pledges and deposits made in the ordinary course of business (i) in compliance with workers' compensation, unemployment insurance and other social security laws or regulations or employment laws or to secure other public, statutory or regulatory obligations or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor or otherwise supporting the payment of items set forth in the foregoing clause (i);

(d)    Liens incurred or pledges and deposits to secure the performance of bids, trade and commercial contracts (other than for the payment of Indebtedness), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same (including Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods), in each case incurred in the ordinary course of business or consistent with past practice;

(e)    Liens securing, or otherwise arising from, judgments and deposits to secure obligations under appeal bonds or letters of credit in respect of judgments that do not constitute an Event of Default under <u>Section 8.1(k)</u>;

(f)    Uniform Commercial Code financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases;

(g)    (i) covenants, easements, imperfections of title, building codes, restrictions (including zoning restrictions), rights-of-way, entitlements, conservation restrictions and other land use restrictions, encroachments and similar encumbrances on real property imposed by law or arising in the ordinary course of business, or (ii) any exceptions on any title policies issued in connection with any mortgaged Material Real Estate Assets, in each case, that do not secure any monetary obligations, and do not materially detract from the value of the affected property or interfere with the conduct of business of the Parent Guarantor or any Subsidiary of the Parent Guarantor;

(h)    rights of recapture of unused real property (other than any Material Real Estate Asset constituting Collateral) in favor of the seller of such property set forth in customary purchase or lease agreements and related arrangements;

(i)    rights of set-off, rights of pledge or similar rights and remedies, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents or contracts in relation to (A) establishment of depository relations with banks or other deposit-taking financial institutions or the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments, (B) pooled deposit or sweep accounts of the Parent Guarantor or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Parent Guarantor or any of its Subsidiaries or (C) purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(j)    Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(k)    Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Parent Guarantor and any other Restricted Subsidiaries;

(l)    servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements or any related non-disturbance arrangements pertaining to the use or development of any of the assets of Parent Guarantor or any of its Subsidiaries, in each case that do not secure any obligations for borrowed money and do not materially detract from the value of the affected property or interfere with the conduct of business of the Parent Guarantor or any Subsidiary of the Parent Guarantor;

(m)    Liens on any Collateral securing any obligation in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Collateral Documents, including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, workers compensation, governmental royalties or pension fund obligations; and

(n)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(o)    Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(p)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Parent Guarantor or any of its Subsidiaries in the ordinary course of business;

(q)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to clearing, commodity trading, brokerage, or similar accounts (including accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, exchanges related to the trading of energy, customers, trading counterparties, any other parties or issuers of surety bonds and proceeds thereof), in each case incurred in the ordinary course business purposes and not for speculative purposes;

(r)    ground leases in respect of Real Estate Assets on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(s)    any zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(t)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(u)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(v)    Liens deemed to exist in connection with repurchase agreements, reverse repurchase agreements, securities lending and borrowing agreements and similar transactions;

(w)    Liens on amounts deposited as "security deposits" (or their equivalent) in the ordinary course of business in connection with actions or transactions not prohibited by this Agreement;

(x)    Liens encumbering property or assets under construction (and proceeds or products thereof) arising from progress or partial payments by a customer of the Parent Guarantor or its Restricted Subsidiaries relating to such property or assets;

(y)    Liens arising pursuant to Section 107(l) of the means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as subsequently amended, and the regulations promulgated thereunder (CERCLA), 42 U.S.C. § 9607(l), or other Environmental Law; and

(z)    Liens under, or in connection with, any Swap Agreement permitted or not prohibited under Section 6.1(i).

"Permitted Holders" means (a) any holder of the Equity Interests in the Parent Guarantor and as disclosed in writing to the Administrative Agent as of the Effective Date (the "Existing Permitted Holders"), (b) any Affiliate of any such Person, (c) any trust or partnership created solely for the benefit of any natural person that is an Existing Permitted Holder and/or members of the family of any natural person that is an

Existing Permitted Holder and (d) any Person where the voting of shares of capital stock of the Borrower is Controlled by any of the foregoing.

"Permitted Intercompany Activities" means any transaction (a) between or among the Parent Guarantor, its Restricted Subsidiaries and any not-for-profit or captive insurance subsidiary which is a Restricted Subsidiary that is entered into in the ordinary course of business of the Parent Guarantor and its Restricted Subsidiaries on a basis consistent with past practice or customary practice in the education or education-technology sector and which, in the good faith judgment of the Parent Guarantor is necessary or advisable in connection with the day-to-day ownership or operation of the business of the Parent Guarantor and its Restricted Subsidiaries, including, but not limited to, (i) payroll, cash management, purchasing and insurance arrangements, (ii) management, technology and licensing arrangements and (iii) product initiatives and customer loyalty and rewards programs; and (b) or among the Parent Guarantor, its Restricted Subsidiaries and any Unrestricted Subsidiary, to the extent pursuant to such transactions, a member of the Group is the recipient of any transferred funds or other assets.

"Permitted Listing Transaction Step" means any action and/or transaction (including any Disposition, merger, Investment, Restricted Payment) taken by the Parent Guarantor, Holdings or any Restricted Subsidiary which is necessary or desirable to effectuate any IPO or Holdco Transaction, provided that (a) the security interests of the Lenders in the Collateral would not be adversely affected or impaired as a result of such action and/or transaction; and (b) such action and/or transaction would not result in the release of any Loan Party from any Guaranty provided under the Loan Documents.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal, replacement or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest, premium and penalties thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.1(b), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, and (c) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is Junior Financing, (i) to the extent such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment and/or secured on a junior lien basis to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment and/or secured on a junior lien basis (as applicable) to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (ii) such modification, refinancing, refunding, renewal, replacement or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended and (iii) if the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended was subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Administrative Agent and the Borrower, the holders of such modified, refinanced, refunded, renewed, replaced or extended Indebtedness (if such Indebtedness is secured) or their representative on their behalf shall become party to such intercreditor arrangements.

"Permitted Tax Distributions" has the meaning set forth in Section 6.4(w)(i).

"Person" means any natural person, corporation, exempted company incorporated with limited liability, limited liability company, trust, Joint Venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"Platform" has the meaning set forth in Section 10.1(c).

"Portfolio Interest Certificate" has the meaning set forth in Section 2.14(e)(ii)(2)(C).

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest *per annum* interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Pro Forma Basis" means, with respect to the calculation of the Consolidated Total Net Leverage Ratio or Consolidated EBITDA (including component definitions thereof) as of any date, that:

(a)    in the case of (i) any Disposition of all or substantially all of the Equity Interests of any Restricted Subsidiary or any division and/or product line of the Parent Guarantor or any Restricted Subsidiary, income statement items (whether positive or negative) attributable to the property or Person subject to such Subject Transaction, shall be excluded as of the first day of the applicable Reference Period with respect to any test or covenant for which the relevant determination is being made and (ii) any Investment described in the definition of the term "Subject Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Subject Transaction shall be included as of the first day of the applicable Reference Period with respect to any test or covenant for which the relevant determination is being made;

(b)    any retirement or repayment of Indebtedness (other than normal fluctuations in revolving Indebtedness incurred for working capital purposes) shall be deemed to have occurred as of the first day of the applicable Reference Period with respect to any test or covenant for which the relevant determination is being made;

(c)    any Indebtedness incurred by the Parent Guarantor or any of its Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of the applicable Reference Period with respect to any test or covenant for which the relevant determination is being made; *provided* that, (i) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Reference Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (ii) interest on any obligation with respect to any Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Parent Guarantor to be the rate of interest implicit in such obligation in accordance with GAAP and (iii) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Parent Guarantor; and

(d)    subject to clause (a) above, the acquisition of any asset (including any Equity Interests) and/or any cash or Cash Equivalents, whether pursuant to any Subject Transaction or any Person becoming a subsidiary or merging, amalgamating or consolidating with or into the

Parent Guarantor or any of its Subsidiaries, or the Disposition of any asset described in the definition of "Subject Transaction", shall be deemed to have occurred as of the last day of the applicable Reference Period with respect to any test or covenant for which such calculation is being made.

"Projections" has the meaning set forth in Section 3.11(a)(i).

"Pro Rata Share" means, with respect to any Term Lender, the percentage obtained by dividing (i) the outstanding Term Loans of that Lender by (ii) the aggregate outstanding Term Loans of all Lenders.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Put Assignee" has the meaning set forth in Section 2.8(e).

"Qualified Equity Interests" means Equity Interests other than Disqualified Equity Interests.

"Quarter Date" means March 31, June 30, September 30 and December 31.

"Rating Agencies" means Moody's, S&P and Fitch.

"RBI" means the Reserve Bank of India established under the Reserve Bank of India Act, 1934.

"RBI Additional Guarantor Approval" means an approval granted by the RBI to an Indian Guarantor (other than the Parent Guarantor or Whitehat India) conveying its no objection to that Indian Guarantor for acceding to the Onshore Guarantee Deed as a Guarantor for an amount equal to the then applicable Guarantee Maintenance Amount.

"RBI Approval" means the approval granted by the RBI to the Parent Guarantor conveying its no-objection to the Parent Guarantor for undertaking 'financial commitment' (as defined in the ODI Regulations) for an amount exceeding $1,000,000,000 in the financial year 2021-2022, including by the issuance of a guarantee by Whitehat India for the Covered Obligations.

"Real Estate Asset" means, at any time of determination, any interest (fee or otherwise, but excluding any leasehold interest) in real property then owned by any Loan Party.

"Recipient" means the Administrative Agent, the Collateral Agent and any Lender, or any combination thereof (as the context requires).

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim (excluding the proceeds of business interruption insurance or other similar compensation for loss of revenue) or any condemnation proceeding relating to any asset of the Parent Guarantor or its Restricted Subsidiaries.

"Reference Date" means March 31, 2020.

"Reference Period" means any period of four consecutive fiscal quarters of the Parent Guarantor for which financial statements have been or are required to have been delivered.

"Refinancing Amendment" has the meaning set forth in Section 2.18(c).

"Refinancing Equivalent Debt" has the meaning set forth in Section 2.18(a).

"Refinancing Term Facility" has the meaning set forth in Section 2.18(a).

"Refinancing Term Facility Lender" has the meaning set forth in Section 2.18(b).

"Refinancing Term Loan" means any Term Loan made pursuant to a Refinancing Term Facility.

"Register" has the meaning set forth in Section 10.4(b)(iv).

"Reinvestment Deferred Amount" means, with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by the Parent Guarantor or any of its Restricted Subsidiaries in connection therewith that are not applied to prepay the Term Loans as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event" means any Asset Sale or Recovery Event in respect of which the Parent Guarantor has delivered a Reinvestment Notice.

"Reinvestment Notice" means a written notice executed by a Responsible Officer of the Parent Guarantor stating that no Event of Default has occurred and is continuing and the Parent Guarantor (directly or indirectly through a Restricted Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event (a) to restore, rebuild, repair, construct, improve, replace, refurbish, remodel, refresh, renovate or otherwise acquire assets (other than inventory) useful in its business (including through the making of Capital Expenditures) or (b) for operating expenditures of the Loan Parties.

"Reinvestment Prepayment Amount" means, with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to restore, rebuild, repair, construct, improve, replace, refurbish, remodel, refresh, renovate or otherwise acquire assets (other than inventory) useful in the Parent Guarantor's business (including through the making of Capital Expenditures) or for operating expenditures of the Loan Parties.

"Reinvestment Prepayment Date" means with respect to any Reinvestment Event, the earlier of (a) the date occurring (i) 360 days after the receipt by the Parent Guarantor or its Restricted Subsidiary of Net Cash Proceeds relating to such Reinvestment Event or (ii) if the Parent Guarantor or any Restricted Subsidiary enters into a binding commitment to reinvest the Net Cash Proceeds relating to such Reinvestment Event within 360 days following receipt thereof, 90 days after the date of such binding commitment, and (b) the date on which the Parent Guarantor shall have determined not to, or shall have otherwise ceased to, restore, rebuild, repair, construct, improve, replace, refurbish, remodel, refresh, renovate or otherwise acquire assets (other than inventory) useful in its business (including through the making of Capital Expenditures) or for operating expenditures of the Loan Parties with all or any portion of the relevant Reinvestment Deferred Amount.

"Rejection Notice" has the meaning set forth in Section 2.8(g).

"Related Businesses" has the meaning set forth in Section 6.7(r).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, or leaching of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"Relevant Guarantor" means each Guarantor other than an Indian Guarantor.

"Relevant Period" means each period of 12 months ending on a Quarter Date.

"Required Governmental Authorization" means all material franchises, approvals, permits, consents, qualifications, certifications, authorizations, licenses, orders, registrations, certificates, variances or other similar permits, rights and all pending applications therefor from or with the relevant Governmental Authority required to operate the business of the Parent Guarantor and its Restricted Subsidiaries, as conducted as of the Effective Date, in accordance with applicable law.

"Required Lenders" means, at any time, a Lender or Lenders having outstanding Term Loans and unused Term Commitments representing more than 50% of the sum of the total outstanding Term Loans and unused Term Commitments at such time. The "Required Lenders" of a particular Class of Term Loans means Lenders having outstanding Term Loans and/or unused Term Commitments of such Class, as applicable, representing more than 50% of the total outstanding Term Loans and/or unused Term Commitments of such Class, as applicable, at such time. The outstanding Term Loans and unused Term Commitments of any Defaulting Lender and any Affiliated Lender shall be disregarded in determining Required Lenders at any time.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means any of the directors of the Board of Directors, the President, Chief Executive Officer, Vice President or Financial Officer of the applicable Loan Party, or any other officer or authorized signatory of the applicable Loan Party designated by such Person in writing to the Administrative Agent from time to time, acting singly.

"Restricted Collateral Provider" means a member of the Group who is restricted by law or regulation from granting a Lien over the Equity Interests it holds in any Restricted Subsidiary.

"Restricted Debt Payment" means the making of any payment, prepayment, repurchase or redemption of or otherwise defeasing or segregating funds (including any offer to do any of the foregoing) in each case, whether optional, voluntary or mandatory (including as a result of a "change of control" or similar event having occurred), with respect to Junior Financing, in each case, prior to the scheduled maturity thereof (excluding any payments of regularly scheduled principal, interest, fees, expenses and indemnification obligations).

"Restricted Amount" has the meaning set forth in Section 2.8(d).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Guarantor or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund, similar deposit or withholding Taxes, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Parent Guarantor or any such Restricted Subsidiary. The conversion of, or payment for (including payments of principal and payments upon redemption or repurchase), or paying any interest with respect to, any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash shall not constitute a Restricted Payment.

"Restricted Subsidiary" means any Subsidiary other than an Unrestricted Subsidiary.

"Reuters" means, as applicable, Thomson Reuters Corp., Refinitiv, or any successor thereto.

"Rupees" mean the lawful currency of India.

"S&P" means S&P Global Ratings, a Standard & Poor's Financial Services LLC business, a subsidiary of S&P Global Inc., and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clause (a) or (b) or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority or any jurisdiction in which the Parent Guarantor or its Subsidiaries do business or United Nations sanctions.

"Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing or for any ABR Borrowing for any Interest Period, the London interbank offered rate as administered by IBA (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent).

"SEC" means the U.S. Securities and Exchange Commission or any successor Governmental Authority.

"Secured Parties" means, collectively (a) each Agent and each Lender and (b) the permitted successors and assigns of each of the foregoing.

"Secured FX Hedging Agreement" shall mean any Swap Agreement that is a foreign exchange or currency swap, option or future, currency exchange agreement, foreign exchange or currency hedging agreement, or any combination of the forgoing (including any agreement or arrangement entered into under and pursuant to a Master Agreement) secured on a *pari passu* basis with the Obligations.

"Secured Interest Rate Hedging Agreement" shall mean any Swap Agreement that is an interest rate swap, floor, cap, collar, option, swaption, hedge, or any other similar agreement or arrangement or any combination of the foregoing in respect of the Covered Obligations (including any agreement or arrangement entered into under and pursuant to a Master Agreement) secured on a *pari passu* basis with the Obligations.

"Security Agreements" means (a) the US Security Agreements and (b) the Singapore Security Agreements, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"Shareholders (Call Option) Agreement" means, where the shares in any Restricted Subsidiary are or will be held by (a) one or more Unrestricted Collateral Providers and (b) one or more Restricted Collateral Providers, a shareholders agreement in form and substance satisfactory to the Administrative Agent pursuant to which each Restricted Collateral Provider shall grant "call option" rights to each Unrestricted Collateral Provider (or a nominee of such Unrestricted Collateral Provider) in respect of such shares (subject to compliance with legal requirements as to any minimum hold periods).

"Singapore Dollars" means the lawful currency of Singapore.

"Singapore Loan Parties" means (a) BYJU's Pte. Ltd. (UEN/Company registration number 202001861H), (b) Great Learning Education Pte. Ltd. (UEN/Company registration number 201525033K) and (c) any other Loan Party incorporated under the laws of Singapore.

"Singapore Security Agreements" means that certain Debenture, dated as of the Effective Date, executed by BYJU's Pte. Ltd., Great Learning Education Pte. Ltd. and the Collateral Agent.

"Social Insurance" means any form of social insurance required under applicable law, including social security, employment, unemployment or employee insurance, workers' compensation and medical insurance, and any contribution payable therewith to any Governmental Authority or social welfare organization.

"Sold Entity or Business" has the meaning set forth in the definition of the term "Consolidated EBITDA".

"<u>Solvency Certificate</u>" means a Solvency Certificate of a Financial Officer of the Parent Guarantor substantially in the form of <u>Exhibit H</u>.

"<u>Solvent</u>" means, with respect to the Parent Guarantor and its Restricted Subsidiaries on a particular date, that on such date (a) the fair value of the present assets of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, is greater than the total amount of liabilities, including contingent liabilities, of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, (b) the present fair saleable value of the assets of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liability of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, on their debts as they become absolute and matured, (c) the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, do not intend to, and do not believe that they will, incur debts or liabilities (including current obligations and contingent liabilities) beyond their ability to pay such debts and liabilities as they mature in the ordinary course of business and (d) the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, are not engaged in business or a transaction, and are not about to engage in business or a transaction, in relation to which their property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under GAAP).

"<u>SPAC Transaction</u>" is defined in clause (c) of the definition of "IPO".

"<u>Spot Rate</u>" means, on any day, with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 12:00 noon, Singapore time, on such date as quoted on the Bloomberg Currency Website after applying the currency converter set forth on the Bloomberg Currency Website. In the event that such rate does not appear on the Bloomberg Currency Website, the Spot Rate shall be calculated by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Spot Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent, on or about 11:00 a.m., London time, on such date for the purchase of such currency for delivery two Business Days later; *provided* that if, at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent, after consultation with the Borrower, may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one *minus* the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Term Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Stressed Assets Framework</u>" means RBI's Prudential Framework for Resolution of Stressed Assets dated June 7, 2019, as amended, modified, clarified, supplemented or replaced from time to time by any rules, regulations, notifications, circulars, press releases or orders by the RBI or any other Governmental Authority in this regard.

"<u>Sub-Agent</u>" has the meaning set forth in <u>Section 9.1</u>.

"<u>Subject Transaction</u>" means, with respect to any Reference Period, (a) the Transactions, (b) any acquisition, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division of, any Person or of a majority of the outstanding Equity Interests of any

Person (and, in any event, including any Investment in (i) any Subsidiary the effect of which is to increase the Parent Guarantor's or any Restricted Subsidiary's respective equity ownership in such Subsidiary or (ii) any Joint Venture for the purpose of increasing the Parent Guarantor's or its relevant Restricted Subsidiary's ownership interest in such Joint Venture), in each case that is permitted by this Agreement, (c) any Disposition of all or substantially all of the assets or Equity Interests of any Restricted Subsidiary (or any business unit, line of business or division of the Parent Guarantor or any Restricted Subsidiary) not prohibited by this Agreement, (d) any incurrence or repayment of Indebtedness (other than revolving Indebtedness), (e) any capital contribution in respect of Equity Interests (other than Disqualified Equity Interests) or any issuance of such Equity Interests and/or (f) any other event that by the terms of the Loan Documents requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, exempted company incorporated with limited liability, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, exempted company incorporated with limited liability, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity (including by value) or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the partnership interests are, as of such date, owned (directly or indirectly), controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent and which is required by GAAP to be consolidated in the consolidated financial statements of the parent.

"Subsidiary" means any subsidiary of the Parent Guarantor; *provided* that, on and after the consummation of a Holdco Transaction, all references to a "Subsidiary" of or to the "Subsidiaries" of the Parent Guarantor herein or in any other Loan Document shall include the Parent Guarantor.

"Swap Agreement" means (a) any agreement with respect to any swap, forward, future, option or other derivative transaction or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or other providers of services of the Parent Guarantor or the Subsidiaries of the Parent Guarantor shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Group" has the meaning set forth in Section 6.4(w)(i).

"Term Commitment" means, with respect to each Lender, the obligation of such Lender, if any, to make Term Loans hereunder, expressed as an amount representing the maximum principal amount of the Term Loans to be made by such Lender hereunder, as such commitment may be (a) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.4, (b) established or increased from time to time pursuant to an Incremental Amendment, (c) established from time to time pursuant to a Refinancing Amendment and (d) established from time to time pursuant to an Extension Amendment. The initial amount of each Lender's Term Commitment is set forth on Schedule 2.1 (the "Initial Term Commitment") or in the Assignment and Assumption, Incremental Amendment, Refinancing

Amendment or Extension Amendment pursuant to which such Lender shall have assumed its Term Commitment, as applicable. On the Effective Date, the aggregate amount of the Term Commitments is $1,200,000,000.

"Term Facility" means the Term Commitments and the extensions of credit made thereunder.

"Term Lender" means each Lender that has a Term Commitment or that holds a Term Loan.

"Term Loan" means the Initial Term Loans and, as the context may require, includes any Incremental Term Loan, any Refinancing Term Loan and any Extended Term Loan.

"Term Loan Extension Request" has the meaning set forth in Section 2.19(a).

"Term Loan Extension Series" has the meaning set forth in Section 2.19(a).

"Term Loan Maturity Date" means the date falling five years after the Effective Date, or, with respect to any applicable Extended Term Loans, the final maturity date applicable thereto as specified in the applicable Term Loan Extension Request accepted by the respective Lender or Lenders.

"Term Loan Note" means a promissory note in the form of Exhibit D, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Third Party Interests" means any Equity Interests in a Restricted Subsidiary that are held by a Person other than the Parent Guarantor or any of its Affiliates due to requirements of applicable law.

"Trade Date" has the meaning set forth in Section 10.4(e)(i).

"Transaction Costs" means all fees, costs and expenses incurred or paid by the Parent Guarantor or any Restricted Subsidiary in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"Transactions" means the execution, delivery and performance by the Loan Parties of each Loan Document to which it is a party, the borrowing of Term Loans and the use of the proceeds thereof, and the granting of Liens in the Collateral under the Collateral Documents.

"Treasury Regulations" means all proposed, temporary, and final regulations promulgated under the Code, as such regulations may be amended from time to time.

"Tynker" means Neuron Fuel, Inc.

"Tynker Acquisition" means the acquisition of all of the Equity Interests of Neuron Fuel, Inc. by Inspilearn LLC pursuant to an Agreement and Plan of Reorganization dated July 23, 2021, by and among Think and Learn Private Limited, Codr Inc., Inspilearn LLC, Neuron Fuel Inc., Neuron Aggregator Holding Trust and Shareholder Representative Services LLC.

"Type" refers to whether the rate of interest on any Term Loan, or on the Term Loans comprising any Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unasserted Contingent Obligations" shall mean, at any time, with respect to the Obligations, obligations for indemnifications, damages, reimbursements and other liabilities that expressly survive the termination of the underlying Loan Documents and in respect of which no written assertion of liability, claim or demand for payment has been made (and, in the case of such Obligations for indemnification, no written notice for indemnification has been issued by the indemnitee) at such time.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Uniform Commercial Code" means the Uniform Commercial Code enacted in the State of New York, as amended from time to time.

"Unrestricted Collateral Provider" means a member of the Group who is not restricted by law or regulation from granting a Lien over the Equity Interests it holds in any Restricted Subsidiary.

"Unrestricted Subsidiary" means any Subsidiary that at the time of determination has previously been designated, and continues to be, an Unrestricted Subsidiary in accordance with Section 5.11; *provided* that any entity listed in Schedule 5.11 shall be an Unrestricted Subsidiary as of the Effective Date.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof; *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Plan" means any Plan, and any other plan, fund or arrangement that provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment or employee welfare or other benefits which are subject to ERISA or the Code, or other United States federal, state or local law, and in each case, which is, or within the prior six years was, sponsored, maintained or contributed to by, or required to be contributed by the Parent Guarantor or any of its Subsidiaries or any ERISA Affiliate (other than a Multiemployer Plan), or with respect to which the Parent Guarantor or any of its Subsidiaries or ERISA Affiliates could have any liability (other than a Multiemployer Plan).

"US Security Agreements" means (a) that certain U.S. Pledge and Security Agreement, dated as of the Effective Date, by and among the Borrower, Whitehat Education Technology LLC, Tangible Play Inc. and each "Additional Grantor" (as defined therein) party thereto from time to time and the Collateral Agent and (b) that certain U.S. Pledge Agreement, dated as of the Effective Date by and between BYJU's Pte. Ltd. and the Collateral Agent.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then-outstanding principal amount of such Indebtedness.

"Whitehat India" means Whitehat Education Technology Private Limited, a company established under the laws of India with corporate identification number U74999MH2018PTC315690.

"<u>wholly-owned</u>" means, when used in reference to a subsidiary of any Person, that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"<u>Withholding Agent</u>" means the Borrower and the Administrative Agent.

"<u>Write-Down and Conversion Powers</u>" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2.    <u>Classification of Term Loans and Borrowings</u>. For purposes of this Agreement, Term Loans may be classified and referred to by Class (e.g., an "Incremental Term Loan") or by Type (e.g., a "Eurodollar Term Loan") or by Class and Type (e.g., a "Eurodollar Incremental Term Loan"). Borrowings also may be classified and referred to by Class (e.g., an "Incremental Term Loan Borrowing") or by Type (e.g., a "Eurodollar Term Loan Borrowing") or by Class and Type (e.g., a "Eurodollar Incremental Term Loan Borrowing").

Section 1.3.    <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, replaced, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, replacements, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

Section 1.4.    <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Parent Guarantor notifies the Administrative Agent that the Parent Guarantor requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Parent Guarantor that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision has been amended in accordance herewith.

- 49 -

Section 1.5.    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.6.    <u>Interest Rates; LIBOR Notification</u>. The interest rate on Eurodollar Term Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including (a) any such alternative, successor or replacement rate implemented pursuant to <u>Section 2.11(b)</u> or <u>(c)</u>, whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (b) the implementation of any Benchmark Replacement Conforming Changes pursuant to <u>Section 2.11(d)</u>), including, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

Section 1.7.    <u>Certain Calculations and Tests</u>.

(a)    Notwithstanding anything to the contrary in this Agreement, to the extent that the terms of this Agreement require (i) compliance with any financial ratio or test (including any Consolidated Total Net Leverage Ratio test) and/or any cap expressed as a percentage and/or based on the amount of Consolidated EBITDA or any other basket as a condition to the consummation of any Limited Condition Transaction or (ii) the absence of a Default or Event of Default (or any type of Default or Event of Default) or the accuracy of representations and warranties as a condition to the consummation of any Limited Condition Transaction or any transaction in connection therewith (including the assumption or incurrence of Indebtedness), the determination of whether the relevant condition is satisfied may be made, at the election of the Parent Guarantor, at the time of (on the basis of the financial statements for the most recently ended Reference Period) the execution of the definitive agreement with respect to such Limited Condition Transaction (the "<u>LCT Test Date</u>"), after giving effect to the relevant Limited Condition Transaction and the incurrence or assumption of any Indebtedness in connection therewith, on a Pro Forma Basis; *provided* that, notwithstanding the foregoing, if the Parent Guarantor has made such an election, (1) the absence of a Payment or Bankruptcy Event of Default shall be a condition to the consummation of any such Limited Condition Transaction and incurrence of any related Indebtedness, (2) if the proceeds of an Incremental Term Loan are to be used to finance a Limited Condition Transaction, then such financing may be subject to customary "SunGard" or "certain funds" conditionality and the representations and warranties required shall be limited to customary "Specified Representations" and acquisition agreement representations and warranties (to the extent such acquisition agreement representations and warranties allow the Parent Guarantor or its applicable Restricted Subsidiary to terminate its obligations under such acquisition agreement or not consummate such acquisition) and (3) the Limited Condition Transaction and the related Indebtedness to be incurred (and any associated Lien) and the use of proceeds thereof (and the consummation of any Acquisition or Investment) shall be deemed incurred and/or applied at the LCT Test Date (until such time as the Indebtedness is actually incurred or the applicable definitive agreement is terminated without actually consummating the applicable Limited Condition Transaction) and outstanding thereafter for purposes of pro forma compliance with any financial ratio or test (including any Consolidated Total Net Leverage Ratio test) and/or any cap expressed as a percentage or based on the amount of Consolidated EBITDA and/or any other basket, as the case may be; *provided, further*, that, with respect to any such ratio test or basket to be used to effect a Restricted Payment or Restricted Debt Payment, the Parent Guarantor shall demonstrate compliance with the applicable test both after giving effect to the applicable Limited Condition Transaction and assuming that such transaction had not occurred. It is

expressly agreed and understood that (1) if any of such ratios or amounts (including due to fluctuations in Consolidated Total Net Leverage Ratio, Consolidated EBITDA or other components of either of the foregoing) for which compliance was determined or tested as of the LCT Test Date are thereafter exceeded as a result of fluctuations in such ratio or amount (including due to fluctuations in Consolidated EBITDA), at or prior to the consummation of the relevant Limited Condition Transaction, such ratios or amounts will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant Limited Condition Transaction is permitted to be consummated or taken, and (2) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Transaction or related transactions. If the Borrower has made such an election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio, basket availability or compliance with any other provision hereunder on or following the relevant LCT Test Date and prior to the earliest of the date on which such Limited Condition Transaction is consummated, the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio, basket or compliance with any other provision hereunder shall be calculated on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith had been consummated on the LCT Test Date.

(b)     For purposes of determining the permissibility of any action, change, transaction or event that requires a calculation of any financial ratio or test (including any Consolidated Total Net Leverage Ratio test and/or the amount of Consolidated EBITDA), such financial ratio or test shall be calculated at the time such action is taken (subject to clause (a) above), such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after such calculation.

(c)     Notwithstanding anything to the contrary in this Agreement, but subject to the foregoing clauses (a) and (b) of this Section 1.7, all financial ratios and tests (including the Consolidated Total Net Leverage Ratio and Consolidated EBITDA) contained in this Agreement that are calculated with respect to any Reference Period during which any Subject Transaction occurs shall be calculated with respect to such Reference Period and such Subject Transaction on a Pro Forma Basis. Further, if since the beginning of any such Reference Period and on or prior to the date of any required calculation of any financial ratio or test (i) any Subject Transaction has occurred or (ii) any Person that subsequently was merged, amalgamated or consolidated with or into the Parent Guarantor or any Restricted Subsidiary since the beginning of such Reference Period has consummated any Subject Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Reference Period as if such Subject Transaction had occurred at the beginning of the applicable Reference Period.

(d)     Notwithstanding anything to the contrary herein, at any time Consolidated EBITDA is less than $0, there shall be no availability under any Consolidated Total Net Leverage Ratio test when determining if any Loan Party or its subsidiaries may take any action permitted hereunder (including any incurrence of Indebtedness).

Section 1.8.     Cashless Rollovers. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Term Loans with Incremental Term Loans, Extended Term Loans, Refinancing Term Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

Section 1.9.     Exchange Rates; Currency Equivalents. Unless expressly provided otherwise, any amounts specified in this Agreement shall be in Dollars.

(a)     The Administrative Agent may set up appropriate rounding-off mechanisms or otherwise round off amounts pursuant to this Section 1.9 to the nearest higher or lower amount in whole Dollars or in

part thereof to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in part thereof, as may be necessary or appropriate.

(b)    For purposes of any determination under any provision of this Agreement with respect to the amount of any transaction, event or circumstance in a currency other than Dollars (each, a "Foreign Currency Event"), the Dollar Equivalent of a Foreign Currency Event shall be calculated based on the Spot Rate for such currency on the date of such Foreign Currency Event (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); *provided* that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than Dollars, and the relevant refinancing or replacement would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable Spot Rate in effect on the date of such refinancing or replacement, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of such Indebtedness being refinanced or replaced, except by an amount equal to (i) unpaid accrued interest and premiums (including tender premiums) thereon plus other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement *plus* (ii) additional amounts permitted to be incurred for such purpose under Section 6.1. No Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any Foreign Currency Event so long as such Foreign Currency Event was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in the foregoing sentence.

Section 1.10.    Basket Reclassification. To the extent that any obligation or transaction could be attributable to more than one exception, dollar threshold, or basket to an applicable covenant ("Relevant Covenant"), the Parent Guarantor or the Borrower shall be permitted, without limitation, to reclassify all or any portion of such obligation or transaction to any such exception, dollar threshold, or basket with respect to that same Relevant Covenant (and not any other covenant) under this Agreement and the Loan Documents, subject to eligibility for, and any caps in respect of, the reclassified basket in respect of such Relevant Covenant. For illustrative purposes only and without limitation, for the purposes of determining compliance with any indebtedness, investments or liens baskets, in the event that an item of proposed indebtedness, proposed investments or any proposed lien meets the criteria of more than one of the applicable permitted baskets or could be incurred under any applicable available ratio based incurrence covenant, the Parent Guarantor or Borrower shall be permitted to classify (or later reclassify in whole or in part in its sole discretion) such item of indebtedness, investments, or lien in any manner that complies with the relevant covenant and such indebtedness, investments, or lien (as applicable) will be treated as having been incurred pursuant to such classification or reclassification.

Section 1.11.    Notices, etc. Any Default or Event of Default that occurs and is continuing solely as a result of a failure of any Loan Party to provide a notice, report, budget, certificate, financial statement or similar written deliverable (collectively a "Reporting Deliverable"), including without limitation pursuant to Section 5.1, Section 5.2, Section 6.7, Section 6.10 or Section 6.11, prior to the date set forth in the Loan Documents with respect thereto or the expiration of the time period specified for the delivery of such Reporting Deliverable shall (provided there has been no acceleration of the Term Loans pursuant to Article VIII) be deemed to be cured upon delivery of such Reporting Deliverable to the Administrative Agent, notwithstanding that the time period for delivery of such Reporting Deliverable shall have expired or passed.

Section 1.12.    Parent Guarantor as Loan Parties' Agent.

(a)    Each Loan Party by its execution of this Agreement irrevocably authorizes the Parent Guarantor to act on its behalf as its agent in relation to the Loan Documents and irrevocably authorizes:

(i)      the Parent Guarantor on its behalf to supply all information concerning itself contemplated by this Agreement to the Secured Parties, to give all notices and instructions (including, in the case of the Borrower, Borrowing Requests), to execute on its behalf and to make such agreements and to effect the relevant amendments, classifications and reclassifications, designations, elections, consultation rights, determinations, supplements and variations (in each case however fundamental) capable of being given, made or effected by any Loan Party notwithstanding that they may increase any Loan Party's obligations or otherwise affect any Loan Party (including giving confirmations as to the continuation or extension of surety obligations), without further reference to or the consent of that Loan Party; and

(ii)      each Secured Party to give any notice, demand or other communication to any Loan Party pursuant to the Loan Documents to the Parent Guarantor,

and in each case each Loan Party shall be bound as though that Loan Party itself had given the notices and instructions (including, without limitation, any Borrowing Requests) or executed or made the agreements or effected the amendments, classifications and reclassifications, designations, elections, consultation rights, determinations, supplements or variations, or received the relevant notice, demand or other communication.

(b)      Notwithstanding the foregoing, it is expressly understood that, unless otherwise expressly stated, the Parent Guarantor shall not be obligated to give any notices and instructions, or enter into amendments or take any action on behalf of the Borrower or any other Loan Party.

(c)      In the event of any conflict between any amendments, classifications and reclassifications, designations, elections, determinations, supplements, variations, notices or other communications of the Parent Guarantor and the Borrower or any other Loan Party, those of the Parent Guarantor shall prevail.

## ARTICLE II
## THE CREDITS

Section 2.1.      Term Commitments. Subject to the terms and conditions hereof, each Term Lender severally agrees to make a term loan to the Borrower in Dollars on the Effective Date in an amount equal to the Initial Term Commitment of such Term Lender (the "Initial Term Loan"). The Term Loans may from time to time be Eurodollar Term Loans or ABR Term Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 2.3 and Section 2.5. Any amounts repaid in respect of Term Loans may not be reborrowed. Unless previously terminated, the Initial Term Commitments shall terminate upon the making of the Initial Term Loans on the Effective Date.

Section 2.2.      Term Loans and Borrowings.

(a)      Each Term Loan shall be made as part of a Borrowing consisting of Term Loans of the same Class and Type made by the Lenders in accordance with their respective Applicable Percentages. The failure of any Lender to make any Term Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Term Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Term Loans as required.

(b)      Subject to Section 2.11, each Borrowing under the Term Facility shall be comprised entirely of ABR Term Loans or Eurodollar Term Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Term Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Term Loan, *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Term Loan in accordance with the terms of this Agreement.

(c)      At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000; *provided* that an ABR Borrowing

may be in an aggregate amount that is equal to the entire unused balance of the total Term Commitment. Borrowings of more than one Type may be outstanding at the same time; *provided* that there shall not at any time be more than a total of ten Eurodollar Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request (or to elect to convert to or continue as a Eurodollar Borrowing) any Eurodollar Borrowing of a Term Loan if the Interest Period requested therefor would end after the applicable maturity date for such Term Loan. After giving effect to all Borrowings, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than 10 Interest Periods in effect at any time.

Section 2.3.    Requests for Borrowings. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, in respect of the Initial Term Loans, not later than 12:00 p.m., New York City time, two Business Days (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion) before the date of the proposed Borrowing), or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing. Each such written Borrowing Request shall be irrevocable and shall be confirmed promptly by e-mail (or other facsimile transmission) to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B attached hereto and signed by a Responsible Officer of the Borrower. Each such written Borrowing Request shall specify the following information in compliance with Section 2.2:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)    the location and number of the account or accounts of the Borrower to which funds are to be disbursed, which shall comply with the requirements of Section 2.4.

If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Term Loan(s) to be made as part of the requested Borrowing.

Section 2.4.    Funding of Borrowings. (a) Each Term Lender shall make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 10:00 a.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Term Lenders. Except as otherwise specified in the immediately preceding sentence, the Administrative Agent will make such Term Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account or accounts designated by the Borrower in the applicable Borrowing Request.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may (but shall not be obligated to) assume that such Lender has made such Applicable Percentage available on such date in accordance with paragraph (a) of this Section and may, in its sole discretion, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its Applicable Percentage of the applicable Borrowing available to the Administrative Agent and

- 54 -

the Administrative Agent has made such amount available to the Borrower, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Term Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Term Loan included in such Borrowing.

Section 2.5.    Interest Elections. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or as otherwise provided in Section 2.3. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated among the Lenders holding the Term Loans comprising such Borrowing in accordance with their respective Applicable Percentages, and the Term Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election in writing pursuant to an Interest Election Request or by email by the time that a Borrowing Request would be required under Section 2.3 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written request shall be irrevocable and shall be confirmed promptly by email (or other facsimile transmission) to the Administrative Agent of a written request (an "Interest Election Request") in substantially the form of Exhibit C attached hereto and signed by a Responsible Officer of the Borrower.

(c)    Each written Interest Election Request shall specify the following information in compliance with Section 2.2:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as *provided* herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing with an Interest Period of one month's duration. Notwithstanding any contrary

provision hereof, if an Event of Default has occurred and is continuing, (1) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (2) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.6.    Repayment of Term Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent, for the account of each Term Lender, the then-unpaid principal amount of each Term Loan of such Term Lender as *provided* in Section 2.6(c), in each case, together with accrued and unpaid interest on such Term Loan, to but excluding the date of payment.

(b)    The Borrower shall repay the Initial Term Loans in quarterly principal installments, commencing on the last day of the first full fiscal quarter of the Parent Guarantor following the Effective Date, in an amount equal to 0.25% of the aggregate principal amount of the Initial Term Loans made on the Effective Date, which amount shall be due and payable on the last day of each fiscal quarter of the Parent Guarantor.

(c)    To the extent not previously repaid, all unpaid Initial Term Loans shall be paid in full in Dollars by the Borrower on the Term Loan Maturity Date. In the event any Incremental Term Loans or Extended Term Loans are made, such Incremental Term Loans or Extended Term Loans, as applicable, shall be repaid by the Borrower in the amounts and on the dates set forth in the Incremental Amendment or Extension Amendment, as applicable, with respect thereto and on the applicable maturity date thereof.

(d)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(e)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Term Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(f)    The entries made in the accounts maintained pursuant to paragraph (d) or (e) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein (absent manifest error); *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement.

(g)    Any Lender may request that Term Loans made by it be evidenced by a Term Loan Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Term Loan Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns). Thereafter, the Term Loans evidenced by such Term Loan Note and interest thereon shall at all times (including after assignment pursuant to Section 10.4) be represented by one or more Term Loan Notes in such form payable to the payee named therein (or, if such Term Loan Note is a registered note, to such payee and its registered assigns).

Section 2.7.    Prepayment of Term Loans. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (except as set forth in Section 2.7(b) and Section 2.13), subject to prior notice in substantially the form of Exhibit K attached hereto and signed by a Responsible Officer of the Borrower, in accordance with this Section and subject to the requirements in Section 2.8(f). The Borrower shall notify the Administrative Agent by email (or other facsimile transmission) or hand delivery of written notice) or in writing of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00p.m., New York City time, three Business Days before the date of prepayment and (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or

portion thereof to be prepaid; *provided* that, a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to a Borrowing of any Class, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.2, except as necessary to apply fully the required amount of a mandatory prepayment.

(b)    Notwithstanding anything to the contrary in this Agreement, any prepayment or repayment of the Initial Term Loans pursuant to Section 2.7(a), 2.8(a) or 2.8(b) (including any mandatory assignment pursuant to Section 2.16(b) with respect to a Non-Consenting Lender) (but excluding, for the avoidance of doubt, any prepayments pursuant to Section 2.8(a), but only to the extent that: (x) the Parent Guarantor has used commercially reasonable efforts to obtain the RBI Approval as soon as practicable and in any event on or prior to 1 April 2022 (y) such prepayment is made on or prior to the date falling 5 Business Days after 1 April 2022 and (z) such prepayment is the minimum prepayment amount possible to ensure that, following the full application of the Parent Guarantor's $1,000,000,000 financial commitment in the financial year 2022-2023 towards meeting the Guarantee Maintenance Requirement, the Guarantee Maintenance Requirement is satisfied), Section 2.8(c) and Section 2.8(e)) or any acceleration of the Initial Term Loans (including as a result of any Event of Default) (an "**Applicable Premium Trigger Event**") shall require payment of the Applicable Premium, and it is expressly understood and agreed that following the third anniversary of the Effective Date, no Applicable Premium Trigger Event shall apply, and no prepayment or repayment of any Term Loans, regardless of the event giving rise to such prepayment, shall require payment of any Applicable Premium.

Section 2.8.    Mandatory Prepayments. (a) If, at any time, the Parent Guarantor is not in compliance with the Guarantee Maintenance Requirement, the Borrower shall immediately prepay the Term Loans in an amount such that, immediately after giving effect to such prepayment, the Parent Guarantor shall be in compliance with the Guarantee Maintenance Requirement.

(b)    If any Indebtedness shall be incurred by any member of the Group (excluding any Indebtedness incurred in accordance with Section 6.1, but including the proceeds of any Refinancing Term Facility or Refinancing Equivalent Debt), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied immediately upon receipt of such Net Cash Proceeds toward the prepayment of the Term Loans (and in the case of any Refinancing Term Facility or Refinancing Equivalent Debt, only the Term Loans being refinanced or replaced) as set forth in Section 2.8(f).

(c)    If any member of the Group shall actually receive Net Cash Proceeds from any Asset Sale or Recovery Event in excess of $10,000,000 in the aggregate for all Asset Sales and Recovery Events in any fiscal year of the Parent Guarantor, then upon actual receipt of such Net Cash Proceeds, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied within five Business Days of the receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in Section 2.8(f) unless a Reinvestment Notice has been delivered in respect of such Net Cash Proceeds within five Business Days of the receipt of such Net Cash Proceeds; *provided* that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans as set forth in Section 2.8(f).

(d)    Prepayments referred to in paragraph (c) above with respect to any Subsidiary of the Parent Guarantor shall, in each case, be subject to permissibility under (i) local law (including financial assistance, corporate benefit, restrictions on upstreaming of cash within the Group and the fiduciary and statutory duties of the directors of the relevant Subsidiaries) and (ii) material organizational documents or constitutional documents (as applicable) restrictions (including as a result of minority ownership) to the extent that such restrictions are not entered into in anticipation of the relevant transaction or solely for the purposes of limiting such prepayment (any of the restrictions or circumstances referred to above, being an

"<u>Impediment</u>"). Notwithstanding this clause (d), each Loan Party shall (and shall cause each member of the Group to) use commercially reasonable efforts to overcome any Impediment. Upon the applicable Impediment ceasing to apply or becoming no longer relevant within 180 days following such event giving rise to such prepayment obligation, the obligation to repay the Term Loans in accordance with paragraph (c) above shall be reinstated. Furthermore, there will be no requirement to make any prepayment to the extent the Parent Guarantor has determined in good faith that repatriation of any proceeds from any Asset Sale or Recovery Event made by any Subsidiary would, as a result of upstreaming cash to make such prepayments (including the imposition of withholding taxes), result in adverse tax consequences (other than de minimis adverse tax consequences) to the Group. The non-application of any such prepayment amounts (all such amounts, "<u>Restricted Amounts</u>") as a result of the foregoing provisions will not constitute a Default or Event of Default and such Restricted Amounts shall be available for working capital and other general corporate purposes of the Group for as long as not required to be prepaid in accordance with the preceding provisions.

(e)    If a Change in Control occurs, the Borrower shall make an offer to prepay the entire outstanding principal amount of the Term Loans (the "<u>Change in Control Prepayment Offer</u>") at 101% of the aggregate principal amount thereof and the Borrower shall notify the Administrative Agent in writing of the Change in Control Prepayment Offer within 30 days after the date of such Change in Control (such notice, a "<u>Change in Control Prepayment Notice</u>"). Each such Change in Control Prepayment Notice shall provide a reasonably detailed calculation of the amount of such prepayment and specify the proposed prepayment date, which shall be no earlier than 30 days and no later than 60 days from the date on which such Change in Control Prepayment Notice is delivered to the Administrative Agent (the "<u>Change in Control Payment Date</u>"). The Administrative Agent shall promptly notify each Lender of the contents of any such Change in Control Prepayment Notice and of such Lender's Pro Rata Share of the prepayment. Any individual Lender may elect, by delivering to the Administrative Agent, not later than thirty (30) days following its receipt of such Change in Control Prepayment Notice, a written notice (such notice, an "<u>Acceptance Notice</u>") that any change in control prepayment be made with respect to all or any portion of the Term Loans held by such Lender pursuant to this <u>Section 2.8(e)</u> (any Lender that so delivers an Acceptance Notice, an "<u>Accepting Lender</u>"). If any individual Lender fails to deliver an Acceptance Notice within the time frame specified above, any such failure will be deemed a rejection of the Change in Control Prepayment Offer as to all outstanding Term Loans of such Lender. Any prepayment of Term Loans pursuant to this <u>Section 2.8(e)</u> shall be applied to the scheduled installments thereof in the manner specified by the Borrower (and absent any such direction, in direct order of maturity of remaining amortization payments). In lieu of any prepayment of Term Loans by the Borrower pursuant to this <u>Section 2.8(e)</u>, the Borrower may arrange for any individual Lender that has rejected (or has deemed to reject) the Change in Control Prepayment Offer or any other Person to purchase from any Accepting Lender (any such rejecting Lender or Person, a "<u>Put Assignee</u>"), in accordance with and subject to the terms of <u>Section 10.4(b)</u>, on the Change in Control Payment Date, all or a portion of the Term Loans held by the Accepting Lender that such Accepting Lender has elected to be prepaid in its Acceptance Notice. So long as such Accepting Lender receives, on the Change in Control Payment Date, payment of an amount equal to 101% of the aggregate outstanding principal amount of the Term Loans held by such Accepting Lender that such Accepting Lender has elected to be prepaid in its Acceptance Notice plus any accrued interest from (i) one or more Put Assignees (to the extent of 100% of the aggregate outstanding principal of such Term Loans) and (ii) the Borrower (to the extent of any accrued interest and 1% of the aggregate outstanding principal of such Term Loans), such Accepting Lender shall execute an Assignment and Assumption with the applicable Put Assignee(s); *provided* that, notwithstanding anything in this Agreement to the contrary, such Accepting Lender need not be a party thereto in order for such assignment to be effective on the Change in Control Payment Date and shall be deemed to have consented to and be bound by the terms thereof as of such date.

(f)    Prepayments of Term Loans shall be accompanied by accrued interest to the extent required by <u>Section 2.10</u> and any costs or premiums as contemplated by <u>Section 2.7(b)</u>, <u>Section 2.8(e)</u> or <u>Section 2.13</u>. Prepayments of Term Loans shall be applied (i) in the case of prepayments pursuant to <u>Section 2.7(a)</u> or <u>Section 2.8(b)</u>, to each Class of Term Loans as directed by the Borrower (and absent any such direction, *pro rata* among all Classes of Term Loans) and to the scheduled installments thereof in the manner specified by the Borrower (and absent any such direction, in direct order of maturity of remaining amortization

payments); *provided* that, (i) in connection with any repayment pursuant to the proceeds of any Refinancing Term Facility or Refinancing Equivalent Debt, such repayment shall be applied to the Class of Term Loans being refinanced; *provided* that, notwithstanding anything else set forth in this Section to the contrary, any Indebtedness (including Incremental Equivalent Debt and any Swap Agreement) that is secured on an equal and ratable basis with the Obligations by a Lien on the Collateral may participate in mandatory prepayments pursuant to Section 2.8(b) (solely to the extent such prepayment does not repay or refinance in full the Term Loans), and Section 2.8(c) on a *pro rata* or less than *pro rata* basis to the extent such Indebtedness is required to be prepaid or redeemed with the Net Cash Proceeds, as applicable, from such mandatory prepayment event. Subject to the foregoing, prepayments of Term Loans shall be applied first to ABR Term Loans and then to Eurodollar Term Loans in each case, in direct order of Interest Period maturities and (to the extent possible in compliance with the requirements of this Agreement and the same is notified by the Borrower to the Administrative Agent) in a manner which minimizes the amount of any payment required to be made by the Borrower.

(g)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to Section 2.8(b) or 2.8(c) at least three Business Days (or such shorter period of time as may be acceptable to the Administrative Agent) prior to the date of such prepayment. Each such notice shall be in substantially the form of Exhibit K attached hereto and signed by a Responsible Officer of the Borrower, shall specify the date of such prepayment and shall provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Term Lender of the contents of any such prepayment notice and of such Term Lender's ratable portion of such prepayment (based on such Lender's Pro Rata Share of each relevant Class of the Term Loans). Each applicable Term Lender may reject all or a portion of its Pro Rata Share of any mandatory repayment of Term Loans pursuant to Section 2.8(b) or 2.8(c) (such declined amounts, the "Declined Proceeds") by providing written (promptly confirmed by email) (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York City time, on the Business Day after the date of such Term Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice shall specify the principal amount of the Declined Proceeds with respect to such Term Lender. If a Term Lender fails to deliver such Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Declined Proceeds for such Term Lender, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Term Loans to which such Term Lender is otherwise entitled. Any Declined Proceeds shall be retained by the relevant member of the Group, as the case may be (subject to any prepayment obligations it may have with respect to other Indebtedness) and may be used for any purposes not expressly prohibited under this Agreement.

Section 2.9.     Fees. (a) The Borrower agrees to pay (i) to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent, (ii) to the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between such Borrower and the Collateral Agent and (iii) to the Arrangers, an upfront fee payable in the amount and at the times separately agreed upon between the Parent Guarantor and the Arrangers.

(b)     All fees payable hereunder shall be paid on the dates due, in Dollars in immediately available funds, to the parties specified herein. Fees paid shall not be refundable under any circumstances.

Section 2.10.     Interest. (a) The Term Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate *plus* the Applicable Rate.

(b)     Subject to Section 2.11(a) and Section 2.11(g), the Term Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Rate.

(c)     Notwithstanding the foregoing, at all times (i) when a Payment or Bankruptcy Event of Default has occurred hereunder and is continuing and (ii) when any other Event of Default has occurred

hereunder and is continuing and the Required Lenders have elected to impose default interest pursuant to this clause (c), all amounts outstanding hereunder shall bear interest, after as well as before judgment, at a rate *per annum* equal to (1) in the case of outstanding principal of any Term Loan, 2% *plus* the rate otherwise applicable to such Term Loan as provided in the preceding paragraphs of this Section or (2) in the case of any other outstanding amounts, 2% *plus* the rate applicable to ABR Term Loans as provided in paragraph (a) of this Section.

(d)    Accrued interest on each Term Loan shall be payable in arrears on each Interest Payment Date for such Term Loan and upon termination of the Term Commitments; *provided* that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Term Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Term Loan prior to the end of the current Interest Period therefor, accrued interest on such Term Loan shall be payable on the effective date of such conversion.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.11.   <u>Alternate Rate of Interest</u>. (a) Subject to clauses (b), (c), (d), (e), (f) and (g) of this <u>Section 2.11</u>, if prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the Screen Rate is not available or published on a current basis), for such Interest Period; *provided* that no Benchmark Transition Event shall have occurred at such time; or

(ii)    the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Term Loans (or its Term Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by email (or other facsimile transmission or electronic mail) as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (1) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and such Borrowing shall be continued as an ABR Borrowing and (2) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of clauses (b) through (h) of this Section:

(b)    *Replacing USD LIBOR*. On March 5, 2021, the Financial Conduct Authority ("<u>FCA</u>"), the regulatory supervisor of USD LIBOR's administrator ("<u>IBA</u>"), announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12- month USD LIBOR tenor settings. On the date (the "<u>Benchmark Transition Date</u>") that is the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is USD LIBOR, the applicable Benchmark Replacement will replace such Benchmark for all purposes hereunder

- 60 -

and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(c)    *Replacing Future Benchmarks*. Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m., Local Time, on the fifth Business Day after the date notice of such Benchmark Replacement is provided to the Lenders, without requiring any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Term Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans. During the period referenced in the foregoing sentence, the component of the Alternate Base Rate based upon the Benchmark will not be used in any determination of the Alternate Base Rate.

(d)    *Term SOFR Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, if (i) the Benchmark Transition Date has occurred and as a result the then-current Benchmark is being determined in accordance with clause (1)(b) of the definition of "Benchmark Replacement", and (ii) the Administrative Agent subsequently determines (at the direction of the Required Lenders), that (w) Term SOFR is or has become available, (x) there is currently a market for U.S. dollar-denominated syndicated credit facilities utilizing Term SOFR as a Benchmark, (y) Term SOFR is being recommended as the Benchmark for U.S. dollar-denominated syndicated credit facilities by the Relevant Governmental Body and (z) Term SOFR and the application thereof is administratively feasible for the Administrative Agent (as determined by the Administrative Agent in its sole discretion), then clause (1)(a) of the definition of "Benchmark Replacement" will, without requiring any amendment to, or requiring any further action by or consent of any other party to, this Agreement or any other Loan Document, replace such then-current Benchmark for all purposes hereunder and under any other Loan Document in respect of such Benchmark setting and subsequent Benchmark settings on and from the beginning of the next Interest Period or, as the case may be, Available Tenor so long as the Administrative Agent notifies the Borrower and the Lenders prior to the commencement of such next Interest Period or, as the case may be, Available Tenor.

(e)    *Benchmark Replacement Conforming Changes*. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(f)    *Notices; Standards for Decisions and Determination.* The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their

sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.

(g)    *Unavailability of Tenor of Benchmark*. At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or USD LIBOR), then the Administrative Agent may remove any tenor of such Benchmark that is unavailable or non-representative for Benchmark (including Benchmark Replacement) settings and (ii) the Administrative Agent may reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

(h)    <u>*Definitions.*</u>

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"<u>Benchmark</u>" means, initially, USD LIBOR; *provided* that if a replacement of the Benchmark has occurred pursuant to this Section, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"<u>Benchmark Replacement</u>" means, for any Available Tenor:

(1)    For purposes of clause (b) of this Section, the first alternative set forth below that can be determined by the Administrative Agent:

(a)    the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration, or

(b)    the sum of: (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of USD LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in clause (b) of this Section; and

(2)    For purposes of clause (c) of this Section, the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time;

*provided* that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Conforming Changes</u>" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such

- 62 -

Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Transition Event" means, with respect to any then-current Benchmark other than USD LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark, or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which may include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that, if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of:

(1)    a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2)    the joint election by the Administrative Agent and the Borrower to trigger a fallback from USD LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted LIBO Rate.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"SOFR" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"USD LIBOR" means the London interbank offered rate for U.S. Dollars.

Section 2.12.  Increased Costs. (a) If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by or participated in, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)  impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Term Loans made by such Lender; or

(iii)  impose on any Recipient any Taxes (other than Indemnified Taxes, Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes, or Tax described in clauses (b) through (d) of the definition of "Excluded Taxes"), on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto,

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Eurodollar Term Loan (or of maintaining its obligation to make any such Term Loan) or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement, the Term Commitments hereunder or the Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  A certificate of a Lender setting forth in reasonable detail the circumstance giving rise to the increased cost incurred by such Lender and the amount or amounts necessary to compensate such Lender or its respective holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or

reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided, further*, that, if the Change in Law giving rise to such increased costs or reductions is retroactive (or has retroactive effect), then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13. <u>Break Funding Payments</u>. In the event of (a) the payment or prepayment of any principal of any Eurodollar Term Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (b) the conversion of any Eurodollar Term Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Term Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Term Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 2.16</u>, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Term Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Term Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Term Loan, for the period from the date of such event to the last day of the-then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Term Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.14. <u>Taxes</u>. (a) Any and all payments by or on account of any obligation of each applicable Loan Party under any Loan Document, any Fee Letter or the Letter Agreement shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by each applicable Loan Party shall be increased as necessary so that, after making such deduction or withholding (including such deductions and withholdings applicable to additional sums payable under this Section), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     In addition, each applicable Loan Party shall (i) timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law or (ii) at the option of any Agent, timely reimburse such Agent for any payment of such Other Taxes.

(c)     Each applicable Loan Party shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes payable or paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      (i) Any Lender that is entitled to an exemption from, or reduction of, withholding Tax with respect to payments made under this Agreement or any other Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.14(e)(ii)(1), 2.14(e)(ii)(2), and 2.14(e)(ii)(4)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing:

(1)      Any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax.

(2)      Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(A)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States of America is a party, (x) with respect to payments of interest under this Agreement or any other Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any other Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)      executed copies of IRS Form W-8ECI;

(C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not (I) a "bank" within the meaning of Section 881(c)(3)(A)

of the Code, (II) a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (III) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "Portfolio Interest Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(D)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a Portfolio Interest Certificate substantially in the form of Exhibit I-2 or Exhibit I-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a Portfolio Interest Certificate substantially in the form of Exhibit I-4 on behalf of each such partner.

(3)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from, or a reduction in, U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(4)    If a payment made to a Lender under this Agreement or any other Loan Document would be subject to U.S. federal withholding Tax imposed pursuant to FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.14(e)(ii)(4), "FATCA" shall include any amendments made to FATCA after the Effective Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand thereof, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(c) relating to the maintenance of a Participant Register and (iii)

any Excluded Taxes attributable to such Lender, in each case that are payable or paid by the Administrative Agent in connection with this Agreement or any other Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent pursuant to this paragraph (f).

(g)     If any Lender or the Administrative Agent determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided, however*, that (i) any Lender or the Administrative Agent may determine, in its sole discretion exercised in good faith consistent with the policies of such Lender or the Administrative Agent, whether to seek a refund for any Taxes; (ii) any Taxes that are imposed on a Lender or the Administrative Agent as a result of a disallowance or reduction of any Tax refund with respect to which such Lender or the Administrative Agent has made a payment to the indemnifying party pursuant to this Section shall be treated as an Indemnified Tax for which the indemnifying party is obligated to indemnify such Lender or the Administrative Agent pursuant to this Section; (iii) nothing in this Section shall require the Lender or the Administrative Agent to disclose its Tax returns or any other information that it deems confidential to a Loan Party or any other Lender (including its tax returns); and (iv) neither any Lender nor the Administrative Agent shall be required to pay any amounts pursuant to this Section for so long as an Event of Default exists. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g), the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(h)     For purposes of this Section 2.14, the term "applicable law" includes FATCA.

(i)     Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Term Commitments and the repayment, satisfaction or discharge of all obligations under this Agreement and the other Loan Documents.

Section 2.15.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.12, Section 2.13 or Section 2.14, or otherwise) prior to 12:00 noon, New York City time, in each case on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent and except that payments pursuant to Section 2.12, Section 2.13, Section 2.14 and Section 10.3 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment or performance hereunder shall be due on a day that is not a Business Day, the date for payment or performance shall be extended to

the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)     If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (as in effect from time to time) (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment or sale of a participation in any of its Term Loans to any assignee or participant, other than to the Parent Guarantor or any Subsidiary of the Parent Guarantor or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(c)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may (but shall not be obligated to) assume that the Borrower has made such payment on such date in accordance herewith and may in its sole discretion, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.4(b) or paragraph (b) of this Section, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.16.    Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.12, or if any of the Loan Parties are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall (if requested by the relevant Loan Party) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If (i) any Lender requests compensation under Section 2.12, (ii) any of the Loan Parties is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority

for the account of any Lender pursuant to <u>Section 2.14</u>, (iii) any Lender is a Defaulting Lender or a Non-Consenting Lender or (iv) any Lender does not make an Extension Election with respect to a Term Loan Extension Request applicable to it under <u>Section 2.19</u>, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 10.4</u>), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (1) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (3) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.14</u>, such assignment will result in a reduction in such compensation or payments, (4) such assignment does not conflict with applicable law and (5) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, (x) the applicable assignee shall have consented to, or shall consent to, the applicable amendment, waiver or consent and (y) the Borrower exercises its rights pursuant to this clause (b) with respect to all Non-Consenting Lenders relating to the applicable amendment, waiver or consent. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation have ceased to apply.

(c)    Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto in order for such assignment and delegation to be effective and shall be deemed to have consented to and be bound by the terms thereof; *provided* that, following the effectiveness of any such assignment and delegation, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; *provided* that any such documents shall be without recourse to or warranty by the parties thereto.

Section 2.17.    <u>Incremental Credit Extensions</u>.

(a)    The Borrower may at any time or from time to time after the Effective Date, by notice of a Responsible Officer of the Borrower to the Administrative Agent, request (i) one or more additional Classes of term loans or additional term loans (the commitments thereof, the "<u>Incremental Term Loan Commitments</u>", the loans thereunder, the "<u>Incremental Term Loans</u>" and (ii) one or more increases in the aggregate principal amount of the Term Commitments (each such increase, a "<u>Term Loan Increase</u>" and together with any Incremental Term Loans, each an "<u>Incremental Facility</u>") and a Lender making such loans, an "<u>Incremental Term Lender</u>"); *provided* that:

(i)    The aggregate principal amount of Incremental Facilities and Incremental Equivalent Debt incurred during the term of this Agreement shall not exceed the Available Incremental Amount;

(ii)    Each Incremental Facility shall have the same guarantees as the existing Term Loans and Term Commitments and may not be guaranteed by any Person that does not guarantee the existing Term Loans and Term Commitments (unless such Person becomes a Guarantor in connection therewith);

(iii)    Subject in all respects to <u>Section 1.7(a)</u>, upon the effectiveness of any Incremental Amendment and after giving effect to such Incremental Facility: (x) no Event of Default shall exist, and (y) the representations and warranties set forth in <u>Article III</u> and in the other Loan Documents shall be true and correct in all material respects (or, in the case of representations and warranties

qualified as to materiality, in all respects) as if made on and as of such date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be true and correct in all material respects (or in all respects, as applicable) as of such earlier date (*provided* that, if the proceeds of the Incremental Facility are to be used to finance a Limited Condition Transaction, then the conditions precedent set forth in Section 1.7(a) (as may be waived or modified by the Incremental Term Lenders providing the Incremental Term Facility) shall apply;

(iv)    after giving effect to the Incremental Facility, the Parent Guarantor shall remain in compliance with the Guarantee Maintenance Requirement, calculated on a Pro Forma Basis;

(v)    Incremental Term Loans (i) shall rank *pari passu* or junior in right of payment with the existing Term Loans and Term Commitments hereunder, (ii) shall be unsecured or secured on a *pari passu* or junior basis with the Term Facility; and (iii) to the extent applicable, shall be subject to customary intercreditor arrangements reasonably satisfactory to the Administrative Agent, the applicable Incremental Term Lenders and the Borrower;

(vi)    Incremental Term Loans shall not (A) mature earlier than the Latest Term Loan Maturity Date then in effect or (B) have a Weighted Average Life to Maturity shorter than the Weighted Average Life to Maturity of the Class of Term Loans then in effect having the Latest Term Loan Maturity Date;

(vii)    Subject to clause (vi) above, the amortization schedule (if any) applicable to any such Incremental Term Loans shall be determined by the Borrower and the applicable Incremental Term Lenders;

(viii)    Subject to clauses (v) to (vii) above and clauses (viii) and (ix) below, Incremental Term Loans shall be subject to the terms, conditions and documentation to be determined mutually by the Borrower and the applicable Incremental Term Lenders; *provided* that any Incremental Facility will have terms that are substantially consistent with or not materially more restrictive or less favorable than (in each case, taken as a whole) the Term Facility or will be otherwise on terms reasonably satisfactory to the Administrative Agent, except (A) covenants or other provisions applicable only to the periods after the Latest Term Loan Maturity Date; or (B) to the extent such more restrictive or less favorable terms and conditions are applied to the Term Facility (any financial maintenance covenant may be added for the benefit of the Incremental Term Loans, without the consent of the Administrative Agent or any of the existing Lenders, to the extent that such financial maintenance covenant is also added for the benefit of the existing Term Loans); in each case, *provided* that a certificate of the Borrower as to the satisfaction of the conditions described in this clause delivered at least 10 Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirements of this clause, shall be conclusive unless the Administrative Agent notifies the Borrower within such 10 Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees);

(ix)    The All-In Yield applicable to any Incremental Facility made hereunder shall be determined by the Borrower and the applicable Incremental Term Lenders, subject to the following conditions (the "MFN Provisions"): with respect to any Incremental Facility (other than an Incremental Facility that is unsecured or secured on a junior basis to the Term Facility) established within 24 months of the Effective Date, the All-In Yield will not be more than 0.50% higher than the corresponding All-In Yield for the existing Term Facility, unless the interest rate margins with respect to the existing Term Facility are increased by an amount equal to the difference between the All-In Yield with respect to the Incremental Facility and the corresponding All-In Yield on the existing Term Facility minus 0.50%; *provided* that any increase in the All-In Yield required pursuant to this clause resulting from the application of any LIBO Rate or ABR floor will be effected solely

through the establishment of or increase to a LIBO Rate or ABR floor (but not the applicable margin);

(x)     Incremental Term Lenders may participate (1) on a *pro rata* basis, greater than pro rata basis or less than *pro rata* basis in any voluntary prepayments of then-existing Term Loans and (2) on a *pro rata* basis or less than *pro rata* basis in any mandatory prepayments of then-existing Term Loans (or on a greater than *pro rata* basis with respect to (i) prepayments of any such Incremental Term Loans with the proceeds of Refinancing Term Facilities and (ii) prepayments of any Incremental Facility that matures earlier than any other Incremental Facility); and

(xi)     Any Term Loans incurred by the Borrower pursuant to a Term Loan Increase shall have the same terms as the Term Loans the principal amount of which is so increased pursuant to such Term Loan Increase (except to the extent necessary to preserve the amortization rate in respect of such Term Loans).

(b)     Each notice from the Borrower pursuant to this <u>Section 2.17</u> shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans.

(c)     Incremental Term Loans may be made by any existing Lender and the Borrower shall offer each such existing Lender the opportunity to provide a portion of such Incremental Facility prior to such Incremental Facility being offered to any prospective Additional Lender, *provided* that, if any existing Lender does not agree to provide the same within 15 Business Days, the Borrower may seek Incremental Facilities from any prospective Additional Lender, in each case in accordance with this <u>Section 2.17</u>; *provided* that no Lender shall be obligated to make all or a portion of any Incremental Term Loan. The Borrower and each applicable Incremental Term Lender shall execute and deliver to the Administrative Agent an amendment to this Agreement (an "<u>Incremental Amendment</u>") and such other customary documentation as the Administrative Agent shall reasonably require to evidence the Incremental Term Loan of such applicable Incremental Term Lender. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this <u>Section 2.17</u>, including those required by the applicable Incremental Term Lenders (and not adverse in any material respect to any existing Lender after giving effect to the Incremental Facilities made pursuant to such amendment). The effectiveness of any Incremental Amendment shall be subject to the receipt by the Administrative Agent of (i) a certificate of a Responsible Officer of the Borrower stating that the conditions with respect to the applicable Incremental Facility under this <u>Section 2.17</u> have been satisfied, (ii) an executed Incremental Amendment and (iii) such certificates, legal opinions or other documents from the Borrower and other Loan Parties reasonably requested by the Administrative Agent in connection with the applicable Incremental Facility.

(d)     The Borrower may, in lieu of obtaining Incremental Facilities (i) issue one or more series of notes that are (A) *pari passu* or subordinated in right of payment to the Obligations and (B) unsecured or secured by Liens ranking junior or subordinate or "mezzanine" to or *pari passu* with the Liens securing the Obligations, in each case in a public offering, Rule 144A of the Securities Act of 1933, as amended, or other private placement, (ii) incur loans that are (A) pari passu or subordinated in right of payment to the Obligations and (B) unsecured or secured by Liens ranking junior, subordinate or "mezzanine" to the Liens securing the Obligations, or (iii) issue or incur Customary Bridge Facilities in lieu of the foregoing, in each case, pursuant to an indenture, interim agreement, note purchase agreement or otherwise and any extensions, renewals, refinancings and replacements thereof (any such Indebtedness on terms and subject to conditions to be mutually agreed by the Borrower and the providers of such Indebtedness, "<u>Incremental Equivalent Debt</u>"); *provided* that (A) the aggregate principal amount of all Incremental Equivalent Debt and Incremental Term Loans shall not exceed the then-available Available Incremental Amount; (B) subject to <u>Section 1.7(a)</u>, no Event of Default shall have occurred and be continuing or would exist immediately after giving effect to incurrence of such Incremental Equivalent Debt, (C) except with respect to Customary Bridge Facilities, such Incremental Equivalent Debt shall not mature earlier than the Latest Maturity Date (as determined as of the date of incurrence of such Incremental Equivalent Debt), or have a shorter Weighted

Average Life to Maturity than the Weighted Average Life to Maturity of the Term Loans outstanding at such time, (D) the terms and conditions of such Incremental Equivalent Debt (excluding pricing, fees, prepayment or redemption premiums) are (I) not materially more favorable (taken as a whole) to the lenders or holders providing such Incremental Equivalent Debt than those applicable to the existing Term Loans or Term Commitments, as determined in good faith by the Borrower (except for (A) covenants or other provisions applicable only to periods after the Latest Maturity Date (as determined as of the date of incurrence of such Incremental Equivalent Debt) or (B) to the extent such more favorable terms and conditions are applied to the Term Facility (any financial maintenance covenant may be added for the benefit of the holders providing such Incremental Equivalent Debt, without the consent of the Administrative Agent or any of the existing Lenders, to the extent that such financial maintenance covenant is also added for the benefit of the Term Loans) or (II) otherwise on current market terms for such type of Incremental Equivalent Debt, (E) such Incremental Equivalent Debt shall not require mandatory prepayments or redemptions to be made except to the extent required to be applied first to the existing Term Loans and no worse than *pro rata* with respect to any other Incremental Equivalent Debt secured on a *pari passu* basis with such Incremental Equivalent Debt, (F) to the extent secured, such Incremental Equivalent Debt shall not be secured by any assets other than the Collateral (unless such assets become Collateral in connection with such transaction) and shall be subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Administrative Agent and the institutions providing such Incremental Equivalent Debt, (G) such Incremental Equivalent Debt shall not be Guaranteed by any Person other than the Guarantors (unless such Person becomes a Guarantor in connection with such transaction) and (H) any such Incremental Equivalent Debt (other than Incremental Equivalent Debt which is unsecured or secured on a junior basis to the Term Facility) shall be subject to the MFN Provisions as if such Incremental Equivalent Debt constitutes Incremental Term Loans secured on a *pari passu* basis with the Initial Term Loans.

(e)     Each Loan Party shall take all steps and execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions including any form filing (including filing of the Form ODI in accordance with ODI Regulations), liaising with Governmental Authority as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Collateral and Guarantee Requirement in relation to the Incremental Facilities and Incremental Equivalent Debt incurred pursuant to this Section continues to be satisfied in accordance with applicable laws.

(f)     This Section 2.17 shall supersede any provisions in Section 2.2(a) or 10.2 to the extent they conflict with this Section 2.17.

Section 2.18.   Refinancing Facilities.

(a)     Upon written notice to the Administrative Agent (which shall promptly notify the Lenders), the Borrower may from time to time elect to refinance any Class of Term Loans, in whole or in part, with one or more new term loan facilities (each, a "Refinancing Term Facility") under this Agreement in accordance with this Section 2.18 with the consent of the Borrower, and the institutions providing such Refinancing Term Facility or, in the case of any Class of existing Term Loans, with one or more series of senior unsecured notes or term loans, senior subordinated notes or term loans or senior secured first lien notes or term loans or senior secured junior lien (as compared to the Liens securing the Obligations) notes or term loans, in each case, if secured, that will be secured by a Lien on the Collateral on a *pari passu* basis or junior priority basis (as applicable) with the Liens securing the Obligations (any such notes or loans, "Refinancing Equivalent Debt"); *provided* that:

(i)     except with respect to Customary Bridge Facilities and without giving effect to prepayments that reduce amortization, any Refinancing Term Facility or Refinancing Equivalent Debt that is secured on a *pari passu* basis to the Term Loans being refinanced shall not mature, or have a Weighted Average Life to Maturity, earlier than the final maturity, or the Weighted Average Life to Maturity, of the Term Loans being refinanced ;

(ii)    except with respect to Customary Bridge Facilities, any Refinancing Term Facility or Refinancing Equivalent Debt that is secured on a junior lien basis to the Term Loans being refinanced or unsecured (such Refinancing Term Facility or Refinancing Equivalent Debt, "Junior Refinancing Indebtedness") shall not mature prior to the date that is 181 days after the maturity date of, or have a shorter Weighted Average Life to Maturity than, the Term Loans being refinanced, and no Junior Refinancing Indebtedness shall have any mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers or events of default) that could result in redemptions of such Junior Refinancing Indebtedness prior to the date that is 181 days after the final maturity date of the Term Loans being refinanced;

(iii)    the other terms and conditions of such Refinancing Term Facility or Refinancing Equivalent Debt (including with respect to lien and payment priority, but excluding pricing, interest rate margins, discounts, fees, rate floors, optional prepayment and redemption terms) shall not be materially more favorable (taken as a whole) to the lenders or investors, as applicable, providing such Refinancing Term Facility or Refinancing Equivalent Debt, as applicable, than those applicable to the Term Loans or Term Commitments being refinanced (taken as a whole), as determined by the Borrower in good faith; *provided* that this clause (iii) shall not apply to covenants or other provisions applicable only to periods after the Latest Maturity Date existing at the time of such refinancing and/or (y) to the extent such covenants or other provisions are applied to the Term Facility (other than that portion being refinanced), it being agreed that, to the extent any other financial maintenance covenant is added for the benefit of such Refinancing Term Facility or Refinancing Equivalent Debt, no consent shall be required to the extent that such financial maintenance covenant is also added for the benefit of each Term Loan remaining outstanding after the incurrence of such Refinancing Term Facility or Refinancing Equivalent Debt; *provided, further*, that a certificate of the Borrower as to the satisfaction of the conditions described in this clause delivered at least 10 Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirements of this clause, shall be conclusive unless the Administrative Agent notifies the Borrower within such 10 Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees);

(iv)    no Refinancing Term Facilities or Refinancing Equivalent Debt shall be Guaranteed by any Person other than the Guarantors (unless such Person becomes a Guarantor substantially concurrently with such transaction);

(v)    the aggregate principal amount of any Refinancing Term Facility or Refinancing Equivalent Debt shall not exceed the aggregate principal amount of Term Loans and Term Commitments being refinanced (plus any premium, accrued or capitalized interest or fees and expenses incurred in connection with such refinancing), and the Net Cash Proceeds of any Refinancing Term Facility or Refinancing Equivalent Debt shall be applied, substantially concurrently with the incurrence thereof, to the *pro rata* prepayment of outstanding Term Loans being refinanced;

(vi)    any Refinancing Term Loans shall share ratably in any prepayments of Term Loans pursuant to Section 2.7 or 2.8 (or otherwise provide for more favorable prepayment treatment for the then-outstanding Classes of Term Loans other than such Refinancing Term Loans);

(vii)    to the extent secured, any such Refinancing Term Facility or Refinancing Equivalent Debt shall not be secured by any Lien on any asset that does not also secure the existing Obligations hereunder and shall be subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Borrower, the Administrative Agent and the institutions providing such Refinancing Term Facility or Refinancing Equivalent Debt (as applicable); and

(viii)    any such Refinancing Term Facility or Refinancing Equivalent Debt (other than any Refinancing Term Facility or Refinancing Equivalent Debt which is unsecured or secured on a junior basis to the Term Facility) shall be subject to the MFN Provisions.

Each such notice shall specify the date on which the Borrower proposes that the Refinancing Term Facility shall be made or the Refinancing Equivalent Debt shall be issued and specify in reasonable detail the proposed terms thereof.

(b)    The Borrower shall offer each existing Lender the opportunity to provide all or a portion of the Refinancing Term Facilities (each, a "Refinancing Term Facility Lender") prior to such Refinancing Term Facility being offered to any prospective Additional Lender, *provided* that, if any existing Lender does not agree to provide all or a portion of the Refinancing Term Facility within 15 Business Days, the Borrower may seek such Refinancing Term Facility from any prospective Additional Lender; *provided* that any Lender offered or approached to provide all or a portion of any Refinancing Term Facility and/or Refinancing Equivalent Debt may elect or decline, in its sole discretion, to provide a Refinancing Term Facility or purchase Refinancing Equivalent Debt.

(c)    The Refinancing Term Facilities shall be established pursuant to an amendment to this Agreement among the Borrower, the Administrative Agent and the Refinancing Term Facility Lenders providing such Refinancing Term Facilities (a "Refinancing Amendment") which shall be consistent with the provisions set forth in this Section. The effectiveness of any Refinancing Amendment shall be subject to the receipt by the Administrative Agent of (i) a certificate of a Responsible Officer of the Borrower stating that the conditions with respect to the applicable Refinancing Term Facility under this Section 2.18 have been satisfied, (ii) an executed Refinancing Amendment and (iii) such certificates, legal opinions or other documents from the Borrower and/or other Loan Parties reasonably requested by the Administrative Agent in connection with the applicable Refinancing Term Facility. The Refinancing Equivalent Debt shall be established pursuant to an indenture, credit agreement or other definitive documentation which shall be consistent with the provisions set forth in this Section. Notwithstanding anything to the contrary contained in Section 10.2, each Refinancing Amendment shall be binding on the Lenders, the Administrative Agent, the Loan Parties party thereto and the other parties hereto without the consent of any other Lender and the Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section, including in order to establish new tranches or sub-tranches in respect of the Refinancing Term Facilities and such technical amendments as may be necessary or appropriate in connection therewith.

(d)    Each Loan Party shall take all steps and execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions including any form filing (including filing of the Form ODI in accordance with ODI Regulations), liaising with Governmental Authority as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Collateral and Guarantee Requirement in relation to the Refinancing Term Facilities incurred pursuant to this Section continues to be satisfied in accordance with applicable laws.

Section 2.19.    Extension of Term Loans.

(a)    The Borrower may at any time and from time to time request that all or a portion of the Term Loans of a given Class (each, an "Existing Term Loan Tranche") be amended to extend the scheduled maturity date(s) with respect to all or a portion of any principal amount of such Term Loans (any such Term Loans which have been so amended, "Extended Term Loans") and to provide for other terms consistent with this Section 2.19. In order to establish any Extended Term Loans, the Borrower shall provide a notice, in the form of Exhibit F hereto or such other form as shall be approved by the Administrative Agent, to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders under the applicable Existing Term Loan Tranche) (each, a "Term Loan Extension Request") setting forth the proposed terms of the Extended Term Loans to be established, which shall (i) be identical as offered to each Lender under

- 75 -

such Existing Term Loan Tranche (including as to the proposed interest rates and fees payable) and offered *pro rata* to each Lender under such Existing Term Loan Tranche and (ii) be identical in all material respects to the Term Loans under the Existing Term Loan Tranche from which such Extended Term Loans are to be amended, except that (1) all or any of the scheduled amortization payments, if any, of all or a portion of any principal amount of the Extended Term Loans may be delayed to later dates than the scheduled amortization payments, if any, of principal of the Term Loans of such Existing Term Loan Tranche, to the extent provided in the applicable Extension Amendment, (2) (A) the interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, funding discounts, original issue discounts and voluntary prepayment terms and premiums with respect to the Extended Term Loans may be different than those for the Term Loans of such Existing Term Loan Tranche and/or (B) additional fees and/or premiums may be payable to the Lenders providing such Extended Term Loans in addition to any of the items contemplated by the preceding clause (A), in each case, to the extent provided in the applicable Extension Amendment, (3) the Extension Amendment may provide for other covenants and terms that apply solely to any period after the Latest Maturity Date that is in effect on the effective date of the Extension Amendment (immediately prior to the establishment of such Extended Term Loans), and (4) Extended Term Loans may have prepayment terms (including call protection and prepayment terms and premiums) as may be agreed by the Borrower and the Lenders thereof; *provided* that (I) in no event shall the final maturity date of any Extended Term Loans of a given Term Loan Extension Series at the time of establishment thereof be earlier than the maturity date of the Existing Term Loan Tranche from which such Extended Term Loans are to be amended, (II) the Weighted Average Life to Maturity of any Extended Term Loans of a given Term Loan Extension Series at the time of establishment thereof shall be no shorter (other than by virtue of amortization or prepayment of such Indebtedness prior to the time of incurrence of such Extended Term Loans) than the remaining Weighted Average Life to Maturity of the Existing Term Loan Tranche from which such Extended Term Loans are to be amended, (III) all documentation in respect of such Extension Amendment shall be consistent with the foregoing and (IV) any Extended Term Loans may participate on a *pro rata* basis or less than a *pro rata* basis (but not greater than a *pro rata* basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case, as specified in the respective Term Loan Extension Request. Any Extended Term Loans established pursuant to any Term Loan Extension Request shall be designated a series (each, a "<u>Term Loan Extension Series</u>") of Extended Term Loans for all purposes of this Agreement; *provided* that any Extended Term Loans established from an Existing Term Loan Tranche may, to the extent provided in the applicable Extension Amendment, be designated as being fungible with any previously established Term Loan Extension Series with respect to such Existing Term Loan Tranche. Each Term Loan Extension Series of Extended Term Loans incurred under this <u>Section 2.19</u> shall be in an aggregate principal amount that is not less than $5,000,000.

(b)    The Borrower shall provide the applicable Term Loan Extension Request at least 10 Business Days prior to the date on which Lenders under the Existing Term Loan Tranche are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, acting reasonably to accomplish the purposes of this <u>Section 2.19</u>. No Lender shall have any obligation to agree to have any of its Term Loans of any Existing Term Loan Tranche amended into Extended Term Loans pursuant to any Term Loan Extension Request. Any Lender holding a Term Loan under an Existing Term Loan Tranche (each, an "<u>Extending Term Lender</u>") wishing to have all or a portion of its Term Loans under the Existing Term Loan Tranche subject to such Term Loan Extension Request amended into Extended Term Loans shall notify the Administrative Agent (each, an "<u>Extension Election</u>") on or prior to the date specified in such Extension Request of the amount of its Term Loans under the Existing Term Loan Tranche which it has elected to request be amended into Extended Term Loans (subject to any minimum denomination requirements imposed by the Administrative Agent). In the event that the aggregate principal amount of Term Loans under the Existing Term Loan Tranche in respect of which applicable Term Lenders shall have accepted the relevant Term Loan Extension Request exceeds the amount of Extended Term Loans requested to be extended pursuant to the Term Loan Extension Request, Term Loans subject to Extension Elections shall be amended to Extended Term Loans on a *pro rata* basis (subject to rounding by the Administrative Agent, which shall be conclusive) based on the aggregate principal amount of Term Loans included in each such Extension Election. Each Lender under the Class that is being extended shall have the opportunity to participate in such extension on the same terms and conditions as

each other Lender under such Class but in any event not to be subject to any "default stopper", financial tests, "most favored nation" pricing or minimum extension conditions.

(c)      Extended Term Loans shall be established pursuant to an amendment (each, an "Extension Amendment") to this Agreement among the Borrower, the Administrative Agent and each Extending Term Lender providing an Extended Term Loan thereunder, which shall be consistent with the provisions set forth in Section 2.19(a) (but which shall not require the consent of any other Lender). The effectiveness of any Extension Amendment shall be subject to the receipt by the Administrative Agent of (i) a certificate of a Responsible Officer of the Borrower stating that the conditions with respect to the applicable Extended Term Loans under this Section 2.19 have been satisfied, (ii) an executed Extension Amendment and (iii) such certificates, legal opinions or other documents from the Borrower and/or other Loan Parties reasonably requested by the Administrative Agent in connection with the applicable Extended Term Loans. Notwithstanding anything to the contrary contained in Section 10.2, each Extension Amendment shall be binding on the Lenders, the Administrative Agent, the Loan Parties party thereto and the other parties hereto without the consent of any other Lender and the Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section, including such technical amendments as may be necessary or appropriate in connection therewith.

(d)      No amendment, conversion or exchange of Term Loans pursuant to any Extension Amendment in accordance with this Section 2.19 shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

(e)      Each Loan Party shall take all steps and execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions including any form filing (including filing of the Form ODI in accordance with ODI Regulations), liaising with Governmental Authority as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Collateral and Guarantee Maintenance Requirement pursuant to the extension of Term Loans in accordance with this Section 2.19 continues to be satisfied in accordance with applicable laws.

Section 2.20.   Defaulting Lenders. (a) Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)      such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in Section 10.2;

(ii)      any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8.1 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Term Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Term Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the

Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (A) such payment is a payment of the principal amount of any Term Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (B) such Term Loans were made when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Term Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Term Loans of such Defaulting Lender until such time as all Term Loans are held by the Lenders *pro rata* in accordance with their respective Applicable Percentages. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto; and

(iii)     No Defaulting Lender shall be entitled to receive any commitment fee pursuant to Section 2.9 for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)     If the Borrower and the Administrative Agent each agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Term Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Term Loans to be held on a *pro rata* basis by the Lenders in accordance with their respective Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and each Agent that:

Section 3.1.     Organization; Powers. (i) Each of the Parent Guarantor, Whitehat India and its Restricted Subsidiaries is an entity duly organized or incorporated, validly existing and in good standing (or equivalent status in the relevant jurisdiction to the extent the concept is applicable in such jurisdiction) under, and by virtue of, the applicable laws of the place of its incorporation or establishment, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing (or equivalent status in the relevant jurisdiction to the extent the concept is applicable in such jurisdiction) in, every jurisdiction where such qualification is required, in each case (other than with respect to the due organization of, valid existence of, and good standing under the laws of the jurisdiction of its organization of, the Borrower, each Restricted Subsidiary and, on and after the consummation of a Holdco Transaction, Holdings), except where the failure to do so does not currently have and would not reasonably be expected to result in a Material Adverse Effect. (ii) None of the Parent Guarantor, Whitehat India, any other Indian Guarantor or any Restricted Subsidiary incorporated in India is carrying on the business of a "non-banking financial company", "non-banking financial institution", or a "core investment company" or is registered or required to be registered as a "non-banking financial company" or a "core investment company" as defined under the provisions of the (Indian) Reserve Bank of India Act, 1934, CIC Regulations or any rules, regulations, notifications, circulars, press releases guidelines or instructions issued by the RBI. (iii) No Indian Guarantor is engaged in the business of providing "financial services" (as defined under IBC) and accordingly shall not be deemed to be a "financial service provider" (as defined under IBC).

Section 3.2.    Authorization; Enforceability. Each Loan Party has all requisite corporate power and authority to enter into, execute, deliver and perform its obligations under each of the Loan Documents to which it is or will be a party and to consummate the transactions contemplated thereunder (including the Transactions). All corporate actions on the part of each Loan Party necessary for the authorization, execution and delivery of the Loan Documents to which it is or will be a party and the performance of all its obligations thereunder (including any board or shareholder approval, as applicable) have been taken. Each Loan Document to which a Loan Party is or will be a party is, or when executed by the other parties thereto, will be, valid and legally binding obligations of such Loan Party, enforceable against such Loan Party in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other applicable laws now or hereafter in effect of general application affecting enforcement of creditors' rights generally, and (b) as limited by applicable laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, regardless of whether considered in a proceeding in equity or at law.

Section 3.3.    Governmental Approvals; No Conflicts. The valid execution, delivery and performance of each Loan Document by each Loan Party and the consummation by such Loan Party of the transactions contemplated thereby (including the Transactions) (a) do not require any filings, notifications, notices, submissions, applications or consents from or with, or any other action by, any Governmental Authority or any other Person, except (i) such as have been obtained or made and are in full force and effect (ii) filing of form ODI with respect to the guarantee being provided by the Indian Guarantors under the Onshore Guarantee Deed, (iii) receipt of the RBI Approval for (A) the Parent Guarantor to issue its guarantee for an amount exceeding $50,000,000 under the Onshore Guarantee Deed prior to April 1 2022 or (B) Whitehat India to issue a guarantee under the Onshore Guarantee Deed prior to 1 April 2022; (iv) the filing of the various reports and forms by the Parent Guarantor with the RBI in terms of the provisions of the Guarantee Regulations; (v) payment of stamp duty on any Loan Document executed in India or subsequently brought into India, and (vi) those filings, notifications, notices, submissions, applications or consents the failure of which to be obtained or made does not currently have and would not reasonably be expected to have a Material Adverse Effect, (b) will not (i) result in any violation of, be in conflict with, or constitute a default under, require any consent under, or give any Person rights of termination, amendment, acceleration (including acceleration of any obligation of the Parent Guarantor or any of its Restricted Subsidiaries) or cancellation under, (1) any applicable order of any Governmental Authority, (2) any provision of the organizational documents or constitutional documents (as applicable) of the Parent Guarantor, any other Indian Guarantor or any of its Restricted Subsidiaries, or any shareholders' agreement entered into with respect to the Parent Guarantor, Whitehat India or any other Indian Guarantor, (3) any applicable law, rule, or regulation, including the ODI Regulations, other than the requirement of the RBI Approval if the Onshore Guarantee Deed for an amount exceeding $50,000,000 by the Parent Guarantor is issued prior to April 1 2022 and Whitehat India issues a guarantee under the Onshore Guarantee Deed prior to April 1 2022, or (4) any indenture, agreement or other instrument (other than the agreements and instruments referred to in the foregoing sub-clause (2)) binding upon the Parent Guarantor, any other Indian Guarantor or any of its Restricted Subsidiaries or its assets, or (ii) result in the creation of any Lien upon any of the properties or assets of the Parent Guarantor, any other Indian Guarantor or any of its Restricted Subsidiaries (other than the Liens created pursuant to the Collateral Documents), except in the case of the foregoing sub-clauses (1), (3), and (4) of clause (i), as does not currently have and would not reasonably be expected to have a Material Adverse Effect; and (c) in respect of the Parent Guarantor, and each other Indian Guarantor is in compliance with the ODI Regulations and the provisions of the RBI Approval (once received) which is in full force and effect.

Section 3.4.    Financial Condition; No Material Adverse Change.

(a)    The Parent Guarantor has delivered to the Administrative Agent the Company Financial Statements. The Company Financial Statements (i) have been prepared in accordance with the books and records of the Parent Guarantor and its Subsidiaries, (ii) fairly present in all material respects the financial condition and position of the Parent Guarantor and its Subsidiaries on a consolidated basis as of the dates indicated therein, and the results of operations of the Parent Guarantor and its Subsidiaries on a consolidated

basis for the periods indicated therein, and (iii) were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved.

(b)    Since the Reference Date, no event, development or circumstance exists or has occurred that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.5.    <u>Title</u>.

(a)    Except where the failure to have title or other interest does not currently have and would not reasonably be expected to have a Material Adverse Effect, each of the Parent Guarantor, Whitehat India and its Restricted Subsidiaries has good and valid title to, or valid leasehold interests in or rights to use, all the assets owned by it (including Equity Interests, but excluding Intellectual Property), whether tangible or intangible (including those reflected in the Company Financial Statements, together with all assets acquired thereby since the Reference Date, but excluding any tangible or intangible assets that have been Disposed of since the Reference Date in the ordinary course of business), and in each case free and clear of all Liens, other than (i) Permitted Encumbrances, (ii) Liens arising by operation of law, (iii) Liens permitted by <u>Section 6.2</u> and (iv) minor defects in title that do not materially interfere with the ability of the Parent Guarantor and its Restricted Subsidiaries to conduct their businesses.

(b)    [Reserved].

(c)    Each of the Parent Guarantor and its Restricted Subsidiaries (i) owns and has title to all Core Assets or (ii) is licensed or has the valid right to use all other material Intellectual Property, in each instance, used in and necessary to operate its business as currently conducted, and in the case of clause (i) above, free and clear of all Liens, other than (1) Permitted Encumbrances, (2) Liens arising by operation of law, (3) Liens permitted by <u>Section 6.2</u> and (4) minor defects in title that do not materially interfere with the ability of the Parent Guarantor and its Restricted Subsidiaries to conduct their businesses. To the knowledge of the Parent Guarantor, each Core Asset is valid and the use of such Intellectual Property by the Parent Guarantor and its Restricted Subsidiaries does not infringe upon the intellectual property or other proprietary rights of any other Person, except for any such infringements that do not currently have and would not reasonably be expected to have a Material Adverse Effect.

Section 3.6.    <u>Litigation and Environmental Matters</u>.

(a)    Except for the Disclosed Matters or as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) there is no Action by or before any arbitrator or Governmental Authority pending, or to the knowledge of the Parent Guarantor, threatened in writing, against or affecting any of the Parent Guarantor or its Restricted Subsidiaries or any of their respective officers, directors or commissioners with respect to their respective businesses or proposed business activities of the Parent Guarantor and its Restricted Subsidiaries, or any officers, directors or commissioners of any of the Parent Guarantor or its Restricted Subsidiaries in connection with such Person's respective relationship with the Parent Guarantor or its Restricted Subsidiaries and (ii) there is no judgment or award unsatisfied against the Parent Guarantor or any of its Restricted Subsidiaries nor is there any order of any Governmental Authority in effect and binding on the Parent Guarantor or any of its Restricted Subsidiaries or their respective assets or properties.

(b)    There are no Actions by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Parent Guarantor, threatened in writing against or affecting the Parent Guarantor or any of its Restricted Subsidiaries that involve this Agreement, any other Loan Document or the Transactions.

(c)    Except for the Disclosed Matters and except with respect to any other matters that do not currently have and would not reasonably be expected to have a Material Adverse Effect, neither the Parent Guarantor nor any of its Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental

Law, (ii) has become subject to any Environmental Liability, or (iii) has received written notice of any claim with respect to any Environmental Liability.

(d)      Since the Effective Date, there has been no change in the status of the Disclosed Matters that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.7.      Compliance with Laws and Agreements. (a) Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) each of the Parent Guarantor and its Restricted Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments (including, but not limited to, the Parent Guarantor Shareholders Agreement) binding upon it or its property (including any Intellectual Property owned by it); and (ii) none of the Parent Guarantor or its Restricted Subsidiaries is, to the knowledge of the Parent Guarantor, under investigation with respect to a violation of any applicable law or is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, domestic or foreign.

(b)      No Default or Event of Default has occurred and is continuing.

(c)      Since the Reference Date, none of the Parent Guarantor or its Restricted Subsidiaries has received any letter or other written communication from, and, to the knowledge of the Parent Guarantor, there has not been any public notice of a type customary as a form of notification of such matters in the jurisdiction by, any Governmental Authority threatening or providing notice of (i) the revocation or suspension of any Required Governmental Authorizations issued to the Parent Guarantor or any of its Restricted Subsidiaries or (ii) the need for compliance or remedial actions in respect of the activities carried out by such Person, which revocation, suspension, compliance or remedial actions (or the failure of the Parent Guarantor or any of its Restricted Subsidiaries to undertake them) currently has or would reasonably be expected to have a Material Adverse Effect.

(d)      The Parent Guarantor Shareholder Agreement remains valid and effective and no Default (howsoever described) is outstanding thereunder.

(e)      The shareholders agreement dated 5 August 2020 entered into between Whitehat India, the Parent Guarantor, Nexus Ventures V Ltd. Mr. Karan Bajaj, the employment agreement dated 5 August 2020 between Whitehat India and Mr. Karan Bajaj and all other related documents have been terminated and ceased to be in force and effect.

Section 3.8.      Investment Company Status. No Loan Party is or is required to be registered as an "investment company" under the Investment Company Act.

Section 3.9.      Taxes. Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect and except those which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, (a) all income and all other Tax returns required to be filed by or with respect to each of the Parent Guarantor and its Restricted Subsidiaries have been filed within the requisite period (taking into account any extensions) and completed in all respects on a proper basis in accordance with applicable law, (b) all Taxes have been or will be paid in a timely fashion or have been accrued for on the financial statements of the Parent Guarantor and/or the applicable Restricted Subsidiary, and (c) since the Reference Date (i) no deficiencies for any Taxes with respect to any Tax returns of the Parent Guarantor or any of its Restricted Subsidiaries have been asserted in writing by, and no written notice of any pending action, audit, assessment or other proceeding with respect to such Tax returns or any Taxes of the Parent Guarantor or any of its Restricted Subsidiaries has been received from, any Tax authority, and no dispute or assessment relating to such Tax returns or such Taxes with any such Tax authority is outstanding, and (ii) no written claim has been made by a Tax authority in a jurisdiction where the Parent Guarantor or any of its Restricted Subsidiaries does not file Tax returns that such Person is or may be subject to taxation by that jurisdiction.

Section 3.10.   <u>U.S. Plans and Non-U.S. Plans</u>. (a) Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) each of the U.S. Plans has been operated and administered in accordance with its terms, and is in compliance with all applicable laws, rules, regulations and orders, and all contributions to, and payments for each such U.S. Plan have been timely made, and no event, transaction or condition has occurred or exists that would result in any liability or obligation to any of the Parent Guarantor or its Subsidiaries under such U.S. Plan; (ii) there are no pending or, to the knowledge of the Parent Guarantor, threatened Actions involving any U.S. Plan (except for routine claims for benefits payable in the normal operation of any U.S. Plan) and no facts or circumstances exist that could give rise to any such Actions; (iii) no U.S. Plan is under investigation or audit by any Governmental Authority and, to the knowledge of the Parent Guarantor, no such investigation or audit is contemplated or under consideration; and (iv) each U.S. Plan which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is composed of a master or prototype plan that has received a favorable opinion letter from the IRS, and, to the knowledge of the Parent Guarantor, nothing has occurred since the date of such determination that would adversely affect such determination. No ERISA Event, either alone or in the aggregate, has occurred, or is reasonably expected to occur, other than as does not currently have and would not reasonably be expected to have a Material Adverse Effect. There exists no Unfunded Pension Liability with respect to any Pension Plan, except as would not reasonably be expected to have a Material Adverse Effect. As of the Effective Date, there are no U.S. Plans except as set forth in <u>Schedule 3.10(a)</u>.

(b)       Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) each of the Non-U.S. Plans has been operated and administered in accordance with its terms, and is in compliance with all applicable laws, rules, regulations and orders, and all contributions to, and payments for each such Non-U.S. Plan have been timely made, and no event, transaction or condition has occurred or exists that would result in any liability or obligation to any of the Parent Guarantor or its Restricted Subsidiaries under such Non-U.S. Plan; (ii) there are no pending or, to the knowledge of the Parent Guarantor, threatened Actions involving any Non-U.S. Plan (except for routine claims for benefits payable in the normal operation of any Non-U.S. Plan) and no facts or circumstances exist that could give rise to any such Actions; (iii) no Non-U.S. Plan is under investigation or audit by any Governmental Authority and, to the knowledge of the Parent Guarantor, no such investigation or audit is contemplated or under consideration; and (iv) each of the Parent Guarantor or its Restricted Subsidiaries is in compliance with all applicable laws and binding contractual obligations relating to its provision of any form of Social Insurance, and has paid, or made provision for the payment of, all Social Insurance contributions required under applicable law and binding contractual obligations.

Section 3.11.   <u>Disclosure</u>.

(a)       (i) All factual information regarding the Parent Guarantor and its Subsidiaries (other than projections, financial estimates, budgets, forecasts and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry nature) contained in the Confidential Information Memorandum and the lender presentation in written form, the supplement to such lender presentation (for public-side Lenders and private-side Lenders) in written form and the Parent Guarantor's financial model, each in the form delivered to Lenders with the initial Confidential Information Memorandum, taken as a whole and as supplemented, when furnished, is accurate (except for any inaccuracy that would not reasonably be expected to result in a Disclosure Material Adverse Effect). (ii) The Projections that have been made available to the Lenders by the Parent Guarantor in connection with the transactions contemplated hereby reflect various estimates and assumptions and have been prepared by the Parent Guarantor in good faith; *provided* that (1) no representations or warranties are made by the Parent Guarantor or any of its Affiliates or representatives as to the accuracy of any Projections, (2) whether or not any Projections are in fact achieved will depend upon future events and conditions, some of which are not within the control of the Parent Guarantor or its Subsidiaries, and (3) actual results may vary from the projected results and such variations may be material.

(b)      As of the Effective Date, to the best knowledge of the Borrower, the information included in each Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 3.12.   Subsidiaries. (a) Schedule 3.12 sets forth as of the Effective Date a list of all Restricted Subsidiaries (identifying all Restricted Subsidiaries and Immaterial Subsidiaries) and the percentage ownership (directly or indirectly) of the Parent Guarantor therein.

(b)      Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, the shares of capital stock or other ownership interests of all Restricted Subsidiaries of the Parent Guarantor have been duly authorized and validly issued and are fully paid and non-assessable and are owned by the Parent Guarantor (other than minority interests held by other Persons that do not violate any provision of this Agreement), directly or indirectly, free and clear of all Liens other than Liens permitted under Section 6.2.

Section 3.13.   Anti-Terrorism Laws; USA Patriot Act. To the extent applicable, the Parent Guarantor and each Subsidiary of the Parent Guarantor is in compliance, in all material respects, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (b) the USA Patriot Act. To the knowledge of the Parent Guarantor, none  of the Loan Parties or their Subsidiaries is the subject of any action or investigation by any Governmental Authority with respect to any actual or alleged violation of the USA Patriot Act.

Section 3.14.   Anti-Corruption Laws and Sanctions.

(a)      The Parent Guarantor has implemented and maintains (and, on and after a Holdco Transaction, Holdings will have and will maintain) in effect policies and procedures designed to ensure compliance by the Loan Parties and their respective Subsidiaries and their respective directors, officers, commissioners, employees and agents (or others acting for or on behalf of them) with Anti-Corruption Laws and applicable Sanctions, and each Loan Party, its Subsidiaries and its and their respective directors, officers, commissioners, employees, and, to the knowledge of the Parent Guarantor, its and their respective agents (or others acting for on behalf of them), are in compliance and have for the past five years been in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

(b)      None of the Loan Parties or their respective Subsidiaries or, to the knowledge of the Parent Guarantor, their respective directors, commissioners, officers, employees, agents or others acting for or on behalf of them is engaged in or subject to any proceedings, demands, inquiries, indictments, or hearings or, to the knowledge of the Parent Guarantor, investigations, by or before any court, statutory or governmental body, department, board or agency relating to applicable Anti-Corruption Laws or Sanctions, and, to the knowledge of the Parent Guarantor, no such proceeding, demand, inquiry, investigation or hearing has been threatened in writing.

(c)      None of the Loan Parties or their respective Subsidiaries or, to the knowledge of the Parent Guarantor, their respective directors, commissioners or officers has ever been found by a Governmental Authority to have violated any Anti-Corruption Law.

(d)      None of (i) the Parent Guarantor or any Subsidiary of the Parent Guarantor or any of its or their respective directors or officers, or (ii) to the knowledge of the Parent Guarantor, any commissioner, employee or agent of (or others acting for or on behalf of) the Parent Guarantor or any Subsidiary of Parent Guarantor that will act in any capacity in connection with or benefit from the Term Facility is a Sanctioned Person.

(e)      No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

Section 3.15.   <u>Margin Stock</u>. (a) None of the Parent Guarantor or any of its Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)     No part of the proceeds of any Term Loan will be used to purchase or carry any Margin Stock or to extend credit for the purposes of purchasing or carrying Margin Stock in violation of the provisions of the Regulations of the Federal Reserve Board, including Regulation T, U or X, or any substantially equivalent law or regulation in effect in any other applicable jurisdiction.

Section 3.16.   <u>Solvency</u>. As of the Effective Date, (i) the Parent Guarantor and its Subsidiaries, on a consolidated basis are, and after giving effect to the incurrence of all Indebtedness and obligations being incurred in connection herewith (assuming for this purpose that the full amount of the Term Commitments is drawn on the Effective Date) will be, Solvent; and (ii) in respect of the Parent Guarantor, Whitehat India or any other Indian Guarantor and except for the Disclosed Matters: (A) no action has been threatened in writing or initiated in relation to the commencement of any insolvency resolution process under the IBC or other analogous laws; (B) no proceeding has been initiated, or order been passed, for liquidation, winding up, bankruptcy or dissolution, under the IBC or other analogous laws; of the Parent Guarantor, Whitehat India or such other Indian Guarantor; (C) it has not voluntarily initiated or commenced any proceeding or filed any petition seeking liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or other relief under the IBC or other analogous laws; and (D) no resolution plan has been prepared pursuant to any framework for resolution of stressed or non-performing assets or any other policy/scheme notified by the RBI or any other relevant Governmental Authority, including but not limited to the Stressed Assets Framework.

Section 3.17.   <u>Affected Financial Institution</u>. No Loan Party is an Affected Financial Institution.

Section 3.18.   <u>Insurance Matters</u>. Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, all insurance policies and all self-insurance programs and arrangements relating to the business, assets, Business Liabilities, operations and directors, commissioners and officers (if any) of each Loan Party are in full force and effect, no written notice of cancellation or modification has been received, and, to the knowledge of the Parent Guarantor, there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default, by any insured thereunder. Such insurance policies are with reputable insurance carriers and provide coverage against such risks and in such amounts and with such deductibles as are customary for businesses of that size in Asia in businesses generally comparable to the business of the Parent Guarantor.

Section 3.19.   <u>Material Contracts</u>. Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect: (i) each Material Contract to which the Parent Guarantor or any of its Restricted Subsidiaries is a party is a valid and binding agreement of such Person, the performance of which by such Person does not violate any applicable law, rule, regulation or order of any Governmental Authority, and each such Material Contract is in full force and effect and enforceable against such Person in accordance with its terms, except (1) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (2) as may be limited by laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies, regardless of whether considered in a proceeding in equity or at law; and (ii) each of the Parent Guarantor and its Restricted Subsidiaries has duly performed all of its obligations under each Material Contract to which it is a party to the extent that such obligations to perform have accrued, and no breach or default, alleged breach or alleged default, or event which would (with the passage of time, notice or both) constitute a breach or default thereunder by such Person with respect thereto, or, to the knowledge of the Parent Guarantor, any other party or obligor with respect thereto, has occurred.

Section 3.20.   <u>Collateral Documents</u>. The Liens granted by the Collateral Documents constitute valid and perfected Liens on the properties and assets covered by the Collateral Documents, to the extent

required by the Loan Documents and subject to no prior or equal Lien except those Liens permitted to be prior or equal by Section 6.2.

Section 3.21.    Employee Matters. Neither the Parent Guarantor nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against the Parent Guarantor or any of its Subsidiaries or, to the knowledge of the Parent Guarantor, threatened against any of them before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is pending against the Parent Guarantor or any of its Restricted Subsidiaries or, to the knowledge of the Parent Guarantor, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Parent Guarantor or any of its Subsidiaries, (c) to the knowledge of the Parent Guarantor, no union representation question existing with respect to the employees of the Parent Guarantor or any of its Restricted Subsidiaries and (d) to the knowledge of the Parent Guarantor, no union organization activity that is taking place, except, with respect to any matter specified in clause (a), (b), (c) or (d) above, that would not reasonably be expected to result in a Material Adverse Effect.

Section 3.22.    Pari Passu Ranking. The obligations evidenced by each Loan Document constitute direct and unconditional general obligations of the Loan Parties, and rank in right of payment and otherwise at least *pari passu* with all other senior unsecured and unsubordinated Indebtedness of the Loan Parties, except for obligations mandatorily preferred by applicable law.

Section 3.23.    Status as Senior Indebtedness. The Obligations constitute "senior indebtedness," "senior debt," "guarantor senior debt" or "senior secured financing" (or any comparable term) as defined in any applicable Junior Financing Documentation.

Section 3.24.    [Reserved].

Section 3.25.    Indian Guarantee

(a)    No Indian Guarantor has made any ODI Investments in any person incorporated or otherwise formed outside of India which (when considered together with the guarantee and indemnity contained in the Onshore Guarantee Deed and all other ODI Investments made by the Parent Guarantor) would cause the Parent Guarantor to be in breach of any applicable laws or regulations or guidelines issued by the RBI (including, without limitation, the Guarantee Regulations and, after the receipt thereof, the RBI Approval). All calculations for the purposes of this Section 3.25 shall be made in accordance with the applicable RBI guidelines and regulations (including, without limitation, the Guarantee Regulations).

(b)    Each Indian Guarantor is in full compliance with the ODI Regulations, the Indian Foreign Exchange Management (Guarantees) Regulations, 2000, the RBI Approval (once received) and any other applicable laws or regulations, including with respect to the Indian Guarantees which are granted in accordance with the Guarantee Regulations.

(c)    Guaranteeing the obligations of the Borrower in the matter set out in this Agreement and the Onshore Guarantee Deed would not cause any guaranteeing or similar limit binding on the Indian Guarantors to be exceeded.

(d)    No Indian Guarantor is on the RBI's exporters' caution list or list of defaulters to the banking system circulated by the RBI, TransUnion CIBIL Limited or any other credit information company as approved by the RBI, or under investigation by an investigation/enforcement agency or regulatory body.

(e)    As of the Effective Date, the Parent Guarantor directly owns 100% of the total paid up and issued share capital of BYJU's Pte. Ltd.

(f)    As of the Effective Date, BYJU's Pte. Ltd. directly owns 100% of the total paid up and issued share capital of the Borrower.

(g)     All transactions of the Parent Guarantor in respect of its investments in BYJU's Pte. Ltd. and the Borrower, including the Onshore Guarantee Deed, are routed through the Authorized Dealer.

(h)     No Indian Guarantor nor the Borrower nor BYJU's Pte. Ltd. are at any time, either jointly or severally, engaged in the real estate, banking business or financial services sectors as referred to in the ODI Regulations.

(i)     The Borrower is engaged in bona fide business activities in terms of the ODI Regulations.

(j)     The Borrower has been constituted in accordance with the ODI Regulations and all share certificates in relation to the shares of the Borrower have been issued to the relevant shareholders.

For the sole purpose of this Article III, any reference to "material" means a matter that is quantifiable in monetary terms in the sum of $10,000,000 or more or which currently has or would reasonably be expected to have a Material Adverse Effect.

ARTICLE IV
CONDITIONS

Section 4.1.    The Effective Date. The obligations of the Lenders to make Term Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 10.2):

(a)     The Administrative Agent shall have received from each party to this Agreement, the Onshore Guarantee Deed and each other Loan Document to be entered into on the Effective Date, in each case, signed on behalf of such party.

(b)     The Administrative Agent shall have received a Term Loan Note executed by the Borrower in favor of each Lender requesting a Term Loan Note in advance of the Effective Date.

(c)     The Administrative Agent and the Collateral Agent shall have received a written opinion (addressed to the Administrative Agent, the Collateral Agent and the Lenders and dated as of the Effective Date) from Linklaters LLP, Talwar Thakore & Associates and White & Case LLP, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(d)     The Administrative Agent shall have received (i) copies of the organizational documents or constitutional documents (as applicable), resolutions of the board of directors and (if customarily provided) shareholders, board of commissioners or other comparable governing body and, if required in the relevant jurisdiction or by the relevant organizational documents or constitutional documents (as applicable), shareholders of the Borrower and each other Loan Party (as applicable) approving the terms of, and the transactions contemplated by, the Loan Documents to which it is a party and the execution and delivery of such Loan Documents to be delivered by the Borrower and the other Loan Parties on the Effective Date and all documents evidencing other necessary corporate (or other applicable organizational) action, governmental approvals and registrations, if any, with respect to the Loan Documents and (ii) all other documents reasonably requested at least five Business Days before the Effective Date by the Administrative Agent relating to the organization, existence and good standing (or the equivalent) of each Loan Party and authorization of the transactions contemplated hereby.

(e)     The Administrative Agent and the Collateral Agent shall have received an incumbency certificate of a Responsible Officer, a manager, a director, the company secretary or an assistant secretary of each Loan Party certifying the names and true signatures of the officers, managers, directors or other authorized signatories of such Loan Party authorized to sign the Loan Documents to which it is a party, to be delivered by each Loan Party on the Effective Date and the other documents to be delivered hereunder on the Effective Date.

(f)     The Administrative Agent shall have received a certificate of a Responsible Officer, a manager, a director, the company secretary or an assistant secretary of each Loan Party confirming that (x) each copy document relating to it and delivered under this <u>Section 4.1</u> is correct, complete and in full force and effect as at a date no earlier than the Effective Date, and (y) guaranteeing or securing the Initial Term Loans (in the case of any Indian Guarantor as of the Effective Date, up to the amount set out in the Onshore Guarantee Deed applicable as of the Effective Date) would not cause any borrowing, guaranteeing, securing or similar limit binding on such Loan Party to be exceeded.

(g)     The Administrative Agent and the Collateral Agent shall have received (i) a certificate of the Parent Guarantor, signed by a director of the Parent Guarantor confirming that (A) the use of proceeds of the Initial Term Loans is for the purpose of the core overseas business of the Borrower, (B) the provisions of Section 185 of the Companies Act, 2013 of India are not applicable to it in relation to entry into, and performance of its obligations in connection with, the Onshore Guarantee Deed since (1) the Borrower is a subsidiary of the Parent Guarantor, and (2) all amounts borrowed under the Initial Term Loans will be utilized by the Borrower for its principal business activities, (C) in relation to Section 186 of the Companies Act, 2013 of India: (1) no prior approval of any public financial institution (as defined under the Companies Act, 2013 of India) is required to be obtained by the Parent Guarantor for providing the Onshore Guarantee Deed; (2) no prior approval of the shareholders of the Parent Guarantor is required in respect of the Onshore Guarantee Deed as the Borrower is a directly or indirectly wholly owned subsidiary of the Parent Guarantor and (3) no default has been committed by the Parent Guarantor in the repayments of any deposits accepted by it or payment of interest thereon; and (D) all representations and warranties of the Parent Guarantor in the Loan Documents are true and correct on the date of the certificate, (ii) a certificate from the Parent Guarantor's statutory auditors, being auditors of international standing, confirming the following: (1) [*reserved*], and (2) that (A) the aggregate ODI Investments by it (including any guarantee contained in the Loan Documents) is within 400% of its ODI Net Worth calculated in accordance with the ODI Regulations and (B) the aggregate ODI Investments by the Parent Guarantor made until the date of this Agreement (including any guarantee contained in the Loan Documents) does not exceed the limits permitted under the ODI Regulations, (iii) a copy, certified to be true by an authorized signatory of the Parent Guarantor of Form ODI submitted to the RBI through the Authorized Dealer in respect of the guarantee provided by the Parent Guarantor under the Onshore Guarantee Deed, as required under the ODI Regulations, (iv) a copy of the UIN issued by the RBI to the Parent Guarantor in respect of its investment in the Borrower, (v) a copy of the most recent annual performance report filed by the Parent Guarantor with the RBI in respect of its ODI Investments in the Borrower for the financial year and (vi) evidence of no-objection from the relevant Investors under the Articles of Association of the Parent Guarantor in relation to the transactions contemplated by it (including the guarantee and indemnity provided by it) under the Loan Documents to which it is a party, the Shareholders (Call Option) Agreement and the IP Licensing Agreement (which may include the board resolution of the Parent Guarantor, if permitted under the Articles of Association and the Parent Guarantor Shareholders Agreement).

(h)     The Administrative Agent shall have received a certificate, dated as of the Effective Date and signed on behalf of the Borrower by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in <u>paragraphs (b)</u> and <u>(c)</u> of <u>Section 4.2</u> as of the Effective Date.

(i)     The Administrative Agent and the Collateral Agent, as applicable, shall have received (i) all fees required to be paid by the Borrower on the Effective Date and (ii) all expenses required to be reimbursed by the Borrower for which invoices have been presented at least three Business Days prior to the Effective Date, in each case on or before the Effective Date.

(j)     The Administrative Agent shall have received the results of recent Uniform Commercial Code (or other applicable law), tax and judgment Lien searches with respect to each of the Loan Parties, and such results shall not reveal any material judgment or any Lien on any of the assets of the Loan Parties except for Liens permitted under <u>Section 6.2</u> or Liens to be discharged on or prior to the Effective Date.

(k)     In order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Collateral, each Loan Party shall have delivered to the Collateral Agent (with a copy to the Administrative Agent):

(i)     [Reserved];

(ii)     (1) subject to Section 5.13, the certificates (if any) representing the Equity Interests (to the extent certificated) required to be pledged pursuant to any Security Agreement (or, if applicable in any local jurisdiction, certified copies of the registers or extracts thereof), together with, as applicable, an irrevocable power of attorney, an undated stock power or similar instrument of transfer for each such certificate endorsed in blank by a duly authorized officer of the pledgor thereof, together with any resolutions of the shareholders of the relevant company adopting such changes to the constitutional documents of each of the relevant companies as the Collateral Agent requires to remove any restriction on any transfer of shares in each of the relevant companies pursuant to any enforcement of the relevant Singapore Security Agreement, (2) each instrument evidencing any Indebtedness which is required to be pledged and delivered to the Collateral Agent pursuant to any Security Agreement endorsed (without recourse) in blank (or accompanied by a transfer form endorsed in blank) by the pledgor thereof and (3) all notices required to be signed and delivered by any Loan Party on or prior to the Effective Date pursuant to any Security Agreement; and

(iii)     (1) Uniform Commercial Code (or similar) financing statements naming the Borrower and each Guarantor as debtor and the Collateral Agent as secured party, in appropriate form for filing, registration or recordation in the jurisdiction of incorporation or organization of each such Loan Party, and (2) subject to Section 5.13, each other collateral document and filing as the Administrative Agent may deem necessary or advisable under applicable law and in any applicable jurisdiction to create and perfect a security interest in the Collateral.

(l)     The Lenders shall have received from the Parent Guarantor the Company Financial Statements.

(m)     The Administrative Agent shall have received (i) a group structure chart reflecting the structure of the Group, (ii) a copy of the IP Licensing Agreement executed by the parties thereto dated as of the Effective Date, (iii) a copy of the Shareholders (Call Option) Agreement in respect of the shares of Great Learning Education Pte. Ltd., duly executed by the shareholders of Great Learning Education Pte. Ltd. and (iv) a copy of any third-party consent required in respect of the entry into and performance of the Loan Documents by each member of the Group under the existing indebtedness and other contractual arrangements of the Group.

(n)     On the Effective Date, the Administrative Agent shall have received a Solvency Certificate executed by the chief financial officer of the Parent Guarantor in the form of Exhibit H.

(o)     (i) The Administrative Agent shall have received, at least three Business Days prior to the Effective Date, all documentation and other information regarding the Borrower and the Guarantors requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act, to the extent requested in writing of the Borrower at least five Business Days prior to the Effective Date. (ii) To the extent a Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least three Business Days prior to the Effective Date, any Lender that has requested, in a written notice to the Borrower at least five Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to such Loan Party shall have received such Beneficial Ownership Certification.

(p)     The Administrative Agent shall have received evidence satisfactory to the Administrative Agent that the stamp duty payable in connection with the execution of the Loan Documents, if any, has been paid.

For purposes of determining compliance with the conditions specified in this <u>Section 4.1</u> and <u>Section 4.2</u> as of the Effective Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.2.    <u>Each Credit Extension</u>. Subject to <u>Section 1.7(a)</u>, the obligation of each Lender to make a Term Loan on the occasion of any Borrowing (other than a Borrowing consisting solely of a conversion of Term Loans of one Type to another Type or a continuation of a Eurodollar Term Loan following the expiration of the applicable Interest Period) and the effectiveness of any Incremental Facility pursuant to <u>Section 2.17</u> or any Extension pursuant to <u>Section 2.19</u> (each of the foregoing, a "<u>Credit Extension</u>"), is subject to the satisfaction of the following conditions:

(a)    The Administrative Agent shall have received a fully executed Borrowing Request;

(b)    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties shall be true and correct in all respects) on and as of the date of such Credit Extension, except that (i) for purposes of this Section, the representations and warranties contained in <u>Section 3.4(a)</u> shall be deemed to refer, following the first delivery thereof, to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of <u>Section 5.1</u> and (ii) to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in such manner as of such earlier date; and

(c)    At the time of and immediately after giving effect to such Credit Extension, (i) no Default or Event of Default shall have occurred and be continuing and (ii) the Guarantee Maintenance Requirement shall be met.

Each Credit Extension shall be deemed to constitute a representation and warranty by the Borrower as to the matters specified in paragraphs (b) and (c) of this Section.

ARTICLE V
<u>AFFIRMATIVE COVENANTS</u>

Until the Term Commitments have expired or been terminated and all Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash, each Loan Party covenants and agrees with the Lenders that:

Section 5.1.    <u>Financial Statements; Other Information</u>. The Parent Guarantor will furnish to the Administrative Agent (for distribution to each Lender):

(a)    as soon as available and in any event no later than (i) for each fiscal year of the Parent Guarantor prior to an IPO and prior to the Parent Guarantor being subject to annual and quarterly reporting requirements under the Exchange Act 180 days after the end of such fiscal year  and (iii) if an IPO has occurred and the Parent Guarantor is subject to annual and quarterly reporting requirements under the Exchange Act, the later of (A) 90 days after the end of each fiscal year and (B) the date the Parent Guarantor is required by the SEC to deliver its Form 10-K for such fiscal year, a copy of (1) its audited consolidated (and, with respect to the Parent Guarantor and its Restricted Subsidiaries, unaudited consolidating) balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized national standing (without a "going concern" or like qualification or exception (other than a qualification related to (x) the maturity of the Term Loans at the Latest Maturity Date or the impending maturity of any other loans or commitments and (y) any actual or prospective breach of any financial covenants (to the extent included in any Junior Financing

Documentation or other documentation evidencing any Indebtedness)) and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent Guarantor and its consolidated Restricted Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, (2) a reasonably detailed reconciliation of the financial statements delivered pursuant to clause (1) above indicating the extent to which any figures set forth therein are not attributable to the Loan Parties, (3) the annual consolidated (and, with respect to the Parent Guarantor and its Restricted Subsidiaries, consolidating) operating budget and projections of Parent Guarantor and its Restricted Subsidiaries showing the quarterly income statement, balance sheet and cash flow statements in reasonable detail, including for key segments and (4) a copy of the annual performance report submitted by the Parent Guarantor to the RBI through its authorized dealer;

(b)    as soon as available and in any event no later than (i) if prior to an IPO and prior to the Parent Guarantor being subject to annual and quarterly reporting requirements under the Exchange Act, 75 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Guarantor and (ii) if an IPO has occurred and the Parent Guarantor is subject to annual and quarterly reporting requirements under the Exchange Act, the later of (A) 45 days after the end of each of the first three fiscal quarters of each fiscal year of Parent Guarantor and (B) the date the Parent Guarantor is required by the SEC to deliver its Form 10-Q for each of the first three fiscal quarters of each fiscal year of the Parent Guarantor, a copy of its consolidated (and, with respect to the Parent Guarantor and its Restricted Subsidiaries, unaudited consolidating) balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then-elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Parent Guarantor and its consolidated Restricted Subsidiaries on a consolidated basis (or, with respect to the Parent Guarantor and its Restricted Subsidiaries, on a consolidating basis, as applicable) in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Parent Guarantor in substantially the form of Exhibit E attached hereto (a "Compliance Certificate") (i) certifying as to whether a Default has occurred and is continuing as of the date thereof and, if a Default has occurred and is continuing as of the date thereof, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) if and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.4 had a material impact on such financial statements, specifying the effect of such change on the financial statements accompanying such certificate;

(d)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Guarantor or any Restricted Subsidiary with the SEC, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be, in each case, that is not otherwise required to be delivered to the Administrative Agent pursuant hereto; *provided* that such information shall be deemed to have been delivered on the date on which such information has been posted on the Parent Guarantor's website on the Internet at any address identified by the Parent Guarantor for such purpose from time to time or at http://www.sec.gov;

(e)    within a reasonable period of time following any request in writing (including any electronic message) therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act;

(f)    [Reserved];

(g)      (i) such other information regarding the financial condition, business and operations of the Parent Guarantor or any of its subsidiaries as the Lenders may reasonably request and (ii) any information regarding Collateral required pursuant to the Collateral Documents; and

(h)      concurrently with any delivery of financial statements under clauses (a) and (b) above, a Narrative Report.

Information required to be delivered pursuant to Section 5.1(a) or Section 5.1(b) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (x) on which the Parent Guarantor posts such information, or provides a link thereto on the Parent Guarantor's website on the Internet at any address identified by the Parent Guarantor for such purpose from time to time or at http://www.sec.gov; or (y) on which such information is posted on the Parent Guarantor's behalf on an Internet or intranet website, if any, to which the Lenders and the Administrative Agent have been granted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). No Agent shall have any obligation to request the delivery or to maintain copies of the documents referred to herein, and in any event shall have no responsibility to monitor compliance by the Parent Guarantor with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 5.2.    Notices of Material Events. The Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following:

(a)      the occurrence of any Default;

(b)      the filing or commencement of any Proceeding by or before any arbitrator or Governmental Authority against or affecting the Parent Guarantor or any Subsidiary of the Parent Guarantor thereof that would reasonably be expected to result in a Material Adverse Effect;

(c)      any other development that becomes known to any officer of the Parent Guarantor or any of its Subsidiaries that results in, or would reasonably be expected to result in, a Material Adverse Effect;

(d)      any change in the information provided in the Beneficial Ownership Certification delivered to any Lender that would result in a change to the list of beneficial owners identified in such certification;

(e)      any notice of any Asset Sale or other event or action (other than a Change in Control which shall be governed by Section 2.8(e)) which will require a mandatory prepayment under this Agreement;

(f)      the occurrence of or forthcoming occurrence of any ERISA Event that would result in a Material Adverse Effect;

(g)      (A) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and (B) any remedial action taken by the Borrower or any of its Subsidiaries in response to (1) any Hazardous Materials Activities the existence of which could reasonably be expected to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(h)      Copies of any notices of default or acceleration (howsoever described) provided to the Parent Guarantor or of any of its Restricted Subsidiaries in connection with any Indebtedness pursuant to the terms of any Junior Financing Documentation, if any, and any Permitted Refinancing thereof, in each case in a principal amount in excess of $50,000,000 and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 5.2.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.3.    <u>Existence; Conduct of Business</u>. The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; *provided* that (a) the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under <u>Section 6.3</u> and (b) none of the Parent Guarantor or any of its Restricted Subsidiaries shall be required to preserve, renew or keep in full force and effect its rights, licenses, permits, privileges or franchises where failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 5.4.    <u>Payment of Obligations</u>. The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves are being maintained for those Taxes and the costs required to contest them, which have been disclosed in the latest financial statements of the Parent Guarantor or such Restricted Subsidiary, as applicable, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.5.    <u>Maintenance of Properties; Insurance</u>. The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, (a) keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear and casualty and condemnation events excepted, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect, and (b) maintain insurance with financially sound and reputable insurance companies or through self-insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 5.6.    <u>Books and Records; Inspection Rights, Quarterly Investor Calls</u>.

(a)    The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and account in which entries full, true and correct in all material respects are made and are sufficient to prepare financial statements in accordance with GAAP. The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent (pursuant to the request made through the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants (*provided* that the Parent Guarantor or such Restricted Subsidiary shall be afforded the opportunity to participate in any discussions with such independent accountants), all at such reasonable times and as often as reasonably requested (but no more than once annually if no Event of Default exists). Notwithstanding anything to the contrary in this Agreement (including in this <u>Section 5</u>), none of the Parent Guarantor or any of its Restricted Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any third-party consent legally binding on the Parent Guarantor or its Restricted Subsidiaries or (c) is subject to attorney, client or similar privilege or constitutes or includes attorney work-product (the foregoing, the "<u>Confidentiality Restrictions</u>").

(b)    The Parent Guarantor will hold a telephone meeting for the Lenders (which shall include the attendance of a Financial Officer of the Parent Guarantor) regarding the on-going business and financial performance of Parent Guarantor and its Restricted Subsidiaries once per fiscal quarter at a reasonable time selected by the Parent Guarantor (on no less than three Business Days' notice to the Administrative Agent).

Section 5.7.    <u>Compliance with Laws and Agreements</u>. The Parent Guarantor will, and will cause each of its Restricted Subsidiaries to, comply with all laws (including Environmental Laws), rules, regulations (including applicable foreign currency regulations and the Investment Company Act) and orders of any Governmental Authority applicable to it or its property (including but not limited to the ODI

Regulations read with the RBI Approval, the Companies Act 2013 of India and the filing requirements with Information Utility in India), and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. The Parent Guarantor currently has, and will maintain in effect and enforce, policies and procedures designed to promote compliance by the Parent Guarantor, its Subsidiaries and its and their respective directors, commissioners, officers, employees, agents (and others acting for or on behalf of them) of the foregoing with Anti-Corruption Laws and applicable Sanctions.

Section 5.8.    Use of Proceeds. The proceeds of the Term Loans will be used for (i) funding Transaction Costs and (ii) working capital and general corporate purposes of the Group, including for the making of Investments (including acquisitions) permitted (or not expressly prohibited) hereunder (notwithstanding anything to the contrary under this Agreement, such Investments or acquisitions shall be permitted without any requirement to satisfy any Consolidated Total Net Leverage Ratio or any other financial or ratio-based metrics). No part of the proceeds of any Term Loan will be used or invested, whether directly or indirectly, in India or for any purpose that entails a violation of any of the Regulations of the Federal Reserve Board, including Regulations T, U and X, or any substantially equivalent law or regulation in effect in any other applicable jurisdiction or the ODI Regulations. The Borrower will not request any Borrowing or Credit Extension, and will not use, and the Parent Guarantor shall procure that none of it, its Subsidiaries (whether acting via their employees, agents or any other third party) nor any of its or their respective directors and officers shall use, the proceeds of any Borrowing or Credit Extension, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.9.    Additional Guarantors. Subject to Section 5.10(c) and any applicable limitations and exceptions of the Collateral and Guarantee Requirement or otherwise any applicable limitations set forth in any Security Agreement or any other Loan Document:

(a)    In the event that any Person becomes a direct or indirect Material Subsidiary after the Effective Date (including: (x) upon the consummation of the EPIC Merger, EPIC and (y) upon the consummation of the Tynker Acquisition, Tynker, but excluding any Excluded Subsidiary and (for so long as it is planned to merge with the Onshore Guarantor (Parent Guarantor) Aakash Educational Services Ltd), the Borrower shall (1) in the case of an Unrestricted Subsidiary becoming a direct or indirect Material Subsidiary that is not otherwise an Excluded Subsidiary, substantially concurrently with the redesignation or deemed redesignation thereof as a Restricted Subsidiary pursuant to Section 5.11, (2) in the case of: (A) EPIC, substantially concurrently upon the consummation of the EPIC Merger and (B) Tynker, substantially concurrently upon the consummation of the Tynker Acquisition, or (3) otherwise, 60 days thereafter (or such longer period of time as the Administrative Agent may agree (in its reasonable discretion) (A) cause such Material Subsidiary to become (I) a Guarantor hereunder by executing and delivering to the Administrative Agent a Counterpart Agreement and (II) (in the case of any Material Subsidiary incorporated in India) a Guarantor under the Onshore Guarantee Deed by executing and delivering to the Administrative Agent an Onshore Guarantee Accession Deed (III) a "grantor", a "security grantor", a "securing party" or act in a similar capacity under the applicable Security Agreement by executing and delivering to the Collateral Agent (with a copy to the Administrative Agent) a security agreement, joinder agreement, amendment agreement, accession deed or accession agreement so as to provide perfected first-priority security interests in, and mortgages on, substantially all tangible and intangible of its assets (including but not limited to accounts, inventory, equipment, commercial tort claims, investment property, intellectual property, Material Real Estate Assets, intercompany indebtedness (which shall be evidenced by a note, which may be a global intercompany note), general intangibles, licensing agreements, real property, letter-of-credit rights, cash deposit and security accounts and proceeds of the foregoing), and (B) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements and certificates reasonably requested by the Administrative Agent or required by the Loan Documents. If reasonably requested by the Administrative Agent or the Collateral Agent, such Person shall

receive an opinion of counsel for the Parent Guarantor or the applicable Loan Party in form and substance reasonably satisfactory to the Administrative Agent or the Collateral Agent, as applicable, in respect of such customary matters as may be reasonably requested by the Administrative Agent or the Collateral Agent, as applicable, relating to any Counterpart Agreement, Onshore Guarantee Accession Deed, joinder agreement, amendment agreement, accession deed, accession agreement or other security agreement (including any Collateral Document) delivered pursuant to this Section 5.9(a), dated as of the date of the applicable document, deed or agreement.

(b)    With respect to each Material Subsidiary of the Parent Guarantor referred to in clause (a) above, the Parent Guarantor shall promptly after delivering the financial statements pursuant to Section 5.1(a) or 5.1(b), as the case may be, send to the Administrative Agent written notice setting forth (i) the date on which such Person became such a Material Subsidiary and (ii) all of the data required to be set forth in Schedule 3.12 hereto; and such written notice shall be deemed to supplement Schedule 3.12 for all purposes hereof.

(c)    On and from the earlier of (i) April 1, 2022 and (ii) within five Business Days of the date RBI Approval is received, Whitehat India shall accede to this Agreement and the Onshore Guarantee Deed as a Guarantor and shall take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by the Administrative Agent or the Collateral Agent or otherwise required by the Loan Documents.

(d)    Substantially simultaneously upon the consummation of a Holdco Transaction, Holdings shall (i) become (1) a Guarantor hereunder (or if Holdings is incorporated in India, under the Onshore Guarantee Deed) by executing and delivering to the Administrative Agent a Counterpart Agreement (or an Onshore Guarantee Accession Deed, as applicable) and (2) a "grantor", a "security grantor", a "securing party" or act in a similar capacity under the applicable Collateral Document by executing and delivering to the Collateral Agent (with a copy to the Administrative Agent) a security agreement, joinder agreement, amendment agreement, accession deed or accession agreement required thereunder, and (ii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by the Administrative Agent or the Collateral Agent or otherwise required by the Loan Documents.

Section 5.10.    Further Assurances; Other Collateral Matters. Subject to Section 5.10(c) and any applicable limitations and exceptions of the Collateral and Guarantee Requirement or otherwise any applicable limitations set forth in any Security Agreement or any other Loan Document:

(a)    each Loan Party shall execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Collateral and Guarantee Requirement continues to be satisfied; and

(b)    not later than 120 days (or such longer period as the Administrative Agent may agree in its sole discretion) (i) after the acquisition by any Loan Party of any Material Real Estate Asset, (ii) after the Effective Date, with respect to any Material Real Estate Asset owned by each Loan Party as of the Effective Date, and (iii) after the date any other Person who becomes a Loan Party following the Effective Date, with respect to any Material Real Estate Asset owned by any such Person as of the date it becomes a Loan Party, cause such Material Real Estate Asset to be subject to a Lien pursuant to a mortgage, deed or similar document in favor of the Collateral Agent for the benefit of the Secured Parties and take such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the Loan Parties and/or Restricted Subsidiaries shall not be required, nor shall the Collateral Agent be authorized, to (x) grant a Lien on any Excluded Property, or (y) perfect Liens in Collateral by any means other than by:

(i)        entry into customary security and pledge agreements, mortgages or deeds or similar documents and the making of such filings, in each case, as the Collateral Agent (on behalf of the Secured Parties if so directed) or the Administrative Agent may deem necessary or advisable under applicable law to create or perfect security interests in any such assets (including applicable filings pursuant to the Uniform Commercial Code or other applicable law and filings with the applicable filing offices or registers with respect to any Intellectual Property constituting Collateral (to the extent that such filings are necessary or advisable to perfect a security interest in such Intellectual Property); *provided* that perfection over any immaterial Intellectual Property constituting Collateral in any jurisdiction located outside of the United States of America and Singapore shall only be done in consultation with the Borrower and upon the advice of local counsel and having regard to a cost benefit analysis in respect of such security) (but without prejudice to the requirement set forth in clause (b)(i)(2) of the Collateral and Guarantee Requirement for the applicable member of the Group to enter an IP Licensing Agreement to the extent required thereunder);

(ii)        mortgages or deeds or similar documents in respect of any Material Real Estate Asset and filings in the applicable real estate records with respect to Material Real Estate Assets or any fixtures relating to Material Real Estate Assets (no landlord waivers, bailee letters, estoppels, warehouseman waivers or other collateral access or similar letters or agreements shall be required);

(iii)        delivery to the Collateral Agent (with a copy to the Administrative Agent) to be held in its possession of all Collateral consisting of intercompany notes, instruments and certificates representing Equity Interests (1) issued by any Loan Party (other than the Parent Guarantor) that do not constitute Third Party Interests or (2) directly owned by a Loan Party and issued by (I) a Restricted Subsidiary, other than any Excluded Subsidiary (unless constituting an Excluded Subsidiary solely pursuant to clause (j) of the definition thereof), or (II) after the consummation of a Holdco Transaction, Holdings, in each case, as expressly required by the Loan Documents and together with, as applicable, an irrevocable power of attorney, an undated stock power or similar instrument of transfer for each such item of Collateral endorsed in blank by the pledgor thereof (or a duly authorized officer of such pledgor); provided that:

> (A)        any pledge of Equity Interests, in the case of Equity Interests of any CFC or FSHCO, shall not include (1) more than 65% of the voting stock of such subsidiary, or (2) the pledge of any assets of such subsidiary; provided that (1) and (2) above shall not apply (A) to any of the Effective Date Loan Parties (or their successors) and (B) if the provision of such Collateral would not result in material U.S. federal income taxes under Section 951(a)(1)(B) of the Code for the Borrower or one of its direct or indirect U.S. subsidiaries or direct or indirect U.S. parent entities as reasonably determined by the Borrower in consultation with the Administrative Agent, after taking into account Treasury Regulations Section 1.956-1(a)(2) and Section 245A of the Code and any related guidance) and no member of the Group shall be required to enter into control agreements with respect to cash, securities or deposit accounts; and

> (B)        prior to the Term Loans being accelerated, no member of the Group shall be required to deliver immaterial notes and other evidence of immaterial Indebtedness; and

(iv)        filing of Uniform Commercial Code financing statements (or equivalent filings in other jurisdictions) in any Collateral consisting of (A) any deposit account, securities account and commodity account, and cash and Cash Equivalents standing to the balance and proceeds thereof, (no member of the Group shall be required to enter into any account control agreements or any other documents with respect to any deposit account, securities account and commodity account, and cash and Cash Equivalents standing to the balance and proceeds thereof), and (B) other than as set forth above, proceeds of any other Collateral.

Section 5.11.    <u>Designation of Restricted and Unrestricted Subsidiaries</u>.

(a)     The Board of Directors or chief financial officer of the Parent Guarantor may designate any Subsidiary of the Parent Guarantor (other than the Borrower, EPIC, Tynker, Whitehat India, any Subsidiary who is a Loan Party or party to a Collateral Document, in each case, on the Effective Date or any Subsidiary who owns, or holds exclusive licenses or exclusive rights to use or enjoy, any Core Asset), including a newly acquired or created Subsidiary of the Parent Guarantor, to be an Unrestricted Subsidiary if it meets the following qualifications:

(i)     such Subsidiary does not own any Equity Interest of the Parent Guarantor or any other Restricted Subsidiary of the Parent Guarantor (or who would remain, following such designation, a Restricted Subsidiary);

(ii)     any Guarantee or other credit support thereof by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor is permitted under Section 6.1 and/or Section 6.7, as applicable;

(iii)     immediately before and after such designation, no Event of Default shall have occurred and be continuing or would result from such designation; and

(iv)     immediately after such designation, the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis) is not more than 4.00:1.00.

Once so designated, the Subsidiary will remain an Unrestricted Subsidiary, subject to subsection (b) below. Any newly acquired or created Subsidiary of an Unrestricted Subsidiary shall be deemed an Unrestricted Subsidiary unless the provisions of Section 6.7 would not permit the Investment in such Unrestricted Subsidiary at the time of its acquisition or formation (it being acknowledged and agreed, for the avoidance of doubt, that the provisions of Section 6.7 do not prohibit Unrestricted Subsidiaries from making or owning Investments in any Person).

(b)     (i) A Subsidiary previously designated as or deemed to be an Unrestricted Subsidiary which fails to meet the qualifications set forth in subsection (a)(i), (a)(iii) or (a)(iv) of this Section 5.11 will be deemed to become at that time a Restricted Subsidiary, subject to the consequences set forth in subsection (d) of this Section 5.11; and (ii) the Board of Directors or chief financial officer of the Parent Guarantor may designate an Unrestricted Subsidiary to be a Restricted Subsidiary if no Event of Default exists at the time of the designation and the designation would not cause an Event of Default.

(c)     Upon a Restricted Subsidiary becoming an Unrestricted Subsidiary:

(i)     all existing Investments of the Parent Guarantor and the Restricted Subsidiaries of the Parent Guarantor therein (valued at the Parent Guarantor's and its Restricted Subsidiaries' proportional share of the fair market value of its assets less liabilities) will be deemed made at that time;

(ii)     all existing Equity Interests or Indebtedness of the Parent Guarantor or a Restricted Subsidiary of the Parent Guarantor held by it will be deemed issued or incurred, as applicable, at that time, and all Liens on property of the Parent Guarantor or a Restricted Subsidiary of the Parent Guarantor securing its obligations will be deemed incurred at that time;

(iii)     all existing transactions between it and the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor will be deemed entered into at that time;

(iv)     it will be released at that time from its Guaranty and its obligations under the Security Agreements and all related Liens on its property will be released at that time; and

(v)     it will cease to be subject to the provisions of this Agreement as a Restricted Subsidiary.

(d)    Upon an Unrestricted Subsidiary becoming, or being deemed to become, a Restricted Subsidiary pursuant to Section 5.11(b),

(i)    all of its Indebtedness and Liens will be deemed incurred at that time for purposes of Section 6.1 and Section 6.2, as applicable;

(ii)    all Investments therein previously charged under Section 6.7 will be credited thereunder;

(iii)    if it is not an Excluded Subsidiary, it shall be required to become a Guarantor to the extent so required pursuant to Section 5.9; and

(iv)    it will be subject to the provisions of this Agreement as a Restricted Subsidiary.

(e)    Any designation by the Board of Directors or chief financial officer of the Parent Guarantor of a Subsidiary as an Unrestricted Subsidiary after the Effective Date will be evidenced to the Administrative Agent by promptly filing with the Administrative Agent a copy of the resolutions of the Board of Directors of the Parent Guarantor giving effect to the designation or a certificate of such chief financial officer certifying that the designation complied with the foregoing provisions.

Section 5.12.    Maintenance of Ratings. As soon as reasonably practicable after the Effective Date, the Parent Guarantor shall use commercially reasonable efforts to procure the Parent Guarantor's corporate credit or corporate family ratings and public credit facility ratings for the Initial Term Loans (the "Credit Ratings") from any two of the Rating Agencies (but not any specific rating or ratings, and with no requirement to maintain any specific rating).

Section 5.13.    Post-Closing Obligations. As promptly as practicable, and in any event within the time periods following the Effective Date specified in Schedule 5.13 or such later date as the Administrative Agent agrees to in writing, the Borrower and each other applicable Loan Party shall deliver the documents or take the actions specified in Schedule 5.13, to the extent any such document is not delivered or any such action is not taken on or prior to the Effective Date.

Section 5.14.    Shareholders (Call Option) Agreement. As promptly as practicable, where the shares in any Restricted Subsidiary (including any Relevant Acquisition Target) are or will be held by (a) one or more Unrestricted Collateral Providers and (b) one or more Restricted Collateral Providers, then each such shareholder shall enter into a Shareholders (Call Option) Agreement.

Section 5.15.    Environmental Matters. Promptly take any and all actions necessary and required under Environmental Laws to (a) cure any violation of applicable Environmental Laws by the Borrower or its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) respond to any Environmental Claim against the Borrower or any of its Subsidiaries and discharge any legally binding obligations it may have to any Person thereunder, in each case, where failure to do so would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.16.    Great Learning Education Framework Agreement.    The Parent Guarantor will ensure that BYJU's Pte. Ltd holds sufficient cash to meet all payment obligations under the Great Learning Education Framework Agreement and shall, promptly following a request for the same from BYJU's Pte. Ltd, reimburse BYJU's Pte. Ltd (or cause it to be reimbursed) for any payments made under the Great Learning Education Framework Agreement after the occurrence of an Event of Default which has resulted in the exercise of any of the remedies provided for in Section 8.1 (or after the Term Loans have automatically become immediately due and payable).

Section 5.17.    Guarantee Maintenance Requirement.

(a)    The Parent Guarantor will ensure that (i) at all times it has sufficient net worth to guarantee an amount equal to the Guarantee Maintenance Amount and is otherwise eligible to issue the guarantee and

procure the guarantee from the other Indian Guarantors (including Whitehat India) (subject to, in the financial year 2021-2022, receipt of the RBI Approval for issuance of guarantee over and above $1,000,000,000 of the financial commitment in the financial year 2021-2022 by the Parent Guarantor; and by Whitehat India); and (ii) at all times from (and including) the date falling five Business Days after April 1, 2022, the amount set out in the most recent Form ODI submitted by or on behalf of the Parent Guarantor to the RBI in respect of its guarantee in respect of the Covered Obligations is not less than the Guarantee Maintenance Amount (the obligations in this paragraph (a)(i) and (a)(ii) being the "<u>Guarantee Maintenance Requirement</u>").

(b)     Each Indian Guarantor (other than the Parent Guarantor) shall at all times from (and including) the date falling five Business Days after April 1, 2022, ensure that (i) it signs and delivers to the Administrative Agent an Onshore Guarantee Accession Deed in accordance with the requirements of <u>Section 5.9</u> and (ii) the amount set out in the most recent form ODI submitted by or on behalf of the Parent Guarantor to the RBI in respect of the guarantee to be provided by such Indian Guarantor in respect of the Covered Obligations is not less than the Guarantee Maintenance Amount, *provided that* (i) if the Guarantee Maintenance Requirement would (without filing Form ODI in respect of the guarantee to be provided by such Indian Guarantor) otherwise remain satisfied; and (ii) if (y) the issuance of the guarantee / accession to the Onshore Guarantee Deed by such Indian Guarantor or (z) the increase in the guaranteed amount of such Indian Guarantor, would require the utilization of the Parent Guarantor's unutilized annual financial commitment headroom under the ODI Regulations in that financial year, then no Default will arise in respect of that  Indian Guarantor's failure to comply with the provisions of this clause (b) provided that such Indian Guarantor uses its reasonable commercial efforts to procure an RBI Additional Guarantor Approval as soon as reasonably practical and complies with the requirements of this clause (b) within five Business Days of the earlier of (y) the date on which the conditions in clauses (i) and (ii) above no longer apply and (z) the date of receipt of such RBI Additional Guarantor Approval.

(c)     The Parent Guarantor will file the Form ODI in accordance with the ODI Regulations and provide a certificate to the Administrative Agent and the Collateral Agent confirming the matters stated in <u>Sections 4.1(f) and 4.1(g)</u> above (i) prior to April 1, 2022, (x) within five Business Days of receipt of any RBI Approval and (y) within five Business Days of the Parent Guarantor becoming aware that any of its annual financial commitment headroom under the ODI Regulations for the fiscal year ending March 31, 2022 would otherwise remain unutilized and is available for application towards the guarantee of the Parent Guarantor under the Onshore Guarantee Deed (ii) within five Business Days from April 1, 2022 and (iii) (if applicable) within five Business Days of any increase to the Covered Obligations and, in the case of any filing required to be made by any other Indian Guarantor pursuant to paragraph (b) above, within five days of such Indian Guarantor acceding to the Onshore Guarantee Deed), in each case to ensure the Guarantee Maintenance Requirement is satisfied.

(d)     Without prejudice to the Guarantee Maintenance Requirement, the Parent Guarantor will use its reasonable commercial efforts to procure the RBI Approval on or prior to April 1, 2022 in order that it and Whitehat India may guarantee the Covered Obligations in an amount not less than the Guarantee Maintenance Amount and if so obtained, shall ensure that it and Whitehat India guarantee (in the case of Whitehat India, by executing and delivering an Onshore Guarantee Accession Deed to the Administrative Agent) the Covered Obligations up to the maximum amount permitted by the RBI Approval. For the avoidance of doubt, (i) any failure to obtain the RBI approval prior to April 1, 2022 (whether in whole or in part) shall not cause a breach of the Guarantee Maintenance Requirement or require any mandatory prepayment of the Term Loans and (ii) in the event the RBI Approval is subject to any conditionality that conflicts with the terms of the Loan Documents or prevents or, on the basis of a reasonable cost-benefit analysis, renders it impractically burdensome for it or Whitehat India to guarantee the Covered Obligations, the Borrower shall discuss such conditionality with the Administrative Agent in good faith with a view to facilitating any amendments to the Loan Documents required in order for such RBI Approval to be effective.

(e)     No Indian Guarantor shall make any ODI Investment under the ODI Regulations unless pro forma for the provision of such ODI Investment, the Guarantee Maintenance Requirement would remain satisfied.

(f)     The Parent Guarantor shall, not later than the date falling seven Business Days after the Effective Date, provide evidence in form and substance satisfactory to the Administrative Agent that the Form ODI required to be submitted to the RBI through the Authorized Dealer pursuant to Section 4.1(g)(iii) has been submitted to the RBI through the Authorized Dealer.

Section 5.18.   Core Assets.

(a)     Except to the extent failure to act would not reasonably be expected to have a Material Adverse Effect, each Loan Party shall (and shall ensure each Restricted Subsidiary will) (i) maintain the validity and enforceability of any registered Core Assets and maintain such registrations and applications of such Core Assets in full force and effect,(ii) pursue any application for registration of each Core Asset and (iii) protect and maintain each Core Asset, including the payment of required fees and taxes, the filing of responses to governmental authorities, the filing of applications for renewal or extension, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect, no Loan Party shall (and shall ensure no Restricted Subsidiary will) do or permit any act or knowingly omit to do any act whereby any of the Core Assets may lapse, be terminated or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(c)     Except where failure to do so would not reasonably be expected to have a Material Adverse Effect, each Loan Party shall (and shall ensure each Restricted Subsidiary will) take all steps to preserve and protect the Core Assets and use commercially reasonable efforts to ensure that all licensed users of any of the Core Assets abide by the applicable license's terms.

Section 5.19.   Indian Guarantors.

(a)     Each Indian Guarantor shall ensure that:

(i)     the guarantee provided by that Indian Guarantor in accordance with the Guarantee Regulations;

(ii)     the aggregate of: (A) all the loans, investments and other contributions by it and all other members of the Group that are incorporated in India to the capital of; and (B) the maximum limit of each of the guarantees issued by it and all other members of the Group that are incorporated in India in favor of, non-India incorporated Joint Ventures and non-India incorporated wholly-owned Subsidiaries does not exceed 400% of the ODI Net Worth of the Parent Guarantor at any time and does not, except to the extent permitted by the RBI Approval (once received), exceed the limit of $1,000,000,000 on the Parent Guarantor in each financial year;

(iii)     neither it nor any other member of the Group that is incorporated in India makes any ODI Investments in any company or other person incorporated or otherwise formed outside of India, which (when taken together with the guarantee and indemnity contained in the Onshore Guarantee Deed and all other ODI Investments made by the Indian Guarantors and each member of the Group that is incorporated in India) would cause the Parent Guarantor to be in breach of, the Guarantee Regulations or require any regulatory approvals under any applicable regulations or guidelines issued by the RBI (including, without limitation, the Guarantee Regulations).

(b)     All calculations for the purpose of this Section 5.19 shall be made in accordance with the applicable RBI guidelines and regulations (including, without limitation, the Guarantee Regulations) and the guarantee provided under the Onshore Guarantee Deed shall be taken into account at its Guarantee Maintenance Amount and all other guarantees and indemnities shall be taken into account at their limit specified for the purpose of paragraph 3 of Section B.1 of the RBI Master Directions.

(c)     At all times during the term of this Agreement, the Parent Guarantor shall ensure that:

(i)     it is not on the RBI's exporters' caution list or list of defaulters to the banking system circulated by the RBI, TransUnion CIBIL Limited or any other credit information company as approved by the RBI or under investigation by any investigation/enforcement agency or regulatory body;

(ii)     it continues to directly own 100% of the total paid up and issued share capital of BYJU's Pte. Ltd.;

(iii)     BYJU's Pte. Ltd. continues to directly own 100% of the total paid up and issued share capital of the Borrower;

(iv)     none of it, BYJU's Pte. Ltd. or the Borrower are at any time, either jointly or severally, engaged in the real estate, banking business or financial services sectors as referred to in the ODI Regulations; and

(v)     all transactions of the Parent Guarantor in respect of its investments in BYJU's Pte. Ltd. and the Borrower, including the guarantee provided by it and procured from Whitehat India in the Onshore Guarantee Deed, are routed through the Authorized Dealer.

(d)     The Parent Guarantor shall comply with all its obligations under the Guarantee Regulations, including the applicable reporting requirements.

(e)     The Parent Guarantor shall not utilize any of its annual financial commitment headroom under the ODI Regulations (a) for the financial year 2022 – 2023 and (b) at any time after an increase in the Covered Obligations, in each case, until the Guarantee Maintenance Requirement is satisfied.

(f)     If a director of any Indian Guarantor or any other member of the Group incorporated in India is found to be a willful defaulter by the RBI, that Indian Guarantor or member of the Group shall ensure that such person is immediately removed from directorship.

Section 5.20.   Information Utility. Within five days of receipt of a request from any Loan Party, each Indian Guarantor shall authenticate any information relating to the guarantee being provided by it under the Onshore Guarantee Deed, which is submitted by that Loan Party with the Information Utility.

ARTICLE VI
NEGATIVE COVENANTS

Until the Term Commitments have expired or been terminated and all Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash, each Loan Party covenants and agrees with the Lenders that:

Section 6.1.   Indebtedness. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, create, incur or assume, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except, in each case, *provided* that the Parent Guarantor shall remain in compliance with the Guarantee Maintenance Requirement, calculated on a Pro Forma Basis, in each case immediately prior to and after the incurrence of such Indebtedness:

(a)     the Obligations (including any Incremental Facilities and Refinancing Term Facilities);

(b)     (i) Indebtedness of the Parent Guarantor or its Restricted Subsidiaries with respect to Capital Lease Obligations, sale and leaseback transactions, mortgage financings and purchase money Indebtedness in an aggregate principal amount outstanding not to exceed, at the time of incurrence thereof, $150,000,000

and (ii) any Permitted Refinancing of any of the foregoing; *provided* that any such Indebtedness shall be secured only by the asset (including all accessions, attachments, improvements and the proceeds thereof) acquired, constructed or improved in connection with the incurrence of such Indebtedness;

(c)    Indebtedness in respect of any Junior Financings in an aggregate outstanding principal amount not to exceed $100,000,000, and any Permitted Refinancing thereof;

(d)    Indebtedness of any Restricted Subsidiary to the Parent Guarantor or to any other Restricted Subsidiary, or of the Parent Guarantor to any Restricted Subsidiary; *provided* that (i) all such Indebtedness owing by a Loan Party to any Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the payment in full of the Obligations (provided that the terms of such subordination shall permit payments between the relevant parties at all times prior to the acceleration of the Term Loans pursuant to Article VIII), and (ii) Indebtedness owing by any Restricted Subsidiary that is not a Loan Party to any Loan Party shall be permitted to the extent the corresponding Investment by such Loan Party in such Restricted Subsidiary is permitted by Section 6.7(b), Section 6.7(c) or Section 6.7(e);

(e)    Indebtedness which may be deemed to exist pursuant to any Guarantees, performance, surety, statutory, appeal or similar obligations (including in connection with workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, or obligations in respect of letters of credit, surety bonds, bank guarantees or similar instruments related thereto incurred in the ordinary course of business (including in connection with or ancillary to brand development, advertising, sponsorship, marketing and co-marketing activities (including (1) celebrity payments and/or (2) payments to sports teams, associations, events, networks or individual professional players and collegiate athletic programs), or pursuant to any appeal obligation, appeal bond or letter of credit in respect of judgments that do not constitute an Event of Default under Section 8.1(k);

(f)    Indebtedness in connection with (i) treasury or cash management or custodial agreements, netting services, overdraft protections and otherwise similarly in connection with deposit accounts and Indebtedness in connection with depository, credit card, debit card, purchasing cards, electronic funds transfer or other similar cards or payment processing services; and (ii) endorsements for collection, deposit or negotiation and warranties of products or services, in each case, incurred in the ordinary course of business;

(g)    Guarantees by the Parent Guarantor of Indebtedness of a Restricted Subsidiary of the Parent Guarantor or, without prejudice to the terms of Section 6.7(b), Guarantees by a Restricted Subsidiary of the Parent Guarantor of Indebtedness of the Parent Guarantor or another Restricted Subsidiary of the Parent Guarantor with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; *provided* that if the Indebtedness that is being guarantied is unsecured and/or subordinated to the Obligations, the Guarantee shall also be unsecured and/or subordinated to the Obligations;

(h)    (i) Indebtedness existing on the Effective Date and described in Schedule 6.1 and any Permitted Refinancing thereof, (ii) Indebtedness in respect of letters of credit which are fully cash collateralized and (iii) Indebtedness in respect of letters of credit which are not fully cash collateralized or unsecured and which (when added with all other letters of credit issued pursuant to this clause (iii)) have an aggregate outstanding face value not to exceed $100,000,000 at any time;

(i)    Indebtedness in respect of Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(j)    Indebtedness of any Person that becomes a Restricted Subsidiary (or of any Person not previously a Restricted Subsidiary that is merged or consolidated with or into a Restricted Subsidiary in a transaction permitted hereunder) after the Effective Date, or Indebtedness of any Person that is assumed by any Restricted Subsidiary in connection with an acquisition of assets by such Restricted Subsidiary permitted hereunder; *provided* that (A) such Indebtedness exists at the time such Person becomes a Restricted Subsidiary (or is so merged or consolidated) or such assets are acquired and is not created in

contemplation of or in connection with such Person becoming a Restricted Subsidiary (or such merger or consolidation) or such assets being acquired, (B) no Restricted Subsidiary (other than such Person or the Restricted Subsidiary with which such Person is merged or consolidated or the Person that so assumes such Person's Indebtedness) shall guarantee or otherwise become liable for the payment of such Indebtedness, (C) the holders of such Indebtedness shall not have any right of recourse to nor any claim, security or other right against any property, assets, income or profits of any Restricted Subsidiary (other than such Person or the Restricted Subsidiary with which such Person is merged or consolidated or the Person that so assumes such Person's Indebtedness), and (D) subject to <u>Section 1.7</u> in the case of any such Indebtedness incurred in connection with a Limited Condition Transaction, both immediately prior to and after giving effect thereto, no Event of Default shall have occurred and be continuing;

(k)    Incremental Equivalent Debt and Refinancing Equivalent Debt (and any Permitted Refinancing of the foregoing);

(l)    Indebtedness that is unsecured or subordinated in right of payment to the Obligations expressly by its terms; *provided* that (i) such Indebtedness shall not mature or require any scheduled amortization or scheduled payments of principal and shall not be subject to mandatory redemption, repurchase or repayment (other than customary offers to purchase on a change of control, Disposition or casualty event and customary acceleration rights after an event of default), in each case, prior to the date which is 181 days after the Latest Term Loan Maturity Date; provided further that the restrictions in this clause (i) shall not apply to any Customary Bridge Facility so long as the long-term Indebtedness into which such Customary Bridge Facility is to be converted satisfies the foregoing limitations, (ii) if any such Indebtedness is Guaranteed, it shall not be Guaranteed by any Person other than a Guarantor, and (iii) subject to <u>Section 1.7(a)</u>, at the time such Indebtedness is incurred and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing and (iv) the terms and conditions (other than any (x) pricing and (y) amortization, maturity and prepayment terms which shall be governed in accordance with clause (i) above) governing such Indebtedness are either (1) not more favorable (taken as a whole) to the lenders or holders providing such Indebtedness than those applicable to the existing Term Loans or Term Commitments, as determined in good faith by the Borrower (except for covenants or other provisions applicable only to periods after the Latest Maturity Date (as determined as of the date of incurrence of such Indebtedness)) or (2) otherwise on then-current market terms for such type of Indebtedness;

(m)    Indebtedness incurred under one or more revolving credit facilities (and any Permitted Refinancing thereof) incurred, in each case, with relationship banks; *provided* that (i) the aggregate principal amount of all outstanding commitments and loans incurred under this clause (m) shall not exceed $1,500,000,000 *less* an amount equal to the aggregate of (y) an amount equal to the aggregate amount of the Term Commitments on the Effective Date and (z) an amount equal to the aggregate amount of Indebtedness incurred and outstanding under the Free and Clear Incremental Basket (ii) such Indebtedness shall not be guaranteed by any Person that is not a Guarantor (unless such Person becomes a Guarantor in connection therewith), (iii) such Indebtedness (A) shall rank *pari passu* in right of payment with the Term Loans and Term Commitments and *pari passu* or junior in right of security with the Liens securing the Obligations, (B) shall not be secured by assets other than the Collateral (unless such assets become Collateral in connection therewith) and (C) shall be subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Administrative Agent and the Borrower, (iv) no Event of Default shall be in existence at the time of, or immediately after giving effect to, the incurrence of such Indebtedness, (v) the Parent Guarantor shall remain in compliance with the Guarantee Maintenance Requirement, calculated on a Pro Forma Basis for such incurrence of Indebtedness, and (vi) for purposes of this clause (m), the amount of Indebtedness incurred under any revolving credit facility shall assume full utilization of such revolving credit facility whether or not fully drawn;

(n)    Indebtedness (i) arising under a lease of vehicles, vessels, equipment, computers or other fixed assets (excluding real properties) or (ii) otherwise arising under any financing arrangements provided by a financial institution of a reputable standing for the purpose of enabling the Parent Guarantor or any Restricted Subsidiary to acquire the same types of assets capable of being acquired by such Person under a

lease in the applicable local jurisdiction, in each case, in the ordinary course of business in an aggregate principal amount outstanding not to exceed, together with any Indebtedness incurred pursuant to Section 6.1(q), $30,000,000 at any time;

(o)       Indebtedness arising out of vendor financing in the ordinary course of business;

(p)       Indebtedness in respect of (i) insurance premium financings (*provided*, that such Indebtedness (A) does not exceed the unpaid amount of such premiums and (B) is either unsecured or is secured solely by the insurance policies financed (and proceeds thereof)), (ii) take-or-pay obligations contained in supply agreements or (iii) credit given by suppliers for goods and services purchased, in each case, arising in the ordinary course of business;

(q)       Indebtedness in an aggregate principal amount outstanding not to exceed, together with any Indebtedness incurred pursuant to Section 6.1(n), $30,000,000 at any time;

(r)       Indebtedness incurred pursuant to any Disposition or transfer by the Parent Guarantor or any of its Restricted Subsidiaries to any buyer or purchaser of or lender in respect of interests in accounts receivable in the ordinary course of business in an aggregate principal amount not to exceed the greater of $75,000,000 and 50.0% of Consolidated EBITDA at any time outstanding; provided that the recourse of the buyer, purchaser or lender of interests in accounts receivable remains limited to the member of the Group which has made the Disposition or transfer only and not to any other member of the Group;

(s)       Guarantees of Indebtedness of an Unrestricted Subsidiary in an aggregate principal amount not to exceed $30,000,000 at any time outstanding to the extent such Guarantees constitute Investments permitted by Section 6.7(c) or Section 6.7(p);

(t)       Indebtedness of the Parent Guarantor or any of its Restricted Subsidiaries in an aggregate outstanding principal amount not greater than 100.0% of the cash and Cash Equivalent proceeds received by it after the Effective Date from (x) the issuance or sale of its Qualified Equity Interests and/or (y) a contribution to its common equity with the net cash and Cash Equivalent proceeds from the issuance and sale by Parent Guarantor (or Holdings, or any of its respective direct or indirect parents) of its Qualified Equity Interests or a contribution to its common equity; provided that such proceeds of such issuance, sale or contribution are Not Otherwise Applied and are fully available to satisfy the liabilities of such Indebtedness;

(u)       Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(v)       guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Parent Guarantor and its Subsidiaries;

(w)       unsecured Indebtedness of the Parent Guarantor or any of its Subsidiaries to current or former officers, managers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any parent thereof permitted by Section 6.4 (which may consist of promissory notes issued by the Borrower or any of its Subsidiaries);

(x)       Indebtedness representing deferred compensation or other similar earn out arrangements in each case to employees of the Parent Guarantor or any of its Subsidiaries incurred in the ordinary course of business or in connection with an acquisition or investment;

(y)       Indebtedness incurred by the Parent Guarantor or any of its Restricted Subsidiaries resulting from an Investment or Disposition expressly permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(z)       trade or other similar Indebtedness incurred in the ordinary course of business (but not for borrowed money) and (i) not more than 90 days past due, or (ii) being contested in good faith and by appropriate proceedings;

(aa)     other Indebtedness of Restricted Subsidiaries of the Parent Guarantor that are not Loan Parties in an aggregate principal outstanding amount the greater of (x) $50,000,000 and (y) 7.50% of Consolidated EBITDA of the Parent Guarantor and its Restricted Subsidiaries as of the last day of the most recent fiscal quarter in respect of which financial statements have been (or were required to be) delivered pursuant to Section 5.1(a) or (b) and calculated on a Pro Forma Basis; *provided* that any such Indebtedness is not guaranteed by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor that is a Guarantor;

(bb)     Permitted Intercompany Activities (to the extent constituting Indebtedness and in each case subject to the requirements of Section 6.1(d)); and

(cc)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and contingent interest on obligations described in the foregoing.

For purposes of determining compliance with this Section 6.1, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories described in clauses (a) through (cc) above, the Borrower shall be permitted to classify (or later reclassify in whole or in part in its sole discretion such item of Indebtedness or any portion thereof (including as between or among the Free and Clear Incremental Basket, Base Incremental Amount and the Incurrence-Based Incremental Amount (or any Permitted Refinancing or combination of the foregoing)) in any manner that complies with this Section 6.1 and such Indebtedness will be treated as having been incurred pursuant to such clauses as designated by the Borrower. Accrual of interest (including capitalized or paid-in-kind interest and any applicable interest on any capitalized or paid-in-kind amounts), the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 6.1. In the event that a portion of Indebtedness or other obligations could be classified as incurred under a "ratio-based" basket (giving pro forma effect to the incurrence of such portion of such Indebtedness or other obligations), the Borrower, in its sole discretion, may classify such portion of such Indebtedness (and any obligations in respect thereof) as having been incurred pursuant to such "ratio-based" basket and thereafter the remainder of the Indebtedness or other obligations as having been incurred pursuant to one or more of the other baskets, clauses or sub-clauses of this Section 6.1.

Section 6.2.     Liens. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, create, grant, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it except:

(a)     Permitted Encumbrances;

(b)     any Lien on any property or asset of the Borrower, the Parent Guarantor or any Restricted Subsidiary existing on the Effective Date and set forth in Schedule 6.2(b) (*provided* that Liens securing Indebtedness or other obligations of less than $500,000 individually and $5,000,000 in the aggregate do not need to be set forth in Schedule 6.2(b) to be permitted Liens under this clause (b)) and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; *provided* that (i) such modification, replacement, renewal or extension Lien shall not apply to any other property or asset of the Parent Guarantor or any Restricted Subsidiary other than (1) improvements thereon or proceeds thereof and (2) after-acquired property that is affixed or incorporated into the property covered by such Lien and (ii) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.1;

(c)     any Lien existing on any property or asset prior to the acquisition thereof by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor or existing on any property or asset of any Person that becomes a Restricted Subsidiary of the Parent Guarantor (other than pursuant to a redesignation or deemed redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary as provided in Section 5.11), in each case after the Effective Date and prior to the time such Person becomes a Restricted Subsidiary of the Parent Guarantor and any modifications, replacements, renewals or extensions thereof; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary of the Parent Guarantor, as the case may be, (ii) such Lien shall

not apply to any other property or assets of the Parent Guarantor or any other Restricted Subsidiary of the Parent Guarantor (other than any replacements of such property or assets and additions and accessions thereto, the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property; *provided* that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Restricted Subsidiary of the Parent Guarantor, as the case may be, and extensions, renewals, replacements and refinancings thereof so long as the principal amount of such extensions, renewals and replacements does not exceed the principal amount of the obligations being extended, renewed or replaced, and (iv) if such Liens secure Indebtedness, such Indebtedness is permitted by Section 6.1;

(d)    Liens on fixed or capital assets (including Real Estate Assets) acquired, constructed or improved by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor; *provided* that (i) such Liens secure Indebtedness that is permitted by Section 6.1(b), (ii) such Liens and the Indebtedness secured thereby are initially incurred prior to or within 235 days after the acquisition or the completion of the construction or improvement of such assets, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such assets and customary related expenses, and (iv) such Liens shall not apply to any other property or assets of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor other than additions, accessions, parts, attachments or improvements on or proceeds of such assets; *provided* that clause (ii) shall not apply to any refinancing, extension, renewal or replacement thereof;

(e)    easements, licenses, sublicenses, leases or subleases granted to others (i) not interfering in any material respect with the business of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, or (ii) not securing any Indebtedness;

(f)    the interest and title of a lessor under any lease, license, sublease or sublicense entered into by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor in the ordinary course of its business and other statutory and common law landlords' Liens under leases;

(g)    in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(h)    in the case of any Joint Venture, any Liens on its Equity Interests pursuant to its organizational documents or constitutional documents (as applicable) or any related Joint Venture agreement or similar agreement;

(i)    Liens securing Indebtedness to finance insurance premiums owing in the ordinary course of business to the extent such financing is not prohibited hereunder;

(j)    Liens on earnest money deposits of cash or cash equivalents or marketable securities made in connection with any acquisition not prohibited hereunder;

(k)    bankers' Liens, rights of set-off and other similar Liens existing solely with respect to cash and cash equivalents or other securities on deposit in one or more accounts maintained by the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor, in each case granted in the ordinary course of business in favor of the bank or banks, securities intermediaries or other depository institutions with which such accounts are maintained, securing amounts owing to institutions with respect to cash management operating account arrangements and similar arrangements;

(l)    Liens in the nature of the right of set-off in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Parent Guarantor or any of its Restricted Subsidiaries in the ordinary course of business;

- 105 -

(m)     Liens securing the Obligations pursuant to any Loan Document;

(n)     other Liens that are junior in priority to the Liens securing the Obligations; *provided* that, at the time of incurrence of the obligations secured thereby, the aggregate outstanding principal amount of obligations secured by Liens in reliance on this clause (n) does not exceed the greater of $50,000,000 and 5.0% of Consolidated EBITDA; *provided* that such Liens shall be subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Borrower, the Administrative Agent and the institutions benefiting from such Liens; *provided, further*, that the aggregate principal amount of Indebtedness secured by any assets of a Restricted Subsidiary of the Parent Guarantor that is not a Loan Party pursuant to this clause (n) shall not exceed $10,000,000;

(o)     Liens on the Collateral to secure Incremental Equivalent Debt and Refinancing Equivalent Debt (and any Permitted Refinancings of the foregoing); *provided* that such Liens shall be subject to customary intercreditor arrangements reasonably satisfactory to, among others, the Borrower, the Administrative Agent and the institutions providing such Incremental Equivalent Debt or Refinancing Equivalent Debt, as applicable;

(p)     Liens to secure Indebtedness that is permitted by Section 6.1(i) provided that, to the extent the holders of such Indebtedness share in the Collateral hereunder with the Lenders, the representative of the holders of each such Indebtedness becomes party to customary intercreditor arrangements reasonably satisfactory to, among others, Administrative Agent and the Borrower;

(q)     Liens (i) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.7 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.3 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (ii) consisting of an agreement to Dispose of any property in a Disposition (including a sale and leaseback transaction) permitted under Section 6.3, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(r)     Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of any Restricted Subsidiary and Liens granted by a Loan Party in favor of any other Loan Party;

(s)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(t)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(u)     Liens securing Indebtedness permitted under Section 6.1(m);

(v)     Liens on cash securing Swap Agreements in the ordinary course of business submitted for clearing in accordance with applicable law;

(w)     Liens on goods or documents of title to goods arising in the ordinary course of business and which are given in respect of letter of credit transactions or similar trade instruments;

(x)     Liens over assets subject to vendor financing in the ordinary course of business;

(y)     Liens securing Indebtedness permitted under Section 6.1(h)(iii);

(z)     Liens securing Indebtedness permitted under Section 6.1(r); and

(aa)     other Liens granted by a member of the Group (other than Liens over (i) Core Assets, (ii) assets or shares of member of the Group not incorporated in India and (iii) loans and receivables of a member of the Group incorporated in India in respect of Investments made to a member of the Group not

incorporated in India); *provided* that, at the time of incurrence of the obligations secured thereby, the aggregate outstanding principal amount of obligations secured by Liens in reliance on this clause (aa) does not exceed the greater of (x) $25,000,000 and (y) 3.75% of Consolidated EBITDA as of the last day of the most recent fiscal quarter in respect of which financial statements have been delivered pursuant to Section 5.1(a) or (b) or Section 3.4(a) and calculated on a Pro Forma Basis; *provided* that the aggregate principal amount of Indebtedness secured by any assets of a Restricted Subsidiary of the Parent Guarantor that is not a Loan Party pursuant to this clause (aa) shall not exceed $15,000,000.

For purposes of determining compliance with this Section 6.2, in the event that a Lien meets the criteria of more than one of the categories described in clauses (a) through (aa) above, the Borrower shall be permitted to classify (or later reclassify in whole or in part in its sole discretion) such Lien in any manner that complies with this Section 6.2 and such Lien will be treated as having been incurred pursuant to such clauses as designated by the Borrower. Without limitation of the generality of the foregoing, in the event that a portion of Indebtedness or other obligations secured by a Lien could be classified as secured in part pursuant a certain sub-clause of Section 6.2 above, the Borrower, in its sole discretion, may classify (or later reclassify) in whole or in part any portion of such Indebtedness (and any obligations in respect thereof) as having been secured pursuant to such sub-clause and thereafter the remainder of the Indebtedness or other obligations as having been secured pursuant to one or more of the other sub-clauses of this Section 6.2. Notwithstanding anything to the contrary in any Loan Document, if any security interest purported to be granted by any Loan Party under any Collateral Document with respect to any asset constituting Collateral is not perfected (or such equivalent concept under applicable local law), then such Loan Party will not take any consensual action to affirmatively perfect (or such equivalent concept under applicable local law) a security interest in such asset in favor of any Person (other than the Secured Parties) unless and until the security interest with respect to such asset granted by such Loan Party under such Collateral Document is perfected (or such equivalent concept under applicable local law).

Section 6.3.    Fundamental Changes; Assets Sales; Changes in Business. (a) No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, (x) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (y) sell, transfer, lease, enter into any sale and leaseback transactions with respect to, or otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Parent Guarantor and its Restricted Subsidiaries, taken as a whole, or (except as permitted by clause (d) of the definition of "Asset Sale") all or substantially all of the Equity Interests of any of its Restricted Subsidiaries (in each case, whether now owned or hereafter acquired), or (z) liquidate or dissolve, except that:

(i)    if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, any Subsidiary of the Parent Guarantor (other than the Borrower) or any other Person may merge into or consolidate with (A) the Borrower in a transaction in which the surviving entity is the Borrower or (B) the Parent Guarantor in a transaction in which the surviving entity is the Parent Guarantor;

(ii)    if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, any Person (other than the Parent Guarantor or the Borrower) may merge into or consolidate with any Restricted Subsidiary of the Parent Guarantor (other than the Borrower) in a transaction in which the surviving entity is a Restricted Subsidiary; *provided* that any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity;

(iii)    any Loan Party may sell, transfer, lease or otherwise Dispose of its assets to any other Loan Party;

(iv)    if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, any Restricted Subsidiary of the Parent Guarantor (other than the Borrower) may merge into or with, or consolidate with any other Person, and any other Person may merge into such Restricted Subsidiary, so long as the Person surviving such merger or

consolidation shall be a Restricted Subsidiary; *provided* that (i) the security interests of the Lenders in the Collateral would not be adversely affected or impaired and (ii) any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity;

(v)    any Restricted Subsidiary of the Parent Guarantor (other than the Borrower) may merge into or consolidate with any other Person in a transaction in which such Restricted Subsidiary ceases to be a direct or indirect Subsidiary of the Parent Guarantor if such transaction is excluded from the definition of "Asset Sale" by clause (i) thereof;

(vi)    if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, any Restricted Subsidiary of the Parent Guarantor (other than the Borrower) may liquidate or dissolve if the Parent Guarantor determines in good faith that such liquidation or dissolution is in the best interests of the Group and is not materially disadvantageous to the Lenders;

(vii)    any IPO and/or Holdco Transaction may be consummated;

(viii)    the EPIC Merger and Tynker Acquisition may be consummated; and

(ix)    the Parent Guarantor and its Restricted Subsidiaries may consummate (i) Dispositions constituting Investments permitted by Section 6.7(b) and (ii) Permitted Intercompany Activities.

(b)    No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, consummate any Asset Sale, provided that  any Loan Party or Restricted Subsidiary may consummate an Asset Sale so long as (i) such Asset Sale is permitted under clause (a) above (ii) such Asset Sale comprises a Disposition of Core Assets to any Loan Party or another Restricted Subsidiary (provided that if the disposing entity is a Guarantor or has provided Collateral, the acquiring entity must be a Guarantor and/or a provider of Collateral (as applicable), or (iii) (A) the mandatory prepayment provision in Section 2.8(c) shall have been (or will be) satisfied, (B) no Payment or Bankruptcy Event of Default shall exist at the time of such Asset Sale or arise as a result thereof, (C) if such Asset Sale relates to a Disposition of Core Assets (other than a Disposition permitted above pursuant to the foregoing clause (b)(ii)), the relevant Core Assets were acquired after the Effective Date  and (D) if such Asset Sale is for a purchase price in excess of $200,000,000, (I) the aggregate consideration received by the Parent Guarantor and its Restricted Subsidiaries for such Asset Sale shall be in an amount at least equal to the fair market value (as reasonably determined by the Borrower in good faith) thereof, and (II) at least 75% of the aggregate consideration for such Asset Sale shall be paid in cash or Cash Equivalents or publicly traded securities; *provided* that the amount of (x) any liabilities (as shown on the Parent Guarantor's most recent consolidated balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Parent Guarantor's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Parent Guarantor) of the Parent Guarantor or such Restricted Subsidiary that are assumed by the transferee of any such assets (or are otherwise extinguished by the transferee in connection with the transactions relating to such Disposition) and for which the Parent Guarantor and all such Restricted Subsidiaries have been validly released, (y) any notes or other obligations (other than publicly traded securities) or securities received by the Parent Guarantor or any such Restricted Subsidiary from such transferee that are converted by the Parent Guarantor or any such Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received), in each case, within 135 days following the receipt thereof (z) any Designated Non-Cash Consideration received in respect of the applicable Asset Sale having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this sub-clause (z) of this proviso that is at that time outstanding, not to exceed $50,000,000 as of the time of receipt of such Designated Non-Cash Consideration (publicly traded securities shall not be subject to the foregoing limit), with the fair market value of each item of Designated Non-Cash

- 108 -

Consideration being measured at the time received and without giving effect to subsequent changes in value, shall, in each case, be deemed to be cash.

(c)     No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Loan Parties and its Restricted Subsidiaries on the Effective Date, and businesses reasonably related, similar, complementary, adjacent, incidental, tertiary or ancillary thereto and vertical or horizontal reasonably related expansions thereof (including any Related Businesses).

Section 6.4.     Restricted Payments and Restricted Debt Payments. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment or Restricted Debt Payment except, so long as (i) in the case of sub-clauses (a), (f), (g), (p), (q), (s) and (w); and (ii) in the cases of sub-clause (u), to the extent such Restricted Payment or Restricted Debt Payment is or would be made to a person which is not a Loan Party, no Event of Default shall have occurred and be continuing or would result therefrom:

(a)     Restricted Payments and Restricted Debt Payments in an unlimited amount so long as the Consolidated Total Net Leverage Ratio is not greater than 3.00 to 1.00 calculated on a Pro Forma Basis, in each case, immediately prior to and after giving effect to such Restricted Payment or Restricted Debt Payment;

(b)     any Restricted Subsidiary of the Parent Guarantor may declare and pay dividends or make other Restricted Payments ratably to (i) its equity holders or (ii) any Loan Party;

(c)     the Parent Guarantor may make Restricted Payments to redeem in whole or in part any of its Equity Interests (including Disqualified Equity Interests) for another class of its Equity Interests or rights to acquire its Equity Interests (other than, in each case, Disqualified Equity Interests) or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests (other than Disqualified Equity Interests); *provided* that the only consideration paid for any such redemption is Equity Interests of the Parent Guarantor or the proceeds of any substantially concurrent equity contribution or issuance of Equity Interest (other than, in each case, Disqualified Equity Interests);

(d)     Restricted Payments made in connection with equity compensation that consist solely of the withholding of shares to any director, officer, employee (or other provider of services) in an amount equal to the employee's (or other provider of services') tax obligation on such compensation and the payment in cash to the applicable Governmental Authority of an amount equal to such tax obligation;

(e)     the Parent Guarantor may declare and make dividends payable solely in additional shares of the Parent Guarantor's Qualified Equity Interests and may exchange Equity Interests for its Qualified Equity Interests;

(f)     following an IPO, the Parent Guarantor may make any Restricted Payment that has been declared by it, so long as (i) such Restricted Payment would be otherwise permitted under clause (a) of this Section 6.4 at the time so declared and (ii) such Restricted Payment is made within 60 days of such declaration;

(g)     following an IPO, the Parent Guarantor may repurchase Equity Interests pursuant to any accelerated stock repurchase or similar agreement; *provided* that the payment made by the Parent Guarantor with respect to such repurchase would be otherwise permitted under clause (a) of this Section 6.4 at the time such agreement is entered into and at the time such payment is made;

(h)     the Parent Guarantor may make Restricted Payments pursuant to and in accordance with equity compensation plans or other similar agreements for directors, officers, employees or other providers of services to the Parent Guarantor and its Restricted Subsidiaries or in connection with a cessation of service of such Person;

- 109 -

(i)      the Parent Guarantor may repurchase Equity Interests or rights in respect thereof granted to directors, officers or employees of the Parent Guarantor or its Restricted Subsidiaries; provided that (i) such repurchase is made in connection with an Acquisition and is expressly contemplated in the agreed sources and uses in respect of such transaction or (ii) the aggregate cash consideration paid in respect of all such repurchases (other than repurchases made pursuant to clause (i)) is less than $25,000,000 in any fiscal year.

(j)      Restricted Payments constituting the (i) repurchase of fractional shares of its Equity Interests arising out of stock dividends, splits or combinations, business combinations or conversions of convertible securities, exercises of warrants or options, or settlements of restricted stock units or (ii) "net exercise" or "net share settle" warrants or options;

(k)      Restricted Payments constituting the receipt or acceptance by the Parent Guarantor or any Subsidiary of the Parent Guarantor of the return of Equity Interests issued by the Parent Guarantor or any Subsidiary of the Parent Guarantor to the seller of a Person, business or division as consideration for the purchase of such Person, business or division, which return is in settlement of indemnification claims owed by such seller in connection with such acquisition;

(l)      the Parent Guarantor and its Restricted Subsidiaries may make Restricted Debt Payments to refinance Indebtedness to the extent permitted by Section 6.1;

(m)      the Parent Guarantor and its Restricted Subsidiaries may make Restricted Debt Payments in the form of capitalized or paid-in-kind interest with respect to Indebtedness permitted by Section 6.1;

(n)      the Parent Guarantor and its Restricted Subsidiaries may make Restricted Debt Payments as part of an "applicable high yield discount obligation" catch up payment with respect to Indebtedness permitted by Section 6.1;

(o)      following an IPO, the Parent Guarantor may repurchase Equity Interests pursuant to the terms of a call spread or similar arrangement entered into in connection with the issuance of Convertible Notes;

(p)      following an IPO, the Parent Guarantor may make Restricted Payments of no greater than 6% *per annum* of the net proceeds received in such IPO and contributed to the Parent Guarantor;

(q)      Restricted Payments and Restricted Debt Payments in respect of Indebtedness (other than the Term Loans) made from the Available Amount; *provided* that the Consolidated Total Net Leverage Ratio is equal to or less than 4:50 to 1.00 calculated on a Pro Forma Basis, in each case immediately prior to and after giving effect to such Restricted Payment or Restricted Debt Payment;

(r)      the conversion or exchange of any Junior Financing to Qualified Equity Interests of the Parent Guarantor;

(s)      Restricted Payments and Restricted Debt Payments in an aggregate amount not to exceed $25,000,000;

(t)      any (i) refinancing of any Junior Financing with the Net Cash Proceeds of any Indebtedness constituting a Permitted Refinancing thereof, or (ii) prepayment of any Junior Financing, or any Permitted Refinancings of the foregoing funded solely by Declined Proceeds, in each case, to the extent Not Otherwise Applied;

(u)      payments of intercompany Indebtedness permitted under Section 6.1 and Permitted Intercompany Activities;

(v)      the Parent Guarantor may redeem or otherwise cancel Equity Interests or rights in respect thereof granted to (or make payments on behalf of) directors, officers or employees other providers of services to the Borrower and its Subsidiaries in an amount required to satisfy any exercise price for options relating to the vesting, settlement or exercise of such Equity Interests or rights; and

(w)    the Parent Guarantor may make Restricted Payments:

(i)    (I) for any taxable period for which the Parent Guarantor or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which the Parent Guarantor is the common parent (a "Tax Group"), to pay the portion of any U.S. federal, foreign, state or local income Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the taxable income of the Parent Guarantor and/or the applicable Restricted Subsidiaries (and, to the extent permitted below, the applicable Unrestricted Subsidiaries); provided that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Parent Guarantor and the applicable Restricted Subsidiaries (and, to the extent permitted below, the applicable Unrestricted Subsidiaries), as applicable, would have been required to pay in respect of such taxable income as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Parent Guarantor or any Restricted Subsidiary for such purpose; and (II) for any taxable period for which the Parent Guarantor is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, an amount not to exceed the amount of the applicable income Taxes that the Parent Guarantor and/or its applicable Subsidiaries would have paid in respect of such taxable income had such income Taxes been paid as stand-alone companies or as a stand-alone group (and assuming for purposes of such calculation that the Parent Guarantor were classified as a domestic corporation for U.S. federal income tax purposes immediately after consummation of the Acquisition and at all times thereafter)] ("Permitted Tax Distributions"); and

(ii)    the proceeds of which shall be used to pay franchise or similar taxes and other fees and expenses required to maintain its corporate existence.

Section 6.5.    Restrictive Agreements. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party to create, grant, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations, (b) the ability of Holdings to repay loans or advances made to Holdings by the Parent  Guarantor on and after the consummation of a Holdco Transaction, or (c) the ability of any Restricted Subsidiary of the Parent Guarantor to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Parent Guarantor or any other Loan Party or any Restricted Subsidiary of the Parent Guarantor to Guarantee Indebtedness of the Parent Guarantor or any other Loan Party under the Loan Documents; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement or any other Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Effective Date identified on Schedule 6.5 (and shall apply to any extension or renewal of, or any amendment or modification, in each case, materially expanding the scope of, any such restrictions or conditions (taken as a whole)), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to (A) any Lien permitted by Section 6.2 and related to the property subject to such Lien, and/or (B) the sale of a Restricted Subsidiary of the Parent Guarantor or assets of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor pending such sale; provided that such restrictions and conditions apply only to the Restricted Subsidiary or assets to be sold and such sale is not prohibited hereunder, (iv) the foregoing shall not apply to any agreement or restriction or condition in effect at the time any Person becomes a Restricted Subsidiary of the Parent Guarantor, so long as such agreement was not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Parent Guarantor, (v) the foregoing shall not apply to customary provisions in Joint Venture agreements and other similar agreements applicable to Joint Ventures, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to Incremental Equivalent Debt, Refinancing Equivalent Debt, or any other secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness

(including negative pledges and restrictions on Liens in favor of any holder of such Indebtedness so permitted to the extent any negative pledge relates to the property financed by such Indebtedness), (vii) clause (a) of the foregoing shall not apply to customary provisions or restrictions in leases, licenses, sub-leases and sub-licenses and other contracts restricting the assignment thereof or restricting the grant of Liens in such lease, license, sub-lease, sub-license or other contract, (viii) clause (c) of the foregoing shall not apply to restrictions or conditions set forth in any agreement governing any other Indebtedness permitted under Section 6.1; *provided* that such restrictions and conditions are customary for such Indebtedness as determined in the good faith judgment of the Parent Guarantor, (ix) the foregoing shall not apply to restrictions on cash or other deposits (including escrowed funds) or net worth imposed under contracts entered into in the ordinary course of business, (x) the foregoing shall not apply to (A) customary restrictions on leases, subleases, licenses or contemplated by asset sale, merger, purchase or other similar agreements not prohibited hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto, and (B) restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder.

Section 6.6.    Transactions with Affiliates. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than between or among Parent Guarantor, any other Loan Party and its respective Restricted Subsidiaries and not involving any other Affiliate, or as otherwise permitted hereunder), except (a) on terms and conditions not less favorable to the Parent Guarantor or such Restricted Subsidiary (taken as a whole) than could be obtained on an arm's-length basis from unrelated third parties as determined in good faith by the Board of Directors or two or more Responsible Officers of the Parent Guarantor or any of its Restricted Subsidiaries (as applicable), (b) payment of customary directors' fees, customary out-of-pocket expense reimbursement, indemnities (including the provision of directors and officers insurance) and employment and compensation (including bonus) and severance arrangements for members of the board of directors, members of the board of commissioners, officers, employees or other providers of services of the Parent Guarantor or any of its Restricted Subsidiaries, (c) any transaction involving amounts less than $500,000 individually or $5,000,000 in the aggregate in any fiscal year, (d) any transaction permitted by Section 6.3, 6.4 or 6.7, (e) any transaction entered into in the ordinary course of business with its Affiliates that are Joint Ventures but not Restricted Subsidiaries, (f) issuances of new Equity Interests to the extent not otherwise prohibited by this Agreement, (g) transactions described in Schedule 6.6 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect, (h) any voting agreement entered into by any holder of its Equity Interest existing on the Effective Date or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect, (i) in connection with or as part of the Transactions and the payment of Transaction Costs, (j) transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business, (k) payments by the Parent Guarantor or any of its Restricted Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower or any of its Restricted Subsidiaries to the extent attributable to the ownership or operation of the Parent Guarantor or any of its Restricted Subsidiaries, but only to the extent permitted by Section 6.4(w)(i), (l) any Permitted Listing Transaction Step, and (m) Permitted Intercompany Activities.

Section 6.7.    Investments. No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a)    Investments in cash and Cash Equivalents and Marketable Securities;

(b)    Investments (including intercompany loans) (i) made by a member of the Group (who is not a Loan Party) to a Loan Party (provided that in each case where any Indebtedness or other payment or repayment arises pursuant to such Investment, such Investments are subordinated to the Obligations on terms satisfactory to the Administrative Agent), (ii) made by a Loan Party to another Loan Party, (iii) made by a non-Loan Party Restricted Subsidiary to another non-Loan Party Restricted Subsidiary, and (iv) made by a Loan Party to a member of the Group (other than a Loan Party) provided that such Loan Party shall

create, in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority Lien on such Investments, subject to Section 5.10 and any limitations and exceptions of the Collateral and Guarantee Requirement or otherwise any applicable limitations set forth in any Security Agreement or any other Loan Document;

(c)    Investments in an unlimited amount in any Person that is not the Parent Guarantor or a Restricted Subsidiary thereof (including Joint Ventures and/or Unrestricted Subsidiaries) derived from sources other than proceeds of the Term Loans provided that (i) the Consolidated Total Net Leverage Ratio is not greater than 4.00 to 1.00 on a Pro Forma Basis, in each case, immediately prior to and after giving effect to such Investment or (ii) (in relation to Investments made from the Available Amount) the Consolidated Total Net Leverage is equal to or less than 4:50 to 1.00 but greater than 4.00:1.00, calculated on a Pro Forma Basis, in each case, immediately prior to and after giving effect to such Investment;

(d)    loans and advances (i) to employees or other providers of services of the Parent Guarantor and its Restricted Subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed $10,000,000 at any time outstanding or (ii) in respect of payroll payments made by the Parent Guarantor or its Restricted Subsidiaries in the ordinary course of its business to an employee, director or officer of the Parent Guarantor or such Restricted Subsidiary;

(e)    Investments existing on the Effective Date and described in Schedule 6.7 and any modification, replacement, renewal, reinvestment or extension thereof provided that the amount of the original Investment is not increased except by the terms of such Investment as of the Effective Date or as otherwise permitted by this Section 6.7;

(f)    Swap Agreements which constitute Investments;

(g)    (i) trade receivables and endorsements for collection or deposit and customary trade arrangements with customers in the ordinary course of business, (ii) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, (iii) Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors, or (iv) any deposit, prepayment, advance payment and other credits by the Parent Guarantor or any Restricted Subsidiary to its suppliers on normal commercial terms and in the ordinary course of business;

(h)    guarantees to insurers required in connection with worker's compensation and other insurance coverage arranged in the ordinary course of business;

(i)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(j)    Investments consisting of negotiable instruments held for collection in the ordinary course of business and lease, utility and other similar deposits in the ordinary course of business;

(k)    Investments of any Person in existence at the time such Person becomes a Restricted Subsidiary or otherwise merges or amalgamates or consolidates into the Parent Guarantor, the Borrower or a Restricted Subsidiary in a manner permitted by this Agreement; *provided* that such Investment was not made in connection with or anticipation of such Person becoming a Restricted Subsidiary or such acquisition, merger, amalgamation or consolidation;

(l)    Investments constituting Designated Non-Cash Consideration received in connection with any Asset Sale permitted by Section 6.3(b);

(m)       Guarantees permitted by Section 6.1(g);

(n)       Guarantees of leases (other than Capital Lease Obligations) or other obligations of any Loan Party or Restricted Subsidiary that do not constitute Indebtedness (including any Guarantee imposed by a legal or administrative authority in connection with prejudgment court proceedings; *provided* that such proceedings would not constitute an Event of Default), in each case, entered into in the ordinary course of business;

(o)       a credit arising from a lease by the Parent Guarantor or any Restricted Subsidiary of its property in the ordinary course of business;

(p)       other loans, grants of credit, Guarantees, indemnities and assumptions of liabilities not to exceed $10,000,000 in the aggregate in any fiscal year;

(q)       other Investments permitted hereunder so long as such Investments do not, in an aggregate amount, exceed $10,000,000;

(r)       the Parent Guarantor or any other member of the Group may acquire (by way of acquisition (including an Acquisition), merger, amalgamation, consolidation or otherwise) all or substantially all of the business and assets, or Equity Interests, of any Person or line of business, or otherwise cause any Person to become a Subsidiary of Borrower or such Guarantors; *provided* that (A) no Event of Default shall have occurred and be continuing at the time such acquisition is consummated or immediately after giving effect thereto (subject to Section 1.7), (B) the acquired company (the "Relevant Acquisition Target") shall be in the same or a reasonably related, similar, complementary, adjacent, incidental, tertiary, accretive or ancillary thereto line of business (or vertical or horizontal reasonably related expansions thereof) as the Parent Guarantor and its subsidiaries (including, without limitation, any education or education-technology sector or related lines of business) ("Related Businesses")); it being understood that any forward or backward integration and/or solicitation, marketing, guaranteeing, funding or financing activities or other provision of or in connection with education loans, services, solutions and similar products shall constitute Related Businesses, (C) the Relevant Acquisition Target and its Subsidiaries shall be required to become Guarantors pursuant to Section 5.9 and shall create, in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority Lien on its Collateral subject to Section 5.10, and (D) each member of the Group acquiring shares in the Relevant Acquisition Target which is or becomes a Restricted Subsidiary shall pledge such acquired shares as Collateral to the Collateral Agent for the benefit of the Secured Parties or (if applicable) enter into a Shareholders (Call Option) Agreement;

(s)       Investments consisting of Equity Interests of any Restricted Subsidiary directly or indirectly owned by the Parent Guarantor;

(t)       Investments consisting of non-cash loans made by the Parent Guarantor or Borrower to officers, directors and employees of a Loan Party which are used by such Persons to purchase simultaneously Equity Interests of any parent thereof;

(u)       Investments which constitute any Permitted Listing Transaction Step;

(v)       Permitted Intercompany Activities;

(w)       Investments for which the consideration consists solely of Equity Interests of the Borrower or its direct or indirect parent entity;

(x)       to the extent constituting Investments, deposit and securities accounts maintained in the ordinary course of business and in compliance with the provisions of the Loan Documents;

(y)       Investments to the extent that payment for such Investments is made solely with Equity Interests (other than Disqualified Equity Interests) of the Parent Guarantor or Borrower (or any direct or indirect parent thereof);

(z)      Guarantees by the Parent Guarantor, Borrower or any of their Restricted Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(aa)     Investments consisting of capital expenditures reasonably necessary to permit the Parent Guarantor or any Restricted Subsidiary to (i) operate its properties and assets in accordance with prudent industry practice or (ii) to comply with applicable law (including any Environmental Laws);

(bb)     earnest money deposits required in connection with permitted acquisitions (or similar Investments).

For purposes of determining compliance with this Section 6.7, (i) the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, less any amount paid, repaid, returned, distributed or otherwise received in cash in respect of such Investment (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) and (ii) in the event that an Investment meets the criteria of any one of the categories described in clauses (a) through (bb) above at the time such Investment is made, there shall not be any requirement for such Investment to meet any other category described in clauses (a) through (bb) above at such time or thereafter.

Section 6.8.     [Reserved]

Section 6.9.     Amendments or Waivers of Organizational Documents; Amendments of Junior Financing Documentation.

(a)      No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, enter into any amendment, supplement or modification to, or waive any of its rights under, any of its respective organizational documents or constitutional documents (as applicable) in a manner that would reasonably be expected to be material and adverse to the Lenders (taken as a whole) after the Effective Date without in each case obtaining the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) to such amendment supplement, modification or waiver; *provided* that, the Loan Parties and the Subsidiaries may enter into any such amendment, supplement, modification or waiver in order to effect or evidence any transaction (including any issuance of Equity Interests) that is expressly permitted by this Agreement.

(b)      No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, agree to any amendment, supplement or modification to, or waive any of its rights in a manner that is material and adverse to the Lenders (taken as a whole) under any Junior Financing Documentation in any respect without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) except to the extent permitted by the applicable subordination agreement or subordination provisions applicable thereto.

Section 6.10.    Fiscal Year. No Loan Party will change its fiscal year-end without the prior written consent of the Administrative Agent, except to change such fiscal year-end to December 31 or any other fiscal year-end reasonably acceptable to the Administrative Agent; *provided* that, the Borrower shall have given the Administrative Agent (who shall promptly notify the Lenders) at least 20 Business Days' prior notice and if such change is implemented the Parent Guarantor shall deliver such restated financial statements as are reasonably requested by the Administrative Agent to enable the Lenders to review the financial statements delivered pursuant to Section 6.1 on a comparative basis with prior years; *provided further* that, no longer than 12 months shall pass without the financial statements of the Group being subject to an audit. In the event of any such change, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any Ministerial Amendments to this Agreement and necessary to reflect such change in fiscal year-end.

Section 6.11.    Accounting Policies. No Loan Party shall, nor will it permit any Restricted Subsidiary to, change its accounting treatment or reporting practices in any material respect, except as

required or permitted by GAAP or as required by applicable law, in each case, without the prior written consent of the Administrative Agent.

Section 6.12.    <u>Anti-Terrorism Laws.</u>

(a)    No Loan Party shall engage in any transaction that violates any of the applicable prohibitions set forth in any terrorism law described in <u>Section 3.13</u>.

(b)    None of the funds or assets of any Loan Party that are used to repay the Term Loans shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Sanctioned Person.

(c)    No Sanctioned Person shall have any direct or indirect interest in such Loan Party that would constitute a violation of any terrorism laws described in <u>Section 3.13</u>.

(d)    No Loan Party shall, and each Loan Party shall procure that none of its Subsidiaries will, fund all or part of any payment under this Agreement out of proceeds derived from transactions that violate the prohibitions set forth in any terrorism law described in <u>Section 3.13</u>.

Section 6.13.    <u>Limitation on amendments to Material Contracts</u> . No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to directly or indirectly, amend, modify, terminate, supplement or waive any term with respect to any Material Contract in which case to which that member of the Group is party), other than any Ministerial Amendments thereto.

Section 6.14.    <u>NBFC/CIC.</u>

(a)    No Indian Guarantor shall carry on the business of a "non-banking financial company" or a "core investment company" or will be required to be registered as a "non-banking financial company" or a "core investment company" as defined under the provisions of the (Indian) Reserve Bank of India Act, 1934 or any rules, regulations, notifications, circulars, press releases guidelines or instructions issued by the RBI.

(b)    No Indian Guarantor shall act as a "financial service provider" (as defined under the IBC).

Section 6.15.    <u>Treatment of Core Assets.</u>

Notwithstanding any other provision of this Agreement to the contrary: (a) (other than a Disposition pursuant to the IP Licensing Agreement) no Loan Party may effect a Disposition of, contribute in the form of an Investment, or distribute by way of Restricted Payment, any Core Assets to any Restricted Subsidiary that is not a Loan Party; (b) neither the Parent Guarantor nor any Restricted Subsidiary may effect a Disposition of, contribute in the form of an Investment, or distribute by way of Restricted Payment: (i) any Core Assets owned as at the Effective Date to any Unrestricted Subsidiary or any other Person; or (ii) any Core Assets acquired or developed after the Effective Date to any Unrestricted Subsidiary or any other Person other than a Disposition comprising an Asset Sale which complies with the requirements of Section 6.3(b); and (c) neither the Parent Guarantor nor any Restricted Subsidiary may grant any Lien over any Core Asset;  provided that (x) in respect of clauses (a) and (b) only, any Loan Party may Dispose of, or contribute in the form of an Investment, any Core Asset to another Loan Party (including any Person that becomes a Loan Party on or prior to receipt of that Core Asset) provided that, if applicable, equivalent Liens are granted by, or on the Equity Interests of, the acquiring Loan Party as those in effect to the disposing Loan Party prior to such Disposition; (y) in respect of clauses (a) and (b) only, any Restricted Subsidiary that is not a Loan Party may Dispose of, or contribute in the form of an Investment, any Core Assets to another Restricted Subsidiary, (z) (in respect of clause (c) only) each of the Parent Guarantor and its Restricted Subsidiaries may grant liens comprising the Collateral.

ARTICLE VII
GUARANTY

Section 7.1.    Guaranty of the Obligations. The Relevant Guarantors jointly and severally hereby irrevocably and unconditionally guaranty the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) or any comparable concept under any other applicable laws relating to a Bankruptcy Event or the occurrence of an Ipso Facto Event) (collectively, the "Guaranteed Obligations").

Section 7.2.    Payment by the Relevant Guarantors. The Relevant Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Relevant Guarantor by virtue hereof, that upon the failure of the Borrower or any other Relevant Guarantor to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Relevant Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of the Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower becoming the subject of a case under the Bankruptcy Code or any other applicable laws relating to a Bankruptcy Event, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Beneficiaries as aforesaid.

Section 7.3.    Liability of Relevant Guarantors Absolute. Each Relevant Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Relevant Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability and this Guaranty is a primary obligation of each Relevant Guarantor and not merely a contract of surety;

(b)    the Administrative Agent may enforce this Guaranty during the continuation of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)    the obligations of each Relevant Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Relevant Guarantor) of the obligations of the Borrower and a separate action or actions may be brought and prosecuted against such Relevant Guarantor whether or not any action is brought against the Borrower, any such other guarantor or any other Person and whether or not the Borrower, any such other guarantor or any other Person is joined in any such action or actions;

(d)    payment by any Relevant Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Relevant Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Relevant Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Relevant Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit and such judgment shall not, except to the extent satisfied by such Relevant Guarantor, limit, affect, modify or abridge any other Relevant Guarantor's liability hereunder in respect of the Guaranteed Obligations;

- 117 -

(e)      any Beneficiary, upon such terms as it deems appropriate under the relevant Loan Document, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Relevant Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Relevant Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Relevant Guarantor against any other Loan Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)      this Guaranty and the obligations of the Relevant Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than Unasserted Contingent Obligations)), including the occurrence of any of the following, whether or not any Relevant Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the change, reorganization or termination of the corporate structure or existence of the Parent Guarantor or any of its Restricted Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations, whether or not consented to by any Beneficiary; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations, or failure to obtain approval of any Governmental Authority for enforcement thereof, as applicable; (vii) any defenses, set-offs or counterclaims which the Borrower or any other Person may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Relevant Guarantor as an obligor in respect of the Guaranteed Obligations.

Anything contained in this Agreement to the contrary notwithstanding, the obligations of each Relevant Guarantor in respect of its Guaranty shall be limited to an aggregate amount equal to the largest

amount that would not render its obligations under this Agreement subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code of the United States of America or any comparable provisions of any similar federal, state or other applicable law.

Section 7.4.    Waivers by Relevant Guarantors. Each Relevant Guarantor hereby waives, for the benefit of the Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Relevant Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Relevant Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Relevant Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Relevant Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Relevant Guarantor's obligations hereunder, (ii) any rights to set-offs, recoupments and counterclaims, (iii) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto, and (iv) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 7.3 and any right to consent to any thereof; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof, in each case other than the indefeasible payment in full of the Guaranteed Obligations.

Section 7.5.    Relevant Guarantors' Rights of Subrogation, Contribution, Etc. Until the Guaranteed Obligations shall have been paid in full in cash (other than Unasserted Contingent Obligations) and the Term Commitments shall have terminated, each Relevant Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Relevant Guarantor now has or may hereafter have against the Borrower or any other Relevant Guarantor or any of its assets in connection with this Guaranty or the performance by such Relevant Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including, (a) any right of subrogation, reimbursement or indemnification that such Relevant Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been paid in full in cash (other than Unasserted Contingent Obligations) and the Term Commitments shall have terminated, each Relevant Guarantor shall withhold exercise of any right of contribution such Relevant Guarantor may have against any other guarantor (including any other Relevant Guarantor) of the Guaranteed Obligations. Each Relevant Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Relevant Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Relevant Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be

paid to any Relevant Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than Unasserted Contingent Obligations) shall not have been paid in full in cash, such amount shall be held in trust for the Administrative Agent on behalf of the Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 7.6.    Subordination of Other Obligations. Any Indebtedness of the Borrower or any Relevant Guarantor now or hereafter held by any Relevant Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of the Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 7.7.    Continuing Guaranty. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash and the Term Commitments shall have terminated. Each Relevant Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 7.8.    Authority of Relevant Guarantors or the Borrower. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Relevant Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 7.9.    Financial Condition of the Borrower. Any Term Loan may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Relevant Guarantor regardless of the financial or other condition of the Borrower or any other Loan Party at the time of any such grant or continuation. No Beneficiary shall have any obligation to disclose or discuss with any Relevant Guarantor its assessment, or any Relevant Guarantor's assessment, of the financial condition of the Borrower or any other Loan Party. Each Relevant Guarantor has adequate means to obtain information from the Borrower and the other Loan Parties on a continuing basis concerning the financial condition of the Borrower and the other Loan Parties and their respective ability to perform their obligations under the Loan Documents, and each Relevant Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and each other Loan Party and of all circumstances bearing upon the risk of non-payment of the Guaranteed Obligations. Each Relevant Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower or any other Loan Party now known or hereafter known by any Beneficiary.

Section 7.10.    Bankruptcy, Etc. (a) So long as any Guaranteed Obligations remain outstanding, no Relevant Guarantor shall, without the prior written consent of the Administrative Agent (acting pursuant to the instructions of the Required Lenders), commence or join with any other Person in commencing any case or proceeding constituting a Bankruptcy Event against any other Loan Party (it being acknowledged and agreed, for the avoidance of doubt, that, subject to Section 8.1, this sentence shall not prohibit any Relevant Guarantor or other Loan Party from commencing any such action, case or proceeding with respect to itself). The obligations of the Relevant Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving a Bankruptcy Event in respect of the Borrower or any other Loan Party or by any defense which the Borrower or any other Loan Party may have by reason of the order, decree or decision of any court or administrative body resulting from any such case or proceeding.

(b)    Each Relevant Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in

- 120 -

clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Relevant Guarantors and the Beneficiaries that the Guaranteed Obligations which are guaranteed by Relevant Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower or any other Loan Party of any portion of such Guaranteed Obligations. Relevant Guarantors will permit any trustee in bankruptcy, receiver, judicial manager, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the Parent Guarantor or any Subsidiary of the Parent Guarantor, the obligations of Relevant Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

ARTICLE VIII
EVENTS OF DEFAULT

Section 8.1.    Events of Default. If any of the following events (each, an "Event of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of five Business Days;

(b)    the Borrower shall fail to pay any interest on any Term Loan or any fee or any other amount (other than an amount referred to in Section 8.1(a)) payable under any of the Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representation or warranty shall prove to have been incorrect in any respect);

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.2(a), Section 5.3 (solely with respect to such Loan Party's existence), Section 5.8, Section 5.17, or Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents (other than those specified in Section 8.1(a), 8.1(b) or 8.1(d)), and such failure shall continue unremedied for a period of 45 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)    the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable (whether by scheduled maturity, required

prepayment, acceleration, demand, or otherwise) and such failure shall have continued after the applicable grace period, if any;

(g)    after giving effect to any grace period, the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor fails to observe or perform any term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any Material Indebtedness or any Material Swap Obligations (other than as described in clause (f) above), if the failure referred to in this clause (g) is to accelerate the maturity of any such Material Indebtedness or Material Swap Obligations, or to cause the holder or holders of such Material Indebtedness or such Material Swap Obligations or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Material Indebtedness or such Material Swap Obligations to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor (no Event of Default shall occur hereunder solely as a result thereof unless and until such Material Indebtedness or Material Swap Obligations have been actually accelerated by the holder(s) (or trustee or other representative) thereof in accordance with its terms); provided that this clause (g) shall not apply to: (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder, (B) with respect to Material Swap Obligations, termination events or equivalent events pursuant to the terms of such Material Swap Obligations; and (C) any event requiring a prepayment or offer to purchase pursuant to customary asset sale or change of control provisions;

*provided further that* there shall be no Default pursuant to <u>Section 8.1(f)</u> and/or <u>Section 8.1(g)</u> to the extent that any failure described in such clause (f) or (g) has been remedied and waived by the holders of such Indebtedness prior to any termination of the Term Commitments or acceleration of the Term Loans pursuant to this <u>Article VIII</u>;

(h)    (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking liquidation, provisional liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or other relief in respect of the Parent Guarantor, any of its Restricted Subsidiaries or its debts, or of a substantial part of its assets, under any Debtor Relief Law or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator or provisional liquidator, judicial manager or similar official for the Parent Guarantor or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered, or (iii) any writ or warrant of attachment or similar process shall be entered or filed against any Restricted Subsidiary or for a substantial part of its assets or property (taken as a whole), and shall remain undischarged, unvacated, unbonded or unstayed (or an action of similar effect in any jurisdiction outside the U.S.) for a period of 60 days;

(i)    in respect of the Parent Guarantor or any Indian Guarantor, any corporate action, legal proceedings or other procedure or step is taken in relation to (i) the preparation of a resolution plan for it in accordance with any mechanism or framework of the RBI for resolution of stressed or non-performing assets, including, but not limited to, the Stressed Assets Framework; (ii) an application being filed (or any legal proceedings being initiated) seeking the commencement of an insolvency resolution process, under the applicable laws (including the IBC): (A) by a 'financial creditor' (as defined under the IBC) from whom it has availed any financial debt (as defined under the IBC) exceeding $50,000,000 (*provided* that no Event of Default shall occur pursuant to this clause (A) if it has (1) made payments towards full and final settlement of all claims of such 'financial creditor' (as defined under the IBC) within 20 days from the date of filing the application with the adjudicating authority for the initiation of such action or legal proceeding and has furnished documentary proof to the Collateral Agent evidencing such full and final settlement; or (2) such action or legal proceeding is dismissed, stayed or withdrawn within 20 days of the filing of the application with the adjudicating authority for the initiation thereof; or (3) such action or legal proceeding is frivolous or vexatious and it has either (i) made payments towards full and final settlement of all claims of such 'financial creditor' (as defined under the IBC) within 45 days from the date of filing the application with the adjudicating authority for the initiation of such action or legal proceeding and has furnished documentary proof to the Collateral Agent evidencing such full and final settlement; or (ii) such action or

legal proceeding is dismissed, stayed or withdrawn within 45 days of the filing of the application with the adjudicating authority for the initiation thereof) or (B) by any other Person (other than pursuant to sub-clause (A) above) (*provided* that no Event of Default shall occur pursuant to this sub-clause (B) if it has: (1) made payments towards full and final settlement of all claims of such Person within 60 days from the date of filing the application with the adjudicating authority for the initiation of such action or legal proceeding and has furnished documentary proof to the Collateral Agent evidencing such full and final settlement; or (2) such action or legal proceeding is dismissed, stayed or withdrawn within 60 days of the filing the application with the adjudicating authority for the initiation thereof or otherwise initiation thereof;

(j)    (i) the Parent Guarantor, any Indian Guarantor or any other Restricted Subsidiary of the Parent Guarantor shall (1) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or other relief under any Debtor Relief Law, (2) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>Section 8.1(h)</u>, (3) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, judicial manager or similar official for the Parent Guarantor, any other Indian Guarantor or any other Restricted Subsidiary of the Parent Guarantor or for a substantial part of its assets, (4) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (5) make a general assignment for the benefit of creditors or (6) pass a resolution or take any formal corporate action for the purpose of approving or effecting any of the foregoing actions referred to herein (as authorized by the Board of Directors of such Person), or (ii) the shareholders of the Parent Guarantor, any other Indian Guarantor or any Restricted Subsidiary of the Parent Guarantor shall pass a resolution to have the Parent Guarantor, any other Indian Guarantor or any Restricted Subsidiary of the Parent Guarantor wound up on a voluntary basis, in each case, other than in accordance with Section 5.3(a) or Section 6.3(a)(vi);

(k)    the Parent Guarantor, any Indian Guarantor or any Restricted Subsidiary of the Parent Guarantor shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(l)    one or more judgments for the payment of money in excess of $125,000,000 in the aggregate shall be rendered against the Parent Guarantor, any Restricted Subsidiary of the Parent Guarantor or any combination thereof (to the extent not paid or covered by (x) a reputable and solvent independent third-party insurance company which has not disputed coverage or (y) an enforceable indemnity to the extent that such Loan Party or Restricted Subsidiary shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed (or an action of similar effect in any jurisdiction outside the U.S.), or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Guarantor or any Restricted Subsidiary of the Parent Guarantor to enforce any such judgment and such action shall not be stayed (or an action of similar effect in any jurisdiction outside the U.S.);

(m)    (i) an ERISA Event shall occur that would reasonably be expected to result in a Material Adverse Effect, or (ii) any condition or event shall occur with respect to any Non-U.S. Plan that would reasonably be expected to result in a Material Adverse Effect;

(n)    (i) any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, (B) as a result of acts or omissions by the Administrative Agent, Collateral Agent or any other Secured Party, or (C) as a result of satisfaction in full of all the obligations (other than Unasserted Contingent Obligations) hereunder or thereunder) ceases to be in full force and effect; or any Loan Party contests in writing in any manner the validity or enforceability of any Loan Document, (ii) subject to Section 5.13, the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document for any reason (other than (1) pursuant to the terms thereof including as a result of a transaction permitted (or not expressly prohibited) under the Loan Documents, (2) as a result of satisfaction in full of all the obligations (other than

Unasserted Contingent Obligations), (3) as a result of acts or omissions by the Administrative Agent, Collateral Agent or any other Secured Party including any loss thereof which results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates delivered to it representing securities pledged under the Collateral Documents or (4) as to Collateral consisting of Material Real Estate Assets to the extent that such losses are covered by (x) a lender's title insurance policy and such insurer has not denied coverage, or (y) an enforceable indemnity to the extent that such Loan Party or Restricted Subsidiary shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim), or (iii) any Loan Party shall contest in any manner the validity or perfection of any Lien in any material portion of the Collateral purported to be covered by the Collateral Documents;

(o)     any Singapore Loan Party is declared by the Minister of Finance to be a company to which Part IX of the Companies Act, Chapter 50 of Singapore applies; or

(p)     any Junior Financing permitted hereunder or the guarantees thereof, if any, shall cease, for any reason, to be validly subordinated to the Obligations in lien and/or payment priority, as provided in the applicable Junior Financing Documentation or the applicable Additional Agreement,

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents in addition to any other remedies available under the Loan Documents or applicable law, including the right to direct the delivery of any notice of exclusive control with respect to any deposit account or securities account constituting Collateral and subject to a control agreement or similar documentation and (ii) declare the Term Loans then-outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Term Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; *provided, however*, in case of any event with respect to the Borrower (and, upon the consummation of the Holdco Transaction, Holdings) described in <u>Section 8.1(h)</u> or <u>8.1(i)</u>, the principal of the Term Loans then-outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Solely for the purpose of determining whether a Default or Event of Default has occurred under <u>Section 8.1(h), (i), (j), (k), (l) or (o)</u>, any reference in any such clause to any Loan Party or Restricted Subsidiary shall be deemed to include only any such Person affected by any event or circumstances referred to in any such clause that is not an Immaterial Subsidiary (it being agreed that all Persons affected by any event or circumstance referred to in any such clause shall be considered together, as a single consolidated Restricted Subsidiary, for purposes of determining whether the condition specified above is satisfied).

Section 8.2.     <u>Application of Funds</u>.  Subject to any Additional Agreement to the extent then in effect, after the exercise of remedies provided for in <u>Section 8.1</u> (or after the Term Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to each of the Agents and amounts payable under <u>Article II</u>, <u>Article IX</u> and <u>Article X</u>) payable to (a) the Collateral Agent and (b) the Administrative Agent, each in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and

disbursements of counsel to the respective Lenders and amounts payable under <u>Article II</u>), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full in cash, to the Borrower or as otherwise required by applicable law.

ARTICLE IX
<u>THE AGENTS</u>

Section 9.1.      <u>Agents</u>.

Each of the Lenders and Secured Parties hereby irrevocably appoints GLAS Trust Company LLC as the Administrative Agent and Collateral Agent (and GLAS Trust Company LLC hereby accepts such appointment) and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf and to exercise all rights, powers and remedies as are delegated to the Administrative Agent and the Collateral Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto. Except, in each case, as set forth in the sixth paragraph of this <u>Article IX</u>, the provisions of this <u>Article IX</u> are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this <u>Article IX</u>.

The Person serving as the Agent (which for purposes of this <u>Article IX</u> shall mean each of the Administrative Agent and the Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates are authorized to accept deposits from, lend money to and generally engage in any kind of banking, trust or other business with the Parent Guarantor or any Subsidiary of the Parent Guarantor or other Affiliate thereof as if it were not the Agent hereunder and without any duty to account therefor to the Lenders.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent: (a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) is not obliged to expend or risk its own funds or otherwise (c) shall not incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it, and (d) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.2</u> or in the other Loan Documents); *provided* that the Agent shall not be required to take, or omit to take, any action (i) unless upon demand in the case of the Collateral Agent, the Collateral Agent receives an indemnification satisfactory to it from the Lenders against all Liabilities that, by reason of such action or omission may be imposed on, incurred by or asserted against the Collateral Agent or any Agent-Related Person thereof or (ii) that, in its opinion or the opinion of its

counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.

The Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Guarantor or any of its Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it in connection with any Loan Document (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.2) or (ii) in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The Administrative Agent may at any time request instructions from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Administrative Agent may refrain from acting unless and until it receives those written instructions or that clarification. In the absence of written instructions, Administrative Agent may act (or refrain from acting) as it considers to be in the best interests of the Lenders and/or use its reasonable discretion in considering whether to act (or refrain from acting) and the Lenders hereby authorize the Administrative Agent to do so. Whether or not the Administrative Agent makes such a request, at all times except with respect to an express obligation set forth herein, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining. If, in performing its duties under this Agreement, the Administrative Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from Required Lenders who do not satisfy the definition of Required Lenders, the Administrative Agent may refrain from taking any action until it receives instructions from the Required Lenders.

The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (2) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or the occurrence of any Default, (4) the due execution, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by emailed pdf or any other electronic means that reproduces an image of an actual executed signature page), or (5) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent. Whenever in the administration of the Loan Documents the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its party, may conclusively rely upon the instructions from the Required Lenders. Each Secured Party waives and shall not assert any right, claim or cause of action it might have against any Agent based thereon. Nothing in this Agreement shall require the Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

In no event shall the Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, pandemics, accidents, acts of war or terrorism, civil

or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

The Agent shall not (i) be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Term Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing, or (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided) provided that the Agent may exercise discretionary action, rights and powers contemplated hereby without instructions from any Lender to the extent provided hereunder or under any Loan Document (including, without limitation, the discretion accorded to the Agent as described in the definition of "Collateral and Guarantee Requirement", the definition of "Daily Simple SOFR", Section 2.11, Section 5.9, Section 5.10 and Section 10.2), and each Lender hereby authorizes the Agent to do so without further instructions.

The Agent shall not be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other Loan Documents pertaining to this matter nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other Loan Document pertaining to this matter.

In no event shall the Agent be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.

Beyond the exercise of reasonable care in the custody thereof, the Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords similar collateral and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee.

The Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens on any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Agent shall have no duty to ascertain or inquire as to or monitor the performance or observance of any of the terms of the Loan Documents by any other Person.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Term Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender

prior to the making of such Term Loan. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agent may perform any and all of its duties and exercise its rights, powers and remedies under, or any other action with respect to, any Loan Document by or through any one or more trustees, co-agents, employees, attorneys-in-fact or any other Person (including any Secured Party, but excluding any Disqualified Lender) (each, a "Sub-Agent") appointed by the Agent. The Agent and any such Sub-Agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of this Article IX shall apply to any such Sub-Agent and to the Related Parties of the Agent and any such Sub-Agent, and shall apply to their respective activities in connection with the syndication of the Term Facility as well as activities as Agent.

The Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to the Lenders and the Borrower. The Administrative Agent shall have the right to appoint a successor to act as the Administrative Agent and/or the Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Required Lenders, and the Administrative Agent's resignation shall become effective on the earliest of (a) 30 days after delivery of the notice of resignation, (b) the acceptance of such successor Administrative Agent by the Borrower and the Required Lenders or (c) such other date, if any, agreed to by the Borrower and the Required Lenders. Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent that is reasonably satisfactory to the Borrower. If neither the Required Lenders nor the Administrative Agent have appointed a successor Administrative Agent, the Required Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that, in the event the Administrative Agent and the Collateral Agent are the same Person, until a successor Administrative Agent is so appointed by the Required Lenders or the Administrative Agent, any collateral security held by the Administrative Agent in its role as the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Any successor Administrative Agent shall be a bank with an office in the United States of America or an Affiliate of any such bank with an office in the United States of America. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring Administrative Agent shall be discharged from its duties and obligations hereunder. Except as provided above, any resignation of GLAS Trust Company LLC or its successor as the Administrative Agent pursuant to this Article IX shall also constitute the resignation of GLAS Trust Company LLC or its successor as the Collateral Agent (to the extent GLAS Trust Company LLC or its successor is serving as Collateral Agent at such time). After any retiring Administrative Agent's resignation hereunder as Administrative Agent or Collateral Agent, the provisions of this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent hereunder and while it continues to hold any collateral security as nominee until a successor Collateral Agent is appointed. Notwithstanding the foregoing or any other provision contained herein, in no event shall a successor Administrative Agent be a Disqualified Lender.

Each Lender represents and warrants to each Agent and acknowledges that (a) the Loan Documents set forth the terms of a commercial lending facility, (b) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender in

the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (c) it has, independently and without reliance upon the Agent, any Arranger or any other Lender or any of their respective Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and (d) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities. Each Lender also acknowledges that it will, independently and without reliance upon the Agent, any Arranger or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Anything herein to the contrary notwithstanding, none of the Arrangers nor any Joint Bookrunner shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, Collateral Agent or a Lender hereunder.

Each Secured Party hereby authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents and any Additional Agreement to the extent then in effect. Subject to Section 10.2, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (a) in connection with a sale or Disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other Disposition of assets or to which Required Lenders (or such other Lenders as may be required to give such consent under Section 10.2) have otherwise consented or (b) release any Guarantor from the Guaranty pursuant to Section 10.17 or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 10.2) have otherwise consented.

Anything contained in any of the Loan Documents to the contrary notwithstanding, each Loan Party, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty; *provided* that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

Notwithstanding anything to the contrary contained herein or any other Loan Document, each Lender hereby consents and directs that when all Obligations (other than Unasserted Contingent Obligations) have been paid in full in cash, all Term Commitments have terminated or expired, upon request of the Borrower, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all Guaranties provided for in any Loan Document. Any such release of any Guaranty shall be deemed subject to the provision that such Guaranty shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon a Bankruptcy Event in respect of the Borrower or any Guarantor, or

upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee, judicial manager or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Each Lender hereby irrevocably directs and authorizes the Administrative Agent, at its option and in its discretion, to direct the Collateral Agent to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.2.

Each Lender hereby irrevocably authorizes each Agent to, and each Agent will at the request and cost of the Borrower, enter into an intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent with respect to Indebtedness that is (a) required or permitted to be incurred hereunder and for which accession to such an intercreditor agreement is required or (b) secured by Liens and which Indebtedness contemplates an intercreditor, subordination or collateral trust agreement (any such intercreditor, subordination or collateral trust agreement, an "Additional Agreement"), and the Secured Parties party hereto hereby acknowledge that any Additional Agreement is binding upon them. Each Secured Party hereby agrees that it will be bound by, and will not take any action contrary to, the provisions of any Additional Agreement and each Lender hereby authorizes and instructs the Agents to enter into any Additional Agreement and to subject the Liens securing the Obligations to the provisions thereof. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Additional Agreement.

The Secured Parties (other than the Collateral Agent) hereby irrevocably authorize the Collateral Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Collateral Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Collateral Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Collateral Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Collateral Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Collateral Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.2 of this Agreement), (iv) the Collateral Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v)

- 130 -

to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties *pro rata* with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Collateral Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

In addition, unless sub-clause (i) in the immediately preceding paragraph is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding paragraph, such Lender further (a) represents and warrants, as of the date such Person became a Lender party hereto, to, and (b) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents, the Arrangers and their respective Affiliates, and not to or for the benefit of the Borrower or any other Loan Party, that none of the Agents or any Arrangers or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related to hereto or thereto).

Each Agent and each Arranger hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (a) may receive interest or other payments with respect to the Term Loans, the Term Commitments, this Agreement and any other Loan Documents, (b) may recognize a gain if it extended the Term Loans or the Term Commitments for an amount less than the amount being paid for an interest in the Term Loans or the Term Commitments by such Lender or (c) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 9.2.    <u>Collateral Agent</u>.

Under the Loan Documents, the Collateral Agent (i) is acting solely on behalf of the Secured Parties, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Collateral Agent" and "collateral agent" and similar terms in any Loan Document to refer to Collateral Agent, which terms are used for title purposes only; (ii) is not assuming any obligation under any Loan Document or any role as agent, fiduciary or trustee of or for any Lender or any other Person, in each case, other than as expressly set forth therein; and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Collateral Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

The Collateral Agent and its Related Parties shall not be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party hereby waives and shall not assert any right, claim or cause of action based thereon, except to the extent of liabilities

resulting primarily from the gross negligence or willful misconduct of the Collateral Agent or, as the case may be, such Related Party (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, the Collateral Agent: (i) shall not be responsible to the Secured Parties or otherwise incur liability to the Secured Parties for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Parties selected with reasonable care (other than employees, officers and directors of the Collateral Agent, when acting on behalf of the Collateral Agent); (ii) shall not be responsible to any Lender or other Person for the preparation, filing or recording or any instrument, document or financing statement or the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection, maintenance or priority of any security interest or any Lien created or purported to be created under or in connection with, any Loan Document; (iii) makes no warranty or representation, and shall not be responsible, to any Secured Party for any statement, document, information, representation or warranty made or furnished by or on behalf of any Loan Party or any Related Party of any Loan Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Loan Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Collateral Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Collateral Agent in connection with the Loan Documents; and (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Loan Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower or any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Collateral Agent shall promptly give notice of such receipt to all Lenders); and, for each of the items set forth in clauses (i) through (iv) above, each Secured Party hereby waives and agrees not to assert any right, claim or cause of action it might have against the Collateral Agent based thereon.

Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by the Collateral Agent in accordance with the provisions of the Loan Documents, (ii) any action taken by the Collateral Agent in reliance upon the instructions of the Administrative Agent, Required Lenders or, where so required, such greater proportion of the Lenders and (iii) the exercise by the Collateral Agent of the powers set forth herein or therein shall be authorized and binding upon all of the Secured Parties.

The Collateral Agent may resign at any time by giving prior written notice thereof to the Lenders and the Loan Parties. The Administrative Agent shall have the right to appoint a successor Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Required Lenders, and the Collateral Agent's resignation shall become effective on the earliest of (a) 30 days after delivery of the notice of resignation, (b) the acceptance of such successor Collateral Agent by the Borrower and the Required Lenders or (c) such other date, if any, agreed to by the Required Lenders and the Borrower. Upon any such notice of resignation, if a successor Collateral Agent has not already been appointed by the retiring Administrative Agent, the Required Lenders shall have the right, upon five Business Days' notice to the Administrative Agent, to appoint a successor Collateral Agent that is reasonably satisfactory to the Borrower. If, after 30 days after the date of the retiring Collateral Agent's notice of resignation, no successor Collateral Agent has been appointed by the Administrative Agent or the Required Lenders in consultation with the Borrower, then the retiring Collateral Agent may, on behalf of the Lenders, appoint a successor Collateral Agent from among the Lenders. Until a successor Collateral Agent is so appointed by the Required Lenders, the Administrative Agent or the Collateral Agent, as the case may be, any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Agreement and

the Collateral Documents, and the retiring Collateral Agent under this Agreement shall, at the cost of the Borrower, as soon as reasonably practicable (i) transfer to such successor Collateral Agent all sums, securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under this Agreement and the Collateral Documents, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents. After any retiring Collateral Agent's resignation hereunder as the Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was the Collateral Agent hereunder and while it continues to hold any collateral security as nominee until a successor Collateral Agent is appointed. Notwithstanding the foregoing or any other provision contained herein, in no event shall a successor Collateral Agent be a Disqualified Lender.

The Collateral Agent may at any time request instructions from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) or the Administrative Agent (acting for and on behalf of the Required Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Collateral Agent may refrain from acting unless and until it receives those written instructions or that clarification. In the absence of written instructions, Collateral Agent, as applicable, may act (or refrain from acting) as it considers to be in the best interests of the Lenders. Whether or not the Collateral Agent makes such a request, at all times except with respect to an express obligation set forth herein, the Collateral Agent shall be entitled to refrain from such act or taking such action unless and until the Collateral Agent shall have received instructions from the Required Lenders or the Administrative Agent (acting for and on behalf of the Required Lenders), and the Collateral Agent shall not incur liability to any Person by reason of so refraining. If, in performing its duties under this Agreement, the Collateral Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from Required Lenders who do not satisfy the definition of Required Lenders, the Collateral Agent may refrain from taking any action until it receives instructions from the Required Lenders or the Administrative Agent (acting for and on behalf of the Required Lenders).

Section 9.3.    Certain ERISA Matters. (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the Term Commitments and this Agreement,

(iii)    such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer, and perform the Term Loans, the Term Commitments and this Agreement, (C) the entrance into, participation in, administration of, and performance of the Term Loans, the Term Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the Term Commitments and this Agreement, or

(iv)    such other representation, warranty, and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in Section 9.3(a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in Section 9.3(a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the Term Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document, or any documents related hereto or thereto).

## ARTICLE X
## MISCELLANEOUS

Section 10.1.    Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing in English and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email (or other facsimile transmission or, subject to clause (b) below, other electronic image scan transmission (*e.g.*, pdf via email)), as follows:

(i)    if to any Loan Party, to it at:

(1)    BYJU'S, 4/1,

6th Floor, Tower D, IBC Knowledge Park,

Bannerghatta Main Road, Bangalore,

Karnataka India- 560 029  ;

(2)    Attention: Riju Ravindran

With copies to Anita Kishore and Roshan Thomas;

(3)    Facsimile: n/a;

(4)    Email: riju@byjus.com

With copies to Anita@byjus.com; Roshan.thomas@byjus.com;

(ii)     if to the Administrative Agent or the Collateral Agent, to it at:

(1)     GLAS TRUST COMPANY LLC,

3 Second Street, Suite 206

Jersey City, NJ 07311

(2)     Attention: Transaction Management;

(3)     (Facsimile 212-202-6246;

(4)     Email: clientservices.americas@glas.agency TMGUS@glas.agency; and

(iii)     if to any other Lender, to it at its address or email (or other facsimile transmission) number) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by email (or other facsimile transmission) shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b). All documents provided under or in connection with any Loan Document shall be in English or, if so required by any Lender, accompanied by a certified English translation; *provided* that any such translation will prevail and may be conclusively relied upon unless the corresponding document is a constitutional, statutory or other official document issued by a Governmental Authority.

(b)     Notices and other communications to any Loan Party and the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent and/or any Loan Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)     Any party hereto may change its address or email (or other facsimile transmission) number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

The Borrower agrees that the Administrative Agent may make the Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, IntraLinks, Syndtrak, ClearPar, the Internet or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system (the "Platform"). THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications effected thereby (the "Communications"). No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") be responsible or liable for damages arising from the use by others of information or other materials (including any personal data) obtained through electronic, telecommunications or other information transmission systems (including through the Platform) or otherwise via the Internet, except to

the extent that such damages have resulted from the willful misconduct or gross negligence of such Agent Party (as determined in a final, non-appealable judgment by a court of competent jurisdiction).

Section 10.2.    Waivers; Amendments. (a) No failure or delay by any Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Parent Guarantor or any Restricted Subsidiary therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Except as provided in Sections 2.11(b), (c) and (d) or as otherwise expressly provided in this Agreement, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; *provided, however*, that no such amendment, waiver or consent shall:

(i)    extend or increase the Term Commitment of any Lender without the written consent of such Lender (or make any changes to the definition of "Applicable Percentage") (it being understood that a waiver of any condition precedent or of any Default, mandatory prepayment or mandatory reduction of the Term Commitments shall not constitute an extension or increase of any Term Commitment of any Lender);

(ii)    reduce the principal amount of any Term Loan, reduce the rate of interest thereon, or reduce any premium or fees payable hereunder, without the written consent of each Lender directly affected thereby; *provided, however*, notwithstanding the foregoing, any changes to the MFN Provisions or any changes to the default rate set forth in Section 2.10(c) shall only require the consent of the Required Lenders;

(iii)    postpone the scheduled date of payment of the principal amount of any Term Loan, or any interest thereon, or any premium or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Term Commitment, without the written consent of each Lender directly affected thereby; *provided* that the waiver (or amendment to the terms of) any mandatory prepayment of the Term Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest; *provided, however*, that notwithstanding clause (ii) or (iii) of this Section 10.2(b), only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate set forth in Section 2.10(c), or to amend the definition of "Consolidated Total Net Leverage Ratio" or in the component definitions thereof;

(iv)    [reserved];

(v)    [reserved]; or

(vi)    change Section 8.2 without the written consent of each Lender directly affected thereby.

(vii)    Notwithstanding anything to the contrary herein:

(1)     no such agreement shall amend, modify or otherwise affect the rights or adversely affect the duties of any Agent hereunder without the prior written consent of such Agent;

(2)     no Defaulting Lender or Affiliated Lender (in its capacity as a Lender) shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders and Affiliated Lenders), except that (x) the Term Commitment of any Defaulting Lender or Affiliated Lender may not be increased or the termination thereof extended without the consent of such Lender, (y) the principal amount of any Defaulting Lender's or Affiliated Lender's Term Loan, or the interest rate thereon or any fees payable hereunder to any Defaulting Lender or Affiliated Lender may not be reduced without the consent of such Lender and (z) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender or Affiliated Lender (in its capacity as a Lender) more adversely than other affected Lenders shall require the consent of such Defaulting Lender or Affiliated Lender, as applicable;

(3)     this Agreement may be amended to provide for an Incremental Facility in the manner contemplated by Section 2.17, a Refinancing Term Facility in the manner contemplated by Section 2.18 and an Extension in the manner contemplated by Section 2.19;

(4)     any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent (without the need to obtain the consent of any other party to any Loan Document) to (y) effect any Ministerial Amendments, so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment, or (z) grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property constituting Collateral; and

(5)     any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Term Loans or Term Commitments of a particular Class (but not the Lenders holding Term Loans or Term Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower, and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time.

(c)     Without the written consent of all Lenders (other than, in the case of clauses (iv) and (v), a Defaulting Lender), no amendment, modification, termination or waiver of any term or condition of any Loan Document, or consent to any departure by any Loan Party therefrom, shall:

(i)     change Section 2.15(b), Section 8.2 or any other Section hereof or of any Loan Document providing for the ratable treatment of the Lenders, in each case in a manner that would alter the *pro rata* sharing of payments required thereby;

(ii)     change any of the provisions of this Section or the percentage referred to in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder;

(iii)    change the definition of "Pro Rata Share"

(iv)    amend, modify, terminate or waive any term or condition of this Agreement or any other Loan Document that expressly provides that the consent of all Lenders is required;

(v)     release all or substantially all of the value of any Guaranty or the Collateral except to the extent the release of any Guarantor or any Collateral is permitted pursuant to Section 6.3, Article IX or Section 10.17;

(vi)    subordinate the Obligations in right of payment, or the priority of the Liens securing the Obligations, to any other Indebtedness (it being understood that this clause (vi) shall not apply to any debtor-in-possession financing and use of cash collateral in compliance with any Additional Agreement or customary intercreditor agreements); and

(vii)   consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document (except as expressly provided in the Loan Documents).

Notwithstanding anything to the contrary in this Section 10.2, no Lender consent is required to (and neither the Administrative Agent not the Collateral Agent shall be obliged to request instructions from the Lenders with respect to) (x) effect any amendment or supplement to any Loan Document, Additional Agreement or intercreditor or similar arrangement permitted under this Agreement that is solely for the purpose and effect of (A) adding the holders of Refinancing Equivalent Debt, Incremental Equivalent Debt, Swap Agreements or Indebtedness permitted pursuant to Section 6.1(m) (and any Permitted Refinancing of the foregoing), and/or the collateral agent, trustee, authorized agent or other representatives of holders of the foregoing Indebtedness to such Additional Agreement or arrangement, (B) causing the Liens granted pursuant to any Loan Document to be in favor of such Persons and/or (C) causing any Indebtedness that is expressly permitted by this Agreement to be secured on a *pari passu* or junior basis with the Term Facility to be secured on that basis or (y) to provide for, evidence or effectuate other amendments or actions that are required to give effect to paragraph (x) above including (1) executing any joinders or other instruments that are contemplated by any such Additional Agreement or arrangement permitted under this Agreement and/or (2) updating or conforming any definitions and/or cross references in any Loan Document to such Additional Agreement or arrangement as in the good faith determination of the Administrative Agent are required to effectuate the foregoing and provided that in each case such changes are not adverse, in any material respect, to the interests of the Secured Parties or could reasonably be considered prejudicial to the validity of such Liens (it being expressly acknowledged and agreed that any sharing of the Collateral on a *pari passu* or junior basis as expressly permitted by this Agreement shall not be deemed to be adverse to the interests of the Secured Parties); provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

The Collateral Documents and related documents in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent (or Collateral Agent, acting on the instructions of the Administrative Agent) and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent  (or Collateral Agent, acting on the instructions of the Administrative Agent) at the request of the Borrower without the need to obtain the consent of any other Secured Party if such amendment, supplement or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) effect any Ministerial Amendments, (iii) to cause such Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including any

updates, imported definitions or conforming changes contemplated by paragraphs (x) or (y) above), or (iv) to confirm the inapplicability of the Collateral Documents to any Excluded Property, for so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment, or (iv) grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property constituting Collateral. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Borrower and the Administrative Agent may enter into any Incremental Amendment in accordance with Section 2.17, any Refinancing Amendment in accordance with Section 2.18 and any Extension Amendment in accordance with Section 2.19 and such Incremental Amendments, Refinancing Amendments and Extension Amendments shall be effective to amend the terms of this Agreement and the other applicable Loan Documents, in each case, without any further action or consent of any other party to any Loan Document.

Section 10.3.    Expenses; Limitation of Liability; Indemnity, Etc. The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Agents and the Arrangers, including the reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of counsel for the Agents and the Arrangers, taken as a whole (and (x) if the Collateral Agent is a third-party agent (it being understood that the Collateral Agent is a third-party agent as of the Effective Date), of a single additional outside counsel for such Collateral Agent, and (y) if reasonably necessary (as determined by the Administrative Agent in consultation with the Borrower), of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole) in connection with the syndication of the Term Facility, the preparation, negotiation, execution, delivery and administration of this Agreement, any other Loan Document or any amendments, modifications or waivers of the provisions hereof or thereof, and (ii) all reasonable and documented expenses incurred by the Agents, the Arrangers and each Lender, including the reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of counsel for the Agents, the Arrangers and the Lenders, taken as a whole (and (x) if the Collateral Agent is a third-party agent, of a single additional outside counsel for such Collateral Agent, and (y) if reasonably necessary (as determined by the Administrative Agent in consultation with the Borrower), of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole), in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section, or in connection with the Term Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Term Loans. For the avoidance of doubt, except as otherwise expressly set forth herein or in any other Loan Document, any action taken by any Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Agents or Required Lenders, shall be at the expense of such Loan Party, and neither the Agents nor any other Secured Party shall be required under any Loan Document to reimburse such Loan Party or any of its subsidiaries for any such expenses.

(b)    Limitation of Liability. To the extent permitted by applicable law (i) no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Agent, any Arranger and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any Liabilities arising from the use by others of information or other materials (including any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Platform or otherwise via the Internet), other than Liabilities that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Lender-Related Person (it being understood that all information and materials so transmitted shall continue to be subject to the confidentiality provisions set forth herein and in the

Platform), and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, exemplary, punitive or consequential damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions or any Term Loan or the use of the proceeds thereof; *provided* that nothing in this <u>Section 10.3(b)</u> shall relieve (A) any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in <u>Section 10.3(c)</u>, against any special, indirect, exemplary, punitive or consequential damages (including any loss of profits, business or anticipated savings) asserted against such Indemnitee by a third party or (B) the Administrative Agent or any Arranger of any liability it may have as a result of a material breach of its obligations under Section 7 of the Letter Agreement.

(c)    <u>Indemnity</u>. Each Loan Party shall indemnify each Agent, each Arranger and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all Liabilities and related reasonable and documented expenses, including the reasonable and documented out-of-pocket fees, charges and disbursements of one firm of counsel for the Indemnitees, taken as a whole (and (x) if the Collateral Agent is a third-party agent, of a single additional outside counsel for such Collateral Agent and each of its Related Parties, taken as a whole, and (y) if reasonably necessary (as determined by the Administrative Agent in consultation with the Borrower), of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Term Loan or the use of the proceeds thereof, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by the Parent Guarantor or any of its Subsidiaries, or any Environmental Liability of the Parent Guarantor or any of its Subsidiaries, or (iv) any actual or prospective Proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such Proceeding is initiated by a third party or the Parent Guarantor or any Affiliate of the Parent Guarantor); *provided* that such indemnity shall not, as to any Indemnitee, be available (1) with respect to Taxes (and amounts relating thereto), the indemnification for which shall be governed solely and exclusively by <u>Sections 2.12</u> and <u>2.14</u>, other than any Taxes that represent losses, claims or damages arising from any non-Tax claim or (2) to the extent that such Liabilities or related reasonable and documented expenses (A) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from (I) the gross negligence or willful misconduct of such Indemnitee, (II) with respect to any Indemnitee other than the Collateral Agent or any of its Related Parties, a material breach by such Indemnitee or one of its Affiliates of its express obligations under this Agreement or any other Loan Document, or (III) with respect to any Proceeding brought by the Parent Guarantor or the Borrower against the Collateral Agent or any of its Affiliates, a material breach by the Collateral Agent or any of its Affiliates of its express obligations under this Agreement or any other Loan Document, or (B) arise from any dispute between and among Indemnitees that does not involve an act or omission by the Parent Guarantor, the Borrower or any of its Subsidiaries (other than any proceeding against any Agent or any Arranger in such capacity); *provided* that any such Liabilities or related reasonable and documented expenses incurred by the Collateral Agent acting in such capacity in connection with any such dispute shall not be excluded pursuant to this clause (B).

(d)    Each Lender severally agrees to pay any amount required to be paid by the Borrower under paragraphs (a), (b) or (c) of this <u>Section 10.3</u> to each Agent and each Related Party of such Agent (each, an "<u>Agent-Related Person</u>") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Applicable Percentage in effect on the date on which such payment is sought under this Section (or, if such payment is sought after the date upon which

the Term Commitments shall have terminated and the Term Loans shall have been paid in full in cash, ratably in accordance with such Applicable Percentage immediately prior to such date), from and against any and all Liabilities and related reasonable and documented expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loans) be imposed on, incurred by or asserted against such Agent-Related Person in any way relating to or arising out of the Term Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; *provided* that the unreimbursed Liability or related reasonable and documented expense, as the case may be, was incurred by or asserted against such Agent-Related Person in its capacity as such; *provided, further*, that no Lender shall be liable for the payment of any portion of such Liabilities, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent-Related Party's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

(e)     Payments. All amounts due under this Section 10.3 shall be payable promptly after written demand therefor.

Section 10.4.   Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) none of the Parent Guarantor, the Borrower or, on and after the consummation of a Holdco Transaction, Holdings, may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower or Holdings, as the case may be, without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (but not to the Parent Guarantor or an Affiliate of the Parent Guarantor or any Defaulting Lender or any Disqualified Lender or any natural person, except to the extent permitted by Section 10.4(f)) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Term Loans at the time owing to it) with the prior written consent of:

(1)     the Borrower; *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Payment or Bankruptcy Event of Default has occurred and is continuing, any other assignee; *provided, further*, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof; and

(2)     the Administrative Agent (such consent not to be unreasonably withheld or delayed) unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, in each case which consent shall not be required.

(ii)     Assignments shall be subject to the following additional conditions:

(1)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Commitment or Term Loans, (A) the amount of the Term Commitment or Term Loans of the assigning Lender subject to each such assignment

(determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if a Payment or Bankruptcy Event of Default has occurred and is continuing and (B) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; *provided* that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Term Commitments or Term Loans;

(3)    (x) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to reduce or waive such processing and recordation fee in the case of any assignment, and (y) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent;

(4)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms required by Section 2.14(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Parent Guarantor and its Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal, state and foreign securities laws;

(5)    no such assignment shall be made to (I) the Parent Guarantor or any Affiliate of the Parent Guarantor (except to the extent permitted by Section 10.4(f)), (II) any Defaulting Lender or any of its subsidiaries, Affiliates or equity holder thereof, or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (II) or (III) any Disqualified Lender;

(6)    in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Term Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (I) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon), and (II) acquire (and fund as appropriate) its full Pro Rata Share of all Term Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become

effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(7)     the assignee shall not be entitled to receive any greater payment under Section 2.12 or Section 2.14, with respect to any assignment, than its assigning Lender was entitled to receive.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.13, Section 2.14 and Section 10.3); *provided* that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting solely for this purpose as an non-fiduciary agent of the Borrower shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitment of, and principal amounts (and stated interest) of the Term Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The Register is intended to establish that each Term Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or any amended or successor version). The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 10.4(b)(iv), except to the extent that such losses, claims, damages or liabilities are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent. The Term Loans (including principal and interest) are registered obligations and the right, title, and interest of any Lender or its assigns in and to such Term Loans shall be transferable only upon notation of such transfer in the Register.

(v)     Upon its (1) receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.14(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section and (2) completion of all "know your customer" or similar processes required under applicable law and regulation, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall

have failed to make any payment required to be made by it pursuant to <u>Section 2.4(b)</u>, <u>Section 2.15(c)</u> or <u>Section 10.3(d)</u>, the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (but not to (I) the Borrower, the Parent Guarantor or an Affiliate of the Parent Guarantor, (II) any Defaulting Lender or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (II), (III) any Disqualified Lender, or (IV) any natural Person) (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Term Loans owing to it); *provided* that (1) such Lender's obligations under this Agreement shall remain unchanged, (2) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (3) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 10.2(b)</u> that adversely affects such Participant (except with respect to any matters that require only the affirmative vote of the Required Lenders). Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 2.12</u>, <u>Section 2.13</u> and <u>Section 2.14</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.14(e)</u>; *provided* that the documentation required under <u>Section 2.14(e)</u> shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant agrees to be subject to the provisions of <u>Section 2.16</u> as if it were an assignee under paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.8</u> as though it were a Lender; *provided* that such Participant agrees to be subject to <u>Section 2.15(b)</u> as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.12</u> or <u>Section 2.14</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Term Commitments, Term Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Term Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the Bank of England or the European Central Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      (i) No assignment or participation shall be made to any Person that was a Disqualified Lender as of the date (the "Trade Date") on which the assigning Lender entered into a binding agreement to sell and assign all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment in writing in its sole and absolute discretion, in which case such Person will not be considered a Disqualified Lender for the purpose of such assignment or participation). With respect to any assignee that becomes a Disqualified Lender after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "Disqualified Lender"), (1) such assignee shall not retroactively be disqualified from becoming a Lender and (2) the execution by the Borrower of an Assignment and Assumption with respect to such assignee will not by itself result in such assignee no longer being considered a Disqualified Lender. Any assignment in violation of this clause (e)(i) shall not be void, but the other provisions of this clause (e) shall apply.

(ii)      If any assignment or participation is made to any Disqualified Lender without the Borrower's sole prior written consent in violation of clause (e)(i) above, or if any Person becomes a Disqualified Lender after the applicable Trade Date, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Lender and the Administrative Agent, (1) in the case of outstanding Term Loans held by Disqualified Lenders, prepay such Term Loans by paying the lesser of (A) the principal amount thereof and (B) the amount that such Disqualified Lender paid to acquire such Term Loans, in each case *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (2) require such Disqualified Lender to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 10.4), all of its interest, rights and obligations under this Agreement to one or more Persons at the lesser of (A) the principal amount thereof and (B) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations, in each case *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(iii)      Notwithstanding anything to the contrary contained in this Agreement, Disqualified Lenders (1) will not (A) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (B) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (C) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (2) (A) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Lender will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Lenders consented to such matter, and (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws, each Disqualified Lender party hereto hereby agrees (I) not to vote on such plan, (II) if such Disqualified Lender does vote on such plan notwithstanding the restriction in the foregoing clause (I), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (III) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (II).

(iv)    The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent to (1) post the list of Disqualified Lenders provided by the Borrower and any updates thereto upon receiving such update (collectively, the "DQ List") on the Platform and/or (2) provide the DQ List to each Lender requesting the same. The parties to this Agreement hereby acknowledge and agree that the Administrative Agent will not have any duty, responsibility or liability to ascertain, inquire into, monitor or enforce, compliance with the provisions relating to Disqualified Lenders (including assignments, participations or other actions in respect of Disqualified Lenders) or otherwise take (or omit to take) any action with respect thereto. Without limiting the generality of the foregoing, the Administrative Agent shall not (A) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Disqualified Lender or (B) have any liability with respect to or arising out of any assignment or participation of Term Loans or Term Commitments, or disclosure of confidential information, to, any Disqualified Lender.

(f)    Notwithstanding anything else to the contrary contained in this Agreement, (x) any Lender may assign all or a portion of its Term Loans to any Affiliated Lender in accordance with Section 10.4(b) and (y) any Affiliated Lender may, from time to time, purchase or prepay Term Loans on a non-*pro rata* basis through Dutch auction procedures open to all applicable Lenders on a *pro rata* basis in accordance with customary procedures to be agreed between the Borrower and the Administrative Agent (or other applicable agent managing such auction); *provided* that:

(i)    no Event of Default has occurred and is continuing or would result therefrom;

(ii)    the assigning Lender and Affiliated Lender purchasing such assigning Lender's Term Loans shall execute and deliver to the Administrative Agent an Affiliated Lender Assignment and Assumption in lieu of an Assignment and Assumption;

(iii)    no Affiliated Lender shall be required to represent or warrant that it is not in possession of material non-public information with respect to the Parent Guarantor and/or any subsidiary thereof and/or their respective securities in connection with any assignment permitted by this Section 10.4(f); and

(iv)    no Term Loan may be assigned to an Affiliated Lender pursuant to this Section 10.4(f) if, after giving effect to such assignment, Affiliated Lenders together in the aggregate would own in excess of 15% of the aggregate principal amount of the Term Loans then outstanding (calculated as of the date of such purchase).

(g)    Notwithstanding anything to the contrary in this Agreement, no Affiliated Lender shall have any right to (i) attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent, the Collateral Agent or any Lender to which representatives of the Loan Parties are not invited, (ii) receive any information or materials prepared by the Administrative Agent, the Collateral Agent or any Lender or any communication by or among the Administrative Agent, the Collateral Agent and/or one or more Lenders, except to the extent such information or materials have been made available to any Loan Party or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders) or (iii) make or bring (or participate in, other than as a passive participant in or recipient of its *pro rata* benefits of) any claim, in its capacity as a Lender, against the Administrative Agent or the Collateral Agent with respect to any duties or obligations or alleged duties or obligations of such Agent under the Loan Documents (other than any claim for such Affiliated Lender's share of any payments required to be made by such Agent to the Lenders pursuant to the terms of this Agreement or any other Loan Document).

(h)    Notwithstanding anything to the contrary set forth in the Loan Documents, but subject to clause (2) of the last paragraph of Section 10.2(b), each Affiliated Lender agrees that none of the Affiliated Lenders shall have any right under any of the Loan Documents in its capacity as a Lender, and each of the Affiliated Lenders hereby waives any such right, to consent or take any other action in its capacity as a Lender with respect to any amendment, modification, termination or waiver of any provision of the Loan

Documents, or consent to any departure by any Loan Party therefrom; it being understood and agreed that, except as set forth in clause (2) of the last paragraph of Section 10.2(b), none of the Affiliated Lenders shall have any voting rights for all purposes under this Agreement (whether before, during or after a Bankruptcy Event) and the other Loan Documents with respect to their Term Loans.

(i)        (i) No Affiliated Lender shall have, in its capacity as a Lender, and each Affiliated Lender hereby irrevocably and voluntarily waives in its capacity as a Lender, any right to make any election, give any consent, commence any action or file any motion, claim, notice or application or take any other action in any Bankruptcy Event in respect of any Loan Party without the prior written consent of all Lenders other than Affiliated Lenders (the "Non-Affiliate Lenders"), (ii) the voting rights of all Affiliated Lenders under the Loan Documents during a Bankruptcy Event in respect of any Loan Party shall automatically and irrevocably be assigned to the Non-Affiliate Lenders and the voting rights of the Non-Affiliate Lenders shall be automatically ratably increased by the Term Loans and Term Commitments, as applicable, held or beneficially owned by all Affiliated Lenders, (iii) the Administrative Agent may vote in any such Bankruptcy Event any and all claims of such Affiliated Lenders as Lenders hereunder, and each such Affiliated Lender hereby irrevocably and voluntarily assigns such rights to the Administrative Agent and appoints the Administrative Agent as its agent, and grants to the Administrative Agent an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to such Affiliated Lender as a Lender hereunder in connection with any case by or against the Borrower or any other Loan Party in any Bankruptcy Event; provided that, in each case, such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent or the Non-Affiliate Lenders) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner to such Affiliated Lender than the proposed treatment of similar Obligations held by Term Lenders that are not Affiliated Lenders; and (iv) no Affiliated Lender, solely in its capacity as a Lender, shall challenge the validity or amount of any claim submitted in such Bankruptcy Event by the Non-Affiliate Lenders or any Agent in good faith in such Bankruptcy Event or take any other action in its capacity as a Lender hereunder in such Bankruptcy Event, which is adverse to any Agent's or any Non-Affiliate Lender's enforcement of their respective claims or receipt of adequate protection (as that term is defined in the Bankruptcy Code) or any comparable concept under any other applicable laws relating to a Bankruptcy Event.

(j)        In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender nor shall the Administrative Agent be obligated to monitor the number of Affiliated Lenders or the aggregate amount of Term Loans held by Affiliated Lenders.

Section 10.5.    Survival. All covenants, agreements, representations and warranties made by any Loan Party herein, in any other Loan Document or in any certificate or other instrument delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Term Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Term Commitments have not expired or terminated. The provisions of Section 2.12, Section 2.13, Section 2.14 and Section 10.3 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Term Loans, the resignation of any Agent, the replacement of any Lender, or the termination of this Agreement or any provision hereof.

Section 10.6.    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall be deemed an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents constitute

the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 10.7.  <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.8.  <u>Right of Set-off</u>. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other amounts at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such obligations; *provided* that, in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.20</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of set-off) which such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such set-off and application; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

Section 10.9.  <u>Governing Law; Jurisdiction; Consent to Service of Process</u>. (a) **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

(b)  Each of the Lenders, the Administrative Agent and the Collateral Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent or the Collateral Agent by any Secured Party relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other applicable Loan Document or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in

respect of any such action or proceeding may (and any such claims, cross-claims or third-party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that any Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Loan Party or its properties in the courts of any jurisdiction.

(d)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other applicable Loan Document in any court referred to in paragraph (c) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 10.1</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(f)    Each Loan Party hereby appoints the Borrower as its authorized agent ("<u>Authorized Agent</u>") upon whom process may be served in any Proceeding arising out of or based upon this Agreement or the transactions contemplated herein which may be instituted in the United States District Court for the Southern District of New York sitting in the Borough of Manhattan, the Supreme Court of the State of New York sitting in the Borough of Manhattan or any appellate court from any thereof. Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon each Loan Party.

Section 10.10. <u>Waiver of Jury Trial</u>. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 10.11. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12. <u>Confidentiality</u>. (a) Each of the Agents and the Lenders agrees to (i) maintain the confidentiality of the Information, (ii) not disclose, divulge, transfer, exchange, assign, license or grant access to any Information to any individual or organization, either internally or externally, without the prior written consent of the Borrower, and (iii) not use the Information for any purpose except in connection with the Loan Documents, except that Information may be (1) disclosed, divulged or accessed to or by its and its Affiliates' directors, officers, employees, other providers of services and agents, including auditors, accountants, legal counsel and other advisors, or to any credit insurance provider relating to any Loan Party and its obligations (collectively, "<u>Representatives</u>"), in each case on a "need-to-know" basis in connection with this Agreement and the transactions contemplated hereby; *provided* that the applicable Agent or Lender disclosing to any such Person pursuant to this clause (1) shall ensure (excluding the need to take any legal action) that such Person is aware of and complies with the confidentiality and non-disclosure obligations

contained in this Section 10.12 and such Agent or Lender, as applicable, shall be responsible to the Borrower for any breach of this Section 10.12 by such Person (except that the Collateral Agent shall only be responsible to the Borrower for any such breach by its or any of its Affiliates' directors, officers or employees), unless such Person has entered into one or more confidentiality agreements with or for the benefit of the Borrower or any of its Affiliates on substantially similar terms as this Section 10.12, (2) disclosed to the extent compelled by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) or required by applicable laws or regulations or by any subpoena or similar legal process (in which case such Agent or such Lender, as applicable, agrees, except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority, to the extent reasonably practicable and permitted by applicable law (A) to provide the Borrower reasonable written notice thereof prior to the disclosure of the same, (B) to disclose only the Information which it is compelled to disclose and (C) to exercise its reasonable efforts to inform the relevant party so requesting or requiring disclosure that the Information is confidential and should be treated accordingly), (3) disclosed to any other party to this Agreement, (4) disclosed in connection with establishing a "due diligence" defense or the exercise of any remedies hereunder or under any Loan Document or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder or under any Loan Document, (5) disclosed subject to an agreement containing provisions substantially the same as those of this Section 10.12 or such other terms as are reasonably acceptable to the Borrower and the Administrative Agent, including as agreed in marketing materials in accordance with customary market standards for dissemination of such type of information or pursuant to customary "click-through" procedures or other affirmative action reasonably acceptable to the Borrower to access the Information and acknowledge the confidentiality obligations in respect thereof, to or by (A) any permitted assignee of any of its rights or obligations under this Agreement or any permitted Participant, (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Parent Guarantor or the Borrower and their respective obligations (in each case other than any Disqualified Lender), (C) any rating agency in connection with rating the Parent Guarantor or its Subsidiaries or the Term Facility or (D) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of identification numbers with respect to the Term Facility, or (6) disclosed to the extent such Information (A) is expressly approved for release by written authorization of the Borrower prior to such disclosure, (B) is already in the public domain or becomes so through no fault of any of the Agents, the Lenders or any of their respective Related Parties or Representatives, (C) is received by any Agent, any Lender or any of their respective Related Parties or Representatives from a third party that such Agent, Lender, Related Party or Representative does not know to have violated, or to have obtained such Information in violation of, any confidentiality obligation to the Borrower with respect to such Information, or (D) is independently developed by any Agent, Lender or their respective Affiliates without reference to any Information and without breach of this Section 10.12. Any Person required to maintain the confidentiality of Information as provided in this Section 10.12 shall be considered to have complied with its obligation to do so if such Person has used the same means such Person uses to protect similar types of confidential information which such Person receives in connection with the evaluation or consummation of transactions similar to the Transactions, but in any event not less than reasonable means (excluding the need to take any legal action) to prevent the disclosure of Information to third parties in breach of this Section 10.12. Nothing in this Agreement shall require any Agent, any Lender or any of their respective Representatives to take any action which could expose any such Person to any legal sanction or penalty, or to take or initiate any legal action or proceeding.

(b)      Each Beneficiary hereby acknowledges and agrees that all Information shall be owned solely by the Loan Parties. Except where required to be retained under applicable laws, regulations or internal document retention practices and policies, all Information and any and all copies, extracts and reproductions thereof shall be returned to the Borrower or destroyed, within fifteen (15) days of written request by the Borrower (in respect of Information stored digitally on electronic mail, computer files or similar storage devices, to the extent that such destruction is reasonably practicable and such information is readily accessible). In the case of destruction, upon written request of the Borrower, each Beneficiary shall provide to the Borrower written certification of compliance therewith within thirty (30) days of such written request. Notwithstanding anything to the contrary herein, each Beneficiary may retain, in a secure

location, a copy of such documents and records for purposes of defending any legal proceeding or as is required to be maintained in order to satisfy any law, rule, or regulation to which such Beneficiary is subject. For the avoidance of doubt, any Information retained will be used and accorded confidential treatment in accordance with this Section 10.12.

(c)    Each Beneficiary shall not, and shall cause its Representatives not to, reverse engineer, disassemble or de-compile any prototypes, schematics, hardware, software or other tangible objects containing any Information.

(d)    Each Beneficiary shall notify the Borrower promptly upon discovery of any unauthorized use or disclosure of the Information in breach of this Section 10.12, or any other breach of this Section 10.12 by such Beneficiary, and will use reasonable efforts (excluding the need to take any legal action) to cooperate with the Borrower to help the Borrower regain possession of the Information and prevent its further unauthorized use in breach of this Section 10.12.

(e)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS AGREEMENT) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE PARENT GUARANTOR AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL, STATE AND FOREIGN SECURITIES LAWS.

(f)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY OR ON BEHALF OF THE PARENT GUARANTOR OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE PARENT GUARANTOR AND ITS RELATED PARTIES OR ITS SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE PARENT GUARANTOR AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.13.  Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Term Loan, together with all fees, charges and other amounts which are treated as interest on such Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Term Loan in accordance with applicable law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Term Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Term Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by such Lender.

Section 10.14.  No Advisory or Fiduciary Responsibility. (a) In connection with all aspects of each Transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its subsidiaries' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers the Joint Bookrunners and the Lenders are arm's length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Agents, the Arrangers, the Joint Bookrunners and the Lenders, on the other hand, (B) none of the Agents, the Arrangers, the Joint Bookrunners and the Lenders is advising any Loan Party as to any legal, tax, investment,

accounting regulatory or any other matters, and such Loan Party has consulted its own advisors to the extent it has deemed appropriate, and (C) such Loan Party is responsible for and capable of independently evaluating, and understands and accepts, the terms, risks and conditions of the Transactions contemplated hereby and by the other Loan Documents, and none of the Agents, the Arrangers, the Joint Bookrunners and the Lenders shall have any responsibility or liability to any Loan Party with respect thereto; (ii) (A) each of the Agents, the Arrangers, the Joint Bookrunners and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its subsidiaries, or any other Person and (B) none of any Agent, any Arranger, any Joint Bookrunner or any Lender has any obligation to any Loan Party or any of its Affiliates with respect to the Transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Joint Bookrunners and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Loan Party and its Affiliates, and none of any Agent, any Arranger, any Joint Bookrunner or any Lender has any obligation to disclose any of such interests to such Loan Party or its Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases, and agrees that it will not assert, any claims that it may have against any of the Agents, the Arrangers, the Joint Bookrunners and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

(b)    Each Loan Party further acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that each of the Agents, the Arrangers, the Joint Bookrunners and the Lenders, together with their respective Affiliates, is or may be a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, any of the Agents, the Arrangers, the Joint Bookrunners and the Lenders may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Loan Parties and other companies with which a Loan Party may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any of the Agents, the Arrangers, the Joint Bookrunners and the Lenders or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

Section 10.15.  <u>Electronic Execution of Assignments and Certain Other Documents</u>. Delivery of an executed counterpart of a signature page of (a) this Agreement, (b) any other Loan Document and/or (c) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to <u>Section 10.1</u>), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each, an "<u>Ancillary</u> <u>Document</u>") that is an Electronic Signature transmitted by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable. The words "execution", "signed", "signature", "delivery", and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; *provided* that nothing herein shall require any Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it (it being understood and agreed that each Agent accepts, consents and approves of transmission through electronic means of any Electronic Signature that is a reproduction of an image of an actual executed signature page); *provided, further*, without limiting the foregoing, (i) to the extent an Agent has agreed to accept any Electronic Signature, the Agents and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic signature and (ii) upon the request of any Agent or any Lender, any Electronic Signature shall be promptly

followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Loan Party hereby (1) agrees that, for all purposes, including in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Agents, the Lenders, and the Loan Parties, Electronic Signatures transmitted by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (2) agrees that each of the Agents and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (3) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (4) waives any claim against any Lender-Related Person for any Liabilities arising solely from any Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature, except to the extent such Liabilities are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Lender-Related Person (it being understood and agreed that all Electronic Signatures and materials so transmitted shall continue to be subject to the terms of the confidentiality provisions set forth herein).

Section 10.16. <u>USA Patriot Act; Beneficial Ownership Regulation</u>. Each Lender that is subject to the requirements of the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lenders) hereby notifies each Loan Party that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act. Each Loan Party shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation.

Section 10.17. <u>Release of Liens and Guarantors</u>.

(a)    A Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Loan Party shall be automatically released, upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Loan Party ceases to be a Restricted Subsidiary (including pursuant to a permitted merger or amalgamation with a Subsidiary that is not a Loan Party or a designation as an Unrestricted Subsidiary) or becomes an Excluded Subsidiary (other than solely pursuant to clause (j) of the definition thereof); *provided* that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.

(b)    Upon any sale or other transfer by any Loan Party (other than a sale or transfer to any other Loan Party) of any Collateral in a transaction permitted under this Agreement, the security interests in such Collateral created by the Collateral Documents shall be automatically released.

(c)    Upon the release of any Loan Party from its Guaranty in compliance with this Agreement, the security interest in any Collateral owned by such Loan Party created by the Collateral Documents shall be automatically released.

(d)      Upon the designation of a Restricted Subsidiary as an Unrestricted Subsidiary in compliance with this Agreement, the security interest created by the Collateral Documents in the Equity Interests of such Subsidiary shall automatically be released.

(e)      Upon termination of the aggregate Term Commitments and payment in full in cash of all Obligations (other than Unasserted Contingent Obligations) under any Loan Document, all obligations under the Loan Documents and all security interests created by the Collateral Documents shall be automatically released.

(f)      In connection with any termination or release pursuant to this <u>Section 10.17</u>, the Administrative Agent or the Collateral Agent, as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Borrower or the applicable Loan Party shall have provided the Administrative Agent or the Collateral Agent, as the case may be, such certifications or documents as the Administrative Agent or the Collateral Agent, as the case may be, shall reasonably request in order to demonstrate compliance with this Agreement.

(g)      Each of the Lenders irrevocably consents, authorizes and directs the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release or termination contemplated by this <u>Section 10.17</u>.

(h)      In the event that (i) all the Equity Interests in any Guarantor are sold, transferred or otherwise Disposed of to a Person other than the Parent Guarantor or its Restricted Subsidiaries in a transaction permitted under this Agreement, (ii) a Guarantor (other than the Parent Guarantor, or on or after the consummation of a Holdco Transaction, Holdings) ceases to be a Material Subsidiary or (iii) a Guarantor (other than the Parent Guarantor, on or after the consummation of a Holdco Transaction, Holdings) would become an Excluded Subsidiary (other than solely pursuant to clause (j) of the definition thereof) upon the consummation of any transaction permitted hereunder, the Administrative Agent shall (subject, in the case of clause (ii) above, to the Guarantor Coverage Requirement remaining satisfied pro forma for the termination of such Guaranty), at the Borrower's expense, promptly take such action and execute such documents as the Borrower may reasonably request to terminate the Guaranty of such Guarantor.

Section 10.18. <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any parties hereto, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.19. <u>Acknowledgment Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this <u>Section 10.19</u>, the following terms have the following meanings:

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Covered Entity**" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 10.20. <u>Limited Recourse and Non-Petition</u>.

(a)    The parties hereto acknowledge that a special purpose entity issuer ("<u>SPE Issuer</u>") may issue or incur debt obligations (the "<u>LPN</u>") for the purposes of enabling such entity to enter into, or become a Lender in accordance with the terms of, this Agreement. The parties hereto further acknowledge that the obligations of such SPE Issuer under this Agreement shall relate separately to such LPN (the "<u>Series</u>"), as distinct from any other debt obligations or notes issued or to be issued by such SPE Issuer.

(b)    <u>General Limited Recourse</u>

(i)    The parties hereto acknowledge and agree that their recourse to the SPE Issuer is limited to the assets, property and/or rights of the SPE Issuer subject to security interests created by

- 155 -

the SPE Issuer in respect of such Series (the "SPE Collateral") and is subject to such security interests, and that they shall not have recourse to any other assets of the SPE Issuer.

(ii)    If, following the application of the proceeds from the realization of the SPE Collateral towards satisfaction of the secured creditors in respect of such Series, the remaining amount of such proceeds (if any) is not sufficient to make payment of any or all amounts due from the SPE Issuer pursuant to this Agreement or any other Loan Document, then no other assets of the SPE Issuer shall be available to meet any resulting shortfall and any remaining debt or other liability of the SPE Issuer shall be extinguished in full and no debt shall be owed by the SPE Issuer in respect thereof. Failure by the SPE Issuer to make payment in respect of any shortfall described in this Section shall in no circumstances constitute a default or an event of default howsoever described.

(c)    None of the parties hereto may institute (or join with any person in instituting) against the SPE Issuer, its directors or officers, any bankruptcy, winding-up, reorganization, arrangement, insolvency or liquidation proceeding or other similar proceeding under any law.

(d)    The parties hereto acknowledge and agree that the SPE Issuer's obligations in respect of this Agreement and the Loan Documents are solely the corporate obligations of the SPE Issuer and that the parties hereto shall not have any recourse against any of the directors, officers or employees of the SPE Issuer for any claims, losses, damages, liabilities, indemnities or other obligations whatsoever in connection with this Agreement or any Loan Document.

(e)    The provisions of this Section 10.20 shall survive notwithstanding the termination or expiration of this Agreement.

Section 10.21.  The Agreement Controls.

For the avoidance of doubt and notwithstanding anything to the contrary in any Loan Document, insofar as any provision relates to the rights and obligations of an Agent, in the event of inconsistency between the terms of this Agreement and any other Loan Document, the terms in this Agreement shall prevail; provided that to the extent an Additional Agreement is then in effect and such Additional Agreement provides for or otherwise relates to the rights and obligations of an Agent, in the event of inconsistency between the terms of this Agreement and such Additional Agreement, the terms in the Additional Agreement shall prevail.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

THINK AND LEARN PRIVATE LIMITED,
as the Parent Guarantor

By: _____

Name: BYJU RAVEENDRAN

Title: FOUNDER DIRECTOR & CEO

[*Signature Page to Project Bright Credit and Guaranty Agreement*]

BYJU's ALPHA, INC., as Borrower

By: _____

Name: RIJU RAVINDRAN

Title: DIRECTOR.

TANGIBLE PLAY, INC., as Guarantor

By: _____

Name: RIJU RAVINDRAN.

Title: DIRECTOR.

[Signature Page to Project Bright Credit and Guaranty Agreement]

BYJU'S PTE. LTD., as Guarantor

By: _____
Name: RIJU RAVINDRAN.
Title: DIRECTOR.

[*Signature Page to Project Bright Credit and Guaranty Agreement*]

GREAT LEARNING EDUCATION PTE.
LTD., as Guarantor

By: _____
Name: RIJU RAVINDRAN.
Title: DIRECTOR.

[*Signature Page to Project Bright Credit and Guaranty Agreement*]

MORGAN STANLEY SENIOR FUNDING
INC., as Lender

By: _____
    Name: Andrew Earls
    Title:  Managing Director

GLAS TRUST COMPANY LLC, as Administrative Agent

By: _____

Name: LISHA JOHN

Title: VICE PRESIDENT

GLAS   TRUST   COMPANY   LLC,   as
Collateral Agent

By: _____

     Name:   LISHA   JOHN
     Title:   VICE   PRESIDENT

# SCHEDULES

Reference is hereby made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (the "Agreement"), among BYJU's Alpha, Inc. as the Borrower, the Guarantors party thereto, the Lenders party thereto, GLAS Trust Company LLC, as Administrative Agent and as Collateral Agent, to which these Schedules (the "Schedules") are attached and made a part thereof. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. Section references herein are to sections of the Agreement. The Schedules are provided on the terms and subject to the conditions of the Agreement.

The Schedules have been arranged into separate parts corresponding to subsections of the Agreement. Information set forth in any part of the Schedules shall be deemed to be disclosed for purposes of the corresponding clause, paragraph, section or subsection of the Agreement and no disclosure made in any particular part of the Schedules shall be deemed made in any other part unless (i) expressly made therein (by cross-reference or otherwise) or (ii) it is reasonably apparent on the face of such disclosure that such disclosure applies to such other representation, warranty or covenant, as applicable. No reference to or disclosure of any item or other matter in the Schedules shall be construed as an admission or indication that such item or other matter is material (nor shall it establish a standard of materiality for any purpose whatsoever) or that such item or other matter is required to be referred to or disclosed in the Schedules. The information set forth in the Schedules is disclosed solely for the purposes of the Agreement, and no information set forth herein shall be deemed to be an admission by the Parent Guarantor or any of its Subsidiaries to any third party of any matter whatsoever, including of any violation of applicable law or breach of any contractual or other obligation. Nothing contained in the Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement.

For the avoidance of doubt, all content contained in the Schedules shall be subject to the terms of Section 10.12 of the Agreement.

**Schedule 1.1(a)**
**Core Assets**

**LIST OF APPROVED AND REGISTERED INDIAN TRADEMARKS- THINK AND LEARN PVT LTD**

| S No | Registration no | Trademark | Class |
|------|-----------------|-----------|-------|
| 1 | 3055340 | BYJU'S THE LEARNING APP | 9 |
| 2 | 3660210 | BYJU | 9 |
| 3 | 2621269 | BYJU'S CLASSES | 16 |
| 4 | 3660682 | BYJU'S | 16 |
| 5 | 3055343 | LOVE TO LEARN | 35 |
| 6 | 3055344 | COME FALL IN LOVE WITH LEARNING | 35 |
| 7 | 2302636 | BYJU'S | 41 |
| 8 | 3660211 | BYJU | 41 |
| 9 | 3660684 | BYJU'S THE LEARNING APP | 41 |
| 10 | 3660685 | Device of B | 41 |
| 11 | 3660687 | BYJU'S | 41 |
| 12 | 3055342 | BIJU'S | 42 |
| 13 | 3660686 | BYJU'S | 42 |
| 14 | 3660680 | Device of 'B' (New Logo) | 9 |
| 15 | 3891972 | BYJU'S | 9 |
| 16 | 3891973 | BYJU'S | 41 |
| 17 | 3891974 | BYJU'S | 16 |
| 18 | 3891975 | BYJU'S | 42 |
| 19 | 3055341 | BYJU'S-THE LEARNING APP- | 41 |
| 20 | 3932829 | BYJUS THE LEARNING APP- | 9 |
| 21 | 3932830 | BYJUS THE LEARNING APP- | 16 |
| 22 | 3932831 | BYJUS THE LEARNINGAPP- | 41 |
| 23 | 3932832 | BYJUS THE LEARNING APP | 42 |
| 24 | 3660679 | BYJU'S | 9 |
| 25 | 3660681 | BYJU'S THE LEARNING APP | 9 |
| 26 | 3660209 | BYJU'S | 41 |
| 27 | 3660214 | THE LEARNING APP | 41 |
| 28 | 3660216 | THE LEARNING APP | 9 |
| 29 | 3660683 | BYJU'S | 41 |
| 30 | 3660208 | BYJU'S | 9 |
| 31 | 4392392 | BYJU'S | 24 |
| 32 | 4392391 | BYJU'S | 18 |
| 33 | 4391515 | BYJU'S with Device of B | 25 |
| 34 | 4387134 | BYJU'S | 25 |
| 35 | 4392393 | BYJU'S | 28 |
| 36 | 4392394 | BYJU'S | 35 |
| 37 | 3660213 | LOVE TO LEARN | 41 |
| 38 | 4488799 | BYJU'S Learn Pad | 41 |
| 39 | 4488800 | BYJU'S Learn Station | 41 |

| 40 | 4717955 | BYJUS Keep Learning | 41 |
| 41 | 4717956 | BYJUS Keep Learning | 41 |
| 42 | 4735792 | BYJU'S LearnPad | 9 |
| 43 | 4757319 | BYJU'S Learn Station | 9 |
| 44 | 4870727 | BYJU'S Magic Workbooks along with device of B | 9 |
| 45 | 4870728 | BYJU'S Magic Workbooks along with device of B | 16 |
| 46 | 4870729 | BYJU'S Magic Workbooks along with device of B | 41 |
| 47 | 4891040 | BYJU'S Classes with device of B | 16 |
| 48 | 4891042 | BYJU'S Classes (Word) | 41 |
| 49 | 4891041 | BYJU'S Classes with device of B | 41 |
| 50 | 4938709 | BYJU'S FUTURE SCHOOL with device of B | 9 |
| 51 | 4938710 | BYJU'S FUTURE SCHOOL with device of B | 16 |
| 52 | 4938706 | BYJU'S FUTURE SCHOOL with device of B | 42 |

**LIST OF APPROVED AND REGISTERED COPYRIGHTS - THINK AND LEARN PVT LTD**

| S No | Diary No. | Copyright |
| --- | --- | --- |
| 1 | 14767/2017-CO-A | BYJU'S-THE LEARNING APP- |
| 2 | A-137500/2021 | B BYJU'S |
| 3 | A-137624/2021 | DEVICE OF B |

**LIST OF APPROVED AND REGISTERED INTERNATIONAL TRADEMARKS - THINK AND LEARN PVT LTD**

| S. No. | Registration no | Trademark | Class | Jurisdiction |
| --- | --- | --- | --- | --- |
| 1 | 4201761 | BYJU'S | 99 (9 & 41) | INDIA |
| 2 | 4201762 | Device of B BYJU'S The Learning App | 99 (9 & 41) | INDIA |
| 3 | 2019/6340 | BYJU'S | 9 | KUWAIT |
| 4 | 2019/6339 | BYJU'S | 41 | KUWAIT |
| 5 | 2019/6338 | BYJU'S THE LEARNING APP | 9 | KUWAIT |
| 6 | 2019/6337 | BYJU'S THE LEARNING APP | 41 | KUWAIT |
| 7 | 312245 | BYJU'S | 9 | UAE |
| 8 | 312246 | BYJU'S | 41 | UAE |
| 9 | 312247 | BYJU'S THE LEARNING APP | 9 | UAE |
| 10 | 312248 | BYJU'S THE LEARNING APP | 41 | UAE |
| 11 | 133288 | BYJU'S THE LEARNING APP | 9 | QATAR |
| 12 | 133289 | BYJU'S THE LEARNING APP | 41 | QATAR |
| 13 | 133286 | BYJU'S | 9 | QATAR |
| 14 | 133287 | BYJU'S | 41 | QATAR |
| 15 | 312245 | BYJU'S | 9 | QATAR |
| 16 | 312246 | BYJU'S | 41 | QATAR |
| 17 | 312247 | BYJU'S THE LEARNING APP | 9 | QATAR |
| 18 | 312248 | BYJU'S THE LEARNING APP | 41 | QATAR |
| 19 | 198411 | BYJU'S | 9 | SAUDI ARABIA |

| 20 | 198412 | BYJU'S | 41 | SAUDI ARABIA |
| 21 | 198415 | BYJU'S THE LEARNING APP | 9 | SAUDI ARABIA |
| 22 | 198416 | BYJU'S THE LEARNING APP | 41 | SAUDI ARABIA |
| 23 | 1440031097 | BYJU'S | 9 | SAUDI ARABIA |
| 24 | 1440031099 | BYJU'S | 41 | SAUDI ARABIA |
| 25 | 1440031101 | BYJU'S THE LEARNING APP | 9 | SAUDI ARABIA |
| 26 | 1440031102 | BYJU'S THE LEARNING APP | 41 | SAUDI ARABIA |
| 27 | 2540993 | BYJU'S FUTURE SCHOOL (Logo) | 9 | Mexico |
| 28 | 2541260 | BYJU'S FUTURE SCHOOL (Logo) | 16 | Mexico |
| 29 | 2540991 | BYJU'S FUTURE SCHOOL (Logo) | 41 | Mexico |
| 30 | 2540997 | BYJU'S FUTURE SCHOOL (Logo) | 42 | Mexico |
| 31 | 2574691 | BYJU'S FutureSchool (Word Mark) | 9 | Mexico |
| 32 | 2574687 | BYJU'S FutureSchool (Word Mark) | 41 | Mexico |
| 33 | 2517167 | BYJU'S (Word Mark) | 41 | Mexico |
| 34 | 2517109 | BYJU'S (Word Mark) | 42 | Mexico |
| 35 | 2516999 | B BYJU'S The Learning App (Device) | 9 | Mexico |
| 36 | 2517101 | B BYJU'S The Learning App (Device) | 16 | Mexico |
| 37 | 2517060 | B BYJU'S The Learning App (Device) | 41 | Mexico |
| 38 | 2517010 | B BYJU'S The Learning App (Device) | 42 | Mexico |
| 39 | 2517036 | BYJU'S (Word Mark) | 9 | Mexico |
| 40 | 2517002 | BYJU'S (Word Mark) | 16 | Mexico |
| 41 | 42021509630 | BYJU'S FUTURE SCHOOL (Logo) | 9 | PHILIPPINES |
| 42 | 42021509631 | BYJU'S FUTURE SCHOOL (Logo) | 16 | PHILIPPINES |
| 43 |  | BYJU'S FUTURE SCHOOL (Logo) | 41 | PHILIPPINES |
| 44 | 42021509633 | BYJU'S FUTURE SCHOOL (Logo) | 42 | PHILIPPINES |
| 45 | 40202109676V | BYJU'S FUTURE SCHOOL (Logo) | 9 | SINGAPORE |
| 46 | 40202109674T | BYJU'S FUTURE SCHOOL (Logo) | 16 | SINGAPORE |
| 47 | 40202109671U | BYJU'S FUTURE SCHOOL (Logo) | 42 | SINGAPORE |
| 48 | 1177060 | BYJU'S FUTURE SCHOOL (Logo) | 9 | NEW ZEALAND |
| 49 | 1177059 | BYJU'S FUTURE SCHOOL (Logo) | 16 | NEW ZEALAND |
| 50 | 1177058 | BYJU'S FUTURE SCHOOL (Logo) | 41 | NEW ZEALAND |
| 51 | 2042555 | BYJU'S | 9 & 41 | AUSTRALIA |
| 52 | 2038144 | BYJU'S THE LEARNING APP | 9 & 41 | AUSTRALIA |
| 53 | 1491582 | BYJU'S | 9 & 41 | EUROPEAN UNION |
| 54 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | EUROPEAN UNION |
| 55 | 18464629 | BYJU'S FUTURE SCHOOL (Logo) | 9 | EUROPEAN UNION |
| 56 | 18464629 | BYJU'S FUTURE SCHOOL (Logo) | 16 | EUROPEAN UNION |

| 57 | 18464629 | BYJU'S FUTURE SCHOOL (Logo) | 41 | EUROPEAN UNION |
|---|---|---|---|---|
| 58 | 18464629 | BYJU'S FUTURE SCHOOL (Logo) | 42 | EUROPEAN UNION |
| 59 | 1491582 | BYJU'S | 9 & 41 | NEW ZEALAND |
| 60 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | NEW ZEALAND |
| 61 | 1491582 | BYJU'S | 9 & 41 | PHILIPPINES |
| 62 | M11487239 | BYJU'S THE LEARNING APP | 9 & 41 | PHILIPPINES |
| 63 | M11491582 | BYJU'S | 9 & 41 | SINGAPORE |
| 64 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | SINGAPORE |
| 65 | 1491582 | BYJU'S | 9 & 41 | UNITED KINGDOM |
| 66 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | UNITED KINGDOM |
| 67 | UK00003631647 | BYJU'S FUTURE SCHOOL (Logo) | 9 | UNITED KINGDOM |
| 68 | UK00003631644 | BYJU'S FUTURE SCHOOL (Logo) | 16 | UNITED KINGDOM |
| 69 | UK00003631643 | BYJU'S FUTURE SCHOOL (Logo) | 41 | UNITED KINGDOM |
| 70 | UK00003631638 | BYJU'S FUTURE SCHOOL (Logo) | 42 | UNITED KINGDOM |
| 71 | 1491582 | BYJU'S | 9 & 41 | RUSSIA |
| 72 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | RUSSIA |
| 73 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | JAPAN |
| 74 | 1491582 | BYJU'S | 9 & 41 | JAPAN |
| 75 | 1491582 | BYJU'S | 9 & 41 | OMAN |
| 76 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | OMAN |
| 77 | 1491582 | BYJU'S | 9 & 41 | IRELAND |
| 78 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | IRELAND |
| 79 | 1491582 | BYJU'S | 9 & 41 | BAHRAIN |
| 80 | 1487239 | BYJU'S THE LEARNING APP | 9 & 41 | BAHRAIN |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- WHITEHAT EDUCATION PRIVATE LTD**

| S No | Reg No. | Mark | Class | Country |
|---|---|---|---|---|
| 1 | 4252284 | Whitehat Jr | 9 | India |
| 2 | 4251271 | Whitehat Jr | 41 | India |
| 3 | 4143790 | Whitehat Jr | 9 | India |
| 4 | 4143802 | Whitehat Jr | 41 | India |
| 5 | 4765358 | Whitehat Jr | 38 | India |
| 6 | 4765361 | Whitehat Jr | 38 | India |
| 7 | 4765363 & 4765364 | Whitehat Jr | 9 & 41 | India |
| 8 | 1583486 | Whitehat Jr | 41 | Philippines |
| 9 | 1583512 | Whitehat Jr | 41 | Philippines |
| 10 | 4834338 | Whitehat Jr | 41 | India |
| 11 | 1589917 | Whitehat Jr | 9 | Belgium |
| 12 | 1589917 | Whitehat Jr | 9 | Netherlands |
| 13 | 1589917 | Whitehat Jr | 9 | Luxembourg |
| 14 | 1592708 | Whitehat Jr | 9 | Belgium |
| 15 | 1592708 | Whitehat Jr | 9 | Netherlands |
| 16 | 1592708 | Whitehat Jr | 9 | Luxembourg |
| 17 | 1583512 | Whitehat Jr | 41 | New Zealand |
| 18 | UK00003576153 | Whitehat Jr | 9 & 41 | United Kingdom |
| 19 | UK00003576159 | Whitehat Jr | 9 & 41 | United Kingdom |
| 20 | 1583512 | Whitehat Jr | 41 | Austria |
| 21 | 1583486 | Whitehat Jr | 41 | Austria |
| 22 | 1583512 | Whitehat Jr | 41 | Singapore |
| 23 | 1583486 | Whitehat Jr | 41 | Singapore |
| 24 | 1583486 | Whitehat Jr | 41 | France |
| 25 | 1589917 | Whitehat Jr | 9 | France |
| 26 | 1583512 | Whitehat Jr | 41 | France |
| 27 | 1583512 | Whitehat Jr | 41 | Germany |
| 28 | 1592708 | Whitehat Jr | 9 | Spain |
| 29 | 1589917 & 1583486 | Whitehat Jr | 9 & 41 | Australia |
| 30 | 1592708 & 1583512 | Whitehat Jr | 9 & 41 | Australia |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- TANGIBLE PLAY INC**

| S No | Registration no | MARK | Class | COUNTRY |
|---|---|---|---|---|
| 1 | 1322418 | AWBIE | 9 | China |
| 2 | 1322418 | AWBIE | 9 | European Union |
| 3 | 1322418 | AWBIE | 9 | International Bureau (WIPO) |
| 4 | UK00801322418 | AWBIE | 9 | United Kingdom |
| 5 | 5370752 | AWBIE | 9 | United States of America |
| 6 | UK00003566811 | ENCHANTED WORLD GAMES | 9 | United Kingdom |
| 7 | UK00003566816 | MATH WIZARD | 9 | United Kingdom |
| 8 | 6175462 | MO | 9 | United States of America |
| 9 | TMA1069044 | OSMO | 9 | Canada |
| 10 | 16417605 | OSMO | 42 | China |
| 11 | 16417606 | OSMO | 41 | China |
| 12 | 16417607 | OSMO | 28 | China |
| 13 | 16417608 | OSMO | 9 | China |
| 14 | 22751047 | OSMO | 9 | China |
| 15 | 27236219 | OSMO | 28 | China |
| 16 | 013272125 | OSMO | 28 | European Union |
| 17 | 1607544 | OSMO | 28 | International Bureau (WIPO) |
| 18 | UK00913272125 | OSMO | 28 | United Kingdom |
| 19 | 4883244 | OSMO | 28 | United States of America |
| 20 | 1478847 | OSMO DETECTIVE AGENCY | 9 | European Union |
| 21 | 1478847 | OSMO DETECTIVE AGENCY | 9 | International Bureau (WIPO) |
| 22 | UK00801478847 | OSMO DETECTIVE AGENCY | 9 | United Kingdom |
| 23 | 6449205 | OSMO DETECTIVE AGENCY | 9 | United States of America |
| 24 | 1511273 | OSMO LITTLE GENIUS | 9 | European Union |
| 25 | 1511273 | OSMO LITTLE GENIUS | 9 | India |
| 26 | 1511273 | OSMO LITTLE GENIUS | 9 | International Bureau (WIPO) |
| 27 | 1511273 | OSMO LITTLE GENIUS | 9 | Japan |
| 28 | UK00801511273 | OSMO LITTLE GENIUS | 9 | United Kingdom |
| 29 | 88484374 | OSMO LITTLE GENIUS | 9 | United States of America |
| 30 | 88953764 | OSMO LIVE | 42 | United States of America |
| 31 | 1431346 | OSMO SUPER STUDIO | 9 | Australia |
| 32 | 1431346 | OSMO SUPER STUDIO | 9 | European Union |
| 33 | 1431346 | OSMO SUPER STUDIO | 9 | International Bureau (WIPO) |
| 34 | UK00801431346 | OSMO SUPER STUDIO | 9 | United Kingdom |
| 35 | 5776886 | OSMO SUPER STUDIO | 9 | United States of America |
| 36 | 1477967 | OSMO TOWN | 9 | European Union |
| 37 | 1477967 | OSMO TOWN | 9 | International Bureau (WIPO) |
| 38 | UK00801477967 | OSMO TOWN | 9 | United Kingdom |
| 39 | 88106559 | OSMO TOWN | 9 | United States of America |

| 40 | 5770917 | SUPER STUDIO | 9 | United States of America |
| 41 | 16417609 | TANGIBLE PLAY | 42 | China |
| 42 | 16417610 | TANGIBLE PLAY | 41 | China |
| 43 | 16417611 | TANGIBLE PLAY | 28 | China |
| 44 | 16417612 | TANGIBLE PLAY | 9 | China |
| 45 | 013272091 | TANGIBLE PLAY | 28 | European Union |
| 46 | UK00913272091 | TANGIBLE PLAY | 28 | United Kingdom |
| 47 | 87878521 | TANGIBLE PLAY | 28 | United States of America |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- GREAT LEARNING**

| S No | Registration no | MARK | Class | COUNTRY |
| --- | --- | --- | --- | --- |
| 1 | 4085995 | GL | 41 | India |

**LIST OF APPS**

| S No | Store | App name | App id |
|------|-------|----------|--------|
| 1 | Google Play store | Aakash App for JEE & NEET | com.byjus.aakash.thelearningapp |
| 2 | Google Play store | BYJU'S FutureSchool Math | com.byjus.bfs |
| 3 | Google Play store | BYJU'S KG, Std.1-3 \| Disney • BYJU'S Early Learn | com.byjus.k3 |
| 4 | Google Play store | BYJU'S – The Learning App | com.byjus.thelearningapp |
| 5 | Apple Store | BYJU'S - The Learning App | 1015059076 |
| 6 | Apple Store | BYJU'S FutureSchool Math | 1579021128 |
| 7 | Apple Store | BYJU'S App - Class 4 & 5 | 1190253184 |
| 8 | Apple Store | Disney • BYJU'S Early Learn | 1470583693 |
| 9 | Apple Store | Aakash App for JEE & NEET | 1558431947 |
| 10 | Google Play store | Great Learning App | com.lms.greatlakes |
| 11 | Apple Store | Great Learning App | 1016344161 |

**LIST OF DOMAINS**

1. www.byjus.com
2. www.byjusclasses.com
3. www.whitehatjr.com
4. www.playosmo.com
5. www.aakash.ac.in
6. www.toppr.com
7. www.byjusexamprep.com
8. www.gradeup.co
9. www.meritnation.com
10. www.greatlearning.in
11. www.mygreatlearning.com
12. www.byjus.net
13. www.thinkandlearn.co.in

**Schedule 2.1**
**Term Commitments**

| Lender | Term Commitment |
|---|---|
| Morgan Stanley Senior Funding Inc. | 1,200,000,000 |

**Schedule 3.6**
**Disclosed Matters**

None

**Schedule 3.10(a)**
**U.S. Plans**

None

**Schedule 3.12**
**Restricted Subsidiaries**

| Current Entity Owned | Record/Beneficial Owner | Direct or Indirect Percentage of Ownership of the Parent Guarantor | Material Subsidiary (Y/N) |
|---|---|---|---|
| WhiteHat Education Technology Pvt Ltd. | Think & Learn Pvt Ltd | 100% | Y |
| Tangible Play Inc | Think & Learn Pvt Ltd | 100% | Y |
| Great Learning Education Pte. Ltd. | BYJU'S Pte Ltd (56.5%)<br><br>Think & Learn Pvt Ltd (35.7%) | 92.2% | Y |
| Aakash Educational Services Ltd* | Think & Learn Pvt Ltd | 29.48% | Y |
| BYJU'S Pte Ltd | Think & Learn Pvt Ltd | 100% | N |
| Specadel Technologies Pvt Ltd* | Think & Learn Pvt Ltd | 100% | N |
| Span Thoughtworks Pvt Ltd* | Think & Learn Pvt Ltd | 100% | N |
| BYJU'S K3 Education Pvt Ltd | Think & Learn Pvt Ltd | 100% | N |
| BYJU'S Inc | Think & Learn Pvt Ltd | 100% | N |
| Inspilearn LLC | Think & Learn Pvt Ltd | 100% | N |
| Toppr Technologies Pvt Ltd* | Think & Learn Pvt Ltd | 70% | N |
| Grade Stack Learning Private Ltd* | Think & Learn Pvt Ltd | 29.8% | N |
| Aakash Edutech Pvt Ltd | Aakash Educational Services Ltd (100%) | 29.48% | N |
| Haygot Services Private Limited | Toppr Technologies Pvt Ltd | 70% | N |
| WhiteHat Education Technology LLC | WhiteHat Education Technology Pvt Ltd. | 100% | N |
| Digital Aristotle Pvt Ltd | BYJU'S K3 Education Pvt Ltd | 100% | N |

| Current Entity Owned | Record/Beneficial Owner | Direct or Indirect Percentage of Ownership of the Parent Guarantor | Material Subsidiary (Y/N) |
|---|---|---|---|
| Inspilearn Education Pvt Ltd | BYJU'S K3 Education Pvt Ltd | 100% | N |
| Tangible Play B.V. | Tangible Play Inc | 100% | N |
| BYJUS TECHNOLOGIA EDUCACIONAL LTDA | BYJU'S Pte Ltd | 100% | N |
| Byjus S.A de C.V. | BYJU'S Pte Ltd | 100% | N |
| BYJU'S Alpha, Inc | BYJU'S Pte Ltd | 100% | N |
| BYJU'S Beta, Inc | BYJU'S Pte Ltd | 100% | N |
| BYJU'S UK Ltd | BYJU'S Pte Ltd | 100% | N |
| Codr Inc | Inspilearn LLC | 100% | N |

\* Denotes entities which are currently intended to merge with the Parent Guarantor.

**Schedule 5.11**
**Unrestricted Subsidiaries**

None

**None. Schedule 5.13**
**Post-Closing Obligations**

Where this <u>Schedule 5.13</u> requires any action to be taken or any other requirement to be satisfied, the Borrower shall deliver evidence thereof to the Administrative Agent promptly after such action is taken or such requirement is satisfied.

Singapore

| | DATE | ACTIONS AND OTHER REQUIREMENTS |
|---|---|---|
| 1 | Within 30 days of the Effective Date. | Each of the Singapore Loan Parties shall deliver a notice of charge over each deposit account and securities account owned by it in Singapore as of the Effective Date (which is not an Excluded Account) pursuant to the Singapore Security Agreements. |
| 2 | Within 14 days of the Effective Date. | Each Singapore Loan Party shall pay (or cause to be paid) the stamp duties required by applicable law in connection with the execution of the following documents: <br><br> (a) this Agreement; and <br><br> (b) Debenture, dated as of the Effective Date, executed by BYJU's Pte. Ltd. |
| 3 | Within 30 days of the Effective Date. | Each Singapore Loan Party shall register (or cause to be registered) the Collateral Agent's security interest in the Collateral under each Singapore Security Agreement with the Accounting and Corporate Regulatory Authority in Singapore and with each other registry or office where such registration is required for perfection under applicable law (including the filing of an electronic statement containing particulars of charge in respect of each of the Singapore Security Agreements and the U.S. Pledge Agreement, dated as of the Effective Date by and between BYJU's Pte. Ltd. and the Collateral Agent). |
| 4 | Within 45 Business Days of the Effective Date. | Each Singapore Loan Party shall, to the extent applicable, file (or cause to be filed) the necessary filings with respect to Intellectual Property registered in Singapore in the appropriate registry or office in Singapore to satisfy the Collateral and Guarantee Requirement. |

United States

| | DATE | ACTIONS AND OTHER REQUIREMENTS |
|---|---|---|
| 1 | Within 120 days of the Effective Date | The Loan Parties shall cause each Material Real Estate Asset as of the Effective Date to be subject to a Lien pursuant to a mortgage, deed or similar document in favor of the Collateral Agent for the benefit of the |

|  |  | Secured Parties and take such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien and to otherwise comply with the requirements of the Collateral and Guarantee Requirement |
|---|---|---|

India

| | DATE | ACTIONS AND OTHER REQUIREMENTS |
|---|---|---|
| **2** | On or prior to the date on which Whitehat India accedes as a Guarantor | A copy of the constitutional documents of Whitehat India amended to the satisfaction of the Collateral Agent (including to remove any references to the shareholders agreement dated 5 August 2020 entered into between Whitehat India, the Parent Guarantor, Nexus Ventures V Ltd. Mr. Karan Bajaj, the employment agreement dated 5 August 2020 between Whitehat India and Mr. Karan Bajaj and all other related documents.) |
| **3** | Immediately following completion of the EPIC Merger. | The Parent Guarantor shall intimate the RBI of the EPIC Merger and shall request an updated UIN. |

**Schedule 6.1**
**Existing Indebtedness**

None

**Schedule 6.2(b)**
**Existing Liens**

None

**Schedule 6.5**
**Existing Restrictions**

None

**Schedule 6.6**
**Existing Transactions with Affiliates**

None

**Schedule 6.7**
**Existing Investments**

None

EXHIBIT A-1

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [NAME OF ASSIGNOR] (the "Assignor") and [NAME OF ASSIGNEE] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit and Guaranty Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | _____ |
| | | [Assignor [is] [is not] a Defaulting Lender] |
| 2. | Assignee: | _____ |
| | | [and is an Affiliate/Approved Fund of [identify Lender]] |
| 3. | Borrower: | BYJU's Alpha, Inc. (the "Borrower") |
| 4. | Administrative Agent: | GLAS Trust Company LLC as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. |

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[1] |
|---|---|---|---|
| Term Facility | $ | $ | % |

Effective Date:__, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:    _____
          Name:
          Title:

---

[1]    Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder.

ASSIGNEE

[NAME OF ASSIGNEE]

By: _____
        Name:
        Title:

Consented to and Accepted:

[_____], AS THE ADMINISTRATIVE AGENT

By: _____
        Name:
        Title:

[Consented to:

[Borrower]

By: _____
        Name:
        Title:][2]

---

[2]   To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Annex I<br>Exhibit A-1

## CREDIT AGREEMENT

Standard Terms and Conditions for<br>Assignment and Assumption

1.      <u>Representations and Warranties</u>.

1.1      <u>Assignor</u>. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.      <u>Assignee</u>. The Assignee: (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and under applicable law, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to <u>Sections 5.1(a)</u> and <u>5.1(b)</u> thereof (or, prior to the first such delivery, the financial statements referred to in <u>Section 3.4(a)</u> thereof), as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) agrees that it will, independently and without reliance on the Administrative Agent, the Arranger, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to or otherwise conferred upon the Administrative Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind and after the Effective Date to the Assignee.

3.    <u>Effect of Assignment</u>. Upon the delivery of a fully executed copy hereof to the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent of the Assigned Interest and as provided in this Assignment and Assumption, have the rights and obligations of a Lender thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent as provided in this Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents to the extent of the Assigned Interest.

4.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. This Assignment and Assumption incorporates herein the electronic execution provisions set forth in the Credit Agreement as if such provisions were set forth herein, *mutatis mutandis*. THIS ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**[FORM OF]**
**AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION**

This Affiliated Lender Assignment and Assumption (the "Affiliated Lender Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [NAME OF ASSIGNOR] (the "Assignor") and [NAME OF ASSIGNEE] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit and Guaranty Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Affiliated Lender Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Affiliated Lender Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | |
| | | [Assignor [is] [is not] a Defaulting Lender] |
| 2. | Assignee: | |
| | | Assignee is an Affiliated Lender [and an Affiliate/Approved Fund of [identify Lender]] |
| 3. | Borrower: | BYJU's Alpha, Inc., (the "Borrower") |
| 4. | Administrative Agent: | GLAS Trust Company LLC, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. |
| 6. | Assigned Interest: | |

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[1] |
|---|---|---|---|
| Term Facility | $ | $ | % |

Effective Date:__, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities), subject to Section 10.4(f) of the Credit Agreement, will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Affiliated Lender Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]


By:    _____
       Name:
       Title:



ASSIGNEE

[NAME OF ASSIGNEE]


By:    _____
       Name:
       Title:



Consented to and Accepted:

GLAS Trust Company LLC as the Administrative Agent

---

[1] Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder. After giving effect to Assignee's purchase and assumption of the Assigned Interest, the aggregate principal amount of Term Loans held together in the aggregate by Affiliated Lenders shall not exceed 5% of the aggregate principal amount of Term Loans then outstanding (calculated as of the date of such purchase).

By: _____
    Name:
    Title:


[Consented to:

[Borrower]



By: _____
    Name:
    Title:][2]

---

[2] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Exhibit A-2

CREDIT AGREEMENT

Standard Terms and Conditions for
Affiliated Lender Assignment and Assumption

1.    Representations and Warranties.

1.1    Assignor. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document; and (c) acknowledges that the Assignee is an Affiliated Lender and may possess material non-public information with respect to the Parent Guarantor and its Subsidiaries or the securities of any of them that has not been disclosed to the Lenders.

1.2.    Assignee. The Assignee: (a) represents and warrants that (i) it is an Affiliated Lender and it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and under applicable law, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender (including as an Affiliated Lender) thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender (including as an Affiliated Lender) thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to Sections 5.1(a) and 5.1(b) thereof (or, prior to the first such delivery, the financial statements referred to in Section 3.4(a) thereof), as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Affiliated Lender Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, (vi) attached to this Affiliated Lender Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, and (vii) after giving effect to this Affiliated Lender Assignment and Assumption, the aggregate principal amount of all Term Loans then held by all Affiliated Lenders does not exceed 5% of the aggregate outstanding principal amount of the Term Loans; (b) agrees that it will, independently and without reliance on the Administrative Agent, the Arranger, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to or otherwise conferred upon the

Administrative Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind and after the Effective Date to the Assignee. 3.      Effect of Assignment. Upon the delivery of a fully executed copy hereof to the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent of the Assigned Interest and as provided in this Affiliated Lender Assignment and Assumption, have the rights and obligations of a Lender thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent as provided in this Affiliated Lender Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents to the extent of the Assigned Interest.

4.      General Provisions. This Affiliated Lender Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Affiliated Lender Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. This Affiliated Lender Assignment and Assumption incorporates herein the electronic execution provisions set forth in the Credit Agreement as if such provisions were set forth herein, *mutatis mutandis*. THIS AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

<u>EXHIBIT B</u>

**[FORM OF]**
**BORROWING REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency;  TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [\_\_\_\_\_], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice, pursuant to <u>Section 2.3</u> of the Credit Agreement, that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "<u>Proposed Borrowing</u>") as required by <u>Section 2.3</u> of the Credit Agreement:

(i)   The Business Day of the Proposed Borrowing is [●]20\_\_.[1]

(ii)   The aggregate principal amount of the Proposed Borrowing is [_____]².

*(cont'd)*

---

[1]   Shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings (or, in respect of the Initial Term Loans, at least two Business Days) after the date hereof and (b) no later than the date of the proposed Borrowing in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings on such day.

[2]   Such amount to be stated in Dollars.

Exhibit B

(iii)    The Proposed Borrowing is to be [an ABR][a Eurodollar] Borrowing.

[(iv)    The initial Interest Period for the Proposed Borrowing is [one/three/six/twelve] months and shall end on [_____].]³

(v)    [The location and number of the account or accounts of the Borrower to which funds are to be disbursed is as follows:

[*Insert location and number of the account(s)*]]

The undersigned hereby certifies that the following statements will be true on the date of the Proposed Borrowing:

(A)    the representations and warranties of the Loan Parties set forth in the Credit Agreement and in the other Loan Documents are true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties are true and correct in all respects) on and as of the date of the Proposed Borrowing, except that (i) for purposes of this Borrowing Request, the representations and warranties contained in Section 3.4(a) of the Credit Agreement shall be deemed to refer (after the first delivery thereof) to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 5.1 of the Credit Agreement and (ii) to the extent that such representations and warranties specifically refer to an earlier date, they were true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties were true and correct in all respects) as of such earlier date; and

(B)    at the time of and immediately after giving effect to the Proposed Borrowing, no Default or Event of Default has occurred and is continuing.

[Signature Page Follows]

---

³    To be included for a proposed Eurodollar Borrowing. Interest Periods of twelve months or less than one month only available with the consent of each Lender.

Exhibit B

The Borrower has caused this Borrowing Request to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.

By:  _____
    Name:
    Title:

EXHIBIT C

**[FORM OF]**
**INTEREST ELECTION REQUEST**

GLAS Trust Company LLC  as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency;  TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice pursuant to Section 2.5 of the Credit Agreement, that it requests to [convert][continue] the Borrowing of Term Loans referred to below, and in that connection sets forth below the information relating to such [conversion][continuation] (the "Proposed [Conversion][Continuation]") as required by Section 2.5 of the Credit Agreement:

(i)     The Proposed [Conversion][Continuation] relates to the Borrowing of Term Loans originally made on _____ ___, 20__ (the "Outstanding Borrowing") in the principal amount of $_____ and currently maintained as [an ABR Borrowing][a Eurodollar Borrowing with an Interest Period ending on __, _____].

(ii)     The effective date of the Proposed [Conversion] [Continuation] is _____, ____.[1]

(iii)     The Outstanding Borrowing shall be [continued as a Eurodollar Borrowing with an Interest Period of [one/three/six/twelve] months ending on [_____]][converted into [an ABR Borrowing][a Eurodollar Borrowing with an Interest Period of [one/three/six/twelve] months ending on [_____]]].[2]

[The undersigned hereby certifies that no Event of Default has occurred and will be continuing on the date of the Proposed [Conversion][Continuation]].[3]

[Signature Page Follows]

---

[1]   Shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings after the date hereof and (b) no later than the date of the proposed conversion or continuation in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings on such day.

[2]   Interest Period of twelve months or less than one month only available with the consent of each Lender. In the event that either (x) only a portion of the Outstanding Borrowing is to be so converted or continued or (y) the Outstanding Borrowing is to be divided into separate Borrowings with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect the same            .

[3]   In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from an ABR Borrowing to a Eurodollar Borrowing or in the case of a continuation of a Eurodollar Borrowing.

Exhibit C

The Borrower has caused this Interest Election Request to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.

By: _____
  Name:
  Title:

Exhibit C

**[FORM OF]**
**TERM LOAN NOTE**

New York, New York

_____ ___, _____

FOR VALUE RECEIVED, [_____] (the "Borrower"), hereby promises to pay, jointly and severally, to _____ or its registered assigns (the "Lender"), in dollars, in immediately available funds, at the office of [_____] (the "Administrative Agent") as designated in writing by the Administrative Agent from time to time on the Term Loan Maturity Date (as defined in the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent, the unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to the Credit Agreement, payable at such times and in such amounts as are specified in the Credit Agreement.

The Borrower promises also to pay to the Lender interest on the unpaid principal amount of each Term Loan incurred by the Borrower from the Lender in like money at said office from the date such Term Loan is made until paid at the rates and at the times provided in Section 2.10 of the Credit Agreement.

This promissory note (this "Note") is one of the Term Loan Notes referred to in the Credit Agreement, and is entitled to the benefits thereof and of the other Loan Documents. As provided in the Credit Agreement, this Note is subject to voluntary prepayment, in whole or in part, prior to the Term Loan Maturity Date and the Term Loans may be converted from one Type into another Type to the extent provided in the Credit Agreement.

In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Credit Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

BYJU's Alpha, Inc.

By:    _____
      Name:
      Title:

**[FORM OF]
COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered to you pursuant to Section 5.1(c) of the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

1.      I am the duly elected, qualified and acting [title of Financial Officer] of the Parent Guarantor].

2.      I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as an officer of the Parent Guarantor.

3.      I have reviewed the terms of the Credit Agreement and the other Loan Documents. The financial statements for the fiscal [quarter][year] of the Parent Guarantor ended [ ] attached hereto as ANNEX 1 or otherwise delivered to the Administrative Agent pursuant to the requirements of Section 5.1 of the Credit Agreement (the "Financial Statements") present fairly in all material respects as of the date of each such statement the financial condition and results of operations of the Parent Guarantor and its consolidated Restricted Subsidiaries on a consolidated basis (and with respect to the Parent Guarantor and its Restricted Subsidiaries, on a consolidating basis, as applicable) in accordance with GAAP consistently applied[, subject to normal year-end audit adjustments and the absence of footnotes][1].

4.      No Default has occurred and is continuing as of the date hereof[, except for _____][2].

5.      There has been no change in GAAP or in the application thereof applicable to [the Parent Guarantor] and its consolidated Restricted Subsidiaries since the date of the audited financial statements referred to in Section 3.4 of the Credit Agreement that has had a material impact on the Financial Statements [,except for _____, the effect of which on the Financial Statements has been [_____]][3].

6.      [Attached hereto as ANNEX 2 or otherwise delivered to the Administrative Agent pursuant to the requirements of Section 5.1 of the Credit Agreement is (a) a reasonably detailed reconciliation of the financial statements delivered pursuant to clause (1) of Section 5.1(a) of the Credit Agreement indicating the extent to which any figures set forth therein are not attributable to the Loan Parties and (b) the annual consolidated (and, with respect to the Parent Guarantor and its Restricted Subsidiaries, consolidating) operating budget and projections of [the Parent Guarantor][Holdings] and its Subsidiaries showing the quarterly income statement, balance sheet and cash flow statements in reasonable detail, including for key segments.][4]

7.      To my knowledge, all Uniform Commercial Code (or similar) financing statements and all other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified in the documents delivered pursuant to clause (ii)(1) of Section 5.1(f) of the Credit Agreement to the extent necessary to effect, protect and perfect the

---

[1]    To be included only if the Compliance Certificate is certifying the quarterly financials.

[2]    Specify the details of any Default, if any, and any action taken or proposed to be taken with respect thereto.

[3]    If and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.4 of the Credit Agreement had an impact on such financial statements, specify the effect of such change on the financial statements accompanying this Compliance Certificate.

[4]    To be included only if the Compliance Certificate is certifying the annual financials.

security interests under the Collateral Documents[, except for the following and as otherwise expressly permitted or set forth in the Loan Documents:

_____

_____ ].][5]

8.      [Attached hereto as <u>ANNEX 3</u> are the computations showing (in reasonable detail) the Consolidated Total Net Leverage Ratio as of, [6].][7]

---

[5]   This certification may be given separately by a Responsible Officer of Parent Guarantor at the time of delivery of annual financial statements.

[6]   Insert the last day of the fiscal year corresponding to the annual financial statements relating to this Compliance Certificate.

[7]   To be included only if the Compliance Certificate is certifying the annual financials.

IN WITNESS WHEREOF, I have executed this Compliance Certificate as of the date first written above.

PARENT GUARANTOR

By: _____
    Name:
    Title: [title of Financial Officer]

<u>ANNEX 1</u>

[Applicable Financial Statements to be attached if applicable]

<u>ANNEX 2</u>

[Applicable Reconciliation and Budget/Projections to be attached if applicable]

The information described herein with respect to the Consolidated Total Net Leverage Ratio is as of the computation date.

**Consolidated Total Net Leverage Ratio**

(a)    Consolidated Total Net Debt of the Parent Guarantor and its Restricted Subsidiaries on the computation date                    $_____

(b)    Consolidated EBITDA with respect to the Parent Guarantor and its Restricted Subsidiaries for the Reference Period ended on the computation date[1]                    $_____

*The ratio of line (a) above to line (b) above*                    ___ *to 1.00*

---

[1]    If such Consolidated EBITDA would be less than 1, then such amount shall be deemed to be 1 for the purposes of calculating the Consolidated Total Net Leverage Ratio

Annex 3 to Exhibit E

EXHIBIT F

**[FORM OF]**
**MATURITY DATE EXTENSION REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [●] (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby requests, in accordance with Section 2.19 of the Credit Agreement, [(i)] an extension of the Term Loan Maturity Date for [describe Class of Term Loans being extended] (the "Extended Term Loans") from [_____], 20[_] to [_____], 20[_], [(ii) the following changes to the Applicable Rate to be applied in determining the interest payable on the Extended Term Loans of, and fees payable under the Credit Agreement to, Extending Term Lenders in respect of that portion of their applicable Term Loans extended to such new maturity date, which changes shall become effective on [_____], 20[_]] [and] [(iii) the amendments or modifications to the terms of the Credit Agreement to be effected in connection with this Maturity Date Extension Request as set forth below:

[_____]].

BYJU's Alpha, Inc., as the Borrower


By:    _____
          Name:
          Title:

Exhibit F

<u>EXHIBIT G</u>

**[FORM OF]**
**COUNTERPART AGREEMENT**

This Counterpart Agreement, dated [          ] (this "<u>Counterpart Agreement</u>") is delivered pursuant to that certain Credit and Guaranty Agreement, dated as of [      ], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

**Section 1.** Pursuant to <u>Section 5.9</u> of the Credit Agreement, the undersigned (the "<u>New Guarantor</u>") hereby:

(a)      agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof with the same force and effect as if originally named therein as a Guarantor; and

(b)      represents and warrants that each of the representations and warranties set forth in the Credit Agreement (other than such representations and warranties that relate solely to facts and conditions as of the Effective Date) and applicable to the undersigned is true and correct in all material respects as of the date hereof; *provided* that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or "Material Adverse Effect" in the text thereof.

**Section 2.** Neither this Counterpart Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Counterpart Agreement) against whom enforcement of such change, waiver, discharge or termination is sought. Any notice or other communication herein required or permitted to be given shall be given to the Borrower in accordance with <u>Section 10.1</u> of the Credit Agreement. In case any provision in or obligation under this Counterpart Agreement shall be invalid or unenforceable in any jurisdiction, the validity and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK. THE TERMS AND PROVISIONS OF SECTION 10.9(B) OF THE CREDIT AGREEMENT ARE INCORPORATED BY REFERENCE HEREIN AS IF FULLY SET FORTH HEREIN.**

[Remainder of page intentionally left blank]

Exhibit G

**IN WITNESS WHEREOF**, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

**[NAME OF NEW GUARANTOR]**

By: _____
      Name:
      Title:

ACKNOWLEDGED AND ACCEPTED, as of the date above first written:

GLAS TRUST COMPANY LLC,
as the Administrative Agent

By _____
     Name:
     Title:

Exhibit G

**[FORM OF]**
**SOLVENCY CERTIFICATE**

[_____], 2021

This Solvency Certificate is being executed and delivered pursuant to Section [●] of that certain Credit and Guaranty Agreement dated as of [●] among [___] ("<u>Borrower</u>"), [___], a [___], [___], a [___]] and the lenders from time to time party thereto and [●], as administrative agent (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"). Capitalized terms used but not defined herein shall have the respective meanings set forth in the Credit Agreement.

I, [●], the [Chief Financial Officer/equivalent officer] of the Parent Guarantor in such capacity and not in an individual capacity, hereby certify as follows:

1.  I am generally familiar with the businesses and assets of the Borrower, the Loan Parties and the Restricted Subsidiaries, taken as a whole, and am duly authorized to execute this Solvency Certificate on behalf of the Borrower pursuant to the Credit Agreement; and

2.  As of the date hereof and after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and the Transactions, that:

    (a)    immediately after giving effect to the Transactions: (i) the fair value of the assets of the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis); (ii) the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iii) the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted; and

    (b)    the Parent Guarantor does not intend to, nor does it believe that it or any of its Restricted Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by it or any such Restricted Subsidiary and the timing and amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Restricted Subsidiary.

[Remainder of page intentionally left blank]

Exhibit H

**IN WITNESS WHEREOF**, I have executed this Solvency Certificate on the date first written above

[_____]

By: _____
Name:
Title: [Chief Financial Officer /
equivalent officer]

<u>EXHIBIT I-1</u>

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of <u>Section 2.14(e)</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By _____
    Name:
    Title:

Date: _____ __, 20[    ]

Exhibit I-1

EXHIBIT I-2

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [\_\_\_\_\_], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By _____
    Name:
    Title:

Date: _____ __, 20[ ]

Exhibit I-2

EXHIBIT I-3

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By _____
     Name:
     Title:

Date: _____ __, 20[ ]

Exhibit I-3

EXHIBIT I-4

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By _____
    Name:
    Title:

Date: _____ __, 20[ ]

Exhibit I-4

**[FORM OF]**
**CERTIFICATION REGARDING BENEFICIAL OWNERS**
**OF LEGAL ENTITY CUSTOMERS**

I.      **GENERAL INSTRUCTIONS**

**What is this form?**

To help the U.S. government fight financial crime, federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who own or control a legal entity (i.e., the beneficial owners) helps U.S. law enforcement investigate and prosecute these crimes.

**Who has to complete this form?**

This form must be completed by the person opening a new account on behalf of a legal entity with a bank, a broker or dealer in securities, or certain other types of U.S. financial institution, and the form must be completed at the time each new account is opened. For these purposes, opening a new account includes establishing a formal relationship with a broker-dealer or lender to effect transactions in securities or for the extension of credit.

For the purposes of this form, a **legal entity** includes a corporation, limited liability company, or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or any other country. **Legal entity** does not include sole proprietorships, unincorporated associations, or natural persons opening accounts on their own behalf.

**What information do I have to provide?**

This form requires you to provide the name, address, date of birth and Social Security number (or passport number or other similar information, in the case of non-U.S. persons) for the following individuals (i.e., the "beneficial owners"):

    (i)      A single individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer); and

    (ii)     Each individual, if any, who owns, directly or indirectly, 25% or more of the equity interests of the legal entity customer (e.g., each natural person who owns 25% or more of the shares of a corporation).

The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), only one individual needs to be identified. Under section (ii), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (i)), and up to five individuals (i.e., one individual under section (i) and four 25% equity holders under section (ii)).

This form also requires you to provide copies of (1) the legal formation document for each legal entity (i.e., the issuer, borrower, or selling securityholder) listed on this form (e.g., Certificate of Incorporation, LLC

Agreement, Partnership Agreement, etc.), and (2) a driver's license, passport or other identifying document for each beneficial owner listed on this form.

## II.    EXCLUSIONS (IF APPLICABLE)

If you believe the legal entity listed in Section III, paragraph (b) below falls under an express exclusion from the "legal entity customer" definition under 31 C.F.R. §1010.230(e)(2), please check the box below and identify the applicable exclusion:

☐    An exclusion applies to the legal entity identified in paragraph (b) of Section III below.

Applicable exclusion: _____

**If the box above is checked, please skip paragraphs (c) and (d) of Section III below.**

### III.    IDENTIFICATION OF BENEFICIAL OWNER(S)

**For the benefit of each of the financial institutions involved in the applicable sale of securities or extension of credit for which this certification is provided, the following information is hereby provided on behalf of the Issuer/Borrower/Selling Securityholder legal entity customer listed below:**

(a)    ***Individual Opening Account.*** Name and Title of Natural Person Opening Account and Completing Certification on Behalf of Legal Entity Customer:

_____

(b)    ***Legal Entity Customer.*** Name, Type, and Principal Business Address of Issuer/Borrower/Selling Securityholder Legal Entity Customer for Which the Account is Being Opened:

_____

   ***Please attach a copy of the legal formation document for each legal entity listed above (e.g., Certificate of Incorporation, LLC Agreement, Partnership Agreement, etc.).***

(c)    ***Control Prong.*** The following information for <u>**one**</u> individual with significant responsibility for managing the Issuer/Borrower/Selling Securityholder legal entity customer listed above, such as:

☐    An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer); or

☐    Any other individual who regularly performs similar functions.

| Name/Title | Date of Birth | Address (Residential or Business Street Address) | *For U.S. Persons*: Social Security Number | *For Non-U.S. Persons*: Social Security Number, Passport Number and Country of Issuance, or other similar identification number[1] |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

   ***Please attach copies of a driver's license, passport or other identifying document for each individual listed above.***

(d)    ***Ownership/Equity Prong.*** The following information for <u>**each**</u> individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of the Issuer/Borrower/Selling Securityholder legal entity customer listed above:

---

[1]    In lieu of a passport number, non-U.S. persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

| Name/Title | Date of Birth | Address (Residential or Business Street Address) | *For U.S. Persons*: Social Security Number | *For Non-U.S. Persons*: Social Security Number, Passport Number and Country of Issuance, or other similar identification number[2] |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

(If appropriate, an individual listed under section (c) above may also be listed in this section (d)).

***Please attach copies of a driver's license, passport or other identifying document for each individual listed above.***

☐    Equity Owner Not Applicable (Please check this box if there is no individual who owns 25% or more of the equity interest of the legal entity listed above.)

---

[2]   In lieu of a passport number, non-U.S. persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

Exhibit J

### IV.     ACKNOWLEDGMENT; SIGNATURE

I, _____ , in my capacity as _____ of the Issuer/Borrower/Selling Securityholder listed above and not in my individual capacity, hereby:

**(a)     acknowledge and authorize on behalf of the Issuer/Borrower/Selling Securityholder and each beneficial owner identified in paragraphs (c) and (d) of Section III above that this certification and the attachments hereto may be provided to each of the financial institutions involved in the applicable sale of securities or extension of credit;**

**(b)     agree on behalf of the Issuer/Borrower/Selling Securityholder identified above, from the date hereof until the closing of the applicable sale of securities or the termination of the agreement providing for the applicable extension of credit, as the case may be, to notify each of the financial institutions involved in such transaction of any change in the information provided herein that would result in a change to the list of beneficial owners identified in paragraphs (c) and (d) of Section III above;**

**(c)     agree on behalf of the Issuer/Borrower/Selling Securityholder identified above, upon request by or on behalf of the financial institutions involved in the applicable sale of securities or extension of credit, to provide documentation supporting any applicable exclusion identified in Section II above; and**

**(d)     certify, to the best of my knowledge, that the information provided above is complete and correct.**

Signature: _____   Date: _____

Legal Entity Identifier _____(Optional)

EXHIBIT K

**[FORM OF]**
**PREPAYMENT NOTICE**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency;  TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice[1], in accordance with Section [2.7][2][2.8][3] of the Credit Agreement and subject to the requirements of Section 2.8(e) of the Credit Agreement, that it intends to prepay a Borrowing under the Credit Agreement, and set forth below is the information relating to such prepayment (the "Proposed Prepayment") as required by Section [2.7][2.8] of the Credit Agreement:

(i)      The Business Day of the Proposed Prepayment is [_____].[4]

(ii)     The Class of Term Loans being prepaid is as follows: [_____].[5]

(iii)    The principal amount of each Borrowing or portion thereof to be prepaid is as follows: [_____].[6]

(iv)    [Attached hereto as Exhibit A is a reasonably detailed calculation of the amount of the Proposed Prepayment.][7]

[Signature Page Follows]

---

[1]    A notice of voluntary prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

[2]    For voluntary prepayments.

[3]    For mandatory prepayments pursuant to Section 2.8(a), 2.8(b), 2.8(c) or 2.8(d) of the Credit Agreement.

[4]    In the case of optional prepayments, this shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings after the date hereof and (b) no later than the date of the proposed prepayment in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings, on such day.

In the case of mandatory prepayments, this shall be a Business Day at least three Business Days after the date hereof (or such shorter period of time as may be acceptable to the Administrative Agent in its sole discretion).

[5]    Applicable for prepayments pursuant to Section 2.7(a) and 2.8(b) of the Credit Agreement.

[6]    Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.2 of the Credit Agreement, except as necessary to apply fully the required amount of a mandatory prepayment.

[7]    For mandatory prepayments pursuant to Section 2.8(a), 2.8(b), 2.8(c) or 2.8(d) of the Credit Agreement.

Exhibit K

The Borrower has caused this Prepayment Notice to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

[_____]


By:    _____
   Name:
   Title: