EXECUTION VERSION

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT**, dated as of November 24, 2021 (this "**Agreement**"), is entered into by and among BYJU's Alpha, Inc., a Delaware corporation ("**Borrower**"), Whitehat Education Technology LLC, a Delaware limited liability company, Tangible Play, Inc., a Delaware corporation, and any Additional Grantors (as defined herein) (each of the foregoing, a "**Grantor**", and collectively, the "**Grantors**"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

### RECITALS

(1) Borrower, Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427 (the "**Parent Guarantor**"), certain Subsidiaries of the Parent Guarantor, the financial institutions party thereto as lenders (each individually referred to as a "**Lender**" and collectively as "**Lenders**"), and GLAS Trust Company LLC, as Administrative Agent and Collateral Agent are parties to a Credit Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Credit Agreement**").

(2) One or more Grantors have entered into, or may from time to time enter into, one or more Hedge Agreements with one or more Secured Parties in accordance with the terms of the Credit Agreement.

(3) Pursuant to the terms of the Credit Agreement, each Grantor is required to execute and deliver this Agreement.

In consideration of the premises and for other valuable consideration, the receipt and sufficiency of which the parties hereto hereby acknowledge, each of the Grantors and the Collateral Agent, on behalf of itself and each other Secured Party (and each of their respective successors or permitted assigns), hereby agree as follows:

## SECTION 1
### DEFINITIONS; RULES OF INTERPRETATION

### Section 1.1   Definition of Terms Used Herein

Unless the context otherwise requires, all capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement.

### Section 1.2   UCC

Terms used herein that are defined in the UCC but not defined herein have the meanings given to them in the UCC, including the following which are capitalized herein:

| | | |
|---|---|---|
| Account | Commercial Tort Claim | Document |
| Account Debtor | Commodity Account | Equipment |
| Bank | Commodity Contract | Financial Asset |
| Certificated Security | Commodity Intermediary | Fixtures |
| Chattel Paper | Deposit Account | General Intangible |

| | | |
|---|---|---|
| Goods | Payment Intangible | Securities Intermediary |
| Instrument | Proceeds | Security |
| Inventory | Promissory Note | Security Entitlement |
| Investment Property | Record | Supporting Obligation |
| Letter-of-Credit Right | Securities Account | Uncertificated Security |

**Section 1.3    General Definitions**

In this Agreement:

"**Additional Grantor**" has the meaning assigned to that term in Section 5.2. "**Agreement**" has the meaning assigned to that term in the Preamble.

"**Borrower**" has the meaning assigned to that term in the Preamble.

"**Cash Collateral Account**" means any Deposit Account or Securities Account under the Control of the Collateral Agent in which Cash and Cash Equivalents may from time to time be on deposit or held therein.

"**Cash Dividends**" means all Dividends paid or payable in Cash.

"**Collateral**" has the meaning assigned to such term in Section 2.1 and excludes all Excluded Property.

"**Collateral Agent**" has the meaning assigned to that term in the Preamble.

"**Control**" means (a) in the case of each Deposit Account, "control" within the meaning of § 9-104 of the UCC, (b) in the case of any Security Entitlement, "control" within the meaning of § 8-106 of the UCC, (c) in the case of any Commodity Contract, "control" within the meaning of § 9-106 of the UCC, and (d) in the case of any Chattel Paper, "control" within the meaning of § 9-105 of the UCC.

"**Copyrights**" means all United States copyrights and all mask works fixed in semi-conductor chip products (as defined in 17 U.S.C. § 901(a)(1)), whether registered or unregistered and whether published or unpublished, now or hereafter in force , all registrations and applications therefor, including the copyrights registered or applied for with the United States Copyright Office referred to in Schedule 3.77 under the heading "Copyrights", whether as author, assignee, transferee or otherwise, all registrations and applications for registration, including extensions, continuations, reissues and renewals of any thereof, the right to sue for past, present and future infringements of any of the foregoing, and all Proceeds of the foregoing, including, with respect to the foregoing, Proceeds from licenses, royalties, fees, income, payments, claims, damages and Proceeds of suit, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office.

"**Credit Agreement**" has the meaning assigned to that term in the Recitals.

"**Debt Termination Date**" has the meaning assigned to that term in Section 9.2.

"**Dividends**" means, in relation to any Equity Interests, all present and future: (a) dividends and distributions of any kind, together with principal, interest and any other sum, in each case received or receivable in respect of such Equity Interests, (b) rights, Equity Interests, Instruments, Cash or other assets accruing or offered by way of redemption, substitution, exchange, bonus, option, preference or otherwise in respect of such Equity Interests, (c) warrants, allotments, offers and rights accruing or offered in respect of such Equity Interests and (d) other Proceeds, rights and assets attaching to, deriving from or exercisable by virtue of the ownership of, such Equity Interests.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest; *provided* that Equity Interests shall not include any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash.

"**Filing**" means, to the extent the same is still in effect, (a) any UCC financing statement (including fixture filings, continuation statements and amendment statements, as applicable) or (b) any analogous filing, registration or Record under applicable law, in each case covering any Collateral (including any IP Security Agreement or other written agreement in which such Grantor grants a security interest in or collateral assignment of any Collateral) that is filed, registered or recorded with any relevant with any governmental, municipal or other office (including any relevant IP Filing Office).

"**Grantor**" has the meaning assigned to that term in the Preamble.

"**Insurance**" means all contracts and policies of insurance of any kind now or in the future taken out by or on behalf of any Grantor or (to the extent of such Grantor's interest) in which it now or in the future has an interest.

"**Intellectual Property**" means, collectively, the Copyrights, the Patents, the Trademarks and the Trade Secrets.

"**Intellectual Property Licenses**" means, collectively, any and all written agreements providing for the granting of any right in or to any Intellectual Property (whether a Grantor is licensee or licensor thereunder), including each agreement referred to in Schedule 3.77 under the heading "Intellectual Property Licenses" and all renewals and extensions thereof.

"**IP Filing Office**" means, as applicable, the United States Patent and Trademark Office or the United States Copyright Office.

"**IP Registrations**" means (i) registrations of Patents, Trademarks and Copyrights and (ii) applications of registration or publication thereof, in each case made with the relevant IP Filing Office.

"**IP Security Agreement**" means a short-form security agreement, substantially in the form of Exhibit C to this Agreement, executed by each applicable Grantor and the Collateral Agent (or any analogous agreement or Filing under applicable law, as may be reasonably necessary to evidence the Collateral Agent's Security Interest in any IP Registration that constitutes a Core Asset).

"**Joinder Agreement**" means a joinder agreement, substantially in the form of Exhibit B to this Agreement, executed by an Additional Grantor and delivered to the Collateral Agent.

"**Lender**" has the meaning assigned to that term in the Recitals.

"**LLC**" means any limited liability company in which any Grantor has an interest, including those set forth on Schedule 3.6.

"**LLC Agreement**" means the limited liability company agreement of any LLC (or any analogous agreement governing the operation of such LLC).

"**Location**" means, with respect to any Person, its "location" within the meaning of § 9-307 of the UCC.

"**Notice Period**" means, with respect to any applicable Collateral acquired (or, in the case of application for IP Registration, filed) after the date hereof, the time periods (and extensions thereof) set forth in <u>Section 5.9</u>, <u>Section 5.10</u> or <u>Section 5.13 of the Credit Agreement</u>, as applicable, from the date of such acquisition or filing.

"**Patents**" means all United States patents and applications therefor, including each patent issued by or applied for with the United States Patent and Trademark Office referred to in Schedule 3.77 under the heading "Patents", all reissues, divisionals, continuations, continuations-in-part, extensions, renewals and reexaminations of any of the foregoing, all rights and privileges corresponding thereto, the right to sue for past, present and future infringements of any of the foregoing, and all Proceeds of the foregoing, including, with respect to the foregoing, Proceeds from licenses, royalties, fees, income, payments, claims, damages, and suit.

"**Permitted Liens**" means Liens expressly permitted under the Credit Agreement.

"**Pledged Account**" means any Securities Account, Commodity Account or Deposit Account constituting part of the Collateral.

"**Pledged Collateral**" means, collectively the Pledged Notes, the Pledged Equity, any other Investment Property of any Grantor, all certificates or other Instruments representing any of the foregoing, all Security Entitlements of any Grantor in respect of any of the foregoing, all Dividends from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing. Pledged Collateral may be General Intangibles, Investment Property, Instruments or any other category of Collateral.

"**Pledged Equity**" means the shares of Equity Interests owned by any Grantor, including all shares of Equity Interests listed on Schedule 3.6.

"**Pledged Notes**" means all of any Grantor's right, title and interest in each Promissory Note or other Instrument evidencing Indebtedness owed to such Grantor, including all Promissory Notes and Instruments described on Schedule 3.6 issued by the obligors named therein, and all Cash, Promissory Notes, Instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Promissory Notes and Instruments.

"**Relevant Agreement**" means any lease, license, contract, permit, Instrument, Security, franchise or other agreement to which any Grantor is a party, together with such Grantor's rights

or interests thereunder (including, for purposes of Section 2.2(a)(iii), any asset in which such Grantor has acquired rights or interests pursuant thereto).

