## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,<br><br>Debtor | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>                    Plaintiff,<br>v.<br><br>BYJU RAVEENDRAN, DIVYA<br>GOKULNATH, and ANITA KISHORE,<br>                    Defendants. | Adv. Pro. No. 25-50526 (BLS)<br><br>Re: Adv. D.I.  77, 78, 93, 116 |

## OPINION DENYING THE MOTION TO DISMISS FILED BY DEFENDANTS BYJU RAVEENDRAN AND DIVYA GOKULNATH[1]

This adversary proceeding is part of the Debtor's ongoing efforts to unravel a series of fraudulent transfers that stripped the Debtor of its assets (including the $533 million Alpha Funds (as defined below) and the proceeds thereof), by placing those assets beyond the reach of the Debtor and its creditors and concealing their whereabouts. On February 27, 2025, this Court issued a Memorandum Opinion in a separate adversary proceeding that granted partial summary judgment on claims of actual fraudulent transfer.[2]  The Debtor has filed this adversary proceeding to "hold

---

[1] This Court has subject matter jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b).

[2] *See Byju's Alpha, Inc. v. Camshaft Cap. Fund L.P. (In re Byju's Alpha, Inc.)*, Adv. Pro. No. 24-50013, Docket No. 383 (Bankr. D. Del. Feb. 27, 2025) (Memorandum Opinion (the "MSJ Mem. Op.") granting the Debtor's motion for partial summary judgment on various claims, including

three powerful BYJU's executives accountable for having purposefully caused the Debtor to fraudulently transfer an asset valued at over half a billion dollars for no consideration."[3]

The Complaint asserts claims for breach of fiduciary duties, aiding and abetting breach of fiduciary duties, accounting, conversion, and civil conspiracy. The Summons was issued on April 9, 2025, the same day the Complaint was filed.

Defendants Raveendran and Gokulnath (the "Moving Defendants") have filed a Motion to Dismiss the Complaint, on three separate grounds: first, that the Debtor has failed to properly serve them with the Summons and Complaint; second, that the Court lacks personal jurisdiction over them; and finally, that the Complaint fails to state valid claims against them.[4] The Plaintiffs filed a response opposing the Motion to Dismiss[5] and the Defendants timely filed a Reply brief.[6] The Court held a hearing to consider the Motion to Dismiss on September 9, 2025. For the reasons set forth herein, the Motion to Dismiss will be denied.

<u>ALLEGATIONS</u>

The Complaint alleges the following:

Debtor Byju's Alpha, Inc. was formed as a Delaware corporation on September 27, 2021, as a special purpose financing vehicle for its former Indian

---

claims of actual fraudulent transfer, against Defendants Camshaft Capital Fund LP, Camshaft Capital Management LLC, Think and Learn Private Limited and Riju Ravindran (the "Camshaft Adversary Defendants")).   The Court determined that between April 2022 and July 2022, the Debtor made a series of wire transfers to Camshaft Capital Fund LP, a small unknown hedge fund, totaling $533 million (the "Alpha Funds").

[3] Adv. D.I. 1 (the "Compl.") ¶ 1.

[4] Adv. D.I.s 77, 78, 79, 80 (the "Motion to Dismiss").

[5] Adv. D.I.s 93, 94.

[6] Adv. D.I. 116.

ultimate corporate parent, Think & Learn Pvt. Ltd. ("T&L").[7]  T&L was co-founded by Raveendran and Gokulnath who both served, along with Byju's younger brother Riju Ravindran,[8] as T&L directors at all relevant times, until their roles were suspended in July 2024, when T&L was involuntarily placed into an insolvency proceeding in India.[9]

The Complaint alleges that the Debtor never had any material active business operations.[10]  From its formation until March 3, 2023, Riju served as an officer and sole director of the Debtor.[11]  The Complaint further alleges that Raveendran also served as an officer of the Debtor (namely, CEO) for an indeterminate period of time.[12]  On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in those roles through the present.[13]

This Court has found that there is "extensive evidence" suggesting that the Debtor was formed "to perpetrate a fraud."[14]    On November 24, 2021, the Debtor borrowed $1.2 billion under a Credit Agreement from a consortium of Lenders, with GLAS Trust Company LLC ("GLAS") serving as Administrative and Collateral Agent.[15]  Within months of executing the Credit Agreement, the Debtor defaulted by

---

[7] Compl. ¶ 23.  Capitalized terms not defined herein have the meanings given to them in the Complaint.

[8] To distinguish between the brothers, Riju Ravindran is referred to herein by his first name, Riju.

[9] Compl. ¶¶ 24, 25.

[10] Compl. ¶ 23.

[11] Compl. ¶ 23.

[12] Id.

[13] Id.

[14] Compl. ¶ 19, n. 11 (citing the MSJ Mem. Op. at 21).

[15] Compl. ¶ 27.

failing to comply with financial reporting and guarantee covenants, permitting the Lenders to accelerate the loans and exercise available remedies, which they ultimately did.[16]

On April 27-28, 2022, the Debtor (through Riju acting as the Debtor's sole director and - - as he later testified during depositions - - taking direction from the T&L Board) initiated three wire transfers totaling $318,000,000 to Camshaft Capital Fund, L.P., a Delaware limited partnership ("Camshaft Fund") for the purported purpose of subscribing for a limited partnership interest.[17] On July 12-13, 2022, the Debtor initiated three additional transfers to Camshaft Fund in the total amount of $215,000,000 from another checking account of the Debtor.[18] In total, the Debtor transferred $533,000,000 to Camshaft Fund in exchange for limited partnership interests in Camshaft Fund (the "Camshaft LP Interest") pursuant to two sets of subscription agreements and corresponding side letters.[19]

The Complaint alleges that there was no legitimate reason for the Debtor to allegedly "invest" over half a billion dollars in Camshaft Fund, which at the time had under $10 million in assets under management, particularly after the Debtor's multiple loan defaults under the Credit Agreement.[20] The Complaint claims that it has since become well publicized that Camshaft Fund was an unproven, fly-by-night hedge fund founded in August 2020 by William Morton - - then, a 23-year old with

---

[16] Compl. ¶¶ 33-35.  The defaults included failure by T&L to provide quarterly financial statements and failure by an affiliate (Whitehat India) to provide a required guarantee. *Id.*

[17] Compl. ¶39.

[18] *Id.*

[19] *Id.*  These transfers are referred to as the "First Fraudulent Transfer."  Compl. ¶ 42.