"**Security Interest**" means the continuing security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties pursuant to Section 2.1.

"**Security Supplement**" means any supplement to this Agreement in substantially the form of Exhibit A to this Agreement, executed by an authorized officer of the applicable Grantor.

"**Trade Secrets**" means all trade secrets, and all other confidential or proprietary information and know-how protectable by applicable law, now or hereafter owned or used in, or contemplated for use in, the business of any Grantor, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating or referring in any way to such Trade Secret, the right to sue for past, present and future infringement of any Trade Secret, and all Proceeds of the foregoing, including Proceeds from licenses, royalties, fees, income, payments, claims, damages and suit.

"**Trademarks**" means all United States trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, trade dress, service marks, certification marks, collective marks and logos, words, terms, names, symbols, designs and general intangibles of a like nature, in each case that are source or business identifiers and any other source or business identifiers, all registrations and applications for any of the foregoing, including the trademarks registered by or applied for with the United States Patent and Trademark Office referred to in Schedule 3.77 under the heading "Trademarks", all extensions, continuations, reissues or renewals of any of the foregoing, all of the goodwill of the business connected with the use of and symbolized by the foregoing, the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and all Proceeds of the foregoing, including Proceeds from licenses, royalties, fees, income, payments, claims, damages and suit.

"**Trigger Event**" means the Administrative Agent has served a notice to the Borrower in accordance with Section 8.1 (*Events of Default*) of the Credit Agreement during the continuance of an Event of Default.

"**UCC**" means the Uniform Commercial Code enacted in the State of New York, as in effect from time to time; **provided that** if by reason of mandatory provisions of law, the attachment, perfection, the effect of perfection or non-perfection, priority of a security interest or remedy is governed by the personal property security laws of any jurisdiction other than New York, "UCC" shall mean those personal property security laws as in effect, from time to time, in such other jurisdiction for the purposes of the provisions hereof relating to such attachment, perfection, priority or remedy and for the definitions related to such provisions.

"**U.S. Securities Laws**" means the Securities Act of 1933, applicable Blue Sky laws or other federal or state securities laws or similar laws analogous in purpose or effect.

"**Vehicle**" means any vehicle or any other asset covered by a certificate of title law of any jurisdiction under the law of which indication of a Security Interest on such certificate is required as a condition of perfection thereof.

**Section 1.4   Rules of Interpretation; Rules of Construction**

(a)   The rules of construction set forth in Section 1.3 of the Credit Agreement apply equally to this Agreement, *mutatis mutandis*.

(b)   If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern. If any conflict or inconsistency exists between this Agreement and any other Loan Document other than the Credit Agreement, this Agreement shall govern.

# SECTION 2
# GRANT OF SECURITY

**Section 2.1   Grant of Security**

As security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations, each Grantor hereby pledges, assigns, transfers and grants to the Collateral Agent, for its benefit and for the benefit of the Secured Parties, a continuing security interest in and Lien on all of its right, title and interest in, to and under the following property (other than Excluded Property), in each case whether now owned or hereafter acquired or existing and wherever located (collectively, the "**Collateral**"):

(a)   all Accounts;

(b)   all Chattel Paper;

(c)   all Documents;

(d)   all General Intangibles, including all Intellectual Property, Intellectual Property Licenses and that portion of the Pledged Collateral constituting General Intangibles;

(e)   all Goods and personal property of such Grantor, whether tangible or intangible, wherever located, including Inventory, Equipment, Fixtures, Cash and Letter-of-Credit Rights;

(f)   all Instruments, including that portion of the Pledged Collateral constituting Instruments;

(g)   all Deposit Accounts, including Cash Collateral Accounts constituting Deposit Accounts;

(h)   all Insurance;

(i)   all Investment Property, including all Securities Accounts and Commodity Accounts (together with all Financial Assets held therein and all certificates and Instruments, if any, representing or evidencing such Securities Accounts and Commodity Accounts), and all Cash Collateral Accounts and/or Pledged Collateral constituting Investment Property;

(j)   all Commercial Tort Claims listed on Schedule 3.8 (as such schedule may be amended or supplemented from time to time);

(k)   all books and Records pertaining to the property described in this Section 2.1;

(l)   to the extent not otherwise included, all (i) Cash or other personal property of any kind received by such Grantor in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Grantor or any of its property or income, and (ii) causes of action, and all Cash and other personal property of any kind received therefrom, and all Cash and other property of any kind recovered by any Grantor;

(m) to the extent not otherwise included, all Supporting Obligations relating to any of the foregoing; and

(n) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of or in respect of any of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to any Grantor from time to time with respect to the foregoing.

For the avoidance of doubt, it is expressly understood and agreed that, to the extent the UCC is revised subsequent to the date hereof such that the definition of any of the foregoing terms included in the description of Collateral is changed, the parties hereto desire that any property (other than Excluded Property) that is included in such changed definitions that would not otherwise be included in the foregoing grants on the date hereof be included in such grants immediately upon the effective date of such revision, it being the intention of each Grantor that the description of Collateral set forth above be construed to include the broadest possible range of assets (other than Excluded Property). Notwithstanding the immediately preceding sentence, the foregoing grants are intended to apply immediately on the date hereof to all Collateral to the fullest extent permitted by applicable law regardless of whether any particular item of Collateral is currently subject to the UCC.

**Section 2.2   Certain Exclusions**

Notwithstanding anything under this Agreement (including Section 2.1) or any Loan Document to the contrary,

(a) in no event will the Collateral include, and no Grantor will be deemed to have granted a security interest in, any of its right, title or interest in any and all of the Excluded Property, and none of the covenants or representations and warranties herein shall be deemed to apply to any assets constituting Excluded Property;

(b) without prejudice to the requirement for any entity in incorporated India to enter into a Shareholders (Call Option) Agreement and to the extent required under Section 5.14 of the Credit Agreement, no Lien, Collateral or other security will be granted by any member of the Group incorporated in India or over any shares of any member of the Group incorporated in India;

(c) no Grantor shall be required, nor shall the Collateral Agent be authorized to perfect Liens in Collateral by any means other than by:

(i) entry into customary security and pledge agreements, mortgages or deeds or similar documents and the making of such filings, in each case, as the Collateral Agent (acting at the direction of the Administrative Agent) may deem necessary or advisable under applicable law to create or perfect security interests in any such assets (including applicable filings pursuant to the Uniform Commercial Code or other applicable law and filings with the applicable filing offices or registers with respect to any Intellectual Property constituting Collateral (to the extent that such filings are necessary or advisable to perfect a security interest in such Intellectual Property); *provided* that perfection over any immaterial Intellectual Property constituting Collateral in any jurisdiction located outside of the United States of America and Singapore shall only be done in consultation with the Borrower and

upon the advice of local counsel and having regard to a cost benefit analysis in respect of such security) (but without prejudice to the requirement set forth in clause (b)(i)(2) of the Collateral and Guarantee Requirement for the applicable member of the Group to enter an IP Licensing Agreement to the extent required thereunder);

(ii)    mortgages or deeds or similar documents in respect of any Material Real Estate Asset and filings in the applicable real estate records with respect to Material Real Estate Assets or any fixtures relating to Material Real Estate Assets (no landlord waivers, bailee letters, estoppels, warehouseman waivers or other collateral access or similar letters or agreements shall be required);

(iii)   delivery to the Collateral Agent (with a copy to the Administrative Agent) to be held in its possession of all Collateral consisting of intercompany notes, instruments and certificates representing Equity Interests (1) issued by any Grantor that do not constitute Third Party Interests or (2) directly owned by a Grantor and issued by (I) a Restricted Subsidiary, other than any Excluded Subsidiary (unless constituting an Excluded Subsidiary solely pursuant to clause (h) of the definition thereof), in each case as expressly required by the Loan Documents and together with, as applicable, an irrevocable power of attorney, an undated stock power or similar instrument of transfer for each such item of Collateral endorsed in blank by the pledgor thereof (or a duly authorized officer of such pledgor); provided that:

(A)    any pledge of Equity Interests, in the case of Equity Interests of any CFC or FSHCO, shall not include (1) more than 65% of the voting stock of such subsidiary, or (2) the pledge of any assets of such subsidiary; provided that (1) and (2) above shall not apply (A) to any of the Effective Date Loan Parties (or their successors) and (B) if the provision of such Collateral would not result in material U.S. federal income taxes under Section 951(a)(1)(B) of the Code for the Borrower or one of its direct or indirect U.S. subsidiaries or direct or indirect U.S. parent entities as reasonably determined by the Borrower in consultation with the Administrative Agent, after taking into account Treasury Regulations Section 1.956-1(a)(2) and Section 245A of the Code and any related guidance and no member of the Group shall be required to enter into control agreements with respect to cash, securities or deposit accounts; and

(B)    prior to a Trigger Event, no Grantor shall be required to deliver any Pledged Note held by such Grantor having a principal amount less than $10,000,000 and other evidence of immaterial Indebtedness having a principal amount less than $100,000,000; and

(iv)    filing of Uniform Commercial Code financing statements (or equivalent filings in other jurisdictions) in any Collateral consisting of (A) any deposit account, securities account and commodity account, and cash and Cash Equivalents standing to the balance and proceeds thereof, (no member of the Group shall be required to enter into any account control agreements or any other documents with respect to any deposit account, securities account and commodity account,

and cash and Cash Equivalents standing to the balance and proceeds thereof), and (B) other than as set forth above, proceeds of any other Collateral; and

(d)    the Obligations will be subject to the relevant fraudulent transfer limitation provisions of the applicable Loan Documents.