[20] Compl. ¶ 43.

no formal training in investing or money management, and no apparent qualification to manage a hedge fund.[21]  On federal and state regulatory filings, Camshaft Fund listed the address of an International House of Pancakes in the Little Havana neighborhood of Miami as its principal place of business.[22] Accordingly, the Complaint alleges the Camshaft Fund was a complete sham and Morton was an inexperienced and highly unqualified manager.[23]

The Complaint further alleges that the transfers to Camshaft Fund rendered the Debtor insolvent, if it was not already so.[24]  Specifically, the Debtor's liabilities (approximately $1.194 billion in outstanding principal on the defaulted loans as of July 12-13, 2022) far exceeded the Debtor's liquid assets (around $131 million in available funds), and the Debtor had no meaningful active operations capable of generating income.[25]  The Court found that Riju breached his fiduciary duties by authorizing these transfers.[26]  To conceal the movement of money from the Lenders, T&L's unaudited financial statements continued to report that the Debtor held over $500 million in "Cash and Bank."[27]

As defaults continued to mount, by the end of September 2022, an *ad hoc* group of Lenders engaged advisors and contacted the Debtor's representatives, including the Moving Defendants and Riju, to resolve the outstanding defaults and

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Compl. ¶ 42.
[25] *Id.*
[26] Compl. ¶ 97; MSJ Mem. Op. at 38-39.
[27] Compl. ¶¶ 50, 53, 68.

restructure the term loans.[28]  On October 4, 2022, the parties entered into the first of what would become seven more amendments to the Credit Agreement.[29] Unbeknownst to the Lenders, around October 2022, the Debtor "started the process" of transferring the Camshaft LP Interest to affiliate Inspilearn, LLC ("Inspilearn").[30]

After months of fruitless negotiations, on Friday, March 3, 2023, GLAS, acting at the Lenders' direction, exercised remedies, including accelerating over $1.2 billion in principal and outstanding interest and fees owed under the Credit Agreement.  GLAS took control of the pledged shares in the Debtor and, as the Debtor's sole shareholder, GLAS appointed Pohl as the Debtor's sole director, who then appointed himself as the Debtor's sole officer.[31]  As this Court would later find, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor."[32]

But on Monday, March 6, 2023, before Pohl was able to secure actual control of the Debtor's assets, the Complaint alleges that Kishore emailed Camshaft's founder (copying Raveendran) seeking to resume the process of transferring the Camshaft LP Interest to Inspilearn.[33]    On March 31, 2023, the Debtor, Inspilearn, and Camshaft executed the Transfer Agreement and Subscription Agreement, among other documentation, resulting in the Debtor having "zero remaining

---

[28] Compl. ¶¶ 36-37, 45.
[29] Compl. ¶ 46.
[30] Compl. ¶¶ 4, 46.
[31] Compl. ¶¶ 55, 64.
[32] Compl. ¶ 11, MSJ Memo. Op. at 42.
[33] Compl. ¶¶ 2, 57.  This Court previously found that "Inspilearn is T&L's alter ego as a matter of law." MSJ Mem. Op. at 16.

interest in the Transferred Interest," (*i.e.*, the Camshaft LP Interest).[34]  Raveendran signed the Transfer Agreement on behalf of the Debtor, as "CEO," and falsely represented that he, on behalf of the Debtor, had "all requisite power and authority to execute, deliver, and perform this agreement."[35]  Riju signed the Transfer Agreement on behalf of Inspilearn and later testified that he "just took direction from the parent company," - - meaning T&L and, more specifically, his brother Byju, and sister-in-law, Gokulnath.[36]  In exchange for the transfer of the Camshaft LP Interest (contemporaneously valued at $540,647,102.29), the Debtor received no consideration whatsoever.[37]

Pohl did not learn about the Transfer Agreement until 2024, when he received a copy of it during discovery in this bankruptcy proceeding.[38]  The Complaint alleges that the Defendants' motive for the Second Fraudulent Transfer was to conceal the asset from the Debtor's creditors and to frustrate their rights to exercise remedies under the Credit Agreement and applicable law.[39]  Raveendran conceded as much during a call in May 2023 with the Lenders' U.S.-based financial advisor and with Raveendran's General Counsel on the line, admitting "the money is someplace the Lenders will never find it."[40]  This Court found: "[i]t is difficult to

---

[34] Compl. ¶¶ 59-60 (quoting the Transfer Agreement).  The "Transferred Interest" was defined in the Transfer Agreement as "100% of the Interest," referring to the Debtor's "total Capital Commitment to [Camshaft Fund] in the amount of $533,000,000.00."  Compl. ¶ 60, n. 18.  This transfer is referred to as the "Second Fraudulent Transfer."

[35] Compl. ¶ 61.

[36] Compl. ¶¶ 61, 63.

[37] Compl. ¶¶ 2, 65.

[38] Compl. ¶ 9.

[39] Compl. ¶ 64.

[40] Compl. ¶ 72.

imagine a single combination of words to demonstrate actual fraudulent intent more clearly."[41]

The Complaint describes details the actions of Raveendran, Gokulnath, Kishore, Riju, and other business associates to continuously conceal the $533 million, including T&L's falsified financials,[42] backdating the Transfer Agreement,[43] and prepetition and post-petition misrepresentations about the $533 million.[44]   The Complaint also alleges that a third fraudulent transfer occurred on the date the Debtor filed for bankruptcy (February 1, 2024), when the Defendants and Riju caused Inspilearn to transfer the Camshaft LP Interest to an offshore trust, which purportedly redeemed it for cash.[45]

The Debtor alleges that its former management and T&L have refused to provide Pohl with the Debtor's books and records, despite Riju's testimony that T&L maintained those records.[46]  The Complaint alleges that the whereabouts of the Alpha Funds remains unknown.[47]  Six parties, including both Raveendran brothers, have been held in contempt rather than cooperate.[48]

---

[41] *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP* (*In re BYJU's Alpha, Inc.*), <u>661 B.R. 109, 123</u> (Bankr. D. Del. 2024).
[42] Compl. ¶¶ 26, 68.
[43] Compl. ¶ 73
[44] Compl. ¶¶ 77-79; 80-82.
[45] Compl. ¶¶ 2, 80.
[46] Compl. ¶¶ 38, 74, 118.
[47] Compl. ¶ 87.
[48] Adv. D.I. 66; Camshaft Adv. No. 24-50013, D.I. 80, 204, 313.