**Section 2.3    Grantors Remain Liable**

(a)    Anything contained herein to the contrary notwithstanding:

 (i)    each Grantor will remain liable under any Relevant Agreement included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed;

 (ii)    the exercise by the Collateral Agent of any of its rights hereunder will not release any Grantor from any of its duties or obligations under any Relevant Agreement included in the Collateral; and

 (iii)    neither the Collateral Agent nor any other Secured Party will have any obligation or liability under any Relevant Agreement included in the Collateral by reason of this Agreement, nor will the Collateral Agent or any other Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment included in the Collateral.

(b)    None of the Collateral Agent, any other Secured Party or any purchaser at a foreclosure sale under this Agreement will be obligated to assume any obligation or liability under any Relevant Agreement unless the Collateral Agent, such other Secured Party or such purchaser otherwise expressly agrees in writing to assume any or all of said obligations or liabilities.

# SECTION 3
## REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Collateral Agent and the other Secured Parties on and as of the date hereof that:

**Section 3.1    Title**

Except where the failure to have title or other interest does not currently have and would not reasonably be expected to have a Material Adverse Effect, such Grantor owns or otherwise has rights in all assets constituting its Collateral (including Equity Interests, but excluding Intellectual Property), free and clear of any and all Liens, rights or claims of all other Persons, other than (i) Permitted Liens (ii) Liens arising by operation of law, and (iii) minor defects in title that do not materially interfere with the ability of the Grantors to conduct their businesses. Such Grantor has not filed or consented to the filing of any Filing, in each case which is still in effect, except, in each case, for (x) Permitted Liens and (y) any Filing evidencing Liens being terminated on the date hereof.

**Section 3.2    Names, Locations**

(a)    Schedule 3.2 sets forth with respect to such Grantor under the heading "Names", (i) its exact name, as such name appears in the public record of its jurisdiction of organization

which shows such Grantor to have been organized, (ii) its U.S. federal taxpayer identification number (or a statement that such Grantor has no such number) and (iii) the jurisdiction of organization of such Grantor and its organizational identification number (or a statement that such Grantor has no such number).

(b)     Schedule 3.2 sets forth with respect to such Grantor under the heading "Locations" the location of the chief executive office and principal place of business of such Grantor.

(c)     Except as set forth on Schedule 3.2 under the heading "Changes in Identity or Organizational Structure", such Grantor has not changed its (i) name, (ii) jurisdiction of organization, chief executive office, principal place of business or other Location or (iii) organizational structure in any way in the past four months. Such changes would include mergers, consolidations and acquisitions, as well as any change in the name, form or jurisdiction of such Grantor. If any such change has occurred, Schedule 3.2 sets forth the date of such change and all information applicable to each acquiree or constituent party to a merger or consolidation.

**Section 3.3     Filings, Consents**

(a)     Each Grantor has delivered to the Collateral Agent, for filing in each governmental, municipal or other office specified in Schedule 3.3, true, complete and correct copies of all Filings containing an accurate description of the Collateral. Such Filings are all of the Filings that are necessary to publish notice of and protect the validity of and to establish a legal, valid and perfected Security Interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States. No further or subsequent Filing is necessary in the United States, except as provided under applicable law with respect to (i) Intellectual Property, (ii) the filing of continuation statements and (iii) any changes to a Grantor's organizational structure or to any Grantor's organizational documents permitted by the Credit Agreement, as required pursuant thereto in order for the Collateral Agent to continue to have at all times following each such change a legal, valid and perfected Security Interest in all the Collateral.

(b)     All filing or recording fees and taxes payable in connection with the filings and Records described in clause (a) above have been or promptly will be paid by such Grantor.

**Section 3.4     Security Interest**

Upon the execution and delivery of this Agreement, this Agreement will be effective to create legally valid and enforceable Liens on the Collateral in favor of the Collateral Agent for the benefit of the Secured Parties. Such Liens will constitute, upon (i) the timely filing of the Filings in accordance with Section 3.3 and (ii) to the extent applicable, the delivery of the tangible Pledged Collateral to the Collateral Agent and the Collateral Agent taking possession of such Pledged Collateral in accordance with Section 3.6, a perfected security interest in all Collateral in which a security interest can be perfected by filing, recording or registering a financing statement or analogous document, or possessing such Collateral pursuant to the UCC or other applicable law in such jurisdictions. The Security Interest is, and will be, prior to any other Lien on any of the Collateral, other than Permitted Liens.

**Section 3.5   [Reserved]**

**Section 3.6   Pledged Collateral; Pledged Accounts**

   (a)   In respect of Pledged Accounts, such Grantor (A) is the sole entitlement holder of each Securities Account and Commodity Account, (B) is the sole account holder of each Deposit Account, and (C) has not consented to, and is not otherwise aware of, any Person (other than the Collateral Agent pursuant to this Agreement) having Control over, or any other interest in, any Pledged Account or any Collateral deposited or carried therein or credited thereto, as applicable.

   (b)   In respect of Pledged Notes:

      (i)   Schedule 3.6 sets forth under the heading "Pledged Notes" all of the Pledged Notes evidencing Indebtedness in a principal amount greater than $10,000,000.

      (ii)   Each of the Pledged Notes listed on Schedule 3.6 constitutes the legal and valid obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of Debtor Relief Laws.

   (c)   In respect of Pledged Equity:

      (i)   Schedule 3.6 sets forth under the heading "Pledged Equity," all Pledged Equity of such Grantor and identifies any such Pledged Equity that is represented by Certificated Securities.  Such Pledged Equity constitutes, as of the date hereof, that percentage of the issued and outstanding Equity Interests of all classes of each issuer thereof as set forth on Schedule 3.6.

      (ii)   Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, all Pledged Equity has been duly authorized and validly issued and are fully paid and non-assessable and are owned by the applicable Grantor (other than minority interests held by other Persons that do not violate any provision of this Agreement), directly or indirectly, free and clear of all Liens other than Permitted Liens.

      (iii)   There are no restrictions on transfer in the LLC Agreement governing any Pledged Equity or any other agreement relating to the Pledged Collateral which would limit or restrict (i) the grant of a security interest in the Pledged Equity; (ii) the perfection of such security interest; (iii) the exercise of remedies in respect of such perfected security interest in the Pledged Equity; or (iv) the transfer of the Pledged Equity, in each case as contemplated by this Agreement.

      (iv)   No consent or approval of any Governmental Authority, or any other Person was or is necessary to the validity and perfection of the security interests created hereby in the Pledged Equity (other than such as have been obtained and are in full force and effect).

**Section 3.7   Intellectual Property**

   (a)   Schedule 3.7 sets forth a true and complete list of (i) all IP Registrations owned by such Grantor that constitute Core Assets and (ii) all Intellectual Property Licenses material to

the business of such Grantor that constitute Core Assets pursuant to which a Grantor receives an exclusive license to any copyright registered with the United States Copyright Office, separately identifying that owned by such Grantor and that licensed to such Grantor.

(b)     All such IP Registrations listed on Schedule 3.7 are currently legally or beneficially owned by such Grantor, and none of the Copyrights owned by such Grantor has been exclusively licensed by such Grantor to any affiliate or third party, except as disclosed in Schedule 3.7, and except for non-exclusive licenses granted in the ordinary course of business.

(c)     True, complete and correct copies of IP Security Agreements containing a complete and correct description of all Collateral consisting of IP Registrations that constitute Core Assets owned by any Grantor have been delivered to the Collateral Agent and submitted for filing by the Borrower or Grantor in the United States Patent and Trademark Office and the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 and 17 U.S.C. § 205, respectively and the regulations thereunder, as applicable, and otherwise as may be required pursuant to the laws of any other appropriate jurisdiction, to protect the validity of and to establish a legal, valid and perfected Security Interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all such IP Registrations in which a security interest may be perfected by filing, recording or registration in any relevant IP Filing Office, and no further or subsequent Filing is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Collateral consisting of IP Registrations that constitute Core Assets acquired or developed after the date hereof).

**Section 3.8    Commercial Tort Claims**

Schedule 3.8 sets forth a description of all Commercial Tort Claims of such Grantor having an individual value in excess of $50,000,000.