<u>DISCUSSION</u>

1.    <u>Whether the Debtor properly served the Complaint and Summons upon Defendants Raveendran and Gokulnath.</u>

Raveendran and Gokulnath move to dismiss the Complaint under <u>Fed.R.Civ.P. 12(b)(5)</u> for insufficient service of process.  The Debtor asserts that Raveendran was served with the Summons and Complaint through the Delaware Officer Consent Statute on April 10, 2025,[49] and Raveendran and Gokulnath were served in the United Arab Emirates on May 14, 2025, pursuant to <u>Fed.R.Civ.P. 4(f)(2)(A)</u> and the laws of the United Arab Emirates.[50]

"In the absence of service of process or a waiver of service by the defendant, due process will not permit a court to exercise power over a party named as defendant in the complaint."[51]  "In resolving a motion under Rule 12(b)(5), the party making service has the burden of demonstrating its validity when an objection to service is made."[52]  "This burden can be met by a preponderance of the evidence using affidavits, depositions, and oral testimony."[53]

Here, the Debtor argues that it properly served Raveendran under the Delaware Consent Statute and properly served both Raveendran and Gokulnath under <u>Federal Rule of Civil Procedure 4(f)(2)</u>.  Raveendran argues that he cannot be served under the Delaware Consent Statute because there is no evidence that he

---

[49] Adv. D.I. 6.
[50] Adv. D.I.s 35-36.
[51] *Mills v. Ethicon, Inc.*, <u>406 F.Supp.3d 363, 391-92</u> (D. N.J. 2019) (citing *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, <u>526 U.S. 344, 350</u>, <u>119 S.Ct. 1322</u>, <u>143 L.Ed.2d 448</u> (1999)).
[52] *Chow v. Canyou Bridge Cap. Partners, LLC*, <u>2024 WL 3510917</u>, *4 (D. Del. July 22, 2024) (quoting *Martin v. OSHA*, <u>2017 WL 1326212</u>, *2 (E.D.Pa. Apr. 11, 2017)).
[53] *Mills*, <u>406 F.Supp.3d at 392</u>.

was formally appointed as the CEO of the Debtor.  Further, both Defendants argue that the Debtor's attempt at service in the United Arab Emirates ("UAE") under Rule 4(f)(2) did not comply with the laws for service in that country.

    (a)   <u>The Delaware Consent Statute</u>

The Delaware Consent Statute, <u>10 Del. C. § 3114</u>, provides that nonresidents of the State of Delaware who serve as officers and directors of a Delaware corporation are deemed to have consented to service of process upon the corporation's registered agent for civil actions brought in Delaware against the corporation or against the officer or director for a violation of their duties.[54] Raveendran argues that the statute cannot apply to him because, he claims, there is no evidence that he was ever officially appointed as an officer of the Debtor. Raveendran relies upon the statute's definition of "officer" as an officer of the corporation who:

(1) Is or was the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer of the corporation at any time during the course of conduct alleged in the action or proceeding to be wrongful;

(2) Is or was identified in the corporation's public filings with the United States Securities and Exchange Commission because such person is or was 1 of the most highly compensated executive officers of the corporation at any time during the course of conduct in the action or proceeding to be wrongful; or

(3) Has, by written agreement with the corporation, consented to be identified as an officer for purposes of this section.[55]

---

[54] <u>10 Del. C. § 3114(b)</u>.
[55] <u>10 Del. C. § 3114(b)</u>.

Raveendran claims that numbers (2) and (3) above clearly do not apply to him, and he further argues that (1) does not apply because he was not actually appointed as CEO of the Debtor.[56]

The Debtor argues, however, that the full text of § 3114(b) plainly states that the Consent Statute applies to any nonresident of Delaware who "after January 1, 2004, accepts election or appointment as an officer of a corporation organized under the laws of this State or *who after such dates serves in such capacity ....*"[57]  The Debtor asserts that Raveendran clearly served as the Debtor's CEO by signing documents with that title (particularly, the Transfer Agreement), and based on the testimony of Riju that Raveendran (and Gokulnath) were the true decision-makers for the Debtor.

The Delaware Court of Chancery squarely considered this issue in *Harris v. Harris* and held:

> Addressing an issue of first impression, this decision holds that the Officer Consent Statute can be used to serve process on a person who serves in the role of president, chief executive officer, chief operation

---

[56] Raveendran also argues that the Plaintiffs conceded in their Complaint that Riju was the sole director and officer of the Debtor.  However, a full reading of paragraph 93 of the Complaint shows that it alleges Riju was the sole director and officer of the Debtor "*at the time . . . Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund."*  This is not inconsistent with other allegations - - made at least ten times throughout the Complaint - - that Raveendran was acting as the Debtor's CEO when signing the Transfer Agreement and initiating the Second Fraudulent Transfer.  Raveendran further asserts that the Court made findings in its Summary Judgment Opinion that Raveendran "was not employed by the Debtor in any capacity" (MSJ Mem. Op. at 40) or that Riju was the sole director and officer of the Debtor (*Id.* at 15-16, 19).  Raveendran argues the Plaintiffs are estopped from arguing otherwise.  The Plaintiffs argue that Raveendran's references are cherry-picked and taken out of context when considered in a full reading of the Summary Judgment Opinion. This Court agrees. In the Summary Judgment Opinion, the Court determined that Raveendran had no authority to effectuate a transfer *after* GLAS exercised its remedies and appointed Pohl as the Debtor's sole director and officer. (*Id.* at 40).  It is also noteworthy that in the Summary Judgment Opinion, the Court determined that Raveendran was "the Debtor's founder, and self-appointed CEO."  (*Id.* at 6).

[57] *Id.* (emphasis added).

officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer of the corporation even if the person does not hold the formal officer position.[58]

The Court explained that the plain meaning of "serves" extends "to someone who fills a role and performs the duties of an office, without formally accepting the position."[59]   The *Harris* Court determined that the list of officer positions in § 3114(b)(1) "designates roles, not titles" and offered the following examples:

> The top executive at a company who uses the title "Grand Poobah" is still subject to service of process under Section 3114(b)(1) as the president or chief executive officer.  A real-world example is Jack Dorsey of Block, Inc. who holds the title of "Chief Blockhead."  He remains subject to service of process under Section 3114(b)(1).  And when Elon Musk re-designated himself as "Chief Twit," he did not fall out of the ambit of Section 3114(b)(1).[60]

The *Harris* Court found it "likely that the drafters of Section 3114(b) expected the statute to reach the individuals who perform the duties, fill the roles, and act in substance as the top executives at private companies, regardless of Formal Officer status."[61]   The Court also warned that limiting the Consent Statute to only formal officers could render it ineffective and enable individuals to exploit gaps in coverage to "evade service of process, whether by inadvertence or design."[62]

Raveendran argues that the *Harris* decision is overbroad and should not be followed, noting that it was a matter of first impression for the Court.  Instead,

---

[58] *Harris v. Harris*, <u>289 A.3d 310, 316</u> (Del. Ch. 2023).
[59] *Id.* at 328.
[60] *Id.* at 329.
[61] *Id.* at 335.
[62] *Id.* at 333.