## SECTION 4
## COVENANTS

**Section 4.1    Change of Name; Location of Collateral; Place of Business**

Unless written notice thereof is given to the Collateral Agent by the applicable Grantor within thirty (30) days (or such other longer period as the Collateral Agent may agree in its reasonable discretion) after the effective date of such event, such Grantor will not change any of the information described in Section 3.2 or take any action which would cause any Filing made in connection with this Agreement to become misleading. Each Grantor agrees to cooperate with the Collateral Agent in making all Filings that are required in order for the Collateral Agent to continue at all times following such change to have a legal, valid and perfected Security Interest in all the Collateral.

**Section 4.2    Security Supplement**

From time to time as requested by the Collateral Agent following the occurrence and during the continuance of a Trigger Event, each Grantor will deliver to the Collateral Agent (a) a Security Supplement, together with all supplements to Schedules hereto or (b) a written confirmation executed and delivered by an authorized officer of such Grantor confirming that there has been no change in the information provided herein since the date such information was last provided. Notwithstanding anything to the contrary in this Agreement, (i) any Security Supplement delivered pursuant this Section 4.2,

together with all applicable schedules, shall satisfy the requirements of each other provision of this Agreement requiring delivery of such a Security Supplement, and (ii) the Security Interest of the Collateral Agent will attach to all additional Collateral immediately upon any Grantor's acquisition of rights therein and will not be affected by the failure of such Grantor to deliver any required Security Supplement.

**Section 4.3    Protection of Security**

Each Grantor will (a) take any and all actions necessary to defend (i) title to the Collateral and (ii) the Security Interest of the Collateral Agent in the Collateral and the first priority thereof against any Lien (except Permitted Liens), in each case against all claims and demands of all Persons at any time, and (b) promptly notify the Collateral Agent if any portion of the Collateral owned or held by such Grantor is damaged or destroyed and such damage or destruction would reasonably be expected to result in a Material Adverse Effect. No Grantor will enter into any agreement or take or cause to be taken any action that could materially impair the Security Interest of the Collateral Agent, except as permitted (or not expressly prohibited) under the Loan Documents.

**Section 4.4    Insurance**

Each Grantor will use its commercially reasonable efforts to cause all of its U.S. Insurance policies for any covered loss in excess of applicable deductibles to (a) name the Collateral Agent (for the benefit of the Lenders) as an additional insured under all liability policies and (b) name the Collateral Agent on behalf of the Lenders as loss payee under all casualty policies.

**Section 4.5    [Reserved]**

**Section 4.6    Accounts**

    (a)    Each Grantor will keep and maintain satisfactory and complete records of its Accounts.

    (b)    [Reserved].

    (c)    [Reserved].

    (d)    At any time following the occurrence and during the continuance of a Trigger Event, any payments of Accounts received by any Grantor will be promptly (and in any event within five Business Days) deposited by such Grantor (in the exact form received, duly indorsed by such Grantor to the Collateral Agent or in blank, if required), in a Cash Collateral Account, and until so deposited, all amounts and Proceeds (including checks and other Instruments) received by such Grantor in respect of such Accounts or any Supporting Obligation will be held in trust for the benefit of the Collateral Agent and will not be commingled with any other property of such Grantor.

**Section 4.7    Pledged Collateral; Pledged Accounts**

    (a)    [Reserved].

    (b)    Subject to Section 2.2, each Grantor will cause any Pledged Note evidencing Indebtedness held by such Grantor having a principal amount greater than $10,000,000 to be delivered to the Collateral Agent pursuant to the terms hereof, duly indorsed in blank to the Collateral Agent.

(c)     In respect of Pledged Equity, without the prior written consent of the Collateral Agent, no Grantor will vote or take any other action to amend or terminate any relevant organizational documents in any manner that would reasonably be expected to be material and adverse to the Lenders (taken as a whole) (including, for the avoidance of doubt, any change to the designation of whether any Pledged Equity in respect of any LLC is governed by Article 8 of the UCC), in each case except as otherwise permitted in the Credit Agreement.  In respect of any Pledged Equity issued by a Grantor and constituting a Security that is not represented by a certificate, such Grantor hereby agrees that it shall follow the reasonable instructions of the Collateral Agent in respect of such Security, without the further consent of any other Grantor or any other Persons.

(d)     With respect to any Pledged Collateral hereafter acquired by such Grantor, it will (A) within the Notice Period, deliver to the Collateral Agent a completed Security Supplement, together with all supplements to Schedules hereto, reflecting such Pledged Collateral and all other Pledged Collateral, and (B) comply with the remaining provisions of this Section 4.7(d) promptly, and in any event within thirty days or such other period of time as agreed to by the Collateral Agent in its reasonable discretion of such Grantor acquiring rights therein, in each case in form and substance satisfactory to the Collateral Agent:

(i)     With respect to any Pledged Collateral constituting any Instruments and Certificated Securities that are acquired or pledged after the date hereof, Grantor will deliver or cause to be delivered to the Collateral Agent all such Instruments and Certificated Securities, stock powers or other instruments of transfer duly executed in blank and otherwise reasonably satisfactory to the Collateral Agent and all such instruments and documents as the Collateral Agent may reasonably request in order to give effect to the pledge granted hereby.

(e)     **Voting and Distributions**

(i)     So long as no Trigger Event has occurred and is continuing:

(A)     each Grantor will be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement, the Credit Agreement or the other Loan Documents;

(B)     to the extent needed by any Grantor to exercise rights with respect to Pledged Collateral or to receive Dividends with respect thereto (to the extent such receipt is permitted under clause (e)(i)(C) below), the Collateral Agent will promptly execute and deliver (or cause to be executed and delivered) to each Grantor all proxies and other instruments as such Grantor may from time to time reasonably request for the purpose of enabling such Grantor to exercise the voting and other consensual rights when and to the extent that it is entitled to exercise the same pursuant to clause (e)(i)(A) above and to receive the Cash Dividends that it is entitled to receive pursuant to clause (e)(i)(C) below; and

(C)     each Grantor will be entitled to receive and retain any and all Cash Dividends (except as set forth below) solely to the extent not prohibited by

the terms and conditions of the Credit Agreement, the other Loan Documents and applicable laws. All (1) non-Cash Dividends, and (2) Cash Dividends in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, and all other distributions (other than distributions referred to in the preceding sentence) made on or in respect of the Pledged Collateral, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise (the foregoing clauses (1) and (2), collectively, the "**Pledged Dividends**"), will be and become part of the Collateral without any further action. Such Grantor will promptly take all steps, if any, that are necessary to ensure the validity, perfection, priority and Control of the Collateral Agent over the Pledged Dividends to the extent that such Pledged Dividends constitute Certificated Securities (including delivery thereof) and pending any such action such Grantor will be deemed to hold the Pledged Dividends, in trust for the benefit of the Collateral Agent and the Pledged Dividends will not be commingled with any other property of such Grantor.

(ii)     Upon the occurrence and during the continuance of a Trigger Event:

(A)     all rights of the Grantors to exercise or refrain from exercising the voting and other consensual rights that they would otherwise be entitled to exercise pursuant hereto will cease and all such rights will thereupon become vested in the Collateral Agent, who will thereupon have the sole right to exercise such voting and other consensual rights; **provided that**, subject to the terms of the Credit Agreement, the Collateral Agent will have the right from time to time following the occurrence and during the continuation of a Trigger Event to permit the Grantors to exercise such rights;

(B)     in order to permit the Collateral Agent to exercise the voting and other consensual rights that it may be entitled to exercise pursuant hereto and to receive all Dividends that it may be entitled to receive hereunder: (1) the Grantors will promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies, Dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request and (2) each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in Section 6.1; and

(C)     all rights of the Grantors to Dividends that any Grantor is authorized to receive pursuant to clause (e)(i)(C) above will cease, and all such rights will thereupon become vested in the Collateral Agent, which will have the sole and exclusive right and authority to receive and retain such Dividends.

After all Trigger Events have been cured or waived, each Grantor will have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise and to receive Cash Dividends that it would otherwise be entitled to receive, in each case pursuant to the terms of clause (e)(i) above.

**Section 4.8    Intellectual Property**

If any Grantor, either itself or through any agent, employee, licensee or designee, files any application for an IP Registration that constitutes a Core Asset with the relevant IP Filing Office, such Grantor will (i) promptly (and in any event within the Notice Period) inform the Collateral Agent and delivers to the Collateral Agent a completed Security Supplement together with all supplements to Schedule 3.77 hereto, and (ii) upon reasonable request of the Collateral Agent, execute and deliver any and all IP Security Agreements.

**Section 4.9    Commercial Tort Claims**

If any Grantor shall at any time after the date of this Agreement acquire a Commercial Tort Claim having an individual value in excess of $50,000,000, each Grantor will promptly (and in any event within the Notice Period) deliver to the Collateral Agent a completed Security Supplement, together with a supplement to Schedule 3.8 hereto, reflecting such new Commercial Tort Claim.