Raveendran relies upon the Delaware Court of Chancery opinion in *HMG/Courtland Properties, Inc. v. Gray*, in which the Court rejected the theory of applying the implied consent provisions of § 3114 to a director's agents or alter ego.[63] But the Complaint here does not allege that Raveendran acted as an agent or alter ego - - it alleges that Raveendran acted in the role of CEO of the Debtor by signing various documents in that capacity and, according to the testimony of Riju, by making decisions in that capacity.

This Court finds that the thorough analysis and rationale of *Harris* is applicable here. The Complaint alleges that Raveendran served in the officer role of CEO to the Debtor, and the Transfer Agreement supports those allegations.[64] Accordingly, the Debtor has met its burden of demonstrating that Raveendran is subject to the Delaware Consent Statute of 10 Del. C. § 3114 and service of process upon Raveendran is proper in this matter.

---

[63] *HMG/Courtland Prop., Inc. v. Gray*, 729 A.2d 300, 305 (Del. Ch. 1999). The *HMG* Court decided that the public policy interest in holding agents or alter egos who work with Delaware directors to breach the rights of Delaware corporations is protected by Delaware's long-arm statute, 10 Del. C. § 3104(c). *Id.* at 306-07.

[64] Raveendran also argues that his designation as CEO on the Transfer Agreement was a clerical error made by Camshaft Fund's William Morton, who allegedly prepared the document, and Raveendran only added his electronic signature. This unsupported assertion belies the plain language of the Transfer Agreement and Riju's testimony that Raveendran was the decision-maker for the Debtor. On this record, the Court finds that Raveendran executed the Transfer Agreement as the Debtor's CEO.

(b)    <u>Service under Fed.R.Civ.P. 4(f)(2) in the United Arab Emirates</u>

The Debtor also contends that it properly served the Complaint and Summons on Raveendran and Gokulnath in the United Arab Emirates ("UAE") under Rule 4(f).[65]

<u>Federal Rule of Civil Procedure 4(f)</u>, made appliable hereto by <u>Federal Rule of Bankruptcy Procedure 7004</u>, governs service of an individual in a foreign country.[66] Rule 4(f)(1) authorizes service on individuals by "any internationally agreed means of service that is reasonably calculated to give notice."[67]    When there is no internationally agreed means of service (such as the Hague Service Convention or other treaty), as is the case for the UAE,[68] then Rule 4(f)(2) applies allowing the Debtor to serve Raveendran and Gokulnath "by a method that is reasonably calculated to give notice as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction."[69]

The Debtor provided a declaration from the Debtor's Emirati counsel to describe the steps taken to serve the Moving Defendants under UAE law.[70]    The Debtor asserts that Raveendran and Gokulnath twice evaded in-person service at their shared home in Dubai, with their security guards falsely claiming that they

---

[65] Adv. D.I. 35.

[66] <u>Fed.R.Civ.P. 4(f)</u>.

[67] <u>Fed.R.Civ.P. 4(f)(1)</u>.

[68] *See Color Switch LLC v. Fortafy Games DMCC*, <u>2018 WL 2298401</u>, *3 (E.D. Ca. May 21, 2018) ("[T]he United Arab Emirates is 'not a party to the Hague Service Convention or any treaty related to service of process.'"); *Celgene Corp. v. Blanche Ltd.*, <u>2017 WL 1282200</u>, *3 (D. N.J. Mar. 10, 2017) ("[T]he UAE … is not a signatory of the Hague Convention or, apparently, any other applicable international agreement.").

[69] <u>Fed.R.Civ.P. 4(f)(2)(A)</u> (citation modified).

[70] Adv. D.I. 93, Ex. A.

did not live there.[71]    The Debtor obtained permission from Dubai Courts to apply to the Immigration Office to investigate the registered address and contact details of the Moving Defendants and, as permitted, served the documents to the Moving Defendants' cellular phone numbers on file via SMS.[72]

Raveendran and Gokulnath, however, argue that part of the Debtor's steps to serve them did not comply with UAE law and supplied a declaration from their Emirati counsel to support their arguments.[73]    For example, the Moving Defendants argue that, although they are not Arabic speakers, the Summons and Complaint should have been translated into Arabic, but the Debtor argues that relevant UAE law only requires that the "process" (or legal notice) be served in Arabic-English bilingual text, which was done.   The Moving Defendants also assert that service must be through a court-appointed bailiff, while the Debtor claims that Dubai Courts presently contract through private parties to take on the role of bailiff.   The Debtor points out that a follow-up declaration by the Defendants' counsel acknowledged that "the court bailiff role was [deputized] years ago by the Dubai Courts to external service providers."[74]    Finally, there is also a dispute over whether the telephone number used to serve the Moving Defendants over text was their current number.   The Debtor asserts that the Moving Defendants provided that phone number to the UAE Immigration Office and that the Moving Defendants were obligated to keep that number current.

---

[71] Adv. D.I. 93, ¶¶ 16, 19.
[72] *Id.* ¶¶ 20-25.
[73] Adv. D.I. 78, Ex. 22.
[74] Adv. D.I. 83, ¶ 9.

While the opinions of both UAE counsel vary, the Debtor contends that its service under UAE law followed the similar steps as those found to be sufficient under Rule 4(f)(2) and UAE law in the case *Pliteq, Inc. v. Mostafa*.[75] Moreover, there is no dispute that Raveendran and Gokulnath had actual notice of the Complaint. "Once a defendant has actual notice of the pendency of an action, the requirements of <u>Fed.R.Civ.P. 4</u> are to be liberally construed."[76] The record before the Court demonstrates that the Debtor's service substantially complied with UAE law and was reasonably calculated to (and did) provide notice to the Moving Defendants. The Moving Defendants' motion to dismiss the Complaint under Rule 12(b)(5) will be denied.

2. <u>Whether this Court has personal jurisdiction over Defendants Raveendran and Gokulnath.</u>

The Moving Defendants also seek to dismiss the Complaint for lack of personal jurisdiction under <u>Fed.R.Civ.P. 12(b)(2)</u> claiming they do not have sufficient contacts with the State of Delaware because they never stepped foot in Delaware and never transacted business there. They argue that the Court's exercise of jurisdiction over them would not comport with constitutional standards of fair play or substantial justice. Raveendran again asserts that he was never formally appointed as an officer of the Debtor.

In response, the Debtor argues that the Court has multiple bases for exercising personal jurisdiction over the Moving Defendants, specifically under the

---

[75] *Pliteq, Inc. v. Mostafa*, <u>2024 WL 3070171</u> (S.D. Fla. Jun. 20, 2024).
[76] *Id.* at *11 (quoting *Banco Latino, S.A.C.A. v. Gomez Lopez*, <u>53 F.Supp.2d 1273, 1281</u> (S.D. Fla. 1999).

traditional "minimum contacts" test, the "effects test" involving intentional torts, and the conspiracy theory of jurisdiction.