## SECTION 5
## FURTHER ASSURANCES; ADDITIONAL GRANTORS

**Section 5.1    Further Assurances**

(a)    Section 5.10 of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*, as if fully set forth herein, and notwithstanding anything to the contrary under this Agreement, no Grantor shall be obligated to take additional steps or actions under this Section 5.1(a) that such Grantor is not required to take under such Section 5.10 of the Credit Agreement. Without limiting the generality of the foregoing, solely to the extent required by Section 5.10 of the Credit Agreement (and subject to the limitations, terms and conditions (including Section 5.10(c)) thereunder), each Grantor agrees that from time to time, it will execute and deliver to the Collateral Agent all further instruments and documents and take all further action, that may be necessary that the Collateral Agent may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any Security Interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, such Grantor will:

(i)    execute, acknowledge, deliver and cause to be duly filed all such further instruments, documents, endorsements, powers of attorney or notices, and take all such actions as may be reasonably necessary, or as the Collateral Agent may from time to time reasonably request, to preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith;

<div style="margin-left:2em">

(ii)    take all actions necessary or, as the Collateral Agent may from time to time reasonably request, to ensure the recordation of appropriate evidence of the Security Interest granted hereunder in the Collateral consisting of Intellectual Property with the appropriate IP Filing Office in which said Intellectual Property is registered or in which an application for registration is pending, including the United States Patent and Trademark Office, the United States Copyright Office and the various Secretaries of State (or equivalent);

(iii)    at the Collateral Agent's reasonable request, appear in and defend any action or proceeding that could reasonably be expected to materially and adversely affect such Grantor's title to or the Collateral Agent's Security Interest in all or any material part of the Collateral.

</div>

(b)    To the extent permitted by applicable law, each Grantor hereby authorizes the Collateral Agent to make Filings in all jurisdictions and with all filing offices as the Collateral Agent may reasonably determine, in its reasonable discretion, are necessary or advisable to perfect the Security Interest granted to the Collateral Agent herein, without the signature of such Grantor. Such Filings may describe the Collateral in the same manner as described herein or may contain an indication or description of the Collateral that describes such property in any other manner as the Collateral Agent may determine, in its reasonable discretion, is necessary, advisable or prudent to ensure the perfection of the Security Interest in the Collateral granted to the Collateral Agent herein in the United States, including describing such property as "all assets (other than Excluded Property)" or "all personal property (other than Excluded Property)".

**Section 5.2  Additional Grantors**

From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "**Additional Grantor**") by executing a Joinder Agreement. Upon delivery of any such Joinder Agreement to the Collateral Agent, notice of which is hereby waived by Grantors to the extent permitted by applicable laws, each Additional Grantor will be a Grantor and will be as fully a party hereto as if such Additional Grantor were an original signatory hereto. Each Grantor expressly agrees that its obligations arising hereunder will not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of the Collateral Agent not to cause any Excluded Subsidiary of any Grantor to become an Additional Grantor hereunder. This Agreement will be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

<div style="text-align:center">

**SECTION 6**
**COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT**

</div>

**Section 6.1  Power of Attorney**

Each Grantor hereby irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent and attorney-in-fact (such appointment coupled with an interest), with full authority in the place and stead of such Grantor and in the name of such Grantor, the Collateral Agent or otherwise, from time to time in the Collateral Agent's reasonable discretion (subject to the limitations set forth in clause (a) below, with respect to actions taken pursuant thereto), to take any action and to execute any instrument that the

Collateral Agent may deem reasonably necessary to accomplish the purposes of this Agreement, including the following:

(a) upon the occurrence and during the continuance of a Trigger Event:

(i) to receive, endorse, assign, collect and deliver any and all notes, acceptances, checks, drafts, Cash orders or other instruments, documents and Chattel Paper or other evidences of payment relating to the Collateral;

(ii) to ask for, demand, collect, sue for, recover, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral;

(iii) to sign the name of such Grantor on any invoice or Document relating to any of the Collateral;

(iv) to send verifications of Accounts to any Account Debtor of such Grantor;

(v) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral;

(vi) to settle, compromise, adjust or defend any claims, actions, suits or proceedings relating to all or any of the Collateral;

(vii) to notify, or to require such Grantor to notify, Account Debtors of such Grantor to make payment directly to the Collateral Agent;

(viii) to make, settle and adjust claims in respect of the Collateral under policies of insurance, to endorse the name of such Grantor on any check, draft, instrument or other item of payment for the Proceeds of such policies of insurance and to make all determinations and decisions with respect thereto;

(ix) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral;

(x) subject to Section 7.1(a)(vi), generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and such Grantor's expense, at any time or from time to time, all acts and things that the Collateral Agent deems reasonably necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's Security Interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do; and

(xi) in the event that the Grantors have failed to do so, to take or cause to be taken all actions reasonably necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including (i) to prepare, sign and file for recordation any IP Security Agreement in any IP Filing Office in the name of such Grantor, or (ii) to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, or the legality or validity thereof, and the amounts necessary to discharge the same to be determined by the Collateral Agent in its reasonable discretion, any such payments made by the

Collateral Agent to become obligations of such Grantor to the Collateral Agent, due and payable immediately without demand; and

(b)    to prepare and make Filings as further described in Section 5.1(a).

### Section 6.2   No Duty on the Part of Collateral Agent or Secured Parties

Notwithstanding any other provision of this Agreement, nothing herein contained will be construed as requiring or obligating the Collateral Agent or any other Secured Party to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent or any other Secured Party, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the Cash due or to become due in respect thereof or any property covered thereby, and no action taken or omitted to be taken by the Collateral Agent or any other Secured Party with respect to the Collateral or any part thereof will give rise to any defense, counterclaim or offset in favor of any Grantor or to any claim or action against the Collateral Agent or any other Secured Party, except to the extent such action constitutes gross negligence, bad faith or willful misconduct. The provisions of this Section 6.2 will in no event relieve any Grantor of any of its obligations hereunder or under any other Loan Document with respect to the Collateral or any part thereof or impose any obligation on the Collateral Agent or any other Secured Party to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by the Collateral Agent or any other Secured Party of any other or further right that it may have on the date of this Agreement or hereafter, whether hereunder, under any other Loan Document, by law or otherwise. The Collateral Agent and the other Secured Parties will be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents will be responsible to the Grantors for any act or failure to act hereunder, except for their own officers', directors', employees' or agents' gross negligence, bad faith or willful misconduct.

### SECTION 7
### REMEDIES

### Section 7.1   Remedies Upon Trigger Event

(a)    Upon the occurrence and during the continuance of a Trigger Event, the Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) or any other applicable law, and also may pursue any of the following separately, successively or simultaneously:

(i)    with respect to any Collateral consisting of Intellectual Property or an Intellectual Property License, on demand (no such demand may be made unless a Trigger Event has occurred and is continuing), cause the Security Interest to become an assignment, transfer and conveyance of any or all of such Collateral by the applicable Grantors to the Collateral Agent, or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any such Collateral throughout the world on such terms and conditions and in such manner as the Collateral Agent may determine (other than where such

assignment, transfer, conveyance, license or sublicense would constitute a breach or violation of any then-existing Intellectual Property Licenses or any other licensing arrangements to the extent that waivers cannot be obtained or to the extent such assignment, transfer or conveyance would impair the validity or enforceability of, or result in the abandonment of, such Intellectual Property or Intellectual Property License);

(ii)     require a Grantor to, and each Grantor hereby agrees that it will promptly upon request of the Collateral Agent (acting at the written direction of the Required Lenders), assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place to be designated by the Collateral Agent that is reasonably convenient to both parties;

(iii)    subject to applicable law or agreements with landlords, with or without legal process and with or without notice or demand for performance (except as specified herein and otherwise in accordance with the terms of the UCC), to take possession of the Collateral and to enter without breach of the peace any premises owned or leased by the Grantors where the Collateral may be located for the purpose of taking possession of or removing the Collateral;

(iv)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent the Collateral Agent deems appropriate;

(v)     without notice (except as specified herein and otherwise in accordance with the terms of the UCC) to the Grantors, (A) transfer all or any portion of the Pledged Collateral to its name or the name of its nominee or agent and/or (B) exchange any certificates or Instruments representing any Pledged Collateral for certificates or Instruments of smaller or larger denominations;

(vi)    subject to the requirements of applicable law and the notice requirements described below (or as otherwise required in accordance with the terms of the UCC), sell, assign, lease, license (on an exclusive or non-exclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale or at any broker's board or on any securities exchange, at any of the Collateral Agent's offices or elsewhere, for Cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable; **provided that** (i) the Collateral Agent will be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, (ii) upon consummation of any such sale the Collateral Agent will have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold, (iii) each such purchaser at any such sale will hold the property sold absolutely, free from any claim or right on the part of any Grantor, and (iv) each Grantor hereby waives (to the extent permitted by law and otherwise in accordance with the terms of the UCC) all rights of redemption, stay, valuation and appraisal that

such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted; and

 (vii) to the extent permitted under applicable law, with respect to any Collateral consisting of Relevant Agreements, the Collateral Agent may notify or require a Grantor to notify any counterparty to any such Relevant Agreement to make all payments thereunder directly to the Collateral Agent.