"[O]nce a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper."[77] "A plaintiff may meet this burden by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum.'"[78] "In bankruptcy cases, the forum is the United States in general, not the particular forum state."[79] Therefore, the Court will consider the Moving Defendants' contacts on a national level, rather than the state of Delaware level, to determine whether this Court's exercise of *in personam* jurisdiction is proper.[80]

(a)    The Minimum Contacts Test

To meet Fifth Amendment due process concerns, courts "impose a general fairness test incorporating *International Shoe's* requirements that 'certain minimum contacts' exist between the non-resident defendant and the forum 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[81] A non-resident defendant's contacts with the forum may give

---

[77] *Alameda Research Ltd. v. Platform Life Sciences Inc.*, 2023 WL 8814216, *1 (Bankr. D. Del. Dec. 20, 2023) (citing *Gurmessa v. Genocide Prevention in Eth., Inc.*, Civ. Action No. 21-869-RGA, 2022 WL 608924, *1 (D. Del. Feb. 23, 2022)). Here, the Plaintiffs have submitted an affidavit with copies of documents and correspondence to support their argument that jurisdiction over the Moving Defendants is proper due to sufficient contacts with the United States. Adv. D.I. 94.

[78] *Id.* (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

[79] *Astropower Liquidating Trust v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*, 2006 WL 2850110, *3 (Bankr. D. Del. Oct. 2, 2006).

[80] *Astropower Liquidating Trust v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*, 335 B.R. 309, 317 (Bankr. D. Del. 2005). Accordingly, the Moving Defendants' citations to the Delaware long-arm statute and related case law are not relevant to the analysis.

[81] *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985) (*superseded in part by rule* as recognized in *In re Paques, Inc.*, 277 B.R. 615 (Bankr. E.D.Pa. 2000) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

rise to either "general" or "specific" jurisdiction.  "General jurisdiction" occurs when a defendant's activities within the forum are so continuous and systematic that the defendant could reasonably anticipate being subject to jurisdiction there, even if the cause of action does not arise from or relate to the activities.[82]  "Specific jurisdiction" is found when a non-resident defendant purposefully directs activities at residents of the forum, and the litigation results from alleged injuries arising out of or relating to those activities.[83]  A single transaction, so long as it creates a substantial connection with the forum, can suffice.[84]

The "constitutional touchstone" of personal jurisdiction is whether the defendant purposefully established "minimum contacts" with the forum.[85]  Courts may exercise jurisdiction over non-residents who purposefully direct activities toward forum residents or who purposefully avail themselves of the privilege of conducting activities in the forum, thus invoking the benefits and protections of its laws.[86]  "[T]he foreseeability that is critical to due process analysis … is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."[87]  "The 'purposeful availment'

---

[82] *Alameda Research*, 2023 WL 8814216, *2; *Astropower*, 2006 WL 2850110, *3 (citations omitted)

[83] *Astropower*, 2006 WL 2850110, *3 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

[84] *Burger King*, 471 U.S. at 475 n. 18 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

[85] *Burger King*, 471 U.S. at 474 (citing *Int'l Shoe*, 326 U.S. at 316).

[86] *Burger King*, 471 U.S. at 473-75

[87] *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."[88]

(i)  *Byju Raveendran – the Transfer Agreement*

The Plaintiffs argue that Raveendran is subject to this Court's jurisdiction by virtue of his execution of documents, including the Transfer Agreement, as CEO of the Debtor.  They claim this was a purposefully-directed activity resulting in a U.S.-centered transfer (*i.e.*, causing a Delaware corporation (the Debtor) to transfer a Delaware limited partnership interest (the Camshaft LP Interest) to a Delaware limited liability corporation (Inspilearn)).  Further, the Plaintiffs assert that Raveendran's execution of the Transfer Agreement resulted in the principal event underlying Counts I, II, and V of the Complaint.[89]

Raveendran, however, argues that executing the Transfer Agreement as the Debtor's CEO - - and not in his individual capacity - - is a single attenuated contact with the United States, not based on his connections to the forum, but based on the happenstance that the Debtor-Plaintiff is incorporated in Delaware.  He relies upon the case *Walden v. Fiore*,[90] in which the Supreme Court held that a Georgia officer's actions in a Georgia airport toward plaintiffs,[91] who were Nevada residents, did not create sufficient contacts to subject the officer to jurisdiction in Nevada.[92]  There,

---

[88] *Burger King*, 471 U.S. at 475 (citations omitted).
[89] Those Counts are aiding and abetting Riju's breach of fiduciary duty, breach of fiduciary duty and conversion.
[90] *Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014).
[91] The officer in *Walden* seized cash suspected to be involved with drug-related activity from the plaintiffs, then helped draft a false probable cause affidavit.  *Walden*, 571 U.S. at 280-81.
[92] *Walden*, 571 U.S. at 284-86.

the Supreme Court decided that "the plaintiff cannot be the only link between the defendant and the forum."[93]

But, in *Walden*, the Supreme Court further explained: "Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."[94]   Here, Raveendran's action as an officer of a Delaware corporation establishes the necessary connection to the United States to provide jurisdiction.  By signing the Transfer Agreement as the Debtor's CEO, Raveendran purposefully availed himself of the privilege of conducting business in the United States.[95]

Further, Raveendran should have anticipated that he could be haled into a Delaware court for executing the Transfer Agreement, thus the exercise of jurisdiction does not offend notions of fair play and substantial justice.  As noted by the Delaware Court of Chancery, a corporate officer "doubtless anticipated – and in any event should have anticipated – that she could face litigation in Delaware over her actions as a senior officer of a Delaware entity."[96]   The timing of the Transfer Agreement further supports this.  Knowing GLAS had accelerated a $1.2 billion

---

[93] *Walden*, 571 U.S. at 285.

[94] *Id.*, 571 U.S. at 285-86.

[95] The Delaware Court of Chancery determined that a defendant who assumed the powers and duties as general counsel and chief legal officer of a Delaware entity "consented implicitly to jurisdiction" in Delaware for claims involving her actions.  *In re P3 Health Grp. Holdings, LLC*, 282 A.3d 1054, 1072 (Del. Ch. 2022).  *See also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293-94 (Del. 2016) (A non-resident (Canadian) director and officer of a Delaware corporation "purposefully availed himself of certain duties and protections under our law," and could not fairly say that "he did not foresee that he would be subject to litigation in Delaware over his conduct in connection with negotiating the Change of Control Agreements.").

[96] *P3 Health Grp.*, 282 A.3d at 1072.

debt, Raveendran could foresee that his action was escalating an already contentious situation by moving the Debtor's sole remaining asset.