(b) In accordance with the terms of the UCC, the Collateral Agent or any other Secured Party may be the purchaser of any or all of the Collateral at any sale thereof and the Collateral Agent, as collateral agent for and representative of the Secured Parties, will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(c) To the extent permitted by law and otherwise in accordance with the terms of the UCC, each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition or all or any part of the Collateral may be made. In the event notice of sale shall be required by applicable law and cannot be waived, each Grantor hereby agrees that any notice made will be deemed reasonable if sent to Borrower, addressed as set forth in the notice provisions of the Credit Agreement, at least thirty (30) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Such notice, in the case of a public sale, will state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, will state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale will be held at such time or times during ordinary business hours and at such place or places as the Collateral Agent may reasonably fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent will not be obligated to make any sale of any Collateral if it reasonably determines not to do so, regardless of the fact that notice of sale of such Collateral may have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent will not incur any liability in case any such purchaser or purchasers fails to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. For the purposes hereof, a written agreement to purchase the Collateral or any portion thereof will be treated as a sale thereof and in no event will the Grantors be entitled to the return of the Collateral or any portion thereof subject thereto.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law

or in equity to foreclose upon the Collateral and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Each Grantor acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.

(d)     If the Proceeds of any sale or other disposition of the Collateral are insufficient to pay the entire outstanding amount of the Obligations, the Grantors will be liable for the deficiency and the fees of any attorneys employed by the Collateral Agent to collect such deficiency. Each Grantor further agrees that a breach of any of the covenants contained in this Section 7.1 may cause irreparable injury to the Collateral Agent, that the Collateral Agent has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 7.1 will be specifically enforceable against the Grantors, and the Grantors hereby waive and agree not to assert any defenses in an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Obligations becoming due and payable prior to their stated maturities. Nothing in this Section 7.1 will in any way alter the rights of the Collateral Agent hereunder.

(e)     The Collateral Agent will have no obligation to marshal any of the Collateral.

(f)     To the extent that applicable law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees (pursuant to § 9-603 of the UCC) that it is not commercially unreasonable for the Collateral Agent (a) to fail to incur expenses reasonably deemed significant by the Collateral Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition or to postpone any such disposition pending any such preparation or processing; (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (c) to fail to exercise collection remedies against Account Debtors or other persons obligated on Collateral or to remove any Lien on or any adverse claims against Collateral; (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (f) to contact other persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of the Collateral; (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (i) to dispose of assets in wholesale rather than retail markets; (j) to disclaim disposition warranties; (k) to purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition

of Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of Collateral; or (l) to the extent deemed appropriate by the Collateral Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section 7.1(f) is to provide non exhaustive indications of what actions or omissions by the Collateral Agent would not be commercially unreasonable in the Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.1(f). Without limiting the foregoing, nothing contained in this Section 7.1(f) shall be construed to grant any rights to any Grantor or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 7.1(f).

**Section 7.2    Intellectual Property**

(a)    Upon the occurrence and during the continuance of a Trigger Event, each Grantor will use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor of each Intellectual Property License to effect the assignment of all of such Grantor's right, title and interest thereunder to the Collateral Agent or its designee.

(b)    For the purpose of enabling the Collateral Agent to exercise rights and remedies under this Section 7.2 at such time as the Collateral Agent is lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent, exercisable only upon the occurrence and during the continuation of a Trigger Event, an irrevocable (except for failure to comply with the terms and conditions set forth herein), non-exclusive license (exercisable without payment of royalty or other compensation to the Grantors) to use, license or sub-license, on a non-exclusive basis only, any of the Collateral consisting of Intellectual Property (other than where such use, license, or sublicense would constitute a breach or violation of any then-existing Intellectual Property Licenses or any other license arrangements), subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of abandonment, invalidation, unenforceability or dilution of such Trademark, now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof. Such license to the Collateral Agent may be exercised, at the option of the Collateral Agent, only upon the occurrence and during the continuance of a Trigger Event; provided that any license, sub-license or other transaction entered into by the Collateral Agent in accordance herewith will be binding upon the Grantors notwithstanding any subsequent cure or waiver of an Event of Default.

**Section 7.3    Application of Proceeds**

(a)    The Collateral Agent will apply the proceeds of any collection or sale of the Collateral as provided in the Credit Agreement. To the extent not specified in the Credit, the Collateral Agent will have discretion as to the time and manner of application of any such proceeds. Any such proceeds will continue to be held as collateral security for the Obligations (and will not constitute payment thereof until so applied).

(b)     All proceeds received by the Collateral Agent in respect of any part of the Collateral prior to the occurrence and continuance of a Trigger Event shall be returned to the applicable Grantor to the extent such proceeds are not required to be applied in any other manner under the Loan Documents.

**Section 7.4   U.S. Securities Laws**

Each Grantor understands that compliance with the U.S. Securities Laws might very strictly limit (a) the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Pledged Collateral, and (b) limit the extent to which or the manner in which any subsequent transferee of any such Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Pledged Collateral under the U.S. Securities Laws. Each Grantor recognizes that, in light of such restrictions and limitations, the Collateral Agent may, with respect to any sale of the Pledged Collateral, limit the purchasers to those who will agree, among other things, to acquire such Pledged Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that, in light of such restrictions and limitations, upon the occurrence of and during the continuance of a Trigger Event, the Collateral Agent, in its sole and absolute discretion exercised in good faith, (i) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof has been filed under the U.S. Securities Laws and (ii) may approach and negotiate with a single potential purchaser to effect such sale. Each Grantor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Collateral Agent will incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Collateral Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 7.4 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices might exceed substantially the price at which the Collateral Agent sells.

## SECTION 8
## STANDARD OF CARE; AGENT MAY PERFORM

(a)     The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and will not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for Cash actually received by it hereunder, the Collateral Agent will have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.  Neither the Collateral Agent nor any of its directors, officers, employees or agents will be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or will be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantors or otherwise.

(b)    To the extent limited by the terms of this Agreement and the Credit Agreement, if any Grantor fails to perform any agreement contained herein, upon the occurrence or during the continuation of a Trigger Event, the Collateral Agent may itself perform, or cause performance of, such agreement, and the reasonable and documented out-of-pocket expenses of the Collateral Agent incurred in connection therewith will be payable by such Grantor in accordance with Section 9.5.

(c)    By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (i) to consent to the appointment of the Collateral Agent as its agent hereunder and under such other Collateral Documents, (ii) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (iii) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Loan Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any other Loan Document and (iv) to agree to be bound by the terms of this Agreement and any other Loan Documents.

## SECTION 9
## MISCELLANEOUS

### Section 9.1   Notices

All communications and notices hereunder will (except as otherwise permitted herein) be in writing and given as provided in the notice provisions of the Credit Agreement.

### Section 9.2   Security Interest Absolute

All rights of the Collateral Agent hereunder, the Security Interest and all obligations of the Grantors hereunder will be absolute and unconditional until the payment in full of the Obligations, other than Unasserted Contingent Obligations (such date, the "**Debt Termination Date**"), irrespective of (a) any lack of validity or enforceability of the Credit Agreement or any other Loan Document, (b) except with respect to, or as a result of, any amendment to the obligations of the Grantors hereunder, any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document, (c) any exchange, release or non-perfection of any Lien on Collateral, or except with respect to, or as a result of, any amendment to the obligations of the Grantors hereunder, any release or amendment or waiver of or consent under or departure from any Collateral Document or the Guaranty, or (d) except with respect to, or as a result of, any amendment to the obligations of the Grantors hereunder, any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Grantors in respect of the Obligations or this Agreement (other than the occurrence of the Debt Termination Date).

### Section 9.3   Survival of Agreement

(a)    All covenants, agreements, representations and warranties made by the Grantors herein and in the certificates or other instruments prepared or delivered pursuant to this

Agreement will be considered to have been relied upon by the Secured Parties and will survive the making by the Secured Parties of any extensions of credit, regardless of any investigation made by the Secured Parties or on their behalf, and will continue in full force and effect until the Debt Termination Date and/or this Agreement terminates in accordance with the terms hereof.

(b)  To the extent that any Grantor makes a payment or payments to any Secured Party (or to any Collateral Agent for the benefit of some or all of the Secured Parties), or any Secured Party enforces any security interests or exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

## Section 9.4    Successors and Permitted Assigns

This Agreement will be binding upon and inure to the benefit of each of the parties hereto, and the Secured Parties not party hereto, and the successors and permitted assigns of each of the foregoing, except that (i) no Grantor may assign or otherwise transfer any of its rights or obligations hereunder or any interest in the Collateral (and any such assignment or transfer will be null and void) unless permitted under or otherwise contemplated by this Agreement or the Credit Agreement, but (ii) all references to any Grantor will include any Grantor as debtor-in-possession and any receiver or trustee for such Grantor in any Insolvency Proceeding. Nothing herein is intended, or will be construed, to give any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

## Section 9.5    Collateral Agent's Fees and Expenses; Indemnification

(a)  Without limitation of its reimbursement obligations under the other Loan Documents, each Grantor agrees to pay upon demand to the Collateral Agent the amount of any and all reasonable and documented out-of-pocket expenses (including the reasonable fees, disbursements and other charges of counsel to the Collateral Agent) on the terms and conditions set forth in Section 10.3 of the Credit Agreement, which such terms shall be incorporated herein by reference, *mutatis mutandis*.