To summarize, Raveendran's execution of the Transfer Agreement as CEO of a Delaware corporation is a substantial forum contact that stripped the Debtor of assets and ensured those assets were beyond the reach of the Debtor and its creditors. This purposefully directed action resulted in alleged harms underlying the claims in the Complaint. Accordingly, this Court has specific *in personam* jurisdiction over Raveendran.

### (ii) *Byju Raveendran and Divya Gokulnath – Control over the Debtor*

The Plaintiffs also contend that Raveendran and Gokulnath purposefully directed and controlled the Debtor's activities since its formation, including the transfer of $533 million of the Debtor's assets into the Camshaft Fund.[97] The Complaint alleges Raveendran and Gokulnath participated in negotiations with the U.S. Lenders to try to resolve the Debtor's defaults under the Credit Agreement.[98] These activities were purposefully directed at the Debtor, a Delaware corporation, and the U.S.-based Lenders, and the litigation here arises from those actions. As explained by the Supreme Court:

> A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not

---

[97] *See* Compl. ¶¶ 2, 11, 98 – 102. In support of these allegations, the Plaintiffs rely on the sworn testimony of Riju Ravindran at the hearing on March 14, 2024 in adversary proceeding no. 24-50013. Compl. ¶ 41.

[98] Compl. ¶ 45.

readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.[99]

The Court's reasoning equally applies to international activities that inflict injury upon U.S. entities, such as the alleged activities by Raveendran and Gokulnath, and supports the exercise of personal jurisdiction over them for the claims arising from those activities.

The Moving Defendants also argue that their purposeful contacts – directing the fraudulent transfers of the Debtor's assets – cannot form the basis of the minimum contacts required for jurisdiction since those acts were undertaken as directors of T&L, and they were only 2 members of a 6-member board.  They claim they are not responsible for the actions of T&L or other foreign subsidiaries that were shareholders of the Debtor.  But "when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer.  Contacts are contacts and must be counted."[100]  The Complaint's allegations, based on the testimony of Riju, assert that Raveendran and Gokulnath directed the Debtor's fraudulent acts.  The Moving Defendants knew or should have known that they could be haled into court in the United States based on these acts.

---

[99] *Burger King*, <u>471 U.S. at 473-74</u> (internal citations and punctuation omitted).
[100] *Urquhart-Bradley v. Mobley*, <u>964 F.3d 36, 46</u> (D.C. Cir. 2020).

(b) <u>The Effects Test</u>

Alternatively, the Plaintiffs argue that this Court has personal jurisdiction over the Moving Defendants under the "effects test"[101] since the Complaint asserts intentional tort claims.  The Moving Defendants argue in response that the Third Circuit recognizes that the "effects test" did not "carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state;"[102] instead, a defendant must "manifest behavior intentionally targeted at and focused on the forum."[103]   The Moving Defendants claim the Plaintiffs have not shown that they intentionally targeted activities at the forum (here, the United States).

Courts have determined that a non-resident defendant has the required minimum contacts for personal jurisdiction when he or she commits an intentional tort outside the forum, "the unique effects of which caused damage to the plaintiff within the forum."[104]   The Third Circuit will consider three factors to determine whether personal jurisdiction under this theory is proper:

(i)      defendant must have committed an intentional tort;

---

[101] *See Calder v. Jones*, <u>465 U.S. 783, 789-90</u>, <u>104 S.Ct. 1482</u>, <u>79 L.Ed.2d 804</u> (1984) (deciding that defendants who wrote and edited an article from their place of business in Florida had sufficient minimum contacts to be subject to jurisdiction in California when their intentional actions were expressly aimed at a resident of California and they knew the effect of their actions would be felt by the plaintiff in California, where the paper had its largest circulation.  Under such circumstances, the defendants must "reasonably anticipate being haled into court there" to answer for the truth of the statements in their article.).

[102] *IMO Indus. Inc. v. Kiekert AG*, <u>155 F.3d 254, 265</u> (3d Cir. 1998)

[103] *Id.*

[104] *Gambone v. Lite Rock Drywall*, <u>288 Fed. App'x 9, 14</u> (3d Cir. 2008) (citing *IMO Indus. Inc. v. Kiekert AG*, <u>155 F.3d 254, 256</u> (3d Cir. 1998)).

(ii)    the plaintiff must have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff; and

(iii)    the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to the focal point of the tortious activity.[105]

In *Gambone*, the plaintiff discovered post-judgment that the defendants were transferring assets for no value to thwart plaintiff's recovery. The Third Circuit determined that the Pennsylvania court had personal jurisdiction over a former board member of the defendant who resided outside the state because he (i) participated in a fraudulent conveyance, "which is a species of the intentional tort of fraud," (ii) for the purpose of preventing the plaintiffs, who are Pennsylvania creditors, from collecting on a judgment rendered in their favor by a Pennsylvania court, (3) and thus, "expressly aimed" his conduct at the forum.[106]

The Moving Defendants argue that Plaintiffs cannot simply rely on the fact that the Debtor was a U.S. corporation to support jurisdiction. However, the Plaintiffs here have presented numerous facts to support application of the effects test here:

(i)    The Complaint asserts claims that are intentional torts: aiding and abetting a breach of fiduciary duty (Count I), breach of fiduciary duty (Count II), Conversion (Count V), and civil conspiracy (Count VI).[107]

---

[105] *Id.*

[106] *Id.*

[107] *See, e.g., Wolstenholme v. Bartels*, 511 F. App'x 215, 219 (3d Cir. 2013) (applying the effects test to a breach of fiduciary duty claim); *Kyko Global, Inc. v. Prithvi Info. Sol. Ltd.*, 2020 WL 1159439, *10, *30-*31 (W.D. Pa. Mar. 10, 2020) (applying the effects test to claims for aiding and abetting breach of fiduciary duty and conversion); and *MaxLite, Inc. v. ATG Elec., Inc.*, 193 F.Supp.3d 371, 390 (D. N.J. 2016) (applying the effects test to claim for civil conspiracy).

(ii)     The Moving Defendants directed and implemented the fraudulent

transfer of assets from one Delaware entity to another harming U.S.-

based creditors by preventing them from exercising remedies and

collecting the debt from the Delaware corporation (so that the brunt of

the Plaintiffs' harm was felt in the United States); and

(iii)    The Moving Defendants expressly aimed their tortious activity at the

United States by intentionally and fraudulently using Delaware

entities to move assets and harm U.S.-based creditors.

Accordingly, this Court may exercise personal jurisdiction against the Moving

Defendants for the intentional tort claims under the effects test.

(c) <u>The Conspiracy Theory Test</u>

The Plaintiffs also assert that the Moving Defendants are subject to personal

jurisdiction before this Court under the conspiracy theory test. The Moving

Defendants argue that the Plaintiffs offer no compelling evidence of a conspiracy

nor evidence that the Defendants "knew" their alleged acts would have an effect in

the United States.