(b)  Without limitation of its indemnification obligations under the other Loan Documents, each Grantor agrees to indemnify the Collateral Agent and each other Indemnitee against, and hold each of them harmless from, any and all claims, damages, liabilities, obligations, losses, penalties, actions, judgments and suits on the terms and conditions set forth in Section 10.3 of the Credit Agreement, which such terms shall be incorporated herein by reference, *mutatis mutandis*.

## Section 9.6    Applicable Law

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK (other than any mandatory provisions of the UCC relating to the law governing perfection or priority of the Security Interests).

**Section 9.7   Waivers; Amendment**

    (a)    No failure on the part of the Collateral Agent to exercise and no delay in exercising any power or right hereunder will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Collateral Agent and the other Secured Parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provisions of this Agreement or consent to any departure by the Grantors therefrom will in any event be effective unless the same is permitted by paragraph (b) below, and then such waiver or consent will be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Grantor in any case will entitle such Grantor or any other Grantor to any other or further notice or demand in similar or other circumstances.

    (b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except (i) as provided herein with respect to any Security Supplement or Joinder Agreement or (ii) pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantors, subject to any consent required in accordance with the Credit Agreement.

    (c)    Notwithstanding the foregoing, the Collateral Agent (acting at the direction of the Administrative Agent) may effect amendments, supplements, waivers and modifications to this Agreement at the request of the Borrower without the need to obtain the consent of any other Secured Party if such amendment, supplement or waiver is delivered in accordance with the last paragraph of Section 10.2 of the Credit Agreement.

**Section 9.8   Waiver of Jury Trial**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**Section 9.9   Severability**

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 9.10 Counterparts; Effectiveness**

This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith (a) may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument (and signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document), and (b) will become effective upon the execution and delivery of a counterpart hereof by each of the parties hereto. Delivery of an executed facsimile or "PDF" ("**PDF**") counterpart of a signature page to this Agreement or any such amendments, waivers, consents or supplements shall be effective as delivery of an original executed counterpart hereof or thereof. The Collateral Agent may also request that any such facsimile or PDF signatures be confirmed by a manually signed original thereof; **provided that** the failure to request or deliver the same shall not limit the effectiveness of any facsimile or PDF signature delivered. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this letter shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by each of the parties hereto, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 9.11 Section Titles**

The section titles contained in this Agreement are and will be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

**Section 9.12 Consent to Jurisdiction and Service of Process**

(a)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the transactions relating hereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third-party claims brought against the Collateral Agent or any of its Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Collateral Agent or any Secured Party may otherwise have to bring any action or proceeding relating to this Agreement against any Loan Party or its properties in the courts of any jurisdiction.

(b)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter

have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.1</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**Section 9.13 Termination**

(a)     This Agreement and the Security Interest will terminate on the Debt Termination Date.

(b)     Upon any sale, lease, transfer or other disposition of any item of Collateral of any Grantor (other than any transfer to another Grantor) in accordance with the terms of the Credit Agreement (including as a result of which such Grantor ceases to be a Grantor or becomes an Excluded Subsidiary), or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral in accordance with the Loan Documents, the Security Interest of the Collateral Agent in such item of Collateral will be automatically released.

(c)     In addition to clause (b) above, if, in compliance with the terms and provisions of the Credit Agreement, (i) all or substantially all of the Equity Interests or property of any Grantor are sold or otherwise transferred (a "Transferred Grantor") to a person or persons, none of which is a Grantor, such Transferred Grantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement and its obligations to pledge and grant any Collateral owned by it hereunder or pursuant to any Collateral Document and (ii) all or substantially all of the Equity Interests of the Transferred Grantor are sold or otherwise transferred to a person or persons, none of which is a Grantor, the pledge of such Equity Interests to the Collateral Agent pursuant to the Collateral Documents shall be automatically released.

**Upon any termination or release pursuant to this Section 9.13, the Collateral Agent will execute and deliver to the applicable Grantor, at such Grantor's expense, all UCC termination statements, releases and similar documents that the Grantors may reasonably request to effect and/or evidence such termination or release.  Any such execution and delivery of termination statements, releases or other documents will be without recourse to or warranty by the Collateral Agent.**

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** the Grantors and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date first written above.

BYJU's Alpha, Inc., a Delaware corporation,
as Grantor

By _____
    Name: RIJU RAVINDRAN.
    Title: DIRECTOR.

Whitehat Education Technology LLC, a Delaware limited liability company,
as Grantor

By _____
    Name: RIJU RAVINDRAN.
    Title: Manager.

Tangible Play, Inc., a Delaware corporation,
as Grantor

By _____
    Name: RIJU RAVINDRAN.
    Title: DIRECTOR.

GLAS Trust Company LLC, a New Hampshire limited liability company,
as Collateral Agent

By _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the Grantors and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date first written above.

BYJU's Alpha, Inc., a Delaware corporation,
as Grantor

By _____
    Name:
    Title:

Whitehat Education Technology LLC, a Delaware limited liability company,
as Grantor

By _____
    Name:
    Title:

Tangible Play, Inc., a Delaware corporation,
as Grantor

By _____
    Name:
    Title:

GLAS Trust Company LLC, a New Hampshire limited liability company,
as Collateral Agent

By _____
    Name:   LISHA JOHN
    Title:  VICE PRESIDENT

A46226424

Signature Page – Pledge and Security Agreement

**Schedule 3.2**

**Names and Locations**

**Names**

| Grantor's correct legal name | Federal tax ID number | Jurisdiction of organization and organizational ID number |
|---|---|---|
| BYJU's Alpha, Inc. | 87-2924260 | State of Delaware - 6265016 |
| Whitehat Education Technology LLC | 84-4389546 | State of Delaware – 7810711 |
| Tangible Play, Inc. | 46-171931 | State of Delaware - 5269835 |

**Locations**

| Grantor | Location of chief executive office | Additional place of business |
|---|---|---|
| BYJU's Alpha, Inc. | Santa Clara, California, USA | N/A |
| Whitehat Education Technology LLC | Wilmington, Delaware, USA | N/A |
| Tangible Play, Inc. | Palo Alto, California USA | N/A |

**Changes in Identity or Organizational Structure**

| Grantor | Description and date of relevant change: |
|---|---|
| BYJU's Alpha, Inc. | N/A |
| Whitehat Education Technology LLC | N/A |
| Tangible Play, Inc. | N/A |

**Schedule 3.3**

**Filings**

| Grantor | Filing Office(s), including any relevant IP Filing Office(s) |
|---------|--------------------------------------------------------------|
| Tangible Play, Inc. | U.S. Patent and Trademark Office, USA |
| Tangible Play, Inc. | Delaware Recorder of Deeds, USA |
| Whitehat Education Technology LLC | Delaware Recorder of Deeds, USA |
| BYJU's Alpha, Inc. | Delaware Recorder of Deeds, USA |

**Schedule 3.6**

**Pledged Collateral; Pledged Accounts**

**Pledged Notes**

None.

**Pledged Equity**

None.

## Schedule 3.7

### Intellectual Property

#### Copyrights

None.

#### Patents

None.

#### Trademarks

| Grantor | Trademark | App. No. | App. Date | Reg. No. | Reg. Date |
|---|---|---|---|---|---|
| TANGIBLE PLAY, INC. | MATH WIZARD | 90804552 | 30-JUN-2021 | N/A | N/A |
| TANGIBLE PLAY, INC. | MATH WIZARD AND THE MAGICAL WORKSHOP | 90804614 | 30-JUN-2021 | N/A | N/A |
| TANGIBLE PLAY, INC. | MATH WIZARD AND THE AMAZING AIRSHIPS | 90804642 | 30-JUN-2021 | N/A | N/A |
| TANGIBLE PLAY, INC. | OSMO LITTLE GENIUS | 88484374 | 21-JUN-2019 | 6540287 | 26-OCT-2021 |
| TANGIBLE PLAY, INC. | OSMO DETECTIVE AGENCY | 88106551 | 06-SEP-2018 | 6449205 | 10-AUG-2021 |
| TANGIBLE PLAY, INC. | OSMO TOWN | 88106559 | 06-SEP-2018 | 6511798 | 05-OCT-2021 |
| TANGIBLE PLAY, INC. | SUPER STUDIO | 87843258 | 21-MAR-2018 | 5770917 | 04-JUN-2019 |
| TANGIBLE PLAY, INC. | OSMO SUPER STUDIO | 87843272 | 21-MAR-2018 | 5776886 | 11-JUN-2019 |
| TANGIBLE PLAY, INC. | MO | 87087871 | 29-JUN-2016 | 6175462 | 13-OCT-2020 |
| TANGIBLE PLAY, INC. | AWBIE | 86968402 | 07-APR-2016 | 5370752 | 02-JAN-2018 |
| TANGIBLE PLAY, INC. | OSMO | 86977780 | 24-MAR-2014 | 4883244 | 05-JAN-2016 |

**Intellectual Property Licenses**

None.