The conspiracy theory expands the contacts prong of a personal jurisdiction

analysis "by imputing the contacts of resident coconspirators to foreign

coconspirators."[108]   Generally, courts considering conspiracy theory jurisdiction

require a plaintiff to prove that a resident coconspirator (i) performed substantial

---

[108] *Kyko Global*, <u>2020 WL 1159439</u> at *31.

acts in furtherance of the conspiracy within the forum, and (ii) the foreign

coconspirator was or should have been aware of those acts.[109]

Here, the Complaint alleges a conspiracy between Raveendran, Riju,

Gokulnath and Kishore to defraud U.S. creditors by using the Debtor to

fraudulently transfer the Alpha Funds and the Camshaft LP Interest.[110]  Riju

testified that the Moving Defendants were decision-makers directing the fraudulent

transfers.[111]  The substantial acts (i.e., the fraudulent transfers) and the effects of

those acts were directed through and at Delaware entities.  Therefore, even if the

Moving Defendants were located outside of the United States, the Plaintiffs have

shown that they conspired to defraud creditors with coconspirators who had

substantial contacts with this forum by directing fraudulent activity using

Delaware entities and harming U.S. creditors. Accordingly, the Moving Defendants

are also subject to personal jurisdiction under the conspiracy theory test.

---

[109] *Kyko Global*, 2020 WL 1159439 at *32.  *See also Levin v. Javeri (In re Firestar Diamond, Inc.)*, 654 B.R. 836, 902 (Bankr. S.D.N.Y. 2023).  Delaware courts have articulated a five factor test for conspiracy theory jurisdiction:  (i) a conspiracy to defraud existed, (ii) the defendant was a member of that conspiracy, (iii) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state, (iv) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state, and (v) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.  *Dan Dee Int'l, LLC v. Global New Ventures Grp., LC*, 2024 WL 3043430, *4 (D. Del. Jun. 18, 2024) (citing *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)).  The main thrust of the two tests is similar:  a substantial act in furtherance of the conspiracy occurred in or had an effect on the forum, and the foreign coconspirator knew or should have known about the act.
[110] Compl. ¶¶ 19, 132.
[111] Compl. ¶¶ 41, 120.

3.    Whether the Complaint states viable claims against the Moving Defendants to withstand a motion to dismiss under Rule 12(b)(6).

The Moving Defendants also assert that the claims against them should be dismissed under Fed.R.Civ.P. 12(b)(6), made applicable hereto by Fed.R.Bankr.P. 7012.   When considering a motion to dismiss under Rule 12(b)(6), a Court should accept well-pleaded factual allegations as true and determine whether they plausibly support an entitlement to relief.[112]  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[113]  This determination is a context specific task, drawing on the reviewing court's judicial experience and common sense.[114]

(a) Count I —Aiding and Abetting Riju Ravindran's Breach of Fiduciary Duties

To support a claim against the Moving Defendants for aiding and abetting Riju's breach of fiduciary duties, the Complaint must plead: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.[115]  This Court has previously determined that Riju Ravindran is liable for breaching his fiduciary duties.[116]  The only factor in dispute is the Moving Defendants' "knowing participation" in that breach.

---

[112] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).

[113] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[114] *Ashcroft*, 556 U.S. at 679.

[115] *Cred Inc. Liquidation Trust v. Uphold HQ Inc. (In re Cred Inc.)*, 650 B.R. 803, 820 (Bankr. D. Del. 2023).

[116] MSJ Mem. Op. at 35-39.

27

"'Knowing participation' requires a showing that the defendant both (1) participated in the breach and (2) knew at the time that the conduct assisted constituted a breach of fiduciary duty."[117]  "To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[118]

The Moving Defendants argue that the Complaint cannot support a claim against them for aiding and abetting Riju's breach of fiduciary duty because they were only two members of T&L's Board and did not have authority to direct Riju. They also argue that T&L owned the Debtor through a subsidiary, thereby further distancing T&L and the Moving Defendants from the authority to direct Riju.[119] But the Complaint alleges sufficient facts from which the Court can infer that the Moving Defendants knowingly participated in the breach of fiduciary duties, including that (i) Riju, although the Debtor's sole director, testified that he made no decisions on his own,[120] including decisions related to the First and Second Fraudulent Transfers,[121] and (ii) when asked who specifically at T&L directed his actions, Riju identified Raveendran and Gokulnath.[122]

---

[117] *Miller v. American Capital, Ltd. (In re NewStarcom Holdings, Inc.)*, 547 B.R. 106, 119 (Bankr. D. Del. 2016) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[118] *Id.* (citing *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862-63 (Del. 2015)).

[119] As pointed out by Plaintiffs in their briefing, the Moving Defendants' own declarations contradicting the allegations by claiming they did not direct Riju to do anything (despite his testimony under oath to the contrary) are factual assertions to be tested with discovery later in this proceeding.

[120] Compl. ¶¶ 41, 99.

[121] Compl. ¶¶ 41, 63.

[122] Compl. ¶ 41.

Furthermore, "knowing participation" can be inferred from a variety of circumstances, including when the terms of the transaction are so egregious as to be inherently wrongful.[123] The Complaint alleges that there was no legitimate reason for the Moving Defendants to direct Riju to make the First and Second Fraudulent Transfers, which transferred $533 million from the Debtor to a sham hedge fund when the Debtor had substantial monetary obligations to fulfill under the Credit Agreement.[124] The Complaint contains sufficient detailed factual allegations to support the claim that the Moving Defendants aided and abetted Riju's breach of fiduciary duty.

### (b) <u>Count II – Claim against Byju Raveendran for Breach of Fiduciary Duties</u>

A claim for breach of fiduciary duty must allege (i) that a fiduciary duty existed, and (ii) that the defendant breached that duty.[125] Raveendran argues that he had no fiduciary duty to the Debtor because he was never formally appointed as an officer or director of the Debtor. Further Raveendran argues that the transfer of the Camshaft LP Interest was a "permitted intercompany activity" under the Credit Agreement. The Plaintiffs disagree.

Count II of the Complaint alleges that Raveendran, while holding himself out as the Debtor's CEO, caused the Debtor to transfer the Camshaft LP Interest to a non-guarantor affiliate (Inspilearn) for no consideration.[126] Allegations that

---

[123] *Klein v. H.I.G. Capital, L.L.C.*, <u>2018 WL 6719717</u>, *17 (Del. Ch. Dec. 19, 2018).

[124] Compl. 93-94, 100.