**Schedule 3.8**

**Commercial Tort Claims**

None.

**EXHIBIT A**

**FORM OF SECURITY SUPPLEMENT**

This **SECURITY SUPPLEMENT**, dated as of [●], is delivered pursuant to the Pledge and Security Agreement, dated as of [●] (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Pledge and Security Agreement**"), among BYJU's Alpha, Inc., a Delaware corporation ("**Borrower**"), Whitehat Education Technology LLC, a Delaware limited liability company, Tangible Play Inc., a Delaware corporation, and any Additional Grantors (as defined therein) (each of the foregoing, a "**Grantor**", and collectively, "**Grantors**") and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**"). Capitalized terms used herein but not defined herein are used with the meanings given them in the Pledge and Security Agreement.

[●] (the "**Undersigned Grantor**") confirms, as set forth in the Pledge and Security Agreement, that it has pledged, assigned, transferred and granted (and, to the extent necessary, it hereby pledges, assigns, transfers and grants) to the Collateral Agent, for its benefit and for the benefit of the Secured Parties, a continuing security interest in, and Lien on, all of its right, title and interest in, to and under the Collateral as security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations (as defined in the Credit Agreement) in accordance with the terms of and subject to the limitations specified in the Pledge and Security Agreement.

The Undersigned Grantor represents and warrants that the attached Supplements to Schedules accurately and completely set forth all information required pursuant to the Security Agreement and hereby agrees that such Supplements to Schedules will [constitute part of][replace][1] the Schedules to the Pledge and Security Agreement.

**IN WITNESS WHEREOF,** the Undersigned Grantor has caused this Security Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

**[UNDERSIGNED GRANTOR]**


By: _____
     Name:
     Title:


**ACKNOWLEDGED AND AGREED:**

GLAS Trust Company LLC, a New Hampshire limited liability company,
as Collateral Agent

---

[1]  Insert appropriate term.

By: _____
     Name:
     Title:

**EXHIBIT B**

**FORM OF JOINDER AGREEMENT**

This **JOINDER AGREEMENT**, dated as of [●], is delivered pursuant to Section 5.2 of the Pledge and Security Agreement dated as of [●] (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Pledge and Security Agreement**"), BYJU's Alpha, Inc., a Delaware corporation ("**Borrower**"), Whitehat Education Technology LLC, a Delaware limited liability company, Tangible Play Inc., a Delaware corporation, and any Additional Grantors (as defined therein) (each of the foregoing, a "**Grantor**", and collectively, "**Grantors**"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**"). Capitalized terms used herein but not defined herein are used with the meanings given them in the Pledge and Security Agreement.

By executing and delivering this Joinder Agreement, [●] (the "**Additional Grantor**"), as provided in Section 5.2 of the Pledge and Security Agreement, hereby becomes a party to the Pledge and Security Agreement as a Grantor thereunder with the same force and effect as if originally named as a Grantor therein and, without limiting the generality of the foregoing, hereby:

(a)     pledges, assigns, transfers and grants to the Collateral Agent, for its benefit and for the benefit of the Secured Parties, a continuing security interest in and Lien on all of its right, title and interest in, to and under the Collateral as security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations (as defined in the Credit Agreement); and

(b)     expressly assumes all obligations of a Grantor under the Pledge and Security Agreement.

The information set forth in Exhibit A hereto [is hereby added to][hereby replaces] [2] the information set forth in the Schedules to the Pledge and Security Agreement.

The Additional Grantor hereby represents and warrants that (a) each of the representations and warranties contained in Section 3 (*Representations and Warranties*) of the Pledge and Security Agreement applicable to it is true and correct on and as the date hereof as if made on and as of such date [and (b) all Equity Interests issued to the Additional Grantor are [[Certificated Securities][ Uncertificated Securities] governed by Article 8 of the UCC][General Intangibles governed by Article 9 of the UCC]]. [3]

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER ARE GOVERNED BY, AND WILL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.**

[Remainder of page intentionally left blank]

---

[2]   Insert appropriate term.

[3]   Conform as applicable. If there are multiple types, consider including all relevant ones and adding ", as described on Schedule 3.6 of Exhibit A as of the date hereof."  Generally, LLC and Partnership interests are not "securities" for the purposes of Article 8 of the UCC.  Include this provision if the governing organizational documents for such LLC or Partnership include an "opt-in" to Article 8 of the UCC such that the LLC or Partnership interests are considered "securities" under Article 8 of the UCC and thus can be perfected by control or possession.

**IN WITNESS WHEREOF**, the Additional Grantor has caused this Joinder Agreement to be duly executed and delivered by its respective officer or representative thereunto duly authorized as of the date first written above.

**[ADDITIONAL GRANTOR]**


By: _____
      Name:
      Title:


**ACKNOWLEDGED AND AGREED:**

GLAS Trust Company LLC, a New Hampshire limited liability company,
as Collateral Agent


By: _____
      Name:
      Title:

**EXHIBIT A TO JOINDER AGREEMENT**

**SUPPLEMENTS TO SCHEDULES**

**EXHIBIT C**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**INTELLECTUAL PROPERTY SECURITY AGREEMENT**, dated as of [●], among BYJU's Alpha, Inc., a Delaware corporation ("**Borrower**"), Whitehat Education Technology LLC, a Delaware limited liability company and Tangible Play, Inc., a Delaware corporation (each of the foregoing, a "**Grantor**", and collectively, "**Grantors**"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

**RECITALS**

(A)    Borrower, Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427 (the "**Parent Guarantor**"), certain Subsidiaries of the Parent Guarantor, the financial institutions party thereto as lenders (each individually referred to as a "**Lender**" and collectively as "**Lenders**"), and the Collateral Agent are parties to a Credit Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Credit Agreement**").

(B)    Grantors are party to a Pledge and Security Agreement, dated as of [●], in favor of the Collateral Agent (as it may from time to time be amended, restated, supplemented or otherwise modified in accordance with its terms, the "**Pledge and Security Agreement**"), pursuant to which the Grantors are required to execute and deliver this Agreement.

(C)    In consideration of the conditions and agreements set forth in the Credit Agreement, the Pledge and Security Agreement and this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1        Defined Terms**

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

**Section 2        Grant of Security Interest in Intellectual Property Collateral**

As security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations (as defined in the Credit Agreement), each Grantor hereby pledges, assigns, transfers and grants to the Collateral Agent, for its benefit and for the benefit of the Secured Parties, a continuing security interest in and Lien on all of its right, title and interest in, to and under all Intellectual Property Collateral (as defined below), whether now owned or hereafter acquired or existing and wherever located.

"**Intellectual Property Collateral**" means each Grantor's right, title and interest in, to and under all of the following property (other than any Excluded Property):

(a)    all Copyrights owned by or licensed to any Grantor, including those referred to on Schedule I hereto;

(b)    all Patents owned by or licensed to any Grantor, including those referred to on Schedule II hereto;

    (c)      all Trademarks owned by or licensed to any Grantor, including those referred to on Schedule III hereto, together with all goodwill of the business connected with the use of, and symbolized by, each such Trademark;

    (d)      all Intellectual Property Licenses to which such Grantor is a party;

    (e)      all reissues, continuations or extensions of the foregoing; and

    (f)      all Proceeds of the foregoing, including any claim by Grantor against third parties for past, present or future (i) infringement or, if applicable, dilution of any owned or licensed Copyright, Trademark or Patent, or (ii) injury to the goodwill associated with any owned or licensed Trademark.

**Section 3      Certain Exclusions**

Notwithstanding anything herein to the contrary, in no event will the Intellectual Property Collateral include and no Grantor will be deemed to have granted a Security Interest in any of its right, title or interest in any Excluded Property.

**Section 4      Pledge and Security Agreement**

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Collateral Agent pursuant to the Pledge and Security Agreement, and each Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest granted by them in the Intellectual Property Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement. To the extent applicable for purposes of this Agreement, the terms and provisions of the Pledge and Security Agreement are incorporated by reference herein. To the extent there is any conflict between the terms of this Agreement and the Pledge and Security Agreement, the Pledge and Security Agreement shall control.

**Section 5      Governing Law**

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER ARE GOVERNED BY, AND WILL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, each Grantor has caused this Intellectual Property Security Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date first written above.

**[GRANTOR]**,
as Grantor


By: _____
    Name:
    Title:


**[GRANTOR]**,
as Grantor


By: _____
    Name:
    Title:

**ACCEPTED AND AGREED:**

GLAS Trust Company LLC, a New Hampshire limited liability company,
as Collateral Agent

By: _____
     Name:
     Title:

**SCHEDULE I TO THE INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**COPYRIGHT REGISTRATIONS**
**Copyrights**

**SCHEDULE II TO THE INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**PATENT REGISTRATIONS**

**Patents**

**SCHEDULE III TO THE INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**TRADEMARK REGISTRATIONS**

**Trademarks**