[125] *Bond v. Rosen (In re NSC Wholesale Holdings, LLC)*, <u>637 B.R. 71, 85</u> (Bankr. D. Del. 2022) (citing *Palmer v. Reali*, <u>211 F.Supp.3d 655, 666</u> (D. Del. 2016)).

[126] Compl. ¶ 104.

Raveendran signed the Transfer Agreement as the Debtor's CEO provide sufficient facts from which the Court may infer that he was serving as CEO and owed fiduciary duties to the Delaware corporation. [127]   Likewise, the Complaint contains sufficient factual allegations to support an inference that the Transfer Agreement's purpose (*i.e.,* to conceal the Debtor's assets at a time when the Debtor needed money to meet its legal and contractual obligations) was in breach of those fiduciary obligations.[128]   Whether the transfer was permissible under Credit Agreement is in dispute[129] and, in any event, irrelevant under the factual allegations pled here.

 (c) Count IV – Accounting

  Count IV seeks "a full and accurate accounting of the Debtor's Alpha Funds, and any proceeds thereof."[130]   The Moving Defendants argue that an accounting claim must be made against Riju, as the Debtor's officer and director, or against the Debtor's parent, Byju's Singapore.

  The Plaintiffs seek the accounting from Raveendran, as the Debtor's CEO, and from both Moving Defendants as directors of T&L because, according to Riju's deposition, "to the extent the Debtor has books and records, they were maintained by or in the custody of T&L."[131]

---

[127] *See Harris v. Harris*, 289 A.3d 310, 331 (Del. Ch. 2023) ("[F]ormality is not required for fiduciary status."); *cf. WaveDivision Holdings, LLC v. Milennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, *3 (Del. Ch. Sept. 17, 2010) (an individual who was not a formal manager, officer or employee of an LLC nevertheless acted as a manager of the LLC and owed fiduciary duties in that capacity.)

[128] Compl. ¶¶ 108-11.

[129] The Plaintiffs argue the Second Fraudulent Transfer violated the covenant requiring compliance with applicable laws, citing Finestone Decl. (Adv. D.I. 94), Ex. 1 § 5.7.

[130] Compl. ¶ 124.

[131] Compl. ¶ 74.  *See also* Compl. ¶¶ 118,

"An accounting is not so much a cause of action as it is a form of relief."[132] Generally, an accounting claim will not be dismissed when there is properly pled claim for breach of fiduciary duty.[133] Here, there are valid claims for breach of fiduciary duty and for aiding and abetting Riju's breach of fiduciary duty. The Complaint alleges sufficient facts to support an accounting claim against the Moving Defendants.

(d) Count V – Conversion

"To state a claim for conversion, a party must allege that (i) it has a property interest in the allegedly converted property; (ii) it had a right to possession of the property; and (iii) the defendants wrongfully possessed or disposed of such property as if it were their own."[134]

The Complaint alleges that the Debtor had an interest in the Camshaft LP Interest as of March 31, 2023, but that the Moving Defendants unlawfully converted the Debtor's interest by directing and causing its transfer to Inspilearn at a time when only Pohl had such decision-making authority.[135]

The Moving Defendants argue for dismissal of the conversion claim because the Lenders had no property interest in the Camshaft LP Interest or the monies

---

[132] *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, *11 (Del. Ch. July 11, 2007).

[133] *Id.*; *see also Scott v. Vantage Corp.*, 2017 WL 3485818, *6 (D. Del. Aug. 15, 2017).

[134] *ESG Capital Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, *15 (Del. Ch. Dec. 16, 2015).

[135] Compl. ¶¶ 126-29. As mentioned earlier, the Complaint also alleges that on March 3, 2023, GLAS took control of the pledged shares in the Debtor and, as the Debtor's sole shareholder, GLAS appointed Pohl as the Debtor's sole director, who then appointed himself as the Debtor's sole officer. Compl. ¶ 55. As this Court would later find, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor." Compl. ¶ 11, MSJ Memo. Op. at 42.

lent to the Debtor once the funds were provided to the Debtor. This argument is irrelevant to the conversion claim, which asserts that the *Debtor* held an interest in the Camshaft LP Interest which was wrongfully transferred. Similarly, the Moving Defendants' argument that the transfer was permitted under the Credit Agreement fails because the Complaint alleges that the Moving Defendants had no right or authority to cause the transfer the Camshaft LP Interest after Pohl was appointed as the Debtor's sole officer and director. The Moving Defendants also assert that the Plaintiffs cannot prove damages from the conversion because the Plaintiffs received guarantees from the Debtor's affiliates. This argument also fails as irrelevant since the Complaint alleges that the Moving Defendants wrongfully deprived the Debtor of its property interest in the Camshaft LP Interest, which is required for the conversion claim.

(e) <u>Count VI – Claim against Moving Defendants for Civil Conspiracy</u>

Civil conspiracy is an independent wrong that occurs when there is: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) actual damage."[136] The Moving Defendants argue that this claim should be dismissed because the Complaint fails to allege any meetings or communications among the Defendants demonstrating a meeting of the minds about an unlawful act and fails to allege any specific act by Gokulnath in furtherance of the alleged conspiracy.

---

[136] *In re American Int'l Grp., Inc.*, <u>965 A.2d 763, 805</u> (Del. Ch. 2009).

However, plaintiffs do "not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators.  And to survive a motion to dismiss, all that is needed is a reasonable inference that [the defendant in question] was part of the conspiracy."[137]  The Complaint here alleges that both Moving Defendants acted together with Riju and others to deprive the Debtor and the Lenders of the Alpha Funds and then the Camshaft LP Interest.[138]  The Complaint alleges that the Moving Defendants have continued to actively conceal and provide misleading information about the Debtor's assets post-bankruptcy.[139]  There are sufficient factual allegations in the Complaint to infer that the Moving Defendants (with Riju and others) participated in the unlawful acts that harmed the Debtor and its creditors.

## CONCLUSION

For the reasons set forth above, the Court concludes that: (i) the Debtor properly served the Summons and Complaint upon the Moving Defendants; (ii) this Court may exercise personal jurisdiction over the Moving Defendants for the claims in the Complaint; and (iii) the Complaint adequately states claims against the Moving Defendants for aiding and abetting breach of fiduciary duty, breach of fiduciary duty (against Raveendran only), accounting, conversion, and civil conspiracy.

---

[137] *CMS Inv. Holdings, LLC v. Castle*, 2015 WL 3894021, *22 (Del. Ch. June 23, 2015) (quoting *American Int'l Grp.*, 965 A.2d at 806)).

[138] Compl. ¶¶ 41, 63-64.

[139] Compl. ¶¶ 120, 132.

An appropriate Order will be entered denying the Moving Defendants' Motion to Dismiss.

FOR THE COURT:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: November 20, 2